

FILED
HARRISBURG, PA

~~~ ~ ~ 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*
*2080 Linglestown Road, Suite 201*
*Harrisburg, Pennsylvania 17110-9670*
*Telephone (717) 540-9170*
*By:    SPERO T. LAPPAS, Esquire*
*        Pa. Supreme Court ID no. 25745*
*ATTORNEYS FOR THE PLAINTIFF*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAURA ZELINSKI,
    Plaintiff

    v.

PENNSYLVANIA STATE POLICE,
COMMONWEALTH OF
PENNSYLVANIA,
LOU ALTIERI,
RICHARD WEINSTOCK,
    Defendants

C.A. NO. 3-CV-01-1979

JURY TRIAL DEMANDED

(CHIEF JUDGE VANASKIE)

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO MOTION FOR SUMMARY JUDGMENT
## FILED ON BEHALF OF DEFENDANTS LOU ALTIERI,
## PENNSYLVANIA STATE POLICE,
## AND COMMONWEALTH OF PENNSYLVANIA

RESPECTFULLY SUBMITTED,

SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.

By: _____
    SPERO T. LAPPAS, Esquire
    ATTORNEYS FOR THE PLAINTIFF

## I.  STATEMENT OF THE CASE

The plaintiff began this case with the filing of her complaint, after receiving right to sue notice from the EEOC.  The Pennsylvania State Police (hereinafter "PSP") and Altieri have filed answers, defendant Weinstock's Rule 12(b)(6) motion is still pending.  Before the court now are motions for summary judgment filed on behalf of all defendants.

## II.  STATEMENT OF FACTS

Laura Zelinski is a single 31 year old woman who, in June 1999 became a member of a specialized drug investigation unit known as the Tactical Narcotics Team.  Her supervisor was Corporal Louis Altieri and her three co-workers were Trooper Richard Weinstock, Trooper Sean Murray and Trooper Daniel Wigley.  Almost immediately, Trooper Weinstock began sexually harassing her.  When she complained to Corporal Altieri about it, he told her he didn't believe her and did nothing to address the harassment.  The harassment continued and culminated in her retaliatory removal from TNT in August 2000.  The evidence has established that Corporal Altieri instigated her removal, that Corporal Altieri was very friendly with the harasser, Trooper Weinstock; and that when the state police eventually investigated Laura's complaints (after her transfer) they determined that Altieri had in fact allowed a hostile work environment to exist at the Tactical Narcotics Team Unit.

This case involves the following lengthy and egregious pattern of sexual harassment which produced a hostile work environment for the plaintiff, Laura Zelinski.

On June 26, 1999, Weinstock told Laura he had been sexually attracted to her

1

since April. He wanted Laura to come to his hotel room where he would give her a full body massage. Weinstock put his hand on her knee. Laura told him to stop. Zelinski 35-38.[1]

On August 4, 1999 Laura was assigned to ride in a van with Weinstock. Weinstock told Laura that he wanted to have sex with her and described in graphic and profane detail the sexual activities which he had planned. Laura told him what he was doing and saying was wrong. Zelinski 41-46.

On or about October 14, 1999 Laura told Altieri that she did not feel comfortable working surveillance with Weinstock, and she told him about the two incidents of harassment. ALTIERI told Laura he didn't believe her. Zelinski 46, 69, 73-76.

On or about December 30, 1999, while conducting a surveillance at a bar Weinstock told Laura, "If I can see down your sweater, everyone else can". Laura was playing pool with another team member at the time. Zelinski 189-91.

On or about February 1, 2000 ALTIERI falsely criticized the Laura for the execution of a search warrant, blaming her for its failure. Zelinski 105-111.

On or about April 13, 2000 ALTIERI falsely criticized Laura for alleged misconducts and notified her that he had placed a disciplinary note in her file, six weeks before. Zelinski 127-128.

On or about June 28, 2000 throughout the day at work, Weinstock made repeated comments in front of other police officers that he could see Laura's underwear.

---

[1]     References to Laura Zelinski's testimony are to her deposition which has been filed as Exhibit A in support of the Commonwealth Defendants' Motion for Summary Judgment.

Zelinski 49-50.

The plaintiff's ordeal culminated with false disciplinary counseling on July 7, 2000 and July 18, 2000, and then with her retaliatory transfer in August. Zelinski 87, 134-135.

## III. ISSUES

1.  Does the evidentiary record establish a genuine question of material fact as to whether or not the plaintiff suffered a hostile work environment?

2.  Does the evidentiary record establish a genuine question of material fact as to whether or not the plaintiff suffered a unlawful retaliation for complaining about Weinstock's sexual harassment of her?

3.  Does the evidentiary record establish a genuine question of material fact as to whether or not there was a conspiracy between Altieri and Weinstock to violate the plaintiff's rights?

For the reasons presented in the following argument and discussion, the Plaintiff suggests that her case should survive summary judgment.

## IV. ARGUMENT

## 1. HOSTILE WORK ENVIRONMENT

TITLE VII SEXUAL HARASSMENT, GENERAL PRINCIPLES: As the Third Circuit has recognized in a number of cases, see, e.g., Hurley v. Atlantic City Police Department, et al, 174 F.3d 95 (3d Cir. 1999) and Durham v. Evans, 163 F.3d 139 (3d Cir. 1999), sexual harassment law changed dramatically and definitively with the dual United States Supreme Court decisions in Burlington Industries v. Ellerth, 118 S.Ct. 2257 (1998) and Faragher v. City of Boca Raton, 118 S.Ct. 2275 (1998). The effect of the Faragher and Ellerth cases was to hold "that employers are vicariously liable for the harassing behavior of their supervisory personnel." Williamson v. City of Houston,

148 F.3d 462 (5th Cir., 1998).

The Third Circuit has concisely explained the new landscape of sexual
harassment law.

> "In Ellerth and Faragher, the Supreme Court drew a line between (1)
> discriminatory work related supervisory acts, such as discriminating
> against women in work assignments to placate pervasive male hostility or
> reprimanding women `in harsh or vulgar terms' while merely bantering
> with men for identical behavior, and (2) expressing sexual interest `in
> ways having no apparent object whatever of serving an interest of the
> employer.' Faragher, 118 S.Ct. at 2288."

Evans, supra, 166 F.3d at 150. The chief difference between the first ("*scope of*
*employment*") and second ("*aided by the agency relation*") scenarios is that in the
"*scope of employment*" case sexual harassment by a supervisor "would automatically
subject the employer to liability." Evans, supra, 166 F.3d at 150 (emphasis added).

In the "*aided by the agency relation*" case, "an employer is subject to vicarious
liability to a victimized employee for an actionable hostile environment created by a
supervisor with immediate (or successively higher) authority over the employee."
Evans, supra, 166 F.3d at 150, citing Ellerth, 118 S.Ct. at 2270. In such cases, the
employer is automatically liable for the sexual harassment if the plaintiff suffered any
tangible employment action took place. (166 F.3d at 150) In cases with no tangible
adverse employment action, there is an affirmative defense available to the employer
"subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c)."
(166 F.3d at 150) comprising three necessary elements.[2]

---

[2] Even thought the courts generally speak of a two part test,
the element of unreasonableness relative to any failure to take
timely corrective action adds a distinct third element.

4

"(A) That the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (B) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

Evans, supra, 166 F.3d at 150, citing Ellerth, supra, 118 S.Ct. at 2270.  In a negative job action case such as this one, there is no affirmative defense available.

Accordingly:

1.    PSP is automatically liable to the Plaintiff for Altieri's retaliation against the Plaintiff and for the hostile work environment if the Plaintiff suffered any tangible adverse employment action,[3] such as being transferred from a more desirable position to a less desirable position.[4]

2.    Even in the absence of a tangible adverse employment action, PSP is vicariously liable on the Plaintiff's Title VII claim unless it can prove its affirmative defense.  In order to establish this defense, it must show that it took reasonable care to prevent and correct promptly any sexually harassing behavior; that the Plaintiff failed to take advantage of any preventive or corrective opportunities provided by the

---

[3]    See, Evans, supra, at footnote 5, page 150.

[4]    The case of Hampton v. Borough of Tinton Falls Police Department, 98 F.3d 107 (3rd Cir 1996), instructs the present case. There, the plaintiff police officer alleged that his rights were violated when Defendants retaliated against him inter alia by transferring him from a detective position to road patrol. The defendants argued that Hampton's transfer was merely a reassignment and not a demotion, because neither Hamptons' rank nor pay were decreased. The Third Circuit pointed out that although the transfer may not have been a demotion, the new assignment, road patrol, was less desirable than the original detective bureau assignment. Hampton, supra at 116.    The Hampton court held that the significance of these facts must be resolved the jury, not in motions for summary judgment. Id.

employer or to otherwise avoid harm; and that the Plaintiff's failure was unreasonable. (Evans, supra, 166 F.3d at 150.)

3. Because Corporal Altieri was the plaintiff's supervisor, PSP is deemed to be on notice of the harassing conduct as soon as Altieri became aware of it. Young v. Bayer Corp., 123 F.3d 672 (7th Cir. 1997). Therefore, PSP's responsibility to remedy the hostile work environment arose no later that Plaintiff's first complaint to Altieri: October 1999.[5]

TITLE VII SEXUAL HARASSMENT, FACTS: The defendants argue in their motion that the work environment endured by Laura Zelinski was not sufficiently egregious to qualify as hostile. There were, they argue, not enough incidents of sexual harassment to give her a Title VII cause of action.

First, we note that PSP's own official investigation concluded that the plaintiff had been subjected to a hostile work environment, and that same investigation concluded that Altieri was responsible for it. Accordingly, Altieri was disciplined for allowing it, Duby Deposition Exhibits 26, 28,[6] and Weinstock was transferred out of TNT, Duby Deposition Exhibits 25, 27, Weinstock 87.[7] Under these circumstances,

---

[5] The fact that laura may have told Altieri that she wanted to try to work through the harassment is immaterial. Altieri admitted at deposition that he knew he had an independent, non-discretionary, and automatically arising duty to report or remedy sexual harassment once it was reported to him. Altieri 9-10 (Exhibit B to Commonwealth Defendants Brief)

[6] References to Corporal John Duby's testimony are to his deposition which has been filed as Exhibit A in support of this Brief.

[7] References to Richard Weinstock's testimony are to his deposition which has been filed as Exhibit B in support of this Brief.

6

PSP is now estopped from denying that the work environment was sexually hostile. In the alternative, this official finding by PSP is binding as an admission of hostile work environment.

Second, the law is clear that there is no <u>minimum</u> number of episodes of harassment necessary to establish a hostile work environment. Even a single incident can suffice. <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000); <u>Torres v. Pisano</u>, 116 F.3d 625, 632 (2d Cir. 1997); <u>Harrison v. Eddy Potash, Inc.</u>, 248 F.3d 1014 (10th Cir 2001). The present case deals with a police officer who is being harassed by another officer with whom she must work in the dangerous world of drug law enforcement. During and after Laura's rejection of Weinstock's crude sexual overtures, Weinstock failed to provide her with proper protection during undercover drug work, Zelinski 52, 191, thereby putting her life in jeopardy.[8] Thus, the sexual harassment, her rejection of it, and its aftermath were not only "annoying" as the defendants argue, the environment was hostile to the point of being dangerous and even life threatening. This is a case in which the plaintiff suffered repeated and vile acts of sexual harassment over a period longer than one year, she reported it to her superior, he ignored her report and even criticized her for making it (he told her he did not believe her and that she was disparaging a "nice guy"). Altieri's unlawful ignoring of

---

[8]   Weinstock explained to Trooper Murray that "Laura tried to hurt me with Lou and now I'm going to hurt her." Zelinski 52. Murray's exact recollection is that Weinstock said that "Laura tried to screw him with Lou and that he's going to get her back." Murray 42. References to Trooper Sean Murray's testimony are to his deposition which has been filed as Exhibit F in support of the Commonwealth Defendants' Motion for Summary Judgment.

plaintiff's complaint put plaintiff's life at risk and all but guaranteed that she would suffer additional harassment. This situation satisfies the test of <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 106 S.Ct. 2399 (1986) in that the plaintiff's employment conditions were altered, and her work environment became hostile and intimidating.

It cannot be said that this environment was so <u>non-severe</u> that summary judgment can be granted on those grounds.


## 2. ALTIERI'S RETALIATION AGAINST THE PLAINTIFF

<u>RETALIATION IN VIOLATION OF TITLE VII AND THE FIRST AMENDMENT</u>:  The plaintiff's complaints regarding her sexual harassment were penalized by her transfer from a more desirable to a less desirable job.  The evidence establishes that Corporal Altieri, the plaintiff's supervisor, instigated this transfer by making complaints about the plaintiff which he reasonably believed would go up the chain of command resulting in plaintiff's transfer.  This case therefore presents Altieri's first and fourteenth amendment violation of the plaintiff's liberty interests in freedom of speech and freedom of petition.  <u>Richardson v. Felix</u>, 856 F.2d 505 (3d Cir. 1988), and related cases recognize that a public employee can bring a Fourteenth Amendment cause of action if a negative job action violates her Fourteenth Amendment liberty interest. <u>See also</u>, <u>Albrecheta v. Borough of Whitehaven</u>, F.Supp. 139, 144 (M.D. Pa. 1992).

Retaliation for the conduct of protected Title VII activity is also unlawful under Title VII.  Under Title VII retaliation analysis, the plaintiff need only show that she engaged in protected acrtivity, that the employer took adverse action against her, and

that a causal link exists between those two event. Weston v. Commonwealth, 251 F.3d 420,430 (3.d Cir 2001). The case can be established by direct or circumstantial evidence. EEOC v.Metal Service Co., 892 F.2d 341 (3d Cir. 1990).

In this case the facts are clear. On or about June 10, 2000, Corporal Altieri began complaining to his direct superior Sergeant Michael Ruda that the plaintiff was an inferior employee. Ruda 8, 9.[9] Altieri knew that these negative reports would go up the chain of command and reach a command decisionmaker. Blocker 27-28[10]; see also, Duignan 35[11] (Altieri was very sensitive to chain of command actions). The reports to Ruda led directly to a report from Altieri to Captain John Duignan. Duignan 18-33. When Duignan received the report from Ruda on or about August 10, 2000, he called Altieri that same day and Altieri gave him a blistering account of the plaintiff's alleged deficiencies. Duignan 18-33. When Duignan suggested that transferring Zelinski out of the TNT unit would leave Altieri short handed and there were no ready replacements, Altieri replied that that was fine with him; he would rather have nobody that the plaintiff. Duignan 35. There is no indication anywhere in the record that plaintiff was at risk of transfer before Altieri started complaining about her.

This evidence shows that Altieri's complaint about the plaintiff was the direct

---

[9]  References to Sergeant Michael Ruda's testimony are to his deposition which has been filed as Exhibit E in support of the Commonwealth Defendants' Motion for Summary Judgment.

[10]  References to Major Tyree Blocker's testimony are to his deposition which has been filed as Exhibit C in support of the Commonwealth Defendants' Motion for Summary Judgment.

[11]  References to Captain John Duignan's testimony are to his deposition which has been filed as Exhibit D in support of the Commonwealth Defendants' Motion for Summary Judgment.

cause of her transfer.   Within days of Altieri's report to Duignan, Major Blocker effectuated the transfer, based wholly on Duignan's information from Altieri.   Blocker 14, 19, 20, 22.[12]

The connection between Altieri's retaliation and the Plaintiff's protected activities is similarly clear.   Although Altieri and PSP argue in their brief that the plaintiff made no external complaints until after her removal from TNT, they ignore the fact that Altieri instigated her removal after she complained directly to him about Weinstock's sexual harassment.   In fact, she complained to him as early as October 14, 1999, Zelinski 74-76.   Instead of taking the action which the law required, Altieri ignored the plaintiff's complaint and told her that he didn't believe her because Weinstock was such "a nice guy."   Zelinski 76.   Altieri's handling of this complaint about Weinstock was characteristic of a larger willingness to cover up for Weinstock's malfeasances.   On another occasion, Weinstock admitted to Altieri that he had tried to coerce a criminal informant and his counsel to falsely accuse an innocent state trooper of crimes and to commit perjury in exchange for favorable treatment.   Altieri heard Weinstock's admissions and took no action.   Murray 108-113.   When Zelinski entered his command in June 1999 Altieri told the male members that she was "a sexual harassment suit waiting to happen."   Zelinski 77.[13]   Trooper Sean Murray, who reported this statement

---

[12]   It is significant that in June 2000, two months before his conversation with Captain Duignan, Corporal Altieri was searching for the plaintiff's replacement.   This fact clearly demonstrates that his June 10 report to Sergeant Ruda was the beginning of a knowing attempt to get rid of the plaintiff.   Zelinski 84.

[13]   Curiously, Weinstock made an identical statement to Trooper Joseph Nigro on November 1, 1999.   Duby Deposition, Exhibit 10.

to Zelinski, recalls that Altieri told the male members that they should watch out for Zelinski, especially because (Altieri claimed) she had filed a previous harassment complaint. Murray 66, 104. During the time between the October 1999 original complaint to Altieri and June 2000 the tension in TNT became more critical, in part because of Weinstock's continuing harassing conduct. The inference is clear that Weinstock was becoming emboldened by Altieri's condonation.[14]

As noted above, the plaintiff's evidence shows that a number of harassing and retaliatory incidents occurred between October 1999 and June 2000. This evidence raises a material issue as to whether or not the plaintiff's August 2000 removal from the TNT unit, a removal which Altieri instigated, was the retaliatory result of plaintiff's complaints to Altieri about Weinstock's sexual harassment.

Because a complaint to a responsible superior is a Title VII event, Altieri's retaliation is a Title VII violation.[15]

Because "a state can not condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," Connick v. Myers, 467 U.S. 138, 142 (1983), retaliation for expressing her sexual harassment concerns to Altieri is a Fourteenth Amendment violation.

---

[14]  Significantly, other members of the TNT unit recognized the hold which Weinstock had over Altieri. Even though Altieri was the supervisor and Weinstock was his subordinate, Weinstock had great influence over Altieri (Murray 114), and Altieri showed favoritism for Weinstock which he showed to no one else (Murray 114). Weinstock was often referred to as "Lou's boy." Murray 113-114.

[15]  See Judge Rambo's opinion denying summary judgemtnin Wilhelm v. Pennsylvania State Police, M.D.Pa. Civil no. 1:CV-01-1057, June 28, 2002, pages 18-21. (Exhibit C in support of this Brief).

Because Altieri was the Plaintiff's supervisor, his retaliation is attributable to PSP by Evans/Ellerth principles.

The defendant asserts that the deposition record establishes legitimate non-retaliatory grounds for the plaintiff's transfer. There are none, however, which are not subject to genuine disputes as to material fact. Captain Duignan testified about the specific allegations which he received from Corporal Altieri and which led to plaintiff's transfer. Duignan 18-33. We will address them all.

1. ALTIERI ALLEGED THAT LAURA ZELINSKI HAD AN ATTITUDE PROBLEM, WAS NOT A TEAM PLAYER, AND WAS DIFFICULT TO SUPERVISE. Trooper Sean Murray testified that Laura Zelinski was "definitely" a team player. Murray 118. Laura has testified that she followed instruction and supervision, but that Altieri's favoritism toward Weinstock and his failure to correct Weinstock's bad behavior created some friction.[16]

Trooper Daniel Wigley, another TNT team member, describes Laura Zelinski as a person who did "an excellent job," Wigley 78,[17] as "very cooperative," Wigley 79, and as a team player. Wigley 78. Wigley, who saw Altieri interact with Zelinski on a regular basis, never saw any evidence that she was hard to supervise, Wigley 79, but he considered Altieri to be a "poor" supervisor. Wigley 81-82.

Another supervisor, Corporal Nicholas Gushka, described Laura's performance

---

[16]    This testimony is found throughout her deposition, but pages 66 through 99 are illustrative.

[17]    References to Trooper Daniel Wigley's testimony are to his deposition which has been filed as Exhibit G in support of the Commonwealth Defendants' Motion for Summary Judgment.

12

in the TNT unit as follows: "I observed her as a hard worker, always conscientious of her actions." He described her as an "outstanding trooper." Duby Deposition, Exhibit 20, page 2.

Significantly, in July 2000 Altieri was asked by Major Blocker if there were any problems in the TNT unit with any of the troopers. One month before blasting her to Captain Duignan, Altieri indicated that there were not. Blocker 23.

2. ALTIERI ALLEGED THAT LAURA ZELINSKI WAS "BAD MOUTHING" CORPORAL ALTIERI TO OTHER PEOPLE. Plaintiff has denied this. Zelinski 25, 83.

3. ALTIERI ALLEGED THAT LAURA ZELINSKI HAD MIS-HANDLED HERSELF DURING A SEARCH WARRANT EXECUTION IN THE CITY OF WILKES-BARRE. The plaintiff testified at length (see, e.g., Zelinski 112-119) that she handled this assignment properly. The warrant execution was not completely successful because the affiant, Trooper Weinstock, had not accumulated sufficient intelligence information to assure success, Murray 122, and because Altieri forbade his officers from notifying the local municipal police of the TNT operation. Murray 123-124.

4. ALTIERI ALLEGED THAT LAURA ZELINSKI HAD CRITICIZED PSP PATROL OFFICERS. This allegation related to an alleged conversation after the search warrant execution incident. Plaintiff testified (Zelinski 119-124) that she never made the negative remark which Altieri attributed to her, and that the patrol lieutenant told her that no officers took offense at anything that plaintiff had said. In fact this lieutenant, Lieutenant Mendofik, blamed the whole misunderstanding on "problems"

13

which the department was having "with Weinstock and Altieri." Zelinski 123. See also, Duby Deposition, Exhibit 7, page 2.

    5. ALTIERI ALLEGED THAT LAURA ZELINSKI FAILED TO KEEP HER SEARCH WARRANT PROBABLE CAUSE INFORMATION CURRENT. Plaintiff testified that this was never a problem, and indeed it was not even a subject that Altieri concerned himself with. His main "paperwork" concern was that money vouchers were properly handled. Zelinski 25. On the one occasion when Altieri accused Laura of not having her "charges prepared" his accusation was false and retaliatory. In truth, not only were her charges prepared but they had already been filed with the magistrate and the arrests had already been made. Zelinski 88-89.

    6. ALTIERI ALLEGED THAT LAURA ZELINSKI CANCELED A PLANNED OPERATION IN JUNE 2000. Laura testified that the operation had to be canceled because her identity as a police officer had been compromised, and further because Altieri had not made himself available to provide necessary supervision. Zelinski 82.

    7. ALTIERI ALLEGED THAT LAURA ZELINSKI WAS ARGUMENTATIVE ON ONE OCCASION. This allegation relates to a meeting after the canceled drug operation described supra. Duignan 29-30. According to Plaintiff, she raised her legitimate safety concerns and no one, other that possibly Altieri, was argumentative. Zelinski 83-84.

    Finally, there is no serious dispute that the removal of Zelinski from TNT was a negative job action such as can be retaliatory. PSP recognizes TNT as a desirable and a competitive position which many state troopers aspire to. Duignan 13, Blocker

10-11. Removal from TNT is often used as a disciplinary punishment. Duignan 19. When Weinstock's sexual harassment of Zelinski was confirmed by the PSP internal investigation, his punishment was to be removed from TNT. Weinstock 87. Finally, Laura has testified that she desired to remain in TNT and that she considered the removal a negative transfer from a position which she preferred to one with much less desirable job duties. Zelinski 100, 141-142. She had, before the transfer, told Major Blocker that she "loved [her] job." Zelinski 100.

Thus the plaintiff has established the elements of a retaliatory transfer: the transfer was a negative job action, it is causally connected to her exercise of a First/Fourteenth Amendment and Title VII event, and the defendant's alleged reasons for the transfer are pretextual.

### 3. CONSPIRACY

The record contains sufficient circumstantial evidence of a conspiracy between Altieri and Weinstock to violate the Plaintiff's constitutional rights to survive the motion for summary judgment. Specifically:

Weinstock and Altieri were unusually close. Murray 113, 114.

Laura complained to Altieri about Weinstock in October 1999.

Altieri knew he had a duty to report this harassment notwithstanding the Laura's stated desires. Altieri 9-10.

Altieri took no action on Laura's complaints.

Altieri had a history of overlooking and ignoring Weinstock's unlawful behavior. Murray 108-113.

15

Altieri disclosed this complaint to Weinstock who was motivated thereby to "get" Laura.  Murray 42, Zelinski 52.

Weinstock and Altieri spoke of Laura in the same words: as a sexual harassment case waiting to happen.  Zelinski 77, Murray 66, 104, Duby Deposition Exhibit 10

.

## V.  CONCLUSION

Wherefore, the Defendants' motion for summary judgment should be dismissed and this case set down for trial by jury.[18]

*RESPECTFULLY SUBMITTED,*

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*

*By:* _____

*SPERO T. LAPPAS, Esquire*
*2080 Linglestown Road, Suite 201*
*Harrisburg, PA  17110-9670*
*(717) 540-9170*
*ATTORNEYS FOR THE PLAINTIFF*

---

[18]The Plaintiff does not contest the defendants' challenges to the PHRC claims, the Title VII claim against Altieri as an individual, or the 1983 claims against the Commonwealth, except to the extent that those challenges may be addressed by one or more of the arguments of this Brief.

16

## CERTIFICATE OF WORD COUNT

*The word count of this Brief is 4443 words.*

CERTIFICATE OF SERVICE


I hereby certify that on this date I served a true copy of the attached

document upon the person(s) named below by mailing a copy addressed as follows,

postage pre-paid, deposited into the U. S. Mail at Harrisburg, Pa.

JAMES GOLDEN, ESQUIRE
1601 MARKET STREET
SUITE 565
PHILADELPHIA, PA.  19103-1443

SARAH YERGER, ESQUIRE
OFFICE OF ATTORNEY GENERAL
STRAWBERRY SQUARE
HARRISBURG, PA. 17120

RESPECTFULLY SUBMITTED,

By: _____

Date:   FEBRUARY 3, 2002