#54
2/4/03

FILED

CLERK

Deputy Clerk

*SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.*
*2080 Linglestown Road, Suite 201*
*Harrisburg, Pennsylvania 17110-9670*
*Telephone (717) 540-9170*
*By:    SPERO T. LAPPAS, Esquire*
*        Pa. Supreme Court ID no. 25745*
*ATTORNEYS FOR THE PLAINTIFF*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAURA ZELINSKI,                          :
   Plaintiff                            :
                                         :
                                         :     C.A. NO. 3-CV-01-1979
                                         :
   v.                                   :
                                         :     JURY TRIAL DEMANDED
                                         :
PENNSYLVANIA STATE POLICE,               :
COMMONWEALTH OF                          :
PENNSYLVANIA,                            :
LOU ALTIERI,                             :
RICHARD WEINSTOCK,                       :
   Defendants                           :
                                         :     (CHIEF JUDGE VANASKIE)

## EXHIBITS IN SUPPORT OF PLAINTIFF'S BRIEFS IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT FILED ON BEHALF OF ALL DEFENDANTS

1. Deposition of Corporal John Duby and selected exhibits to that deposition.

2. Deposition of Defendant Richard Weinstock and exhibits.

3.  Memorandum and Order in <u>Wilhelm v. Commonwealth of Pennsylvania, et al.</u>

RESPECTFULLY SUBMITTED,

SERRATELLI, SCHIFFMAN, BROWN AND CALHOON, P.C.

By: _____

SPERO T. LAPPAS, Esquire
ATTORNEYS FOR THE PLAINTIFF



1                      IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3

4   LAURA ZELINSKI,                       :
                   PLAINTIFF              :
5                                         :
             VS.                          : C.A. NO. 3-CV-01-1979
6                                         :
    PENNSYLVANIA STATE POLICE,            :
7   COMMONWEALTH OF PENNSYLVANIA,         :
    LOU ALTIERI, RICHARD WEINSTOCK,       :
8                   DEFENDANTS            :
9

10

11

12

13

14
             DEPOSITION OF:   JOHN C. DUBY
15
             TAKEN BY:        PLAINTIFF
16
             BEFORE:          LISA A. HANSELL, REPORTER
17                            NOTARY PUBLIC
18    DATE:                   NOVEMBER 15, 2002, 11:07 A.M.
19    PLACE:                  SERRATELLI, SCHIFFMAN,
                              BROWN & CALHOON, P.C.
20                            2080 LINGLESTOWN ROAD
                              HARRISBURG, PENNSYLVANIA
21

22

23

24

25

**PLAINTIFF'S EXHIBIT**
A

**2**

1  APPEARANCES:
2  SERRATELLI, SCHIFFMAN, BROWN & CALHOON, P.C.
   BY: SPERO T. LAPPAS, ESQUIRE
3      FOR - PLAINTIFF
4  OFFICE OF THE ATTORNEY GENERAL
   BY: PATRICK S. CAWLEY, DEPUTY ATTORNEY GENERAL
5      FOR - PENNSYLVANIA STATE POLICE, COMMONWEALTH OF
       PENNSYLVANIA AND LOU ALTIERI
6
   HAMBURG & GOLDEN, P.C.
7  BY: JANE B. LAPORTE, ESQUIRE
       FOR - DEFENDANT RICHARD WEINSTOCK
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1        TABLE OF CONTENTS
2
           WITNESS
3
   FOR PLAINTIFF      DIRECT CROSS REDIRECT RECROSS
4
   John C. Duby
5  By Mr. Lappas:      5      25
   By Ms. LaPorte:     –      –
6  By Mr. Cawley:     23      –
7
8
9        INDEX TO EXHIBITS
10
                          PRODUCED
11 EXHIBIT NO.           AND MARKED
12 4 - Interview Verification of William Murphy    12
13 5 - Interview Verification of Gary Thomas        12
14 6 - Interview Verification of Joseph Prula       12
15 7 - Interview Verification of Paul Mendofik      12
16 8 - Interview Verification of Tyson Haven        12
17 9 - Interview Verification of Kevin Dykes        12
18 10 - Interview Verification of Joseph Nigro      12
19 11 - Interview Verification of Augustus Diana    12
20 12 - Interview Verification of Jamie Clark       12
21 13 - Interview Verification of Beth Guenther     12
22 14 - Interview Verification of Carmen Altavilla  12
23 15 - Interview Verification of Diane Stackhouse  12
24 16 - Interview Verification of Gary Severns      12
25 17 - Interview Transcript of Nicholas Madigan    16

**4**

1        INDEX TO EXHIBITS (CONT'D.)
2
3
                          PRODUCED
4  EXHIBIT NO.           AND MARKED
5  18 - Interview Transcript of Laura Zelinski      16
6  19 - Interview Transcript of Daniel Wigley       16
7  20 - Interview Transcript of Nicholas Gushka     16
8  21 - Interview Transcript of Richard Weinstock   16
9  22 - Interview Transcript of Louis Altieri       16
10 23 - Interview Transcript of Sean Murray         16
11 24 - Tape recorded interview of James McEvoy     18
12 25 - Summary Report of Richard Weinstock         21
13 26 - Summary Report of Louis Altieri             21
14 27 - Disciplinary Action Report of Richard Weinstock  22
15 28 - Disciplinary Action Report of Louis Altieri      22
16
17       (Exhibits retained by Mr. Lappas)
18
19
20
21
22
23
24
25

**5**

1        JOHN C. DUBY, called as a witness, being
2  sworn, testified as follows:
3
4        DIRECT EXAMINATION
5
6  BY MR. LAPPAS:
7    Q    Would you give us your full name, please.
8    A    Yes. Corporal John C. Duby.
9    Q    Corporal Duby, as you know, the reason we've
10 asked you to be here today is to testify at a deposition
11 filed in connection with a federal – rather to be held in
12 connection with a federal lawsuit filed by Laura Zelinski
13 against certain defendants.
14        During the course of the deposition, which
15 hopefully will not take very long, you'll be asked questions
16 by me and perhaps the other counsel.  You've been sworn to
17 your oath, which requires that you answer the questions
18 truthful, completely and accurately to the best of your
19 ability.
20        If you don't know the answer to a question,
21 you're allowed to say that as long as – that's a proper
22 answer as long as it's a truthful answer.  I don't know if
23 this is technically true, but for the purposes of the
24 deposition I will assume that you're represented by counsel
25 from the Attorney General's office, and if there's any time

**6**

1  during the course of this deposition that you want to
2  consult with counsel for any purpose whatsoever, you can do
3  that simply by telling me that that's what you want to do,
4  and we'll give you sufficient time in a private place to
5  meet. Okay?
6     A   Yes, sir.
7     Q   It's my understanding you're currently
8  employed by the Pennsylvania State Police; correct?
9     A   That is true.
10     Q   What is your current title and assignment?
11     A   I'm a corporal assigned to the Bureau of
12  Professional Responsibility, the Internal Affairs Division
13  Central Section.
14     Q   How long have you been a member of the
15  Pennsylvania State Police?
16     A   Approximately 16 years and 1 month.
17     Q   And how long have you been with the Bureau of
18  Professional Responsibility?
19     A   Two years and approximately two months.
20     Q   Give me a summary of your duties, status and
21  its changes from the time you graduated from the State
22  Police Academy until the time that you became a member of
23  the Bureau of Professional Responsibility.
24     A   Sure. I entered into the Pennsylvania State
25  Police Academy on October 13th, 1986. From there, I was

**7**

1  assigned to a patrol unit at Troop J Lancaster when I
2  graduated in March of 1987. From March of 1987 to September
3  of 1991, I was assigned to a patrol unit at Troop J
4  Lancaster. From September of 1991 until September of 2000,
5  I was assigned as a criminal investigator to the Criminal
6  Investigation Unit at Troop J Lancaster headquarters. From
7  September of 2000 till currently, I have been assigned as an
8  investigator with the Internal Affairs Division Central
9  Section in Harrisburg.
10     Q   As an investigator with the Internal Affairs
11  Division, what are your job duties?
12     A   My primary responsibility is to investigate
13  allegations of misconduct alleged against members of the
14  Pennsylvania State Police and its employees.
15     Q   Who assigns you your investigations?
16     A   Generally, they're assigned to me either by my
17  direct supervisor, which would be Lieutenant Michael
18  Patrick, or Captain John Brown, who is the Director of
19  Internal Affairs.
20     Q   Now, we've learned during the pretrial
21  proceedings in this case that you participated in an
22  investigation against certain individuals relative to a
23  complaint filed or presented by Trooper Laura Zelinski; is
24  that correct?
25     A   That is correct.

**8**

1     Q   And we have listed as the subjects of that
2  investigation Richard Weinstock, Louis Altieri, Michael Ruda
3  and Tyree Blocker. Is that consistent with your
4  recollection?
5     A   Yes, it is.
6     Q   Now, the thick binder of materials which I
7  have in front of me, which I'm not going to mark as an
8  exhibit, represents what I will call the BPR report that was
9  produced during your investigation. Generally, how does an
10  investigation such as the one that you did in this case
11  proceed? What do you do in conducting the investigation?
12     A   Generally, the investigation is assigned to
13  me. I am provided with what we call a SP1-101 Form. It's a
14  use of force or complaint reception and processing work
15  sheet. That primarily details the specifics of the
16  allegations alleged against the subjects. Once I obtain
17  that information — and that's generally going to be always
18  Attachment 1 of the investigation. And, in fact, it's noted
19  in the first paragraph where it says reason for
20  investigation. It would be on Page 1 of the report itself.
21     Q   Sure enough, it is Attachment 1.
22     A   Okay. From there, I look at the allegations
23  itself, and I decide which course of direction the case
24  should go as far as who to interview and just basically
25  conduct the investigation that way. And as you're doing

**9**

1  more interviews, additional interviews will come to light.
2  From there, when the investigation is completed, I submit it
3  to my supervisor for his review, and after it is submitted
4  to him it will then go to each of the subject's bureau
5  director or commanding officer for what is called an
6  adjudication. An adjudication would be the decision what,
7  if any, department policies, rules or regulations were
8  violated, and that decision is made by their bureau director
9  or their commanding officer if they're assigned to a troop.
10     Q   Now, you stated that during the course of your
11  investigation you conduct interviews with -- well, I guess
12  it could be both state police members and civilians;
13  correct?
14     A   Yes.
15     Q   With respect to the interviews you conduct
16  with members of the Pennsylvania State Police, are there any
17  rules or regulations that require members of the
18  Pennsylvania State Police to speak to you if you desire to
19  speak to them relative to an investigation?
20     A   Yes, there are.
21     Q   To summarize those regulations, would it be
22  fair to state that a member of the Pennsylvania State Police
23  is required to provide you with any information you request
24  relative to an investigation?
25     A   Yes.

3 (Pages 6 to 9)

DUBY, JOHN
11/15/2002

ZELINSKI VS
PSP

**10**

1  Q    And are there also provisions that require the
2  state police members to be completely honest and truthful
3  with you when you interview them?
4  A    Yes.
5  Q    Again, in this BPR report there are a number
6  of documents which I want to discuss with you. Some of the
7  forms that we've received are -- before I even mark them,
8  I'll just show you this group of documents. They're
9  entitled Interview Verification. Now, the packet that I've
10  given you I'm going to mark as exhibits in a moment, but in
11  general terms are you familiar with the type of form called
12  interview verification?
13  A    Yes, I am.
14  Q    What is an interview verification?
15  A    Basically, it's a verification of information
16  that was already related to me by the person that I had
17  talked to about the particular matter. It's basically an
18  authentication of information that was provided.
19  Q    So would it be true to say that in an
20  interview verification form you obtain the information from
21  the subject of the interview, and then you put it into a
22  written format?
23  A    That is correct.
24  Q    And I notice that these forms, which I will
25  hand you again in a moment, all have a signature line at the

**11**

1  bottom of the form, and each one of these signature lines
2  appears to contain the signature of the subject of that
3  interview. Is that also your standard operating procedure?
4  A    That is correct.
5  Q    Under what circumstances does the subject of
6  the interview verification form receive the form so that
7  they can sign it?
8  A    Typically, I have done two ways of presenting
9  the form to the members interviewed. One would be after it
10  is written up I would send it to that member via our state
11  e-mail system, and the member would typically just print it
12  out, review it, make any corrections, sign it and send it
13  back to me by mail, or I would send it to them by the United
14  States mail.
15  Q    And then that person would sign it and return
16  it to you?
17  A    That is correct.
18  Q    And is this done under circumstances that
19  convince you that when you receive the form back it is truly
20  the signature of the person to whom you have sent it?
21  A    Yes, in my opinion. Basically, what the form
22  is used for typically is -- and I think if you'll read some
23  of those forms it was like I contacted them by telephone.
24  They're minor interviews where it would not be advantageous
25  for me to drive three hours one way to maybe talk to

**12**

1  somebody for him to just tell me something in a paragraph
2  which he could tell me over the phone. So typically they
3  are telephone type interviews or interviews of more of a
4  less significant matter which did not necessitate a
5  tape-recorded interview.
6  Q    And even though these interviews did not take
7  place face to face, you're certain of the person with whom
8  you're speaking, correct?
9  A    In my opinion, yes.
10  Q    And the person with whom you are speaking, if
11  they're a member of the Pennsylvania State Police, is still
12  required to provide you with honest, truthful and accurate
13  information?
14  A    Yes.
15  (Interview Verifications marked as Exhibits 4
16  through 16.)
17  BY MR. LAPPAS:
18  Q    Now, I'm going to hand you a packet of
19  interview verifications, which I've marked as Exhibits 4
20  through 16, and I'm simply going to ask you to tell me on
21  the record the name of the subject of each interview
22  verification and the exhibit number of each one, please.
23  A    Sure. Exhibit 4 is an interview verification
24  from a conversation I had with Corporal William Murphy of
25  the Bureau of Drug Law Enforcement on April 23rd, 2001.

**13**

1  Exhibit 5 is an interview verification --
2  Q    I'm sorry. My mistake. Would you also -- in
3  addition to telling us the exhibit number that appears on
4  the sticker that I just affixed, also tell us what
5  attachment number it was to your report. That appears in
6  the bottom right-hand corner.
7  A    Sure. Exhibit 4 is going to be Attachment
8  108, Page 1 of 1. Exhibit 5 is an interview verification
9  form from an interview that I conducted with Corporal Gary
10  Thomas on April 11th, 2001. Corporal Thomas is assigned to
11  the Criminal Investigation Unit at Troop P Wyoming. This
12  would be Attachment 106, Page 1 of 1.
13  Exhibit 6 is an interview verification form
14  from an interview that I conducted with Trooper Joseph Prula
15  of Troop B Wyoming on April 9th, 2001, and it would be
16  Attachment 99, Page 1 of 1. Exhibit 7 is an interview
17  verification form for an interview that I conducted with
18  Paul Mendofik of Troop P Wyoming on April 11th, 2001. It
19  would be Attachment 100, Pages 1, 2 and 3.
20  Attachment 8 is an interview verification form
21  from an interview that I conducted with Trooper Tyson Haven
22  of the Bureau of Drug Law Enforcement on April 10th, 2001.
23  It would be Attachment 97, Page 1 of 1.
24  Q    That's our Exhibit 8; correct?
25  A    That's correct. My error there. It's Exhibit

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

DUBY, JOHN
11/15/2002

ZELINSKI VS
PSP

---

14

8.

Q   Thank you.

A   Exhibit 9 would be an interview verification for an interview that I conducted with Corporal Kevin Dykes of the Bureau of Drug Law Enforcement on April 3rd, 2001. It would be Attachment 98, Page 1 of 1. Exhibit 10 is an interview verification for an interview that I conducted with Trooper Joseph Nigro of the Bureau of Drug Law Enforcement on April 3rd, 2002. It would be Attachment 96, Page 1 of 1.

Exhibit 11 is an interview verification for an interview that I conducted with Trooper Augustus Diana of the Bureau of Drug Law Enforcement on April 2nd, 2001. It would be Attachment 91, Page 1 of 1. Exhibit 12 is an interview verification for an interview that I conducted with Lieutenant William R. Fraley, Commander, Staff Services Section, Troop P Wyoming, on October 25th, 2000. It would be Attachment 87, Page 1 of 1.

Exhibit 13 is an interview verification for an interview that I conducted again with Lieutenant William Fraley of Troop P Wyoming on October 23rd, 2000. It would be Attachment 76, Page 1 and 2 of 2. Exhibit 14 is an interview verification for an interview that I conducted with Captain Carmen Altavilla, Commanding Officer, Troop P Wyoming, on March 13th, 2001. It would be Attachment 68,

---

15

Page 1 of 1.

Q   Is there a number missing?

A   Actually, I thought Exhibit 13 the date was incorrect. I guess it is October of 2000. I was thinking it might have been 2001. Referring back to Exhibit 14, it would be attachment 68, 1 of 1.

Exhibit 15 is an interview verification again of Lieutenant William R. Fraley of Troop B Wyoming, conducted on October 25th, 2000. It would be – I believe it's attachment 69, 1 of 1. Lastly, Exhibit 16, is an interview verification for an interview conducted with Corporal Gary Severns, Troop P Vice Narcotics Unit, on February 26th, 2001. It would be Attachment 54, Page 1 of 1.

Q   Thank you. Now, with respect to all of those interview verification forms, just to recap what I believe you've told us already, you would prepare this form as a true and accurate summary of information given to you by the subject. You would then provide the subject with this form in some manner, either by e-mail or as a hard copy document. The subject would then read it for accuracy, make any suggestions or changes that he felt or she felt were appropriate, and then once it was determined to be accurate by the subject he or should she would sign it and return it to you; is that fair?

---

16

A   That is correct.

Q   And you've indicated that you would do this under certain circumstances, and I also understand that on different circumstances you would conduct tape recorded face-to-face interviews; is that accurate?

A   That is correct.

(Interview transcripts marked as Exhibits 17 through 23.)

BY MR. LAPPAS:

Q   I'm going to also hand you a stack of documents which I've marked as Exhibits 17 through 23, and I'm going to indicate to you that those are documents which we have obtained as discovery, and they purport to be transcripts of face-to-face interviews. Is it true that those are transcripts of face-to-face taped interviews?

A   Yes. These would be copies of the transcripts.

Q   How is the transcription done, for example?

A   Basically, the interview is tape recorded. From there, I made a decision on which interviews would be transcribed and which would not be transcribed. If I made the decision that the interview was transcribed, I provided the tape to our secretarial staff for transcription. Once the transcription is completed, it comes back to me, usually by e-mail, our e-mail system, as a Word document, and from

---

17

there I review the transcript for accuracy, print it, and then make it an attachment to my investigation.

Q   So by the time it becomes part of your investigation report, you have confirmed that the transcript is a true and accurate copy of the conversation you had with the interview subject?

A   Yes, to the best of my ability at the time, sure.

Q   Now, I'm going to ask you to do the same thing with these documents. Just identify each one of those transcripts by the interview subject, by the exhibit sticker number that I have affixed, and also by its designation number to your BPR report.

A   Exhibit 17 is a copy of a transcript for an interview that I conducted with Trooper Nicholas Madigan on April 16th, 2001. It would be Attachment 107, Pages 1 through 16. Exhibit 18 is a copy of a transcript that I conducted with an interview of Trooper Laura Zelinski on March 20th, 2001. It would be Attachment 104, Pages 1 through 62.

Exhibit 19 is a copy of a transcript for an interview that I conducted with Trooper Daniel Wigley on March 2nd, 2001. It would be Attachment 88, Pages 1 through 30. Exhibit 20 is a copy of a transcript for an interview that I conducted with Corporal Nicholas Gushka on March 7,

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**

DUBY, JOHN
11/15/2002

ZELINSKI VS
PSP

18

1   2001. It would be Attachment 82, Page 1 through 16.
2        Exhibit 21 is a copy of a transcript for an
3   interview that I conducted with Trooper Richard S. Weinstock
4   on March 8th, 2001. It would be Attachment 77, Pages 1
5   through 68. Exhibit 22 would be a copy of a transcript for
6   an interview that I conducted with Corporal Louis Altieri on
7   March 8th, 2001. It would be Attachment 67, Pages 1 through
8   57. Exhibit 23 is a copy of a transcript from an interview
9   that I conducted with Trooper Sean Murray on March 6th,
10  2001. It would be Attachment 66, Pages 1 through 30.
11       (Tape-recorded interview form of James McEvoy
12  marked as Exhibit 24.)
13  BY MR. LAPPAS:
14  Q    Now, the report that we received also contains
15  forms, such as the one I'm about to show you, which I will
16  mark as Exhibit 24. This was Attachment 72 to your report.
17  Basically, the form just indicates that you have obtained a
18  tape-recorded interview with the person identified. The one
19  I gave you indicates Trooper James McEvoy, but there are
20  several others which I'm going to show you in a moment.
21  Under what circumstances would you decide what interview
22  reports to have transcribed and which you would not have
23  transcribed?
24  A    Well, basically, there were two factors for
25  it. The first factor was if it seemed to be more important

19

1   to the investigation, it was transcribed. The second factor
2   was it depended on the backlog of our clerical staff. If
3   they were swamped with tapes -- because they actually do
4   tapes for all of our cases for the entire bureau -- I would
5   sit back and look at maybe the possibility that they were
6   too busy transcribing and the report needs to be completed,
7   so then I would just summarize the report. In this
8   particular case, I tried to get as many of the more
9   prominent interviews that I could transcribed as opposed to
10  not transcribed.
11  Q    And with respect to the interview tapes that
12  you did not have transcribed, the sheets that we have in
13  your report indicate that the original is retained at IAD
14  Central. Does that refer to the original of the tape
15  cassette that was used to tape record the interview?
16  A    That's correct.
17  Q    Do you know for how long those tapes are kept?
18  A    No, I don't.
19  Q    Do you know whether or not the ones in this
20  case still exist?
21  A    We should still have them.
22  Q    And they would be -- IAD Central means
23  Internal Affairs Division Central?
24  A    That's correct.
25  Q    And you're located here in Harrisburg, I

20

1   understand?
2   A    Yes.
3   Q    Now, at the conclusion of your investigation,
4   you indicated that a decision would be made by another state
5   police official, and this decision was called an
6   adjudication; is that accurate?
7   A    Yes.
8   Q    Before the adjudication is made, does that
9   officer, whether it be the bureau director or lieutenant
10  colonel or someone else, have access to your entire report
11  or just part of it?
12  A    He should have access to all of it, the
13  interview tapes and the entire binder files. Now,
14  typically, to cut down on mailing the stuff out, if the
15  interview was transcribed maybe those tapes were not sent
16  over for the adjudicator to listen to, but if some of the
17  interviews were not transcribed and there was reporting then
18  typically those tapes would be sent over.
19  Q    Now, does the adjudicator receive any
20  information from you or from anyone in IAD in the form of a
21  recommendation?
22  A    No. Actually, internal investigations are
23  basically fact finding. We are not permitted to put a
24  recommendation or conclusion or an opinion in the
25  investigative report. And if you refer to the first page of

21

1   the general investigation report, there is some instructions
2   on how to fill these things out.
3   Q    Okay. Put them on the record, please.
4   A    Sure. Block 6 says reason for investigation,
5   synopsis of investigation, conclusions, recommendations and
6   comments. The conclusion and recommendations and comments
7   are purposely left out on administrative investigations so
8   it assumes a posture of neutrality.
9   Q    So you provide -- for lack of a better term,
10  you provide raw information to the adjudicator, and then it
11  is up to that official, whoever he or she may be, to
12  interpret your data and to make findings and take actions
13  that appear appropriate to that person?
14  A    That's correct.
15       (Summary Report of Richard Weinstock marked as
16  Exhibit 25.)
17       (Summary Report of Louis Altieri marked as
18  Exhibit 26.)
19  BY MR. LAPPAS:
20  Q    Now, I'm going to show you two documents that
21  I have marked as Exhibits 25 and 26, and I'm going to ask
22  you if you are familiar with those documents.
23  A    No, sir, I'm not.
24  Q    Okay. The documents are entitled summary
25  report, and one of them deals with Trooper Richard S.

6 (Pages 18 to 21)

22

1  Weinstock and the other Corporal Louis Altieri. Are these
2  -- and both of these, I will tell you, were attached to
3  your BPR report, at least in the form in which I received
4  it. Would these be documents that you would become aware of
5  prior to them being attached to your report?
6      A.    No. After our case leaves from the bureau and
7  makes it way over to the adjudicator, the adjudicator would
8  prepare these types of documents. Typically, once they come
9  back to the bureau they're just filed with the case file
10  itself. They're made an attachment to the investigative
11  report. Most times I do not even know or receive any
12  correspondence from the department regarding the case
13  status. I send it through and move on to the next case
14  essentially.
15      (Disciplinary Action Report of Richard
16  Weinstock marked as Exhibit 27.)
17      (Disciplinary Action Report of Louis Altieri
18  marked as Exhibit 28.)
19  BY MR. LAPPAS:
20      Q    The next two forms that I'm going to mark are
21  Exhibits 27 and 28, and these are disciplinary action
22  reports, one dealing with Richard Weinstock and one with
23  Louis Altieri. Would it be your testimony then that you do
24  not see these reports when they are returned to the bureau?
25      A    That is correct. I am familiar with the

23

1  disciplinary action report. It's a standard form used in
2  the state police for receiving discipline that typically is
3  in personnel files for other subjects of an investigation,
4  but these particular disciplinary action reports I have not
5  seen.
6      Q    Okay. In general terms, what is the purpose
7  of a Pennsylvania State Police Disciplinary Action Report?
8      A    Basically, it's the department's initiation of
9  discipline is my understanding.
10      Q    Would this report follow the conclusion of
11  your investigation or would it precede the occurrence of an
12  investigation?
13      A    It would follow. After my investigation would
14  be submitted, these would be reports prepared by the
15  adjudicator and beyond. That would not get back to me.
16      MR. LAPPAS: I have no further questions.
17  Thank you.
18      MS. LAPORTE: I have no questions.
19      MR. CAWLEY: I'll note for the record that
20  Trooper Duby reserves the right to read and sign the
21  transcript of the deposition. Could we go off the record
22  for a second?
23      (Discussion held off the record.)
24
25      CROSS-EXAMINATION

24

1
2  BY MR. CAWLEY:
3      Q    I'll refer you to what has been marked as
4  Exhibit 12. You identified this as being an investigation
5  involving William Fraley; right?
6      A    Yes.
7      Q    I just wanted to note that this has to do
8  specifically with Trooper Jamie Clark; am I right?
9      A    Actually, you are correct. When I read
10  Lieutenant Fraley's name for the record, that was the first
11  line I saw, and I didn't read beyond that. You are correct.
12      Q    And Trooper Clark's signature appears at the
13  bottom?
14      A    Yes.
15      Q    I'm asking this just to keep straight which
16  document we're talking about.
17      A    There were a couple of Lieutenant Fraleys, so
18  that might be the same error.
19      Q    Exhibit 13 also deals with Fraley as well,
20  doesn't it?
21      A    That is correct, and that would actually be an
22  interview with Trooper Beth Guenther.
23      Q    I'll refer you to Exhibit 15, which you also
24  identified as dealing with William Fraley.
25      A    And that would be an interview with Lieutenant

25

1  Diane Stackhouse. Again, that would be an error on my
2  original statement for that.
3      Q    And Lieutenant Stackhouse's signature appears
4  at the bottom of the page?
5      A    Yes.
6      Q    I'm not suggesting an error. Both names
7  appear on there. I just need to --
8      A    Well, I read the first one, and that's all I
9  read, so hopefully I didn't do that on every one of them.
10      MR. CAWLEY: Those are all the questions I
11  have.
12
13      REDIRECT EXAMINATION
14
15  BY MR. LAPPAS:
16      Q    Well, now you've got me sort of curious as to
17  whether there was any other mistakes. What I'm going to
18  suggest -- I'm just going to read them into the record as I
19  stand here with the witness, and you can tell me, sir, if I
20  make any mistakes. I'll just use the exhibit number.
21  Exhibit 4 deals with an interview with Corporal William
22  Murphy; correct?
23      A    Yes.
24      Q    Exhibit 5 deals with an interview with
25  Corporal Gary Thomas?

7 (Pages 22 to 25)

DUBY, JOHN                                                                ZELINSKI VS
11/15/2002                                                                        PSP

---

26

```
 1   A      Yes.
 2   Q      Exhibit 6 deals with an interview with Trooper
 3   Joseph Prula?
 4   A      Yes.
 5   Q      Exhibit 7 deals with an interview with
 6   Lieutenant Paul Mendofik?
 7   A      Yes.
 8   Q      Exhibit 8 is an interview with Trooper Tyson
 9   Haven?
10   A      Yes.
11   Q      Exhibit 9 is an interview with Corporal Kevin
12   Dykes?
13   A      Yes.
14   Q      Exhibit 10 is an interview with Trooper Joseph
15   Nigro?
16   A      Yes.
17   Q      Exhibit 11 is an interview with Trooper
18   Augustus Diana?
19   A      Yes.
20   Q      Exhibit 12 is an interview with Trooper Jamie
21   Clark?
22   A      Yes.
23   Q      Exhibit 13 is an interview with Trooper Beth
24   Guenther?
25   A      Yes.
```

---

27

```
 1   Q      Exhibit 14 is an interview with Captain Carmen
 2   Altavilla?
 3   A      Yes.
 4   Q      Exhibit 15 is an interview with Lieutenant
 5   Diane Stackhouse?
 6   A      Yes.
 7   Q      And Exhibit 16 is an interview with Corporal
 8   Gary Severns?
 9   A      Yes.
10   MR. LAPPAS:  Thank you.
11   MR. CAWLEY:  And I have no further questions.
12   MR. LAPPAS:  Corporal, I guess you're done.
13   (The deposition was concluded at 11:42 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

---

28

```
 1   STATE OF PENNSYLVANIA  :
                            : ss
 2   COUNTY OF YORK         :
 3
 4        I, Lisa A. Hansell, a Reporter Notary-Public,
 5   authorized to administer oaths within and for the
 6   Commonwealth of Pennsylvania and take depositions in the
 7   trial of causes, do hereby certify that the foregoing is the
 8   testimony of JOHN C. DUBY.
 9        I further certify that before the taking of
10   said deposition, the witness was duly sworn; that the
11   questions and answers were taken down stenographically by
12   the said reporter, Lisa A. Hansell, a Reporter
13   Notary-Public, approved and agreed to, and afterwards
14   reduced to typewriting under the direction of the said
15   Reporter.
16        I further certify that the proceedings and
17   evidence contained fully and accurately in the notes by me
18   on the within deposition, and that this copy is a correct
19   transcript of the same.
20        In testimony whereof, I have hereunto
21   subscribed my hand this 5th day of December, 2002.
22
23        _____
              Lisa A. Hansell, Reporter
24            Notary Public
25   My commission expires:
     May 20, 2004
```

---

☎ 717 693 1813                    '22/01  09:2? L9 :02    NO

STD-501X                                COMMONWEALTH OF PENNSYLVANIA

DATE:            August 21, 2000

SUBJECT:         Termination of Detached Duty Status

TO:              Trooper Laura A. Zelinski
                 Troop P Tactical Narcotic Team

FROM:            Major Tyree C. Blocker
                 Director
                 Bureau of Drug Law Enforcement


1.      You are hereby notified that your detached status with the Bureau of Drug Law Enforcement is terminated. Effective August 22, 2000, you will return to Troop P, Wyoming for further duty.

2.      On August 22, 2000, at 0900 hours, you will report directly to Lieutenant Willard M. Oliphant at Troop P Headquarters in full uniform. Your grooming and appearance shall conform with applicable Department Regulations.

1.
2.
3.
4.
5.
6.
7.
8.
9.
10.



EXHIBIT
3
11-15-02



General Investigation Report
IAD Investigation 2001-0093
Interview Verification-Lt. Mendofik

## Interview Verification

On Wednesday, April 11, 2001, at approximately 0830 hours, I interviewed Lieutenant Paul J. Mendofik, Commander, Patrol Section Troop P, Wyoming. The interview was conducted over the telephone. The purpose of the interview was to verify information that Trooper Laura Zelinski had filed in her complainant to the Pennsylvania Human Relations Commission/EEOC on January 12, 2001. The interview would be in reference to IAD Investigation 2001-0093, which is an "Attorney Work Product". Lieutenant Mendofik is not the Subject of this investigation, and the investigation is an Administrative matter within the Pennsylvania State Police.

The interview primarily focused on the facts surrounding a briefing and a debriefing that was held at the Troop P, Wyoming station in connection to a search warrant that was served on March 3, 2000.

In discussing the briefing with Lieutenant Mendofik, he related that there were two residences that were being served with search warrants by the B.D.L.E. unit on this day. Lieutenant Mendofik related that the search warrants were from a B.D.L.E. operation. B.D.L.E. was also using uniformed Troopers resources, as well as Wilkes-Barre City Police Department, and Troop Vice members to assist. Lieutenant Mendofik related that Troop P, members were assigned to provide a "uniformed presence" at the houses.

Lieutenant Mendofik related that he attended the search warrant(s) execution briefing held in the Troop P-garage. Lieutenant Mendofik related that during the briefing, it was learned dogs may be present at the houses. It was agreed that a CO2 fire extinguisher would be utilized to deter/disorient/distract the dogs if they were aggressive.

Lieutenant Mendofik related that after the briefing he remained at his station. Lieutenant Mendofik related that he felt somewhat uncomfortable with how the briefing went but, there was no reason to believe the plan would place members in additional jeopardy. However, the information brought out during the briefing met the requirements outlined in the "FR", and the search warrants were being executed by members in B.D.L.E who had received the Department training in "High-Risk Search Warrant Service". In addition, other supervisors' and individuals' having experience in the serving of drug related warrants would also be participating in their execution.

Lieutenant Mendofik related that it has been a long standing concern of his to gather as much information as possible for these types of search warrants. For example, to gather as much information as possible about the people/places being arrested/searched, photographs of the residences, the people involved, floor plans and any other intelligence information. Lieutenant Mendofik related that he has addressed these concerns previously through suggestions within the Department. Lieutenant Mendofik further related that subsequently he developed a "Raid Planning Packet" for future operations. Lieutenant Mendofik related that he understands there may be occasions where this information may be unknown at the time when the search warrant must be executed. Lieutenant Mendofik related that when this type of information is not

EXHIBIT
7

General Investigation Report
IAD Investigation 2001-0093
Interview Verification-Lt. Mendofik

available, he would feel better if S.E.R.T. would be utilized, provided there is sufficient time and it would not make the probable cause stale.

Lieutenant Mendofik related that Trooper Richard Weinstock gave the briefing, and the actual raid would be supervised by Corporal Louis Altieri. Lieutenant Mendofik further related that Corporal Nicholas Gushka, Vice Unit Supervisor, Troop P, also participated in the raids. Lieutenant Mendofik related that he was at the communications console when Corporal Gushka notified the barracks, via radio, of the shooting occurrence.

Lieutenant Mendofik related that he asked for the debriefing. The debriefing took place the day after, in the Patrol Room of Troop P, Wyoming. Lieutenant Mendofik related that it is not unusual to have these types of debriefings. He encourages attending personnel to be up front and candid during the debriefings about what had taken place.

Lieutenant Mendofik was asked how the debriefing went, and he related that it went fine. Lieutenant Mendofik related that he said that he wanted the members to be up front to capitalize on Department strengths and correct any deficiencies.

Lieutenant Mendofik related that during the debriefing, Trooper Zelinski did say something about the Patrol Unit Members not being involved in the initial entry because they do not have the "Dynamic Entry Training". Lieutenant Mendofik related that he did not recall the exact words that Trooper Zelinski had used, but the comment was made in-group discussion, and that he did not take the comment that she made as being derogatory.

Lieutenant Mendofik related that he talked to Corporal Louis Altieri a couple of days later. Corporal Altieri said he was "sorry about the hard feelings between Patrol & BDLE". Lieutenant Mendofik related that he told Corporal Altieri "there are no hard feelings". Later, Lieutenant Mendofik inquired with Corporal Michael Davis, Supervisor, Patrol Unit, Troop P, Wyoming about any "hard feelings". Corporal Davis related some of the Patrol Members were offended by the comment Trooper Zelinski made at the debriefing. Lieutenant Mendofik said he and Corporal Davis had a discussion about the comments and believed the comment was clarified, leaving no hard feelings between Patrol and B.D.L.E. .

Lieutenant Mendofik related that he did not find Trooper Zelinski's comment to be offensive or demeaning, and no one raised any concerns about the comment at the debriefing. Lieutenant Mendofik related that Corporal Davis was also present during the debriefing. Lieutenant Mendofik related that the comment became construed from *"not having the training"* to *"not being capable of doing it."*

When asked if Trooper Zelinski was blamed in connection with the search warrant, Lieutenant Mendofik related that he did not think that anybody blamed her. Lieutenant Mendofik related that he did not believe there was a failure to the execution of the search warrant. However, the search warrant could have been planned better.

When asked if Trooper Zelinski's comment caused some hard feelings, Lieutenant Mendofik related, yes. Lieutenant Mendofik related that this was because of how it was interpreted by the

General Investigation Report
IAD Investigation 2001-0093
Interview Verification-Lt. Mendofik

other members.  Lieutenant Mendofik related that he did not think the statement Trooper
Zelinski made hampered them operationally, just on how the statement was interpreted.
Lieutenant Mendofik related that Trooper Zelinski did talk to him about it afterwards.  That
conversation pertained to her believing the Patrol Unit thought she made derogatory comments
about them. Lieutenant Mendofik stated he clarified the issue with her much the same as he did
with Corporal Davis.

Lieutenant Mendofik related that as a result of the search warrant, a "Raid Planning Packet" was
created to better plan the execution of search warrants/arrest warrants in the future.

Lieutenant Mendofik provided this information based strictly from his memory. He related he
did not maintain any notes in connection with this incident.


I _Lieutenant Paul J. Mendofik_ have reviewed the above 3 page summation of my April 11,
2001, interview with Corporal John C. DUBY.  Having been able to make any necessary
corrections, I find the summation accurately reflects my answers and explanations given during
the interview.


Signature: _____  Date: _O4-11-O1_    Time: _1703 HΣS_

General Investigation Report
IAD Investigation 2001-0093 Page 1 of 1
Interview Verification- Trooper NIGRO

## Interview Verification

On April 3, 2001, at 1217 hours, I interviewed **Trooper Joseph NIGRO**, Bureau of Drug Law Enforcement, Troop J, T.N.T. Unit. The interview was conducted over the telephone and the purpose of the interview was in regards to Trooper ZELINSKI's claim that Trooper WEINSTOCK told him that she was a sexual harassment suit waiting to happen. Trooper ZELINSKI claimed that this comment was made about her while Trooper WEINSTOCK was attending a high risk search warrant class between November 1-5, 1999.

I asked Trooper NIGRO if he attended this class with Trooper WEINSTOCK during November of 1999, and he related that he had. I asked Trooper NIGRO if Trooper WEINSTOCK had commented to him that Trooper ZELINSKI was a sexual harassment suit waiting to happen. Trooper NIGRO stated that Trooper WEINSTOCK did. Trooper NIGRO related that he had a brief conversation with Trooper WEINSTOCK in the hallway during this class about the new people in his unit, and during this conversation, Trooper WEINSTOCK had made the comment about Trooper ZELINSKI. Trooper NIGRO related that Trooper WEINSTOCK did not expand on the comment, and further related that this was only about the second time that he had met Trooper WEINSTOCK.

Trooper NIGRO had no direct knowledge or information in regards to sexual harassment between Trooper ZELINSKI and Trooper WEINSTOCK.

No further information

I Trooper Joseph NIGRO have reviewed the above 1 page summation of my April 3, 2001, interview with Corporal John C. DUBY. Having been able to make any necessary corrections, I find the summation accurately reflects my answers and explanations given during the interview.

Signature: _____    Date: _04/09/01_    Time: _1556_





This is Trooper John C. DUBY of the Pennsylvania State Police, Internal Affairs Division, Central Section. Today is Tuesday, March 20, 2001, and the time is 1200 hours. I am interviewing Trooper Laura ZELINSKI, Badge Number 7915, who is assigned to the Troop P, Vice Narcotics Unit. We are at Troop R, Dunmore, located at 85 Keystone Industrial Park, Dunmore, PA 18512, and the interview concerns IAD Investigation 2001-0093, which is an attorney work product.

DUBY:       Trooper ZELINSKI, are you aware that this interview is being tape-recorded?

ZELINSKI:   Yes, I am.

DUBY:       Okay, and do you decline to have your PSTA representative here with you today?

ZELINSKI:   Yes, I do.

DUBY:       I'd like to also inform you that you are not the subject of my investigation, and this investigation and interview is an administrative matter within the Pennsylvania State Police. Do you understand that?

ZELINSKI:   Yes, I do.

DUBY:       And when were you assigned to the Bureau of Drug Law Enforcement at Troop P, TNT?

ZELINSKI:   May 1st of 99.

DUBY:       And when were you removed from that position?

ZELINSKI:   August 21st of 2000.

DUBY:       Okay, we'll go into the complaint that you had filed with the Pennsylvania Human Relations Commission. I'm going to refer to Attachment #3 of my investigation. And what I'm going to do is just take your complaint, basically line by line. We'll go over each one of the allegations and we can just kick it around then.

ZELINSKI:   Okay.

DUBY:       Okay, on or about June 22nd of 1999, you claim that Trooper WEINSTOCK told you that he was attracted to you since he met you in April, and said that he wanted you to come to his room with him and give you a full body massage. Please tell me everything you can about this particular incident.


EXHIBIT
18

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 2 of 62

ZELINSKI:    Sure. Uh, we were, Trooper WEINSTOCK and I, were required to attend a wiretap class which was to take place from the 21st of June to the 25th of June at the BESO building at the Academy.  We had met only on one other occasion prior to that and that was at the class in April, uh, which was a Basic Drug Investigator's Class. It was to run from the 12th through the 16th.  Dan WIGLEY was also in attendance.  And basically that was for people entering - Dan and Rich entered two weeks prior to my start.  Their Troop released them to go into BDLE sooner.  My Troop, because of manpower needs, I didn't - I wasn't released until the 1st.  So we attended this class. Uh, drove down and I had - my accommodations were on base and they decided to get rooms off base, Dan and Rich did.  And we had minimal contact through that week.  Uh, Trooper GUNTHER was in that class and a couple other people that I knew.  Umm, we went to dinner one night, but uh, I was always with Trooper WIGLEY when Trooper WEINSTOCK was around at that time.

So then uh, on May 1st, I came to Troop R to be trained by Trooper Gina TASSELMYER.  Basically, because we were all new in the unit down in Troop P.    There was WEINSTOCK, MURRAY, WIGLEY, Corporal ALTIERI was also new. So Trooper ADAMS trained WEINSTOCK, and Trooper MURRAY trained WIGLEY.  That really left no one for me.  So I came here to be trained. And uh, I was here until that time being trained, up until June, when I had that class.  I think the week prior I had Camp Cadet in Troop P.  And then I went to the class that Sunday night, and I stayed at a Comfort Inn in Linglestown.  The start of the next day we had our class.  I saw Trooper WEINSTOCK.  I knew that he was going to be coming down to the class, umm, as I'm sure he was aware I was too. Before that we really had no contact between the class, at the Gap, and this class.

I had an old van that I was driving that was my undercover vehicle.  It wasn't very reliable.  He offered to take me to the class the next morning. So we went to the class and upon our return about, I don't know, I guess it was about four thirty or five on the 22nd, uh, his wife was staying overnight and it was the first time I'd met her and he introduced us and his two kids were there.  And it was just a brief introduction and I went in and I think I - I may have been meeting Jamie CLARK for dinner that evening. I'm not sure what I did that evening.  Umm, I was by myself.  I didn't have further contact that evening with Trooper WEINSTOCK.  He just in conversation would, "come by in the morning and I'll give you a ride in," and that would've been uh, again the morning of the, I guess it would've been the 23rd.  He did give me a ride into class that morning.  So we went into class. I met him in his uh, at his hotel room.  His wife was there and kids were there.  They were going to Hershey Park for the day.  And we left and we went to class.

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 3 of 62

Uh, had our class. Umm, I think we finished about four thirty that evening. He would've been driving me back to the hotel. And that's where this conversation began. He said uh, as I recall, you know, "I was attracted to you at the class in April." He said, "It was very hard for me, you know, with Trooper WIGLEY present." You know, he didn't put it exactly in those words. He said Dan, "Dan was present." Uh, he said, "It's killing me staying on the same floor as you in the hotel." And he just started saying this - it was just odd. I didn't know where he was going with it.

He said, "Do you see those shoes you're wearing?" And I didn't know - I said, "What do you mean?" And he said, "Would you wear those same pair of shoes every day?" And I said, "Rich, you know, I just met your wife." And he said, umm, he wanted to come back to my room and he wanted to give me a full body massage. I said, "We didn't even start working in the unit together. We just started working together." And he said to me, uh, "Don't you think that would be neat though?" And he put his hand on my left knee at that time and I brushed it off. I said, "Rich, please, let's - I don't want to talk like that. I don't want this, you know, these things to be said. We just started," we didn't even start working together really in the unit. And again, he just - he said, "I want to come back to your room. I want to give you a massage."

So upon our entry into the parking lot, I had my car. I had the keys to the van. I said, "Look," what was gonna happen later that evening about six o'clock, we were going to meet Corporal KAZIMER and Trooper WIGLEY. They were staying in the same motel as we were for the Fitness Coordinator Program, which Trooper WEINSTOCK was a part of. WEINSTOCK had mentioned that earlier in the day umm, about meeting them for dinner, like at about six o'clock. So it was about five o'clock at that time. I said, "I'll see ya later." I said, "I'm gonna go to the outlets," and I just stayed there, you know, the Hershey Outlets. I drove down there. I was there about an hour and a half. And uh, I just drove back, went straight to my room, and then left at about seven the next morning, just to avoid him.

DUBY:        Did you have any further contact with him that night?

ZELINSKI:   No, he did not come to my room or anything further like that.

DUBY:        No telephone calls or anything like that?

ZELINSKI:   No. No, there wasn't.

DUBY:        Basically, he was referring to his wife being an old pair of shoes?

ZELINSKI:    Yes, that's what I then gathered. I was a little bit slow on that but. . .

DUBY:    You wouldn't mind trying a new pair of shoes on, so to speak?

ZELINSKI:    I can't - yeah, I can't wear the same pair. "You don't wear the same pair." That's how he put it, "You don't wear the same pair every day." Like I can't - you know, whatever he was suggesting at that time. But that's how I interrupted it and then he had that contact. And I was just very uncomfortable, you know. And I - that's what I said. I mean, I know - I was in Troop R. I know I was going to be coming down to work on an investigation the following month, and I thought - I just - I don't want to have any contact with this person, you know. Umm, and then like I said, when we returned to the parking lot, I just left. I said, "I'm gonna go shopping. See ya later," like that.

DUBY:    How did the rest of the week go? Were there any other comments made to you?

ZELINSKI:    Well that was - that was Wednesday evening. And then, like I said, I left early the next morning and went to class. And I told - that's when I told Jamie CLARK. She was in BCI from west. I had just met her at the class and started talking with her. We became friendly with each other. I had told her what he did. I felt uncomfortable, and I said, "I don't know who he thinks he is, you know, doing that," but you know - and that was Thursday.

And what we planned to do Thursday night was it was Lieutenant - it was Sergeant Wanda GILBERT at the time - I asked like on behalf of the class if we could have study meeting at the Academy library and she made arrangements for us. So that was put out to the whole class. So immediately afterwards uh, I didn't stick around after the class. I made arrangements with Jamie to go for something to eat prior to the study group. So we were at the study group and WEINSTOCK came in about like midway through and I didn't talk to him at all. We just discussed the class material. And then afterwards I immediately left with Jamie, and we took our test the next day. I stayed after. I was talking to uh, I believe it was Trooper Joe KALIS. I talked to him for a little while. I was talking to Mary BUNGO. And uh, Jamie and I went for our lunch at that time. We finished early and then I drove home. I had no further contact with him.

DUBY:    Is there anything else that happened during that week between Richard and you?

ZELINSKI:    No, that was - that was all that I can recall, just that - that conversation, uh, Wednesday evening. And then we had umm, conversation during the study hall, but other than that, no.

DUBY:    Okay, and he wanted to come to your room or did he want. . .

ZELINSKI:    He wanted to come to my room.

DUBY:    Okay. On or about August 4th of 1999, you claim that you were assigned to ride in a van with Trooper WEINSTOCK, and he graphically told you how he wanted to have sex with you. Is that correct?

ZELINSKI:    Yes, that's correct.

DUBY:    Okay, and please tell me everything about that.

ZELINSKI:    Okay. I think - I believe it was mid July. I was still being trained in Troop R at that time. I didn't have contact any further with Trooper WEINSTOCK umm, between the class and the investigation. I was told by Trooper SHUTTER he was at uh, a friend of his, Danny MIMNAUGH, who I know. He was in Vice in Troop R at the time. So I got to know him while being trained here. He and WEINSTOCK worked out at the same gym and Danny MIMNAUGH, again hearsay, but Danny MIMNAUGH related to Billy that he was at the gym and WEINSTOCK called me an "asshole" in front of a group of people. And this was between the class and the start of this investigation, it was a wiretap that was conducted out of the Area II office in Hanover Township.

DUBY:    Who was in charge of the investigation?

ZELINSKI:    It was uh, Troop N, TNT. They were the affiants, as well as DEA that were involved with the investigation. I believe it was adopted. But Jimmy HISCHAR, he's a Trooper in TNT, uh, he was the affiant on this investigation. And Troop P, Troop R, we were all pulled to work on it at that time, as well as I believe Vice members from Troop P and Troop N, and I don't think there were any Vice members from Troop R area there.

DUBY:    Okay, and what happened inside of the van?

ZELINSKI:    Uh, that morning I believe I was a six to two. And we were instructed to take the van for surveillance and uh, I forget who would've made that request at the time, but we did have to sign the van out. It may have been Corporal MURPHY. He was on a midnighter. He may have told us to do so. I believe they anticipated movement from the primary target. Uh, he - and we did, we did follow him. But prior to that, Trooper WEINSTOCK

and I were in the van and that's when this conversation took place. Again, it was the first time that we were alone together since that class. And that's when he told me how he wanted to have sex with me and he told me how he wanted to have sex with me.

DUBY:       How did he tell you that? What did he say?

ZELINSKI:   Umm, umm. . .

DUBY:       I know.

ZELINSKI:   He told me he wanted to lift my legs and put his dick in me. That's what he said.

DUBY:       Okay. How did that make you feel?

ZELINSKI:   Uncomfortable.

DUBY:       Okay.

ZELINSKI:   And this went on for a few minutes, just this talk. And I (inaudible) just upset by it, again knowing that I was gonna have to come down. . .

DUBY:       And work with him on a daily basis?

ZELINSKI:   Yeah.

DUBY:       Were you driving the van or was he driving the van?

ZELINSKI:   I believe he was driving the van. Yes, he was driving the van. It was around that time before uh, they called us up because the plan - I apparently received a phone call that they had been (inaudible). Uh, the target was going to be leaving his residence and we were in the area of his residence. I do remember prior to this going for, just to get a drink, and I know Gus DIANA, I don't know if he would remember, we met him at uh, it was in Orlowski's (phonetic sp.), not far from where the plant was, and I went to get a drink. I mean, I know he saw us. We were together in the van and he hung out and talked to us a little bit.

DUBY:       Okay, and who was that again?                           *See* *Page #7*

ZELINSKI:   Uh, Augustus DIANA.                                     *OF ATTACHMENT 77*

DUBY:       Augustus DIANA?

ZELINSKI:    DIANA. He is the asset forfeiture officer for Area II, and he was also conducting surveillance.

DUBY:    So he actually saw both of you in the van together?

ZELINSKI:    Uh-huh.

DUBY:    Okay, let me just see if I can find out real quick. He's BDLE?

ZELINSKI:    He's BDLE. Umm, he was then and is currently assigned to the same position.

DUBY:    An asset forfeiture to which unit?

ZELINSKI:    Area II office, which is the Bureau of Drug Law. So essentially in the same office that Sergeant RUDA's in. I don't know who his direct supervisor would be. I think they're out of DHQ. I don't think its Sergeant RUDA. I think he follows under like a different chain of command, like that.

DUBY:    Okay. I'll - that's a guy, right, Augustus?

ZELINSKI:    Uh-huh.

DUBY:    Okay. I'll contact him then. So he can put you and Trooper WEINSTOCK in this van then during this operation?

ZELINSKI:    I never had a conversation with him since then about it. I would hope he would remember. That was the day that we followed uh, the main target. He went to a location on 309, which was - it was an ATV dealer in Dallas. And that's where he went and we sat there and watched him. I believe it was Augustus or Gus that was there.

DUBY:    What was his assignment for the wires?

ZELINSKI:    He was also conducting surveillance.

DUBY:    He was surveillance?

ZELINSKI:    Yeah, and we had shifts that usually coincided. It was six to two shifts.

DUBY:    And what kind of van was this? Do you remember the color?

ZELINSKI:    It was a confiscated van they had. It was a conversion van. It was white with pin striping, like aqua colored pin striping and uh. . .

DUBY:        He would definitely remember the wire.

ZELINSKI:    He would remember it, oh yeah, yeah. He was assigned to that the whole time.

DUBY:        All right, not a problem. I do have to go back on one thing here.

ZELINSKI:    Sure.

DUBY:        The incident up at the Academy. You told Trooper CLARK about it?

ZELINSKI:    Yes.

DUBY:        And did you tell anyone else about it, what had happened?

ZELINSKI:    Yes, I told - when I returned from the class I told Trooper SHUTTER and Trooper TASSELMYER. I can't really name the dates that I had told them, because Gina was on vacation at a certain point and that's when Billy started coaching me. We were supposed to have sixty days coach period. But with the wire, it translated to something like thirty, or something like that. But I told Billy, I believe we were in his vehicle maybe doing surveillance, and between the time I returned from the class and the time that we went up on this wire which was in the middle of July, July 15th or something, but I told both of them.

DUBY:        During December 30th, 1999, you claim that you were conducting a surveillance at a bar and that Trooper WEINSTOCK said, quote, "If I can see down your sweater, everyone else can." Can you please tell me about that incident?

ZELINSKI:    It was earlier that day, I think I was working a day shift, and it was about - I had to go somewhere with Corporal ALTIERI. I think he had to pick up a vehicle. So I drove him over there and then drove back over to the barracks. And WEINSTOCK was conducting an investigation while Lou - see it was more like a General Investigation, possible drug activity at this one location. So near this apartment house where there was this drug activity, we had been able to get a space above a doctor's office just to do surveillance. So I told Corporal ALTIERI, I said, "I'll go up and help," you know, no problem, you know, and help WEINSTOCK out with this. So Lou and I went up. Corporal ALTIERI and I went up, and we met Al WEISS, Trooper Al WEISS, Kevin SEIDEL, and umm, WEINSTOCK was already there. And nothing really transpired. We didn't see anything.

So I had a General Investigation at Rich and Charlotte's in Dallas that was pending that we needed to get up there for. And with the holidays, it was kinda tough. We didn't have the time to do it. And Trooper SEIDEL was there, so I thought, you know, at this time I had already advised Corporal ALTIERI things that had transpired in June and in August.

DUBY:       Okay, so you already told him. . .

ZELINSKI:   I already told him in October.

DUBY:       Okay.

ZELINSKI:   And then I don't know, do you want me to backtrack to that?

DUBY:       No, actually that's, that's next, so we'll talk about that afterwards.

ZELINSKI:   Okay. We went to this Rich and Charlotte's, and it's a dive bar in Harvey's Lake area. And. . .

DUBY:       Okay, so at this point, it's just the three of you?

ZELINSKI:   It's the three of us.

DUBY:       Trooper WEINSTOCK, yourself, and Trooper SEIDEL.

ZELINSKI:   Yes.

DUBY:       Okay.

ZELINSKI:   Umm, basically when we go into do these investigations, which I'm sure you know we just, we try to mix with the crowd, uh, begin conversations, engage in conversations, which I did, with a female there. There was again claims of drug activities at this location, particular targets that were named and in mind uh, owners of the facility. Uh, Kevin and I, Trooper SEIDEL, we had played pool with two of the individuals that we engaged in conversation with. At this time Rich WEINSTOCK was sitting at the bar and he was watching me.

DUBY:       Watching you play pool?

ZELINSKI:   Yeah.

DUBY:       Okay.

104
9 of 62

ZELINSKI:   Umm, I had on like a zipped up hooded sweatshirt with nothing on underneath it. It zipped up to like about my - here.

DUBY:       Okay. Up to your like Adam's apple, so to speak.

ZELINSKI:   Yeah. And I bent over, I assume, to shoot or make a shot. And I was standing at the pool table again waiting for my turn and WEINSTOCK motioned over to me. So I walked over to him and he said, "If I can see down your sweater, everybody else can."

DUBY:       Okay, you weren't wearing a sweater, just a sweatshirt though?

ZELINSKI:   Yeah, under the sweatshirt sweater. . .

DUBY:       I'm sorry. . .

ZELINSKI:   . . .It was like a zip up, like hoody sweater. Like a hooded sweater.

DUBY:       Okay.

ZELINSKI:   And it zipped up to the top.

DUBY:       And did you have an undergarment on beneath that?

ZELINSKI:   Yes, my bra.

DUBY:       Okay.

ZELINSKI:   And uh, that was his comment, and I just walked away from him.

DUBY:       And was Trooper SEIDEL present when he said this?

ZELINSKI:   No, he had motioned me over and he said that to me and I walked back over. To my knowledge, Kevin didn't know and I didn't make mention to Kevin that statement.

DUBY:       How did that make you feel?

ZELINSKI:   Uncomfortable.

DUBY:       Again.

ZELINSKI;   And I think I uh, quit pretty much at that point and just sat at the end of the bar and continued my conversation with the female that I was talking to uh, I engaged in conversation previous to the start of the game.

DUBY:     On June 28th of 2000, you claim that throughout the work day, Trooper WEINSTOCK continuously made comments in front of the unit and Patrol members that he could see your underwear.

ZELINSKI:     Yes.

DUBY:     And would you please tell me about that incident?

ZELINSKI:     Surely. I believe that was a Wednesday. Umm, I was in work that morning particularly early. That was during the week of our DART program, which basically the DART program is just extensively going out and purchasing drugs and then we were going to do a roundup on the 30th, which was Friday. I was in the office about six that morning. And about twelve o'clock, prior to that, most of the team members were in. About twelve o'clock we were making arrangements to go out and I was in - when you walk into our office, the Corporal's desk for BDLE, which is Lou ALTIERI, is right there immediately as you enter. And then across from his is Corporal Nick GUSHKA's desk. He's a Vice, the Vice Corporal at the time.

DUBY:     So they had their own office essentially?

ZELINSKI:     Had like almost their own office. And then on the left is the entryway to our office. And then you have to walk through our office to go to the Vice office, which is on the other far end of the building.

DUBY:     Does Corporal ALTIERI's office have a door that he can close, things of that nature, or is it, are we talking. . .

ZELINSKI:     Umm, there's like a swinging door. There's no like - there's not a knob on it.

DUBY:     So it's not like a work - like a modular workstation or anything?

ZELINSKI:     No.

DUBY:     He has a room that he's in with Corporal GUSHKA?

ZELINSKI:     Yes, it's a room that the two Corporals are in together. And I believe Joe PRULA was present from Patrol and Dan WIGLEY was there. Uh, and I don't know if Sean overheard this, but he said it repeatedly through the day actually. I had jeans on and a T-shirt, and I think my waistband was loose.

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 12 of 62

DUBY:        Okay, your jeans were loose fitting?

ZELINSKI:    My jeans were loose fitting around the waist and if anything he saw, it was probably the band of my underwear.

DUBY:        Like if he was walking behind you and you were sitting and your shirt would ride up?

ZELINSKI:    Exactly. Exactly. And he was just looking down at me and then he would look at me and said, "I can see your underwear." And at one point, I think when I came back in, I just blew it off again and walked away. But I know some people must've overheard it. And then this happened, I think, when we were out in between doing buys. I mean, my mind was, you know, on the buys and working with the informant. We did all the buys from these two informants we were using. They were a married couple. We were in their house, in and out of their house all day, every day of that week. And I know WEINSTOCK had entered on a couple of occasions and said the same thing, again, "Are you showing me your underwear?" Uh, just embarrassing, just embarrassing. I attempted to fix it. I mean, it was just a loose fitting jeans on and my waist.

DUBY:        And you think Trooper MURRAY was present and Trooper WIGLEY was present?

ZELINSKI:    Yes.

DUBY:        And was there any other Troopers present that might've heard it?

ZELINSKI:    I don't know if he would remember, but Joe PRULA I believe was sitting at - I visibly remember him sitting at Corporal ALTIERI's desk. Corporal ALTIERI wasn't in the room at the time. Uh, I do believe that he would've overheard that.

DUBY:        You think Joe would've?

ZELINSKI:    Yes.

DUBY:        Okay, and where's Joe at right now?

ZELINSKI:    He's out of Troop P, Wyoming Patrol Unit.

DUBY:        He used to be in BDLE.

ZELINSKI:    Yes, he did.

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 13 of 62

DUBY:      Yeah, I remember him when he was in BDLE.   Okay. Is there anything
           else that happened about that, in that incident there?

ZELINSKI:  With that comment? He just said the comment, which - and he said it, like
           as I said, repeatedly, uh, on different occasions throughout the day.  And
           he said it in front of people.  Uh, he didn't only say it when we were alone.
           I do remember him, and I can't cite a specific time during the day, but
           coming up to me and saying the same thing again.

DUBY:      How many times do you think it actually happened as far as numbers?

ZELINSKI:  At least four during the day.

DUBY:      At least four?

ZELINSKI:  At least four.

DUBY:      On October 14th of 1999, you claim that you told Corporal Lou ALTIERI
           that Trooper WEINSTOCK - that you did not feel comfortable working
           surveillance with Trooper WEINSTOCK, and that you told him about the
           two incidents.

ZELINSKI:  Yes.

DUBY:      Okay. And please tell me a little bit about that.

ZELINSKI:  Sure.  I can't remember the specific day, I think it was Thursday, but I
           know it was the 14th.  We had - I had received a General Investigation for
           Jimmy's.  It's a bar on the Sansouee (phonetic sp.) in Hanover Township.
           I'd been there maybe one or two occasions prior to that during
           surveillance.  Again, basically drug activity.  The complainant rented an
           apartment in the building directly in front of the bar.  He owns or managed
           the bar.  He was saying that the top floor occupants of the dwelling he
           resided in had a lot of traffic.  So what umm, his name was Jimmy
           SHEPPARD that owned the place.  What he provided us with was like a
           trailer almost, that was alongside of the bar so that we could watch, have
           a view of the bar as well as his residence, the building, to see - to note
           drug activity.  So Corporal ALTIERI and I were there that evening and we
           sat there and uh, just waited and didn't see anything.

           On our way back he asked me how I was getting along with other unit
           members.  And I told him, you know, I didn't feel comfortable working in
           that capacity with Trooper WEINSTOCK, and he wanted to know why.
           And I just felt, you know, at that time we just started - I just came back
           down to the unit.  I had probably worked maybe once - one week with

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 14 of 62

Trooper WEINSTOCK, in total. Because when the wire was over, say mid August, I came back up here to Troop R and did marijuana erad with the Troop R members, with Gina TASSELMYER and Billy SHUTTER, and MCEVOY, HAHN. And then right after that, I came back down to Wyoming, and I believe it was the end of August that Trooper WIGLEY and Trooper WEINSTOCK were sent down to Troop J for the wiretap, or another wire. So they were down there, I would say the majority of September. And towards the end of September, I had - I believe I had Top Gun Training, and when we were sent, Trooper MURRAY, Corporal ALTIERI, and myself, were sent on a wiretap to Troop K, Philly, which only lasted three days. And the plug was pulled kind of on that, we came back.

So essentially, we hardly worked together at all in the office. So I knew the time would come where we would be working alone again and I just felt uncomfortable because of these practices. I almost expected it to happen again. So I did - I advised Corporal ALTIERI what happened in June and what happened in the beginning of August.

DUBY:       That would be the van incident and the hotel?

ZELINSKI:   The van and wiretap, at the wiretap class, what happened. And I told him, you know, I felt uncomfortable working in that capacity. And I said, you know, I'll do whatever I have to do. You know, whatever he needs in assistance with investigations, you know, I'll be there. I don't feel comfortable for those reasons.

DUBY:       Was anyone else with you when you told him this?

ZELINSKI:   No.

DUBY:       Okay. So this was in private in a vehicle, that you talked to him about it?

ZELINSKI:   It started - the conversation, I believe, started as we were conducting surveillance in that trailer, like that camper that was provided, but it continued. We were wrapping that up because nothing was going on. You know, it was about eleven o'clock at night, I would say, eleven, eleven thirty, and we started - his vehicle was at the barracks in Wyoming, so I drove him back in the van. And that's when the, like the conversation continued. So he told me that uh, at first, "I don't believe it. I don't believe that he would do that." And you know, I just - I said, "Well it did happen, and I'm telling you this. I feel uncomfortable," I said. I said, "Corporal," I said, "I don't want anything done about it. But I just want you to know that that's how I feel." I said, "I know we all just started. We haven't even worked together." We hadn't even done an investigation together, really,

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 15 of 62

at that point.  "I just want you to know I feel uncomfortable about it."  He said, "Okay, I will not say anything to Trooper WEINSTOCK."

It was around this time that Trooper MURRAY told me, and I believe it was around this time, he said when WEINSTOCK and I were in the barracks one day over the summer, this was when I was in Troop R, Lou came in - and Corporal ALTIERI came in and said to them, "You gotta watch Laura with sexual harassment.  She tried to give, I guess, the Sergeant in Towanda shit over it.  She's a sexual harassment suit waiting to happen."

DUBY:        Okay, so that information came from Trooper MURRAY to you then?

ZELINSKI:    Trooper MURRAY, and it was at that time - and then umm, just to go one step further.  We - I don't know what exactly the events were that transpired the rest of that month, as far as investigations and involvement, but it was the first week of November, we were all at uh, Trooper WIGLEY, myself, and Corporal ALTIERI went in one vehicle and we went in the van, and we had all of our gear.  We left on a Sunday.  It was October 31st of 99.  We went to a Basic Search Warrant school, which was being held at the Southwest Training Center.  It was put on by the SERT team from out west.    And I believe MURRAY and WEINSTOCK went down in WEINSTOCK's vehicle.  MURRAY's vehicle at the time was very undependable.  It was an old Beretta with no brakes.  So they went down together in Trooper WEINSTOCK's vehicle.  Plus, we had all my gear.  We had to take the van.

So we got down there and through the course of the week Troop J members were present, and that Trooper Joe NIGRO, at a class in April, it was a Basic Drug Investigator's Class, and it was later in the week, I was talking to him.  I went out with him and Corporal DYKES one evening because the rest of my unit members didn't want to go out.  They were staying in that night.  And it was a long week.  It was a tough week.  The SERT team that put it on - and uh, we went out and that was when Trooper NIGRO told me, he said, "Rich said in front of a bunch of us," from Troop J, I'm assuming, "that you were a sexual harassment suit waiting to happen."

DUBY:        Rich said this?

ZELINSKI:    Yes, in front of Joe NIGRO, and Joe told me that.  And it was just, at that time, you know, I just knew that umm, Lou told him everything.  I just really felt that.

DUBY:        So not only did Lou say this, but Rich said this also.  Both of them said it?

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 16 of 62

ZELINSKI:    He said that, yeah, he said that to Joe NIGRO.

DUBY:    Joe NIGRO, and he's currently with BDLE out of Troop J?

ZELINSKI:    J - I believe he still is.

DUBY:    Okay, and Rich specifically said to him, basically accused you of being a sexual harassment suit. . .

ZELINSKI:    Waiting to happen.

DUBY:    . . .waiting to happen. And do you remember what time of the year was this again?

ZELINSKI:    This was between November 1st and the 5th of 99. We were all at this class for the Search Warrant school. There were members from Troop J TNT, Troop C TNT, which I don't know what Troop C is - Punxsutawney? And our whole unit was there. And WEINSTOCK and I didn't speak that whole week. He didn't. . .

DUBY:    Okay. All right. So at this point, you believed that Corporal ALTIERI then confided in Trooper WEINSTOCK about what you had told him?

ZELINSKI:    Yes, I believe that.

DUBY:    Did circumstances begin to change then in the unit, as far as. . .

ZELINSKI:    I would say from that point on, definitely.

DUBY:    Okay, so from around November of 99, until you eventually left, that things were pretty bad then?

ZELINSKI:    Yes. Right. I believe so.

DUBY:    All right. On February 22nd of 2000, you claim that Trooper WEINSTOCK told a co-worker that you had tried to hurt him with Lou ALTIERI, and now he was going to hurt you. Was that co-worker Trooper MURRAY?

ZELINSKI:    Yes.

DUBY:    Is there anything more to that? Trooper MURRAY came up to you and told you that, "Hey this is what. . ."

ZELINSKI:    He told me that, but it was almost up to the point to umm, this buy that I did on the 22nd, and I really don't know the order of my grievance. I don't

know if we're gonna get to that point. I don't want to jump ahead at all. But umm, we had - there were a couple of instances that then occurred in November. Umm, I believe it was November 9th, we were at - umm, I don't know if you were aware of this, the bus indiction that we had done?

DUBY:      No.

ZELINSKI:  And there came a time - now this was just the week after we had that class. And it just kind of cemented it for me that this animosity that was there. We were at the bus terminal in Wilkes-Barre, it's a Martz terminal. It was myself, Trooper MURRAY, and Trooper WEINSTOCK. And we decided to do interdiction that night. Umm, I don't know if - I don't know exactly our reasoning being there. I believe Trooper MURRAY had some type of tip. Actually, it may have been even one of my informants that reached out to me. I'm not certain.

DUBY:      Actually, I am familiar with this. This is where a foot chase started then?

ZELINSKI:  Yeah.

DUBY:      Okay.

ZELINSKI:  Yeah, we had a foot chase. We observed an individual get off the bus and he just exhibited all the signs of uh, that he was carrying. So we did approach him. We uh, engaged in conversation with him, the three of us. We walked with him and uh, I forget exactly how it progressed, but we asked to pat him down at one point, and he pushed off on Sean and ran, and Sean fell.

I was right behind Rich. Rich was right behind him. Rich tackled him. We both had him on top of the ground. And it's residential. There's lights coming on, you know. I don't know what type of gun Rich was carrying, but he took it out and I was getting my cuffs out. I mean we had him under control and we had his hands out. Uh, Rich said, you know, "How does it feel to have," and I guess it was a .357, "to have a .357 to your head?" And it was loud and there were neighbors on their porches.

So we just handled the situation. I got him cuffed. Umm, got him to his feet. Wilkes-Barre City showed up. I stopped a driver that was passing by once he was cuffed, and we used uh, her cellphone, and I placed a 911 call. Umm, we get him back to Wilkes-Barre Station and of course, we're concerned about Sean. Sean fell on his hands and it's a long wait coming down there so, Rich made a comment to me, like he kind of pulled me aside and said, "We're on the same page with this, right? You're not gonna get me in trouble for this?" Because I told him when we had him on

the ground, "Calm down, Rich," like that. I know the adrenaline was running, definitely. Umm, but he asked me, he just pulled me on the side and just kind of - I want to say viciously said that to me, like, "You're not gonna get me in trouble for this, are you?" I said, "No, Rich." I said, "I just didn't think being in the public like that, that comment should've been said." You know, because there were people there and he said that loudly.

And then it was around the 24th of November, uh, it was the end of the shift. It was like an eight to four, Rich and I umm, I had - I don't know if I was at the magistrate's. I had hearings that day, and so forth. It was right before, it was the day before Thanksgiving, and it was about ten of four and we were in eight to four, and Rich said, "I have to serve this warrant today. I have to pick up this guy." And I said, "Alright, I'll go with you," you know. We went to Wilkes-Barre City. We met his probation officer. We went to pick up this guy. His name was Kenny uh, D'CASTALIO (phonetic sp.) or something like that. And we went in with the probation officer and uh, he did have a weapon. But prior to that, I mean he had I believe two small children there. And uh, he had a Rottweiler, which was in the bathroom. And Rich said in front of his whole family, you know, "If that comes out, I'm gonna splatter its brains all over the F'n wall." He said it in front of his kids and everything, you know.

And again, he just like stuck to me afterwards and said, "You're not gonna get me in trouble for this again, are you?" I said, "Rich," you know, again I said, "I don't have to tell ya. I don't think that was right to say in front of his whole family," you know. And I could just sense, you know, there was all this animosity pretty much at that point.

And then basically we went into December of the 30th, that had occurred. Umm, in January umm, I believe it was around the 10th or prior to that, WIGLEY and I worked our full week, but sometimes we would work weekends, you know. And uh, MURRAY told me that WEINSTOCK and him were working weekends and late Friday. I said, "Why didn't you tell us? We could've worked with you. We would've done some extra work or whatever." He said WEINSTOCK told him that Lou had told WEINSTOCK that he felt that WEINSTOCK and MURRAY work better as a team together. I said, "Oh, okay." So I didn't say anything to Dan about it. I just worked my normal day on Friday, whatever we did, and uh, called it quits and didn't work the weekend.

Well apparently, umm they were gonna work like a noon to eight, and Sean told me that he was in the office and Rich called him about three o'clock on Saturday and said he had ball - like game tickets, and he didn't work the weekend. That was the bottom line. And he didn't change his

timesheet. Now I wasn't privy to any of that until after the fact. What happened was, Corporal ALTIERI found tickets, I guess, in Rich's coat. And Rich, I don't know, I don't know what he said or how he presented that to Corporal ALTIERI, but he blamed us. He kept saying to me over and over again, "My timesheet's missing," like putting it on us.

DUBY:        Trooper WEINSTOCK kept blaming you?

ZELINSKI:   Yeah. I said, "Rich, you know, I didn't even know what took place over the weekend." I said, "I don't know what happened to your timesheet."

DUBY:        So basically, Rich put down that he worked the weekend and didn't work the weekend?

ZELINSKI:   And didn't work the weekend.

DUBY:        And did Corporal ALTIERI make him make up that time or did he resolve that?

ZELINSKI:   I don't know. I don't know if it was resolved. I know that was around the time, I believe, that WEINSTOCK - he had shoulder surgery. So I don't know if he had taken time off. And you know what, that was between those two and it was just that he was insinuating I took his timesheet.

So it was about the 13th, I guess, or it may have been the day, the night prior, I did something - I did a buy kind of late. I was working an investigation in N, N's area, and I had information uh, the informant had given to me. And I gave it to Troop N, but they were tied up on something else. So we ran with it. It was a really good deal. Uh, we were going to use like an unwit that didn't know anything about the investigation to get us into these people in Hazleton. Well we had about two buys then and Trooper SEIDEL and Trooper WEISS, and Trooper MURRAY and Trooper WIGLEY were assisting us. And I don't think I relayed yet, but WEINSTOCK, we always tried to include in anything.

There was a buy I did on December 16th, he was supposed to meet and didn't show up and we really needed him for surveillance. It was a direct purchase I did. And it just seemed, you know, we would work a noon to eight, and Corporal ALTIERI would be a nine to five, and WEINSTOCK would be gone. "I'll meet up with ya later," and wouldn't show up. But we always made the attempt.

DUBY:        He would leave Corporal ALTIERI left for the day, essentially?

ZELINSKI:   Essentially, and we would always include him or try to. And this whole
            deal that I did in Hazleton, he never came out I believe once with us. So
            Corporal ALTIERI, I mean, it was - it would've probably been a longer term
            investigation, Corporal ALTIERI wanted us to pull out of there. It wasn't in
            our area, you know. So it was about the 12th, I was in my office, and
            MURRAY called me and said that WEINSTOCK had just called him and in
            conversation between Corporal ALTIERI and WEINSTOCK, Corporal
            ALTIERI related he was using the trickle down effect to put information
            through WEINSTOCK to us, instead of addressing it one on one. He said
            he was unhappy that we weren't involving WEINSTOCK, including him in
            drug purchases and so forth. Which, that didn't even have to be spoken.
            That was just ridiculous, that we didn't include him. I mean, he just would
            not be there. Every attempt, every purchase I know I ever made, I wanted
            to do as a unit, and he just didn't want any part of it, so. . .

DUBY:       And up until this point, you've already confided in Trooper WIGLEY and
            Trooper MURRAY about some of the sexual events that. . .

ZELINSKI:   With MURRAY, I can't even pin - I can't - I probably in January if not prior.

DUBY:       January of 2000?

ZELINSKI:   2000, if not prior to that, about the sexual advances. WIGLEY, I didn't
            relate to until later on. I just was embarrassed. But I told MURRAY. I
            think MURRAY had more of an insight with the goings on with Corporal
            ALTIERI and Rich, and you know, at that point it was like, "is it me?" Or,
            but in my heart of hearts, I just felt like after that class in November, you
            know, I just thought he told them everything. So umm, so he told me
            about this trickle down effect and so forth and I thought that's just
            nonsense. Especially, I'm thinking why is Corporal ALTIERI telling Rich,
            when he knows how I feel about Trooper WEINSTOCK, and that I don't
            feel comfortable with him.

DUBY:       Did you ever ask Corporal ALTIERI if he told Trooper WEINSTOCK what
            you had mentioned to him?

ZELINSKI:   Oh, I never directly asked him.

DUBY:       Never directly asked him?

ZELINSKI:   No, I didn't.

DUBY:       Did you ever confront Trooper WEINSTOCK with the fact that what your
            belief, that Corporal ALTIERI had talked to him?



ZELINSKI:    No. No, I didn't. I just thought - and I think at that point, I just felt, even in the beginning, you know, he's manipulating Corporal ALTIERI. That's the way I felt. And I conveyed that - I did convey that to Corporal ALTIERI at one point.

DUBY:    So after your conversation with Corporal ALTIERI about Trooper WEINSTOCK, you started seeing more of a radical change?

ZELINSKI:    Yes.

DUBY:    As far as how you were perceived in the unit and how you were treated?

ZELINSKI:    Yes. Yes, and I just felt that at that class. Uh, not that obviously we had much - WEINSTOCK and I had much contact prior to that class, but it was a cold shoulder all week. You know, umm, we didn't even speak even when we were doing group activities. He was kind of critical, uh, they both were.

DUBY:    Let's get into a little bit about the search warrant involving the dog. (END OF TAPE 1, SIDE A)

- TAPE 1, SIDE B -

DUBY:    (inaudible) 2000, Trooper WEINSTOCK began stating that the reason Patrol would not serve search warrants with you, well I guess the unit, was because it was your fault for messing up the drug bust. Is that pretty much accurate?

ZELINSKI:    Yes.

DUBY:    Okay, why don't you tell me a little bit about how that search warrant took place.

ZELINSKI:    Sure, sure. It was just - well, if I could backtrack to February 22nd.

DUBY:    Absolutely.

ZELINSKI:    We had a drug - I did a drug purchase and these were bad actors. We suspected them of being armed. On the occasion there were five males we were dealing with. It was Trooper WIGLEY's investigation, but I was undercover and we were also utilizing an informant. And how this buy was to go down, I had a panic pager and I don't know if you're familiar with a panic. . .

DUBY:    Yes.

ZELINSKI:    Okay, I had that on.

DUBY:    Okay, so we're talking February of 2000 then?

ZELINSKI:    Yes.

DUBY:    Okay.

ZELINSKI:    I had that on and I umm, the game plan was that I would enter the informant's. We would place a call to the targets and they would arrive - number, I didn't know, usually would be two, and sometimes different ones. Never the same. And we would do the deal. They would leave. And then I would just call out to surveillance and let them know how everything went and then I'd transport everything back and square it away. So that's pretty much what happened on my end of it. But I was advised afterwards by Trooper WIGLEY that Trooper WEINSTOCK umm, before they arrived, got paged by an informant, and he went and used a phone somewhere. I don't know if he used Trooper MURRAY, had his cellphone. He left and he was monitoring my panic pager. He came back and I think he got back on the radio, "Hey, they're leaving." I mean, anything could've happened.

DUBY:    He wasn't there when they arrived and showed back up when they were leaving?

ZELINSKI:    When they were leaving.   So there would be no way he could've monitored that pager.

DUBY:    So it would've created a safety issue on your part?

ZELINSKI:    Absolutely.   Absolutely.   Umm, I was really frustrated, I guess, after hearing that.  I did - I believe address it with WEINSTOCK, maybe two or three weeks later.  I didn't feel it was my place to because I didn't observe it and it was WIGLEY's investigation.  I didn't want to step on Dan.  So it was these people that he was - the informant that was contacting him, he wanted to set up a buy for later on in the evening for his own investigation. This investigation uh, would parlay then into the search warrant, pretty much that occurred on March 3rd, I believe, which was a Friday.

DUBY:    Okay, now up to this point, did you tell Corporal ALTIERI about the safety issue that happened?

ZELINSKI:    No, I kind of left that up to Dan. Again, for those reasons.  Umm, again, that informant was setting up pretty much the search warrant and the buys

subsequent to that, that would happen before the search warrant. I wasn't privy to any of those buys. I was then asked to go out. Uh, if anything with investigations, it was getting to the point that I felt like I was intruding. You know, umm, and it wasn't as if I wanted to take anybody's investigation. I had enough work of my own. But I just wanted to help. And then I was later told not to jump the gun, but it was none of my business.

But anyway, so I had no information on who these targets were, on where these buys were made. Two days prior to this search warrant, I was assisting LCE with an investigation they were conducting in East Stroudsburg. I think I finished about two o'clock in the morning, March 2nd into the 3rd, it was a Thursday into the Friday. I had received a voice mail from Lou ALTIERI, saying to report to the barracks at eleven for the search warrant itself. So I got there and umm, they had a briefing. Again, it was the first time I heard of this information and it seemed rushed. There wasn't intel done. We knew that there were two Pitbulls at the first location. Uh, Sergeant WHITAKER was going to have the fire extinguisher spray, and this and that, and we went over some points of the entry. Umm, I don't know, I think it was a catastrophe, pretty much.

DUBY:       Who actually organized it? Was it Corporal ALTIERI or. . .

ZELINSKI:   It was Trooper WEINSTOCK.

DUBY:       Okay, was Corporal ALTIERI around?

ZELINSKI:   Yes, he was present. He was present, uh, Lieutenant MENDOFIK was present, Patrol Unit members, Trooper SPAGNOLA, uh. . .

DUBY:       Sergeant WHITAKER?

ZELINSKI:   Sergeant WHITAKER, he was present as well. We then proceeded to that location, all different cars. Upon entry, Dan was to take the door out. I was about the second or third one in. A guy - right above the door was a window. A guy's hanging out of the window prior to us entering and I remember yelling, "We got one out on top." Uh, the call was supposed to be made to Wilkes-Barre City to advise them that we were going to be doing this. John SCOBLE was supposed to place that call. We had Corporal GUSHKA, WEINSTOCK, and I forget who else was out on the perimeter at that time. GUSHKA was to make the call, or something of that nature.

DUBY:       Was this one of those things that they were - he was going to make the call just as you guys were going to do it or not like two hours prior or anything like this?

ZELINSKI:   I think they were aware.

DUBY:       Oh, okay.

ZELINSKI:   I think they were aware prior. I'm not certain though, that end of it. I know that there were problems afterwards because of it, but umm, just from the entry on. We entered. I went right. I cleared the bottom half on my side. Gus DIANA was also there as a team member that went in. Al WEISS, Al WEISS saw the whole thing, and I know he was never interviewed, but there was screaming upstairs. I heard dogs barking as soon as I entered. I made my way up the steps. I saw - the way the steps were, they were open on top, like spindled railings. And I was approaching upstairs, and here's like the door, here's the railing, and here I am coming up. I could see Ray WHITAKER, and I think SPAGNOLA, Trooper SPAGNOLA, who's with the Patrol Unit in Wyoming. And I came up and this is what I saw.

            I came up around and it was like, you know, you could see it in slow motion. Ray sprayed - Sergeant WHITAKER sprayed, it didn't do anything. I could see in the room that the suspect and another Pitbull were on the bed, on the side in the corner. I could see that. I stepped up to the doorway. Trooper SPAGNOLA was to my left. I think we were actually outside the doorway, in actuality, maybe like I'm here and the doorway's here. SPAGNOLA's to my left. SPAGNOLA, I think, had the hoop with him for the collar, to put a collar on it. Couldn't get it. The dog jumped.

DUBY:       Jumped off the bed?

ZELINSKI:   It was on the floor in front of SPAGS, SPAGNOLA.

DUBY:       Okay, so there's two dogs. . .

ZELINSKI:   The suspect and the one Pitbull are on the bed, off to the right, and I could see them off to the right. Then there's a black Pitbull, and it was pushed back once Ray sprayed it, but it kept charging forward and then moving back. Charging forward, moving back. SPAGNOLA stepped in. He took a swing at it with the thing. It stepped back and it, it jumped forward at SPAGS, and it was really close to his leg, and at that time I shot at it. It seemed to me that I pierced the back leg. There was fur and it whimpered, and it moved back and it was whimpering.

The next thing I know, DEGNAN, Corporal Jay DEGNAN is in the doorway. I mean, it's like we were kind of moving back and forth. Jay has the barrel of a shotgun like this, like moving in and trying to target it. And at that time I believe I was pushed into the wooden doorframe and I hit my wrist. And I just moved back to give him a shot and he shot. And I just moved from the situation. SPAGNOLA and I, before there was another shotgun blast to the dog, before that even occurred, SPAGNOLA and I moved down to the other end of the hallway and we're clearing the other room on the side. Trooper Al WEISS was behind this whole, he was behind in the hallway. He had our rear guard, almost, and he saw the whole thing happen.

DUBY:     He saw the dog getting shot?

ZELINSKI: He saw the dog getting shot. He saw me take the shot at the dog. Now. . .

DUBY:     So the dog that was on the bed was not shot. Is the dog. . .

ZELINSKI: I don't believe it was shot, no, because SPAGNOLA and I went and cleared that side room. I came back. They already - that dog was kind of pushed back. The suspect was grabbed by I don't know who. I think Chris O'BRIEN, who's a Trooper in Patrol in Wyoming. I took my cuffs out, cuffed him, and got him on the floor. Told him to calm down. "What's your name? Calm down." This guy's dog was shot right there.

DUBY:     Okay, so it's the black one that's shot then, essentially?

ZELINSKI: That's shot.

DUBY:     Okay.

ZELINSKI: SPAGNOLA was able to get then - we were able to control the brown Pitbull. Got the collar around it, got it in the bathroom. At one point, chased it in the bathroom, and then we got the collar on it. We didn't have to kill that one.

DUBY:     Okay, so the only dog that was shot is the black one?

ZELINSKI: Was the black one.

DUBY:     And then that's the one that was one the floor and lunged at Trooper SPAGNOLA.



ZELINSKI:    Yeah. By the time that thing was shot, it was out into the hallway, shot the second time.

DUBY:    Okay, it was shot out in the hallway then?

ZELINSKI:    For probably the second shot that Corporal DEGNAN made, because I think he had two shotgun. . .

DUBY:    Where is Corporal DEGNAN out of?

ZELINSKI:    He is now a Sergeant and he is the Sergeant of - see I don't know if he's the Crime yet - he was Patrol Sergeant in Towanda and upon this next transfer, he'll be the Crime Sergeant, but he's in Towanda right now.

DUBY:    He's in Towanda?

ZELINSKI:    Yeah.

DUBY:    Okay.

ZELINSKI:    The barracks number, do you want that?

DUBY:    No, I have it.

ZELINSKI:    You got it? Okay.

DUBY:    So he was present and then Trooper Al WEISS, who's in Patrol . . .

ZELINSKI:    Al WEISS, he was behind me and saw the whole thing. He's in Patrol at PSP Tunkhannock.

DUBY:    Okay, so he saw it and so did Trooper DEGNAN.

ZELINSKI:    Yes.

DUBY:    Or Corporal DEGNAN.

ZELINSKI:    Corporal DEGNAN, at the time, now he's a Sergeant.

DUBY:    Okay.

ZELINSKI:    But he's the one that shot it. He walked in with a shotgun and he was - and Al could attest to that - I really think that's how I hit my wrist was that he just knocked me out of, you know, and umm, because I was still drawing down on it and I just - he had a shotgun, which was good, and I

moved out of the way and then he had, as far as I was concerned, that situation.

Then Trooper SPAGNOLA and I went and cleared the rest, because the rest of the upstairs floor was not cleared and safe. So as soon as this was over, I walked outside and I realized my wrist was bleeding a little bit. I had a cut, umm, but it was sore.

And we then went to another location to hit the second house that there was supposedly Rottweilers at, Pitbull. I think there were two Rottweilers. Went there, went with Trooper SPAGNOLA, Trooper Al WEISS, and cleared the whole upstairs on that at that location. Umm, we were able to contain the dog and the owner, who we arrested. I believe we arrested her. We were able to control that situation. SPCA came. So we finished clearing the upstairs and came down and I just uh, proceeded to take care of evidence and interviews and searching and so forth.

At that time my wrist was really throbbing. So I told Corporal ALTIERI, and Corporal ALTIERI said uh, I asked him at that time, I said, "Am I gonna be investigated over this," you know. And I was, you know, that was like the furthest thing from my mind. We were just talking and that, and he said, "I don't know."

DUBY:      Okay.

ZELINSKI:  All right. I said, "You know, I just," I said, "I don't think I, you know, I don't think anything's broken." I said, "My wrist really hurts." So once everything was squared away at that location, Trooper WIGLEY took me to the hospital. And I was there for awhile waiting probably in the emergency room . And uh, he thought it may be fractured and it turned out to be fine. He just put a setting on it. No big deal.

We went back to the barracks and I did uh, like a Work Injury, I think, report, or something like that. I helped Corporal ALTIERI with that. And the other guys, apparently they had information about marijuana coming in, being from one of the people they arrested at the Martz bus terminal in Wilkes-Barre. So Dan had left and went there to meet Trooper WEINSTOCK and Trooper MURRAY, and I believe that there was a problem with that because Corporal ALTIERI told them to stay out, which they did. And then they didn't make - they weren't able to like further that investigation, either make an arrest or find anything else out and he refused to pay (inaudible) for that. So that was that.

DUBY:      Okay, and as a result of that, were you blamed for that search warrant?



ZELINSKI:    Yes, I was.

DUBY:    Who blamed you for that?

ZELINSKI:    It was Corporal ALTIERI and Trooper WEINSTOCK. We had a debriefing on March 6th, I believe it was the Tuesday after that search warrant was served. And I was present and Dan WIGLEY was present and Corporal ALTIERI. Those were the only BDLE members. And then there was uh, Lieutenant MENDOFIK, and I'm not certain who else was present. But umm, I think I upset Lou by something I said during the meeting, which was Lieutenant MENDOFIK went around to critique things, which was very good to do, and uh, for criticisms of anything. I said I thought, you know, everybody performed well together. We went to that other location and cleared it, no problem. Umm, I said we should've had more BDLE members present there because of, just the other training that we've had. And as far as I knew, no one took it in an offensive way.

So that was March 6th. March 4, or excuse me then, I was there almost a whole month. I went on vacation for the first week in April. I came back April 14th, which I believe was a Friday. I'm in the office and MURRAY called me. And this time, maybe two weeks prior to that, MURRAY went on another wiretap in Bloomsburg's area in support of Troop N Vice wire. And he was the only one from our unit that went. He called me. He said, "Laura," he said, "why - a couple of the guys here were saying," meaning Troop N TNT members, which were Jimmy HISCHAR, Dave DARROUGH, Tommy TOLAN. WEINSTOCK, I guess, was up there for whatever reason, or maybe saw them at the Area II office and said that I got out of a BPR, that I should've been BPR'd over that whole incident, that it was my fault, that Patrol would not do search warrants with us.

That's the first I heard of anything. I said, "Seen, who told you this?" He said, "I heard that from those guys." Trooper MADIGAN also asked me about it. Trooper Nick MADIGAN is a TNT member in Troop F. He's had extensive dealings with Corporal ALTIERI, in the past when he worked for him in the Crime Room in Towanda. I called Nick, I mean, and I said to Nick, you know, "What is being said here?" He said that he had heard that Lou made derogatory comments about me and that the reason why the Patrol Unit would not serve search warrants with me or with the TNT Unit was because of what I have done or the negative comments I said.

He kind of, I think, said that uh, I said I wouldn't serve them with Patrol because they weren't trained properly, and that is not at all what I said. I know I did not say that. I would never hurt anybody like that. And I didn't feel that way or I wouldn't of gone to that other location or - so I'm like, that's it. I'm gonna call a spade a spade here. So Rich came in, and I

104

59...62

know he was standing outside of the doorway of our office. I was in the Vice area. I said to Rich, I said, "What is being said here?" I said, "Did you hear anything about these comments being made about Patrol not wanting to serve search warrants with us because of me, the comments I made?" Sean MURRAY told me that time directly Rich had said that on three occasions, that Patrol would not serve search warrants because of my comments. He looked at me like this, "You may want to ask him," and Lou was standing in the doorway.

So Lou walked in at that point. I said, "What's going on here?" He said, "Oh, I meant to talk to you about that." I said, "About what?" And I think there were other Vice Unit members around, but they uh, they did not have a good relationship with Trooper WEINSTOCK and Corporal ALTIERI. I think some of them left at that point. I said, "What's being said here?" And he told me, he said, "You're the reason why." Just right out like that, "You're the reason why Patrol won't serve search warrants." I said, "I think they won't serve search warrants because it was poorly planned." And I just - I said that to him right then and there. He said, "Do not go around and ask people. You're gonna upset people." I said, "Corporal ALTIERI," I said, "if I made a mistake, if I've offended anybody, I want to apologize to them about it. You know, I would never insult anybody." He said, "Do not talk to anybody about it. You're gonna make the situation worse."

At that point I, you know, I was shocked. I walked out of the office and I ran into Corporal Gary THOMAS, who is the Crime Room Supervisor, and I said to Gary, I said, "Did you hear anything about this?" He said, "I heard some rumblings about it, but I think he heard it from Rich. I said, "I can't believe this, you know." I said, I told him what they kind of just threw on me. So I walked away...

DUBY:     So you talked to him about the allegation that Patrol members wouldn't serve search warrants with you, because of you?

ZELINSKI:  Yeah, he said, "I heard some rumblings," but I think he said he heard it from WEINSTOCK.

DUBY:     Okay.

ZELINSKI:  So I was so upset and at that point, I went into the Patrol Room area at Wyoming and as I would find out, Lou sent WEINSTOCK out there to talk to Gary to see what I said to him, and I'll tell you how I found that out.

But in the meantime, I go in and the first person I run into is Lieutenant MENDOFIK, and he's a straight shooter. He was the Lieutenant in Patrol

at the time. And I said, "Could I talk to you for a minute, sir?" And umm, we went in his room, his office, and I told him, I said, "I want to apologize to you from the bottom of my heart, that I never meant to insult anybody, if I did." And he said, "Laura, where is this coming from?" And I told him what Lou just told me. He said he just gave me the bad scoop, and he went to pick up the phone and I saw Lou leaving the garage area in his car. I said, "Sir, I think he's just leaving." So he hung up the phone and he said to me, you know, uh, "The reason why Patrol won't serve search warrants is because it was poorly planned, it was a rush deal." He indicated that he was aware of problems with Corporal ALTIERI and WEINSTOCK.

And umm, Nick GUSHKA, the Vice Corporal, that night when we got back, when I got back from the hospital, MURRAY was there, and WIGLEY brought me back from the hospital. This is prior to them going to the Martz terminal. MURRAY said, "You're not gonna believe what Lou just did." I said, "What?" He said, "Lou called Captain DUIGNAN." What had happened was when the shots were fired in the city, it was Lou's responsibility, I guess, to contact Wilkes-Barre City, then he didn't so. So when shots were fired, they responded. They're officers responded, shots fired. Which is dangerous, obviously. Lou blamed it on Nick. He called Captain DUIGNAN, and said, now this is from Sean, and of course from Nick. He told me the same thing, and said that Lou contacted Captain DUIGNAN. So Nick came in and Nick was upset. And you know, Nick just - he, he couldn't win, you know what I mean, and he just was like, "I can't," he said, "Did this happen?" He said, "I think this happened. I think Lou called DUIGNAN." And Nick said, "Now its all up at the front office. How does that make me look?"

And I know him and Lou had a conversation that night. And Lou - Nick told me, Lou admitted that he actually uh, called DUIGNAN and blamed it on Nick. Blamed on it Nick that Wilkes-Barre City wasn't contacted. He said he was gonna call DUIGNAN to rectify everything and Nick didn't trust Lou. So Lou talked to Carmen - Captain ALTAVILLA, who then called, I'm assuming, Major BLOCKER, to clear up this little situation. So basically, that's what MENDOFIK had conveyed to me.

DUBY:       So MENDOFIK told you that you were not to blame for the search warrant failure. It was because of poor planning.

ZELINSKI:   I said, "Did I say something in that meeting that. . . ." And so he said, "No, no one took like that, no one." And that was from the Lieutenant. And no one had come to me. I mean, I knew these guys almost - a lot of them - like you know, since I've been on the job. They're all good guys.

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 31 of 62

DUBY:        So how did it go around that, for lack of a better word, that they said that
             you insulted the Patrol guys?

ZELINSKI:    I believe it was WEINSTOCK.  And how did WEINSTOCK know that,
             because he was not at the meeting?  Where did he formulate that opinion
             from?  I believe it was Corporal ALTIERI.

DUBY:        Okay.  So there's a debriefing.  Corporal ALTIERI - it was a critique
             session, so to speak.  You made a comment about wanting to have, or
             you wished that you would've had more. . .

ZELINSKI:    More like BDLE members there or Vice Unit members.  I mean, they've
             done search warrants.  You know, just they're expertise just, you know,
             dealing with people like that, and intel.  You know, I didn't say any of that
             in the, at the meeting.  I didn't say the intel was poor.  I got there, I didn't
             even know who these people were, you know what I mean, or what we
             were dealing with.

DUBY:        So you leave and you go for about a month and come back and you find
             out that all this dissention's going on?

ZELINSKI:    Yes.

DUBY:        In which now you attribute to probably Corporal ALTIERI?

ZELINSKI:    Yes, most certainly.

DUBY:        And you see the Lieutenant about it and he's like, "No, that's not what
             happened."

ZELINSKI:    He's like, "You got the bad scoop."

DUBY:        Okay.

ZELINSKI:    So then umm, I go back into the office and my Nextel goes off and you
             have the two way radio, and WIGLEY was there, and it's Lou.  And Lou
             said, "Laura," and his voice was really funny, "don't go around and ask
             people about what happened.  Don't talk to anybody about it." He said,
             "What did you say to Gary THOMAS?" I said, I lied to him, I said, "I talked
             about my vacation." So I lied to Corporal ALTIERI then.  And uh, he said,
             he said, "Alright." The next thing, and I looked at Dan, and I said, "Look at
             what was going on here." And I told Dan what MENDOFIK had just told
             me.



So Lou calls me on my extension, the next thing I know, he went to the Area II office. He said, "Are you sure that's what you told Gary THOMAS?" I said, "Yes." So I lied again. And umm, he said, "Don't go anywhere. I want to see you before you leave." I said, "That's fine." And at this point, I was furious. You know what I mean, that he would do this to me. So he takes me - when he gets back - I wait for him. It was probably about three o'clock on that Friday. He takes me back to the CI informant room and he has a piece of paper and a pen. He said, "You lied to me." I said, "What'd ya mean?" And he said, "I know that you told Corporal THOMAS, you asked Corporal THOMAS about what happened." I said, "So what?"

I found out - I apologized to Gary THOMAS later. I said, "I'm sorry I involved you. I'm sorry Lou confronted you." He said, "It wasn't Lou." He said, "Laura, I'm sorry." He said, "WEINSTOCK, as soon as you walked away from me, WEINSTOCK came out," and asked him what I said. And I asked Rich about it later. I said, "I know what Lou made you do." He said, "I'm sorry. I shouldn't of done that for Lou."

DUBY:      And what did you actually say to Corporal THOMAS?

ZELINSKI:  I said, I said, "What have you been hearing about the search warrant," and so forth. I said, "Have you heard anything negative." And he told me, he indicated, "Yeah, there were rumblings," but like nothing really. And it made it sound like - he made it sound like it was coming from WEINSTOCK. He said it's nothing. So it was actually Rich that went out. As soon as I walked away from Gary, Lou sent him out there. "See what she's saying."

DUBY:      And at that point, you're talking to Lieutenant MENDOFIX about what happened and . . .

ZELINSKI:  Yes. Yes.

DUBY:      And then after you're done with that conversation, that's when Corporal ALTIERI contacts you?

ZELINSKI:  Yeah, he contacted me and was really funny. "Don't talk to anybody. What did you say to Gary?" And I said, "We talked about my vacation."

DUBY:      Okay. And you go into his office. He says that you lied to him and he has a piece of paper?

ZELINSKI:  Uh-huh. Yeah, he has a piece of paper and he draws a diagram from the dog shooting incident and he said, "You were at fault for this." He said,

"You should've been BPR'd." He said, "Captain DUIGNAN, Lieutenant LOMAX, Major BLOCKER, they're all aware of what happened," but for some reason, he said, my gun misfired. I said, "I aimed at it and fired." I said, I said, "I know what happened." And my unit, the rest of my unit members that day were not on that floor with me. My, like the essential members - WEINSTOCK, MURRAY, WIGLEY, ALTIERI. I don't know where they were. They were downstairs. WEINSTOCK was outside. He wasn't a witness. . .

DUBY:       So they weren't a witness to the shooting itself?

ZELINSKI:  No.

DUBY:       Do you know if the dog was ever wounded in the back of the leg?

ZELINSKI:  I don't believe so.

DUBY:       Okay.

ZELINSKI:  Corporal DEGNAN indicated to me, like right after it, he said, "I thought you shot it." There was fur that flew. And I don't know - I don't know if I grazed it. And I mean, this was the first time I've ever been interviewed really over it.

DUBY:       Yeah, well what happened to the dog after you guys left? Did the dog - was the dog taken away by anybody?

ZELINSKI:  I think the SPCA came for it, I want to say, because then I went to another house and served that search warrant at the other house. So I didn't stick around to see exactly who did what. I believe the SPCA removed it.

DUBY:       Okay.

ZELINSKI:  But he drew the diagram and said, "Your shot went here," and this is the first knowledge I had of anything that I may have done wrong at the shooting. He said, "You should've been BPR'd over it, but for some reason, you weren't." And he said, "I put a note in your file over that comment." I said, "You put a note in my file six weeks ago and you never told me about it?" I said, "What did the note say?" And he said, "Something to do with your," and that's how he said it, "something to do with your poor communication skills." I asked to see it and he didn't have the file. I mean, I don't know where they were keeping it at the time. I assume, like the Area II office. And he said, "It's in your file." He said he put it in. And. . .



DUBY:       So he didn't write this note out in front of you or ask you to sign anything then?

ZELINSKI:   No.  No, and then he said umm, that the Captain and Sergeant RUDA were all made aware of the comment that I made at that debriefing.  And you know, I said, "I never, ever would do that." And at this time, I didn't tell him, but I talked to Lieutenant MENDOFIK, and I kind of in the back of my mind, I just assumed maybe that he knew.  You know, I don't know if he went and researched everybody I talked to, you know.  I just let it go at that then.  But obviously, I was really upset.  And then after that, I mean. . .

DUBY:       And this specific comment that you think you made at the debriefing, do you remember what that was?

ZELINSKI:   I don't know what he thought I said.

DUBY:       Okay.

ZELINSKI:   I don't know exactly what  I, I mean I read, I got my copy of the complaint, which is interesting to see - all the denials, you know, obviously.  How they lied about things, one right after the other, you know, but I did  read what he thought I said.  That I made that negative - like just that Patrol wasn't trained and that we shouldn't serve search warrants.

DUBY:       And you didn't say that?

ZELINSKI:   No.

DUBY:       Okay.

ZELINSKI:   And Lieutenant MENDOFIK, he said, "No one perceived," he said, "I don't recall you saying anything like that.  I don't perceive it that way."

DUBY:       Your remark was pretty much, "I wish we would've had some more members?"

ZELINSKI:   More BDL - and I looked at Lou when I said that, and I just felt like he's upset with me for saying that.

DUBY:       Okay.  After you were transferred from BDLE, now you claim that Trooper WEINSTOCK said that you were transferred because of your paperwork?

ZELINSKI:   Yes.

DUBY:        And you also say that Corporal ALTIERI said that you were transferred because of being a liability from the March 3rd search? How did that information come about? Who told you about that?

ZELINSKI:    Sergeant RUDA also said that it was a personality conflict. So the three had different stories. I was told, not directly by Trooper Tyson HAVENS, but by Trooper Nick MADIGAN. Trooper Nick MADIGAN and Trooper Tyson HAVENS are TNT members in F, and they were both at the conference together, the BDLE conference, which I believe was in the end of September or early October. Trooper HAVENS was approached by WEINSTOCK, and said my paperwork was horrible. That's why I was removed.

DUBY:        WEINSTOCK told Trooper HAVENS that you were removed because of your paperwork?

ZELINSKI:    My paperwork.

DUBY:        And what did anybody say to Nick MADIGAN?

ZELINSKI:    HAVENS told MADIGAN that.

DUBY:        Oh, okay.

ZELINSKI:    Yeah, HAVENS then - I then spoke to HAVENS directly. I mean, he and I are acquaintances from work and so forth, but he didn't reach out to me and tell me that, MADIGAN did.

DUBY:        Okay, so HAVENS told you that WEINSTOCK came to him and said that you were transferred because of your paperwork?

ZELINSKI:    Uh-huh. HAVENS actually said it to MADIGAN. He never said that to me directly.

DUBY:        Oh, okay, MADIGAN said that to you?

ZELINSKI:    Yes.

DUBY:        Okay.

ZELINSKI:    But HAVENS will tell you that.

DUBY:        Okay, so MADIGAN said to you that HAVENS told him that WEINSTOCK said you were transferred because of your paperwork?



ZELINSKI:    Because of my paperwork.  He said it was terrible.  I know he told MURRAY after he moved, we had it coming.  We did it to ourselves.

DUBY:    Okay, so MADIGAN said that HAVENS told him that WEINSTOCK said that you were transferred because of your paperwork?

ZELINSKI:    Yes.

DUBY:    Okay, and how did the information about Corporal ALTIERI come out, as far as the end (inaudible)?

ZELINSKI:    Again, I mean I know he'll tell you what happened.  Umm, it was after I was removed, probably mid September.  Uh, I had a conversation with Joe NIGRO again about this.  Uh, he knew I was removed and he told me that, this was mid September, like just the other day he said, "I was in," uh, he was in the office with Corporal DYKES, his Corporal.  And Lou was on the phone with him.  And Lou told Corporal DYKES directly that I was a safety issue and that that's why I was removed.

DUBY:    Okay, so Corporal ALTIERI told Corporal DYKES. . .

ZELINSKI:    Yeah, I don't know if Corporal DYKES will say that, but that's what happened.  That's what Joe told me anyway.

DUBY:    That you were removed because of a safety issue?

ZELINSKI:    Yes.  I know that he said that to other people.  Umm, ask him - I mean, I know it came back to me quite a bit.

DUBY:    Okay, so I just want to make sure I have this right.

ZELINSKI:    Sure.

DUBY:    So Joe NIGRO told Corporal DYKES. . .

ZELINSKI:    No, he - Joe was present when Corporal ALTIERI called DYKES, and that's what he said, that that's the reason why I was removed.  Joe stood there, I guess, as they were talking, I don't know.  I don't know.

DUBY:    Why would he call Corporal DYKES?

ZELINSKI:    I don't know.  Maybe it was over. . .

DUBY:    Just a casual conversation maybe?

ATTACHMENT 104
PAGE 36 of 62

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 37 of 62

ZELINSKI:   Casual or maybe uh, over equipment or who knows, I don't know.

DUBY:       Okay.

ZELINSKI:   I don't know what they're relationship is. I'm sure a friendly Corporal relationship.

DUBY:       All right.

ZELINSKI:   And I know that Sergeant RUDA had that conversation with Joe SARKIS, saying that, "It was a personality conflict, we all know that."

DUBY:       And Sergeant RUDA told Joe SARKIS?

ZELINSKI:   Uh-huh.

DUBY:       And where's Joe out of?

ZELINSKI:   Right here. He's uh, he's a Corporal and he is the Corporal we filed - he's also the FOP president of this lodge. And we both, Dan WIGLEY and I, filed our grievances through him.

DUBY:       Okay, so RUDA told Sergeant or told Corporal SARKIS that you were removed because of a personality conflict?

ZELINSKI:   Personality conflict, uh-huh.

DUBY:       Okay, anything more to that? Have we pretty much covered that?

ZELINSKI:   Yeah, I think so.

DUBY:       On January 13th of 2000, did Corporal ALTIERI accuse you of refusing to work with Trooper WEINSTOCK?

ZELINSKI:   Yes, he did.

DUBY:       And uh. . .

ZELINSKI:   I know that he had told MURRAY that he was gonna pull all of our reports and look at who did surveillance for our drug purchases to see if WEINSTOCK was a part of any of them. Which you know my opinion was, you know, go ahead and I'll give you a reason for every single drug purchase, why he was not present.

DUBY:       Okay, it's because. . .

ZELINSKI:    I would ask him and he would not show up or he would not be there to ask. I mean, it's as simple as that.

DUBY:    July 7th of 2000, Corporal ALTIERI told you that you were being counseled for not having your charges prepared from the previous drug purchases and there was a safety issue on June 28th?

ZELINSKI:    Yes.

DUBY:    Okay, let's take that one at a time. What is the situation involving the charges not being prepared?

ZELINSKI:    Okay, he would - his standing order was to have charges prepared after every drug purchase. And mine were up-to-date and I told him that. I said they were, uh, in my desk. And his contention was with that, that was the reason we had umm, overtime issues the week of the DART program. And I was - we were scheduled noon to eight from Tuesday until Friday. And we were informed that we'd be doing this DART program late in the day, probably about six o'clock in the evening on Monday the 26th. We discussed it at our morning meeting. Uh, fiscal year was ending. They needed to get a DART program in for our area and one had not been done. I think Troop R was supposed to do one and couldn't get one in. So we had four days essentially to make it happen.

Umm, the 27th, I came in probably about four hours before my shift started to get caught up on paperwork. The informants that we were using were my informant. One in particular, I was gonna be used as the UC, in undercover for all the drug purchases.

Umm, because the end of the year was approaching, he wanted all our vouchers, GI's, everything to date. I mean, I had pending paperwork from the week before, drug purchases, and so forth. I came in on my own time to get caught up. And I stayed late the next day, or that night when we returned, an extra maybe two hours, never put in for anything for those hours. He's saying that the reason I was coming in was to prepare. WEINSTOCK and I did not - he addressed that at that meeting with me on the 7th - he said, "You and WEINSTOCK did not have your charges prepared."

DUBY:    Was it you and WEINSTOCK, or you and WIGLEY?

ZELINSKI:    He said me and WEINSTOCK.

DUBY:    Oh, okay. All right.

ZELINSKI:    And I said, "They were prepared. They were in my desk." I mean, if - if that's what his bone of contention is, I didn't put in for anything on the 27th, any hours. And it was Wednes - and that's what his argument is, that we - I came in early that day to do old charges, which were already up-to-date, and I never even put in for any time for the hours that I was in there doing everything to prepare for umm, this DART program. So the 28th, again, he got into - he said, "I'm counseling you for that." And I told him that they were done. He said, "No, they weren't. You and WEINSTOCK did not have your charges done." I said, "Yes, they were." I mean, go back and forth about it, you know.

So then the next day, we were using one informant in particular. It was a female. And what happened with the safety issue, on the day of the 28th, we got out there, we got everybody set up with surveillance. And what we would do, we would call these people from the informant's house. And I was in charge of all the vouchers, all the evidence, all the property records. When we would make these buys and we would - he wanted us to do six or seven buys per evening. He wanted us to do like two targets per night and I mean, I could see on the 27th that that wasn't gonna happen. I mean, we were running our behinds off and you know, we're just doing the best that we could.

So we went out there on Wednesday, and the first purchase that we set up, I was buying from this individual named Josehan (phonetic sp.), and I was meeting him behind a bar. This was the day of the 28th, the safety issue.

DUBY:    Okay.

ZELINSKI:    And I was with the informant and I was in Sean MURRAY's undercover car, which was like a Grand Prix. It had been seen around town quite a bit, you know. I was driving. The informant was in the passenger seat. This target, Josehan, got in the backseat. We did the buy. He made the exchange with me directly. We went for a ride and then we dropped him off on the street further away.

But prior to us dropping him off, we had passed by a residence on South Franklin Street in Wilkes-Barre, and I looked over and recognized this other target. Well he waved at us, and he wasn't waving at the informant or myself. He was waving at the guy in the backseat. And we didn't know they knew each other, but they knew each other. This individual that was on the porch, his name was Oodie (phonetic sp.).

Umm, PSP Wyoming was just about to arrest him for a shooting that had taken place probably uh, the week prior at a bar in Plymouth Town or Plymouth Borough. And I assisted and we all had assisted in the investigation with that, just trying to talk to informants, see what information they had. It was definitely him that did it. Umm, the arrest warrant was about to be issued. So we knew he was a bad actor. Uh, he had been involved in a shooting a few years ago, possibly a murder. So later on, when we get back to the informant's place, I take care of all the evidence. I notify everybody about the buy. Told Sean MURRAY, I know, and I, I don't know who else I may have related to, possibly WEINSTOCK, of what took place there, a little recognition between the targets.

We then placed a call to Victor DIAZ (phonetic sp.). Victor DIAZ, I had made three, I think hand to hands to at that time. I assumed he was gonna show up by himself, you know. Never had any problem dealing with him. The informant would be present with me and he would deal with me, no problem. Well we were to meet him probably just down the street from the informant's home. So the informant and I walked down to the end of the street. A car pulls up and who's driving but this Oodie, the shooter. Victor's in the passenger seat.

DUBY:     And you had no knowledge that this would happen then?

ZELINSKI:  We didn't know that they knew each other. We had no intel stating that. Umm, we had just seen him and he - if he had half a brain in his head, he'd be like, "They were just down there with this guy in the backseat. God knows, they were probably buying drugs. Why are they calling him." I mean, these are the thoughts that were going through my mind. I thought I was compromised. I thought I was done.

DUBY:     Okay, let me stop you right there. I want to change tapes here real quick.

- TAPE 2, SIDE A -

DUBY:     Okay, it's 1332 hours, and we're continuing with the interview.

ZELINSKI:  Okay. At that point, I felt that I was compromised, these two characters, Oodie and Victor DIAZ. The informant and I were standing there and they drove right past us and looked hard at us. And the informant and I just looked at each other, "This isn't good." MURRAY, WIGLEY, uh, I believe WEINSTOCK, I can't really say who else would've been out on surveillance at that time, uh, they apparently went around the block and they came back and they rolled down, Oodie rolled down the driver's side window and the informant and I began to approach the vehicle and he looked at me, or Victor the passenger, looked at me and said, "No, not you

- her." And I thought this isn't good. So the informant then got in the backseat and they drove off. And I mean I was very concerned. Uh, a short time later, she was walking down one of the side streets towards me and she was visibly shaken. We walked back to her house and I called the unit members in and I told them what happened. I said, "This is not good. We're fishing in the same barrel of targets essentially right now and some know each other - we weren't even aware of at that time.

DUBY:       Now was Trooper WEINSTOCK involved in this thing too?

ZELINSKI:   Yes. I said we can't - I said, "We're gonna have to call it this evening." I said, "If we progress any further, we don't know who's going to show up next." At that time I thought I was compromised. I thought it may all be over. I believe MURRAY had contacted Corporal ALTIERI at that time and uh, relayed what had happened. We then met back at the PSP Wyoming barracks and all the unit members had a meeting. Trooper PATTON, who's with TNT F Intel, he has an Intel position with BDLE, he was in an adjoining room as well as Trooper SEIDEL. Trooper SEIDEL left before we started this meeting, and we just discussed the safety issue. And MURRAY placed another call to Lou ALTIERI. Lou ALTIERI didn't believe that there was a safety issue, and it was my understanding that Sean told him what happened. Lou ALTIERI never asked me, the UC that was out there. Umm, Corporal ALTIERI worked nine to five that whole week. I mean, he wasn't out there with us on any drug purchases, per se.

DUBY:       What time was this meeting?

ZELINSKI:   Oh, I would say it was umm, I don't - seven thirty, eight o'clock at night.

DUBY:       And what time would you've been done?

ZELINSKI:   Uh, probably about eight o'clock, maybe it would've been prior to that.

DUBY:       So it was close to eight?

ZELINSKI:   It was close. It was close.

DUBY:       Close to the end of you shift?

ZELINSKI:   Definitely. Umm, and I said, after MURRAY said that, that Lou, you know, wanted us to go back out there, that two drug purchases weren't acceptable for the evening. I said, "Look, if Lou isn't going to listen to our arguments for the safety issue here, I think we should go to Sergeant RUDA," and WEINSTOCK said, "No. No, we cannot do that." He spoke up about it. So we as the unit decided to just call it quits for the night after

what happened. Just let it lie overnight and see what would happen tomorrow, the next day. So I stayed at the barracks probably another two hours just working on paperwork that evening and doing the paperwork that was necessary for the drug purchases that we had performed, putting in evidence and so forth.

The next day, I arrived at about ten o'clock, this is the 29[th,] and Dan WIGLEY wasn't there, MURRAY was. He said that Lou and Rich were arraigning an individual at TUPPER's (phonetic sp.) office. Umm, they paged - Lou had paged PATTON to meet them at TUPPER's office. This is PATTON, who overheard the whole conversation that the unit member's had. He was in an adjoining room. His name is Bill PATTON. Umm, what happened, as we came to find out, Lou put it to PATTON umm, "There were Vice members that overheard what was discussed. You tell me what was said last night." Nick GUSHKA had made a call then to Lou to say - there were no Vice members in the building - umm, he just wanted PATTON to say what happened. Then they essentially, I don't know, uh, they came back.

Dan had to go and pick up the informants. Lou wanted to interview them. So around the same time that Dan came back with the informants, Lou and Rich came back to the station. It was Rich that told Lou everything that was discussed at that meeting. And I'll get into the reason why I feel that way, but Lou apparently informed the informants what happened. And I still didn't know this until that point was that the informants were later contacted by that Victor DIAZ, I guess maybe overnight, and apparently Oodie and Victor DIAZ were fighting over me. And I didn't know that, you know, that evening. We would never would've called it off if I thought that was the problem. I probably would've tried to buy more, you know, but that's what was put to Lou. So Lou said, "There was no safety issue, and you knew there was no safety issue."

He called the meeting at about five thirty. In between that time and five thirty, there's two computers in our office, we were all in the computers. We were typing charges, we were going back and forth from the magistrate's office getting warrants crunched for the following day for the roundup. We were doing initial reports, we were doing vouchers, we were doing GI's. I was doing supplementals for the informant histories. I mean, we're still so far in the hole with paperwork. So he called the meeting about five thirty, which again, he reiterated that he thought we were lying about the safety issue. He asked if there were any additional issues and Dan and I both spoke up. And he looked right at me, pointed at me, "You wait your turn." And Dan was very upset. We all were, because at that time it just seemed to me that he didn't care about our safety. If he



thought that there was a question with the safety issue, why didn't he ask me? Why didn't he ask Dan? He talked to WEINSTOCK about it.

So he said that there was a buy that we knew about that happened. He said that Dan and I knew about a buy, that it either happened on the 27th or 28th, that one of the informants in the couple, the husband, had walked out and met with someone and I mean, it could've - maybe it did happen. I'm not saying that it didn't. WIGLEY was out on surveillance. He wasn't around the building at all. I know I was on the phone. I was taking care of evidence. I was trying to call up targets. If he walked out, I didn't notice it. But he swore up and down that Dan and I knew about it. And I said - we had a one on one meeting, and I said that I didn't. But that's the meeting he finally came around to me then and I said - he asked if I was unhappy and I said, "Yes, I am unhappy." I said, "We had the safety issue last night." I said, "It wasn't a matter of going out and making drug purchases." I said, "I felt I was compromised."

He again reiterated, "No, there was no safety issue." And then he said, he asked me if there were any other problems and I said that uh, prior, a month or like two weeks prior, Sean MURRAY and I had done a drug purchase in Wyoming County. And it went well. I made a direct purchase of marijuana from a target and I was in with this group. No problem with this informant. Well, right after that WEINSTOCK was told that he was the only one that would work with MURRAY in Wyoming County. So I took it, you know, this opportunity to address it with Lou. I said, "Why is it that, why am I not involved with hopefully furthering an investigation in Wyoming County?" "It's none of your business," he told me. So umm, you know that was pretty much the end of that meeting.

DUBY:    Where did the overtime issue come into play?

ZELINSKI:    Umm, he said that we did not have prior authorization to be in uh, working those hours that we did. There was probably double the hours. I think I put in for eight hours that were denied. I probably worked double that and didn't put in for it. He saw us every morning in the building uh, doing our work. He then discussed the 29th, in between the time the informants were there and the meeting, he was discussing with Sean MURRAY our comp time and how we would be - initially in the beginning of the week, he said that comp umm, hours for comp, extra hours that we'd work, would be discussed later.

DUBY:    Did he have a system of comp time in his unit?

ZELINSKI:    Yes. He said that we would not rape the State. He said that if we were to go out and work hours beyond our shift, that if we got something out of it,

meaning an arrest, that's the way I interpreted it, that we could take overtime. But if we didn't get anything, we would eat those hours. And that's what often would happen.

DUBY:     So you wouldn't get like comp time. It was just kind of like, "Oh well, it happened," or. . .

ZELINSKI:     Yeah. And he wouldn't uh, as far as the overtime, there may be a handful of times that we did receive overtime as I was in the unit, the whole time I was in the unit, I would say. But he discussed the comp issue in front of me with Sean MURRAY. And he said the following week, it was the fourth of July week, uh, the fourth of July fell on Tuesday last year. He said Monday, we'd be on regular days off Saturday and Sunday. He said Monday would be an "A" day, Tuesday would be the holiday, and Wednesday through Friday we would take comp time.

DUBY:     Okay, so comp time was basically an acceptable practice in the unit then?

ZELINSKI:     Yeah, yeah.

DUBY:     Okay.

ZELINSKI:     And I mean at that time, you know, by the time Friday rolled around and especially after that meeting, I mean if the writing wasn't on the wall before, then it certainly was. I just felt taking comp time - if something were to happen, if I were to be seen by a member of the brass or a noncom on comp day, "where are you," or if they called Corporal ALTIERI, I think Corporal ALTIERI would say, "I don't know where they are," you know.

DUBY:     Let's talk briefly about a refusal to sign off on a drug purchase that WEINSTOCK had made, because you weren't present. Can you tell me a little bit about that?

ZELINSKI:     I think, upon reading that, umm, I received that then, a copy of that from the individual that did the complaint in Human Relations. I think that was Ron, the way she stated that. Umm, I think what she meant, there was a letter, and this is the way I related to her. There was a letter that uh, Corporal ALTIERI wanted MURRAY to sign off on about that buy that Dan and I didn't know anything about. And MURRAY, to my knowledge, refused to sign off on it. He said that Laura and Dan did not know about that buy. He said I did, and I mean, I don't know if Sean just said I did to put the brakes on it. But that, that was a mistake, I think, in the actual complaint that I didn't catch. But I, I remember relating it to her, I believe that's what I had meant.

ATTACHMENT 104
44  62

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 45 of 62

DUBY:        So this is not the situation where you have to fill out that paperwork because you gave an informant money and those things?

ZELINSKI:    Yeah, there was no problem. I was doing buys for Rich. I mean, I gave him targets, you know, and I just did the buys for him. I did all the subsequent paperwork. All he had to do was, you know, the initial, the complaint itself.

DUBY:        So this was a thing that Corporal ALTIERI wanted Trooper MURRAY to sign then?

ZELINSKI:    Yeah, I think he comprised the letter saying - I think he just wanted to hang Dan and I on that buy.

DUBY:        And which buy would you be referring to?

ZELINSKI:    I'm not sure what day or if it even took place. I really don't know, but yeah, I read that when I received umm, the complaint in the - and I didn't know what it was even talking about and I had to go back and look at the grievance and uh, I don't know where she got that from, but that was a mistake, I think.

DUBY:        Okay. All right. And did Corporal ALTIERI accuse you of not being a team player?

ZELINSKI:    No, not at uh - we did have a subsequent meeting on the 7th, and that was because on the 6th, I came into work and he realized we came into work that week instead of taking the comp time. The timesheet was off my desk. And he saw what I had put in for the following, the previous week during the DART, and he called a meeting with me for the 7th. It was the end of the day on the 6th. He said, "I want you to report at eight o'clock tomorrow morning for a meeting."

DUBY:        Okay.

ZELINSKI:    So uh, no, he never - in January, he said that he didn't feel we were including WEINSTOCK, but I mean, here we were, and not for nothing, but I was you know, doing all those buys and I was giving Rich targets and, you know, with my informants. I never had, "You can't use my informants." He, on the other hand, I wasn't privy to any of his investigations. I was not welcome to come with him on any investigations. I would've been the UC on any, if it was easier for a female to get in with a target, you know I would've helped him out. I, I really feel he knew that.

DUBY:       All right.  And you contacted union president, Trooper PLANT, to discuss some problems with Corporal ALTIERI?

ZELINSKI:   Yes.  It was immediately after the meeting on the 7th, and I told him uh, about these allegations, about what happened.  I said - during that meeting on the 29th, that we had with Corporal ALTIERI, he also said - he looked, he pointed right at me and he said, "I know you want to go to see Sergeant RUDA," and I know he got that from Rich, because Rich was present at the meeting the night before.  And I said, you know, flat out, I said - I couldn't deny it, I said, "Yes, I did."  And he said, "If you're thinking about going to Sergeant RUDA," he said, "Captain DUIGNAN, Major BLOCKER, Lieutenant LOMAX, they're all on board.  Don't think of bucking the chain of command."

DUBY:       This is about the shooting incident then, right?

ZELINSKI:   No, this was about umm, the safety issue.

DUBY:       Oh, about the safety issue?

ZELINSKI:   Yeah, and that meeting umm, when he said that comment, was the 29th of June.

DUBY:       That would've been about the overtime and the whole issue?

ZELINSKI:   All that.  Well, overtime wasn't brought up then because he didn't realize, you know, that we're going to put in for the hours we worked.  And uh, that - the overtime issue, when he asked me to change my timesheet and denied my overtime was on the 7th, when I met with him.

            Immediately after that meeting, I went to talk to PLANT about it.  And I told PLANT there's threats, there's intimidation.  I said, "This is what's going on here."  He said, "As FOP president, I'll contact Sergeant RUDA, and I'd like to arrange a meeting, you know, with Sergeant RUDA and anyone that has complaints," and there were quite a few of us.

            Wendell MORRIS, he was the Corporal in TNT and F, uh, he apparently - Corporal ALTIERI was the acting Sergeant for a time from November say of 99, to maybe January of 2000.  I think those were the dates.  Sergeant RUDA was away on another investigation.  And he wanted Corporal MORRIS, Lou ALTIERI wanted Corporal MORRIS to change Wendell's, or pardon me, to change Trooper MADIGAN's evaluation.  Uh, Corporal Wendell MORRIS handed in a very favorable evaluation of Nick MADIGAN, and Lou wanted him to change it.

This was also the time - Trooper MADIGAN lives in Towanda, as well as Trooper ADAMS, Mike ADAMS, who's now my partner in Vice Unit. And so there's two different units there, Vice, and MADIGAN's in TNT. But because they live so close together in the sticks, you know, when they would have an investigation, they'd back each other up. And sometimes their investigations would overlap. Well, there came a time when Nick MADIGAN assisted Mike ADAMS with a buy and put in for overtime for it, and Wendell attempted to submit the overtime. Lou wouldn't approve of it because he said that TNT would not be paid overtime for assisting a Vice member. So that's why Wendell wanted to be there.

Nick GUSHKA wanted to be there for uh, various issues. The three other additional unit members, myself, WIGLEY, MURRAY, umm, I believe Mike ADAMS, and those were the people - I believe he named them to Sergeant RUDA, and Sergeant RUDA declined to have a meeting. So, and that was I believe the 18th, he declined to have a meeting.

DUBY:       July 18th, 2000?

ZELINSKI:   Uh-huh.

DUBY:       Okay. Please tell me a little bit about the uh, your meeting with Sergeant RUDA, in which you claim that he told you that you would have to be sent to school and be retrained in the basic room entry.

ZELINSKI:   That was the 19th.

DUBY:       Of July?

ZELINSKI:   Of July of 2000.

DUBY:       Okay, please tell me a little bit about that. How did that come about?

ZELINSKI:   Umm, the meeting was - after I met with Corporal ALTIERI on July 7th, he said, "We will have a follow-up meeting with Sergeant RUDA." I said, "Alright." So I walked into the room and there was a chair right in front of Sergeant RUDA's desk and Lou was sitting on the side.

DUBY:       So it was just the three of you?

ZELINSKI:   Three of us. And Corporal ALTIERI said, "I never authorized - I've never given out overtime," or excuse me, "comp time. Never." Sergeant RUDA said, and I could just feel they were very upset with me for putting in for overtime.

DUBY:      So comp time was basically an accepted practice within the unit, but Corporal ALTIERI denies it ever even exists?

ZELINSKI:  Denied it, ever giving it, yes, ever giving it.  He said, "I never offered overtime, ever."

DUBY:      Overtime or comp time?

ZELINSKI:  Comp time, I'm sorry.

DUBY:      Comp time, okay, not a problem.

ZELINSKI:  Sorry.  "I've never given comp time."  So Sergeant RUDA said uh, I could feel that they were very upset with me for putting in for overtime and I said, "I only put in for the hours that I worked."  I said, "Corporal ALTIERI knew that I was present, okay, for those hours that I worked."  He said, "Well I'm denying your overtime."  Sergeant RUDA said that.  I said, "Am I being counseled?  Am I going to be counseled?"  I said, "I have my charges prepared," and I said, "I'd like to know if Trooper WEINSTOCK and I are being counseling for not having our charges prepared."  And at that time, Lou said, "Yes, you'll be counseled.  That will be dealt with," something to that effect, but I would be counseled.

DUBY:      Was there a conversation about whether or not you officially requested the overtime, essentially, a pre-approval of the overtime?

ZELINSKI:  He said that umm, I did not.  Corporal ALTIERI said, "I did not approve."

DUBY:      Did not get prior approval for the overtime?

ZELINSKI:  Right, he did say that.

DUBY:      Okay.

ZELINSKI:  Umm, I said – and that's when I said I was – "You knew I was in there those hours, and the work that it entailed, and there were probably "X" amount of hours, double than what I put in, that I didn't put in for."  I think he was hinging it on me not having my charges filed, which all the work that was involved of that week, I mean there just – there wasn't enough time.

DUBY:      So you didn't specifically ask Corporal ALTIERI if you could have some overtime to write these charges up or whatever to do paperwork?

ZELINSKI:    Right, no, no. And the day that he actually said that, the 27th that he said that I would've been in there typing those charges, I didn't put in for any overtime that day on the 27th.

DUBY:    Okay. I know when I worked in the Crime Room, I very rarely ever got pre-approval for overtime. I just worked it and then I put in for it and it was either accepted or whatever. So this is pretty much the same thing, he knew that you were in the office. You were working. You simply put in for the overtime. You never asked for prior approval, you just did it.

ZELINSKI:    No, no, I just - and again, umm, it was a situation I believe with uh, taking comp time. I didn't feel that it was right. So then umm, I asked him about the counseling statement. He then said, umm, or Sergeant RUDA presented me with some paperwork and it was an application for a basic search entry - like building search class that was going to happen in November at the Academy. Umm, I asked him why I would have to. I reviewed it. I was kind of dumbfounded about it. I asked why I would need to put in for this. And he was just, "You know why." And umm, he said, "You know why." And I said, "Am I the only one from my unit that will have to go to this?" He said, "Yes." And he said, uh, something to the effect that, "You know why," again, "with the Supervisory Inquiry that was done against you." And I had no knowledge of that. And I looked over at Lou, and he just looked at me and smirked. And uh. . .

DUBY:    So what he's referring to on the inquiry, you're thinking about the shooting incident then?

ZELINSKI:    That's what I'm thinking. That's what I uh, I felt that I was being sent to that class for.

DUBY:    You had no knowledge of any kind of an investigation being conducted?

ZELINSKI:    No, I knew that from my conversation with Lou, that he wanted to have me BPR'd for it and it wasn't BPR'd. So I didn't - I knew that's what he meant, but I didn't really know why. So at that time, Sergeant RUDA asked Lou to leave, and Lou was very hesitant to not want to leave the room, and he left the room. And he said, "Don't take this personally. I think you're doing a good job," and that was it. And just felt very uncomfortable with both of them.

DUBY:    Did he ever use the word "retrained" or did - or is that pretty much the wording in the complaint?

ZELINSKI:    I think that's the wording in the complaint. He said I - He said, "I think that you should go to this class." This is - those were his words. He didn't. . .

DUBY:       I think he said it to me, he suggested that the school would be good for you. To go to this class would be good for you.

ZELINSKI:   Okay. He didn't say that to me. He kind of expounded that uh, he didn't expound upon the point, he just said, "You should go to this class."

DUBY:       Okay, he said, "I'm sending you to this class and you should go to it."

ZELINSKI:   "You should go to it," like I had no - my feelings were if I were to contest it, there would be a problem.

DUBY:       Okay, so the word "retrained" was not used. It was just like, "You should go to this class?"

ZELINSKI:   "You should go to this class."

DUBY:       "Here's the paperwork."

ZELINSKI:   Yes, and he didn't get into, and I didn't ask any further questions. I could see that the case was kind of closed on it.

DUBY:       Did he make it clear that this wasn't discipline or anything like that, or it's just basically, "You're gonna go," and that. . .

ZELINSKI:   "You're just gonna go."

DUBY:       Okay. He didn't say it was a form of discipline or punishment or anything like that?

ZELINSKI:   No, he didn't get into - he didn't say anything along those lines at all. He didn't say anything. He just said, "You're going to this class," basically.

DUBY:       Okay. We're almost done. Let's talk a little bit about the vehicle incident.

ZELINSKI:   Okay.

DUBY:       With Trooper SEIDEL, Trooper WIGLEY, and Trooper WEINSTOCK.

ZELINSKI:   Surely, sure. Umm, it was around this time though after this meeting, uh, it got back to me through Trooper MADIGAN, umm, Trooper ADAMS, who again, they work a lot out of the Towanda substation, and that's where Lou originally was in the Crime Room. And he has one or two friends in the Crime Room, and it did get back to me around this time that he was recruiting for our positions. And that was after the 18th, I found that out.

DUBY:         After July 18th?

ZELINSKI:     Yes. Uh, it was right after, the very next day, I believe we had a meeting
              here in Troop R. Trooper SHUTTER was conducting an investigation. It
              was like a small wire at the Skyview Apartments. A real problem area in
              Scranton district. We're going to assist him.

              And essentially to, just to uh, cut to the chase there, that Sunday umm,
              Sergeant RUDA was present. We had done buys and so forth and uh, we
              had to move things along. We had a home invasion at one point, and I
              was present for that and assisted. And uh, we then had to push along our
              roundup which was around, I want to say we worked maybe a ten day
              stretch, like around the 30th - maybe not, we didn't, no, it was prior to that.
              It was probably the weekend prior to that, we did the roundup. It was a
              Sunday, and we worked a three to eleven. And Sergeant RUDA was
              present, Corporal MURPHY, uh, SEIDEL as we mentioned, uh, all the
              team members from R. And Dan WIGLEY and I were requested again to
              stay up there throughout the duration. So we were requested by Corporal
              MURPHY, I believe.

              We needed WEINSTOCK's vehicle. WEINSTOCK was driving a Skylark
              at the time and it had tinted dark windows. So Dan and I went down to -
              he drove me down to the barracks on Sunday to pick it up. We picked it
              up and we took it to the staging area in Scranton. The staging area's all
              rocky and it's just a parking lot. So we dropped the car off and that was
              essentially it, with my contact with the car and Dan's. Uh, the very day,
              umm, and Sergeant RUDA was there when I brought it up and got out of
              the car and everything. The very next day, I believe it was SEIDEL came
              up to get a car. He brought WEINSTOCK up to get a car. WEINSTOCK
              was very upset. He was the acting, I guess at that time. Umm,
              WEINSTOCK knew where we were, absolutely.

DUBY:         He accused you of not knowing where you were?

ZELINSKI:     Yes, he did, at one point and that was - we had wrapped up everything.
              We had to go up for a subsequent roundup day just for another roundup day for
              service of arrest. And I believe it was the 31st, it was a Monday, Trooper
              SHUTTER reached out to me and said, "You and Dan may be needed to
              come up here tomorrow." I said, "Alright," and that was early in the
              morning. I let WEINSTOCK know. We were in the barracks at that time.
              So later in the day, Billy confirmed it with me, Trooper SHUTTER. He
              said, "I'm definitely gonna need you and Dan up here." Dan was in the car
              with me. I just got done interviewing an informant in Plymouth. I got on
              the Nextel. I called Rich. Sean MURRAY was in the car with Rich. I said,

"We're definitely going to Troop R," this would've been August 1st, to again with. He knew, no doubt in my mind.

DUBY: Did you ever talk to Sergeant RUDA about this? Did Sergeant RUDA ever call you and say, you know, where you guys were at or. . .

ZELINSKI: I was never questioned about anything. I know that umm, he talked to Dan and had an odd conversation with Dan. He said something in the effect to Dan WIGLEY, uh, "Does WEINSTOCK know where you are?" And I can't nail down the day. This is previous to August 1st though - or no, it was the day of August 1st. Dan said, "Yeah, of course he knows where we are." And uh, he said, "All right," and I forget what else was said between the two.

But back to like when I dropped that car off and Sergeant RUDA was present. I think it was the next day, WEINSTOCK called Kevin SEIDEL. And we were all standing there, myself, Corporal MURPHY, all of us, uh, Danny WIGLEY. Uh, he calls SEIDEL, and requests either Dan or myself to come down and back him up on a job that he was doing. And Dan - that's right, Dan wasn't there. Him and Al were out on uh, picking someone up at that time. So WEINSTOCK, being acting Corporal, doesn't call Corporal MURPHY. Doesn't call one of us that has our phones. He calls Kevin SEIDEL, you know, to have one of us come down and assist him. I was about to assist an arrest with females, so Dan WIGLEY went down and assisted Rich. But again, common courtesy, he doesn't even call Corporal MURPHY and MURPH, Corporal MURPHY said, "I will send Dan down." I had to go and do this thing.

So we go on a long weekend then I believe, and then that's when that transpired, the 31st to the 1st, we came back the 1st. Then we were in the office either the 2nd or the 3rd, and uh, Sean came in. He said, "Rich is furious with you guys." I said, "Why?" And he said, "The front of his car's all chipped up." And Sean said, "You know, I saw it and it seems like the paint is chipped up." I said, "Sean," I said, "we took his car up and that was it. You know, we didn't even utilize it after that." SEIDEL was umm, essentially why we had the car there, we had an informant and we would be dragging people out of Skyview. We'd run the informant through to ID these people. And that's why we needed a tinted out car. And Kevin SEIDEL's kind of the chauffeur that day with the informant. And I said, "We never - I would never," and he - I guess WEINSTOCK kind of relayed the information like we intentionally chipped his car, which we would never do and I was never questioned about, and I guess he called us "fuckers," and said we did it intentionally.

DUBY: So basically loose gravel from the lot that you were in caused the damage



ZELINSKI:    If that. If it wasn't already there. So I know that I believe that ALTIERI had mentioned to WIGLEY, WIGLEY told me this later on, he kind of stepped to him at point, either on the 1st or 2nd, and said, "What was the deal with the car?" Meaning, why didn't - WEINSTOCK was upset because of the one day he didn't have a car. And WIGLEY just said, "Well they requested it. Sergeant RUDA was there when we brought it up." I was never questioned about any damage or anything by anyone, Corporal ALTIERI or RUDA.

DUBY:    Do you know if Trooper WEINSTOCK did submit a letter to Sergeant RUDA about the damage to the car?

ZELINSKI:    Uh, again, that was relayed to me that he had.

DUBY:    And how did that come to you? Do you remember who that. . .

ZELINSKI:    Karen KLAUSE, who is the secretary at the Area II office.

DUBY:    Karen KLAUSE?

ZELINSKI:    Yes, its K-L-A-U-S-E. She's a civilian, the secretary there. Umm, she, I believe, to the best of my knowledge, told MURRAY that. That WEINSTOCK had submitted a 501 stating we damaged his vehicle, that he didn't know where we were, which was ridiculous.

DUBY:    So you believe that Karen told MURRAY that WEINSTOCK submitted a letter about the damage to the vehicle?

ZELINSKI:    Yes.

DUBY:    And that he didn't know where you were at?

ZELINSKI:    Yes, specifically on the 1st. I know he said that he didn't know where we were, and I advised him the 31st, you know, as soon as Billy or Trooper SHUTTER called me, I called WEINSTOCK, and told him Dan and I, both of us, are requested to be back up there. And I said, "That comes from Corporal MURPHY," and it did. And if he had a problem, I don't know why he didn't contact Corporal MURPHY, being that he was still the acting, I guess, at that time.

DUBY:    Okay, and the - I guess the final thing would really be, so tell me what happened when you went and saw Major BLOCKER. How'd that come about and what was said?

ZELINSKI:    Sure. The week after umm, that thing, it was the week of the first. The following week, I - I was - I guess a voice mail, Corporal ALTIERI left me a voice mail and the PSP Laporte barracks called me. They had an informant they wanted me to start, possibly roll or try to start an investigation with. And she definitely had a lot of contacts. So I spent the majority of the following week in Laporte umm, getting intel from this girl. She had targets in Bradford County, so this was in Sullivan County. I went to Bradford County, took some pictures, got some additional intel from the Crime members there. So I had - I wasn't even at, I don't think maybe but one day I was at the barracks the following week, the week of the 14th through the 18th, and both Trooper WIGLEY and I were on vacation.

We came in at ten o'clock or maybe nine o'clock Monday morning for the ten o'clock meeting. Umm, Sergeant RUDA called and wanted to speak to Trooper WIGLEY. And I believe that he told WIGLEY the same thing he told me, because WIGLEY passed the phone then to me. I could hear Dan saying, "Yes, Laura's here," and he shot it over to my extension and it was Sergeant RUDA, and he was very formal. And I - he said umm, "I need you to report as is, 1300 hours. Disregard your meeting with uh, Corporal ALTIERI, and head down to Harrisburg. Major BLOCKER wants to see you." And I guess, just foolishly, I thought you know, he got wind of everything and wants to talk about things.

DUBY:    So you and Trooper WIGLEY get in a car together. . .

ZELINSKI:    WIGLEY went down - and go down - uh-huh.

DUBY:    Okay, then what happened?

ZELINSKI:    Got there early, and went in and we were waiting and I saw, you know, Captain CONNON was there and umm, we got called in. And I knew as soon as I walked in, he had two letters, and I just knew one had my name on it, I guess.

DUBY:    Did you get called in together or separately?

ZELINSKI:    Yes, together.

DUBY:    Oh separate - okay, together, okay.

ZELINSKI:    As soon as I sat down, I had jeans and T-shirt on, I apologized for what I was wearing and he said, "That's not a problem." He said, "I want to notify you that your services are no longer required." He gave us our letters, to report the next day to our appropriate barracks or wherever. I can't - he said, "I can't," I don't know if Dan - I was in shock. I don't know if Dan

made a motion to say something, but he said, "I cannot answer any of your questions at this time." He was very formal. I don't think I said a word. I just got up and walked out.

DUBY:     He didn't request you to sign anything or. . .

ZELINSKI:  No. The letter just said August 22nd, report - and that was it.

DUBY:     Okay, he didn't expand on it as far as any kind of reasoning or, and he didn't give you a chance to explain?

ZELINSKI:  No. He said, "I cannot answer any of your questions," and that was it.

DUBY:     Okay. Is there anything else about that meeting that took place or happened that you didn't tell me about? Is that pretty much it? You get called down. You go in. He gives you the letter. Is that pretty much it?

ZELINSKI:  I think he said something, I mean I was in a state of shock. I mean, I think that he may have said uh, "Good luck in your careers," or something to that effect, and that was it.

DUBY:     Just a few more and then we're done. Trooper WEINSTOCK claims that you once gave him a hug and a kiss. Is that true?

ZELINSKI:  No, that is not true.

DUBY:     Okay. I think he was - this would've been like the evening of the bar incident, Rich and Charlotte's?

ZELINSKI:  Right. No.

DUBY:     Okay, and Corporal ALTIERI also claims that he observed you give Trooper WEINSTOCK a hug and a kiss. Is that true?

ZELINSKI:  No.

DUBY:     Okay. How long have you known Trooper WEINSTOCK, just since BDLE?

ZELINSKI:  Just since BDLE. He actually umm, prior to us entering, which was January of 99, I had tested, I think I was one of the first tested in that round, and he had called me. I was in Patrol in Shickshinny, and I had never met him, spoke to him before. I had heard about him. And he wants to know what questions were on the test for the BDLE. And I didn't even know who he was. And I said, "It was easy." I said, "You know, just

common sense stuff," and that's all I really said. And prior to that, I never met him. And I never saw him until the class in April.

DUBY:    What kind of Trooper is he?

ZELINSKI:    Umm, he's just the type of Trooper that has to let everybody know he has authority, that he's a cop. Uh, I don't believe he has any compassion. Umm, I think he uh, speaks before he really thinks about what he's saying, and I think he's uh, very self-centered in that he's a one-way street with uh, a lot of things.

DUBY:    How would you rate his character?

ZELINSKI:    Low, very low.

DUBY:    And how about his credibility?

ZELINSKI:    Very low.

DUBY:    And you consider him to be a friend or an enemy?

ZELINSKI:    I would say at this point an enemy.

DUBY:    Okay, and how long have you know Corporal ALTIERI?

ZELINSKI:    Umm, he was the Crime Supervisor when I first went to Towanda right out of the Academy. So since late 98.

DUBY:    And what kind of a Trooper is he?

ZELINSKI:    Umm, I can't really - as a supervisor, do you mean, or. . .

DUBY:    Well, some people say that when you ask that question, it's like, "Oh yeah, he's a good Trooper," or "He's a bad Trooper," "He's somebody I wouldn't want to be around with," or somebody that, "Oh, yeah, I would be around with them." It's just more of a personal opinion.

ZELINSKI:    Okay. Well he just - he's always made it clear that he is the supervisor and as a supervisor, I felt that he was very limited.

DUBY:    Okay. Do you think he was naïve to what was going on, or do you think he just knew what was going on and just stood by and left it happen?

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 57 of 62

ZELINSKI:    I think that initially umm, he liked WEINSTOCK. Then I feel that after I told him, he knew what was going on, I think he encouraged the whole environment at work through his relationship with WEINSTOCK.

DUBY:    And how would you rate his character?

ZELINSKI:    Low.

DUBY:    And how about his credibility?

ZELINSKI:    Very low.

DUBY:    Okay, and would you consider him a friend or an enemy too, pretty much?

ZELINSKI:    I would say an enemy.

DUBY:    And Trooper Sean MURRAY, how long have you known him?

ZELINSKI:    Uh, since I entered the unit, umm, around that time since very early 99. I would say of mid 99.

DUBY:    And what kind of a Trooper is he?

ZELINSKI:    He's a go-getter. He's a good Trooper.

DUBY:    And how would you rate his character and credibility?

ZELINSKI:    He has high character. He's a good-hearted man. His credibility's good.

DUBY:    And you consider him a friend also, I would imagine?

ZELINSKI:    Yes, I do.

DUBY:    And Trooper Daniel WIGLEY, how long have you known him?

ZELINSKI:    Same amount of time.

DUBY:    Same as Trooper MURRAY?

ZELINSKI:    Yes.

DUBY:    Okay, and what kind of Trooper is he?

ZELINSKI:    I think he's a very conscience Trooper.

DUBY:        And how would you rate his character?

ZELINSKI:    Very high. Very high.

DUBY:        And how about his credibility?

ZELINSKI:    Very good.

DUBY:        And you'd consider him a friend also?

ZELINSKI:    Yes, I would.

DUBY:        Most of this stuff you already covered during your interview.

ZELINSKI:    Oh yeah, the two tapes.

DUBY:        Oh, did you tell Sergeant RUDA about any problems that you were having with Trooper WEINSTOCK?

ZELINSKI:    No, I never directly spoke to him about it. Even when I went into that meeting, I just felt like the atmosphere, I felt uncomfortable speaking around Corporal ALTIERI. I know he asked Corporal ALTIERI to step out of the room, but I felt that door was already closed as far as being able to talk to him about it.

DUBY:        You would not have felt comfortable disclosing it?

ZELINSKI:    No, no.

DUBY:        Okay, and did you tell Lieutenant Paul MENDOFIK about any of the problems that you were having with Trooper WEINSTOCK?

ZELINSKI:    He was aware from Corporal GUSHKA that uh, WEINSTOCK and Lou were a problem. Umm, I, I didn't speak directly to him about these allegations, no. But just that I felt that uh, the line between Trooper and supervisor didn't exist. I mean, its one thing to be friendly and get along with your supervisor. I said, I think uh, its well over that line.

DUBY:        And did you tell Captain ALTAVILLA about any of the problems? When I say the problems, I should clarify - the sexual problems between Trooper WEINSTOCK and yourself?

ZELINSKI:    He and I never spoke directly about it, but I know it was uh, it was the same day, it was October 13th, when I had my interview with Lieutenant FRALEY. Uh, it was the first time I spoke to the Captain after I was

removed. And I was in his office and he had read what I had submitted and he was appalled pretty much by it. He didn't ask me specific questions and I didn't offer really any information.

DUBY: Okay. All right, did you ever tell Trooper SEIDEL about the comment that Trooper WEINSTOCK had made to you about being able to see down your sweater?

ZELINSKI: No, I did not.

DUBY: And you already told me that you talked to Jamie CLARK, and Trooper GUNTHER?

ZELINSKI: Yes. I think it was like later on, I told umm, Beth that, Trooper GUNTHER, that I told Lou.

DUBY: What did you actually tell Trooper GUNTHER? I don't think we talked about this. Did you tell her about the van incident and the Academy incident?

ZELINSKI: Yes, I told her. I don't know if I got into specific detail about locations, but she told me things that he had said that she - and she didn't even get into detail. She said that she was offended, you know, she's seven months pregnant. I said, "I've had the same problems with him." And I know later on, I did tell her, because that was after the wire, which was in September, and it was not long after then that I spoke to Lou ALTIERI about what had transpired. And I did relay that to her, that I spoke to Lou about it.

DUBY: And in summary, do you feel that you were subjected to sexual harassment?

ZELINSKI: Yes. Yes, I was.

DUBY: And by Trooper WEINSTOCK?

ZELINSKI: By Trooper WEINSTOCK.

DUBY: Okay, anybody else?

ZELINSKI: I feel that Corporal ALTIERI is very responsible in the situation.

DUBY: You felt that he didn't take appropriate action?

ZELINSKI: I do.

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 60 of 62

DUBY:       Is there anything else that happened or took place that you didn't tell me about, anything that you would like to add, maybe something that I didn't ask you about?

ZELINSKI:   Not offhand that I can think of.

DUBY:       Okay. Are there any other sexual harassment issues that you left out that you didn't tell me about? We pretty much covered it?

ZELINSKI:   I believe so.

DUBY:       Okay, we have the Academy, the van, your undergarment incident and the uh, and basically the sweater incident?

ZELINSKI:   Yes.

DUBY:       Those were the four major ones?

ZELINSKI:   Yes, that were describ - yes. And then just the animosity, the whole picture, work environment.

DUBY:       Okay. Is there anything else you'd like to add?

ZELINSKI:   No, not at this time.

DUBY:       Do you think we pretty much covered it?

ZELINSKI:   I think so.

DUBY:       Okay. And how did I treat you here today?

ZELINSKI:   Very well. I appreciate it.

DUBY:       All right. Okay. You know what, I don't have any other questions. Pretty much, are there any other individuals that you would like me to interview on your behalf, other than the ones you just mentioned?

ZELINSKI:   I think uh, Trooper MADIGAN.

DUBY:       Okay.

ZELINSKI:   Trooper HAVENS.

DUBY:       Okay. Probably Joe NIGRO?

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 61 of 62

ZELINSKI:     Yes.

DUBY:     Okay.

ZELINSKI:     Umm, I don't know if Augustus DIANA is going to be able to recall. I think
he would possibly be able to.

DUBY:     And what was that about?

ZELINSKI:     He was umm, he had seen us in the van, I believe, that day.

DUBY:     Okay, the surveillance van.

ZELINSKI:     The only other person that may have seen us in the van that day that I
know was working the same shifts was Trooper SARAFINKO, who's Troop
N Vice.

DUBY:     I'm sorry, Trooper?

ZELINSKI:     SARAFINKO. I know, I'm killing ya!

DUBY:     Okay, so SARAFINKO might be able to say that you were in the van with
Trooper. . .

ZELINSKI:     He maybe - it was - I was ninety-nine percent sure it was Gus DIANA, but
it could've been Brian SARAFINKO.

DUBY:     And he's Troop N Vice? (END OF SIDE A)

- TAPE 2, SIDE B -

ZELINSKI:     That if anyone could recall, it would've been him.

DUBY:     Okay, and Joe NIGRO would probably be about the sexual harassment
suit waiting to happen?

ZELINSKI:     Yes, and I don't know if he . . .

DUBY:     From WEINSTOCK.

ZELINSKI:     Right, I don't know if he can relay that comment that was made to
Corporal DYKES, because it was very secondhand, but he was there
when Corporal ALTIERI called.

104
61 62

Interview/Trooper Laura ZELINSKI, Re: IAD-2001-0093
Page 62 of 62

DUBY:        I actually know Kevin DYKES. I've known him for years, so maybe I'll talk
             to him too.

ZELINSKI:    Really? I, I don't - I mean, I know there's the Corporal relationship, but
             from Joe, I know that conversation happened where he blamed it on. . .

DUBY:        Well my opinion of Corporal DYKES is he's a very credible person and. . .

ZELINSKI:    I agree.

DUBY:        Yeah, he would - if something happened, he would tell me about. I'm
             sure. Okay, anything else?

ZELINSKI:    I think that's it. I think you pretty much covered every base.

DUBY:        Okay. All right, then I'm going to end the interview at 1420 hours.

This is Trooper John C. DUBY of the Pennsylvania State Police, Internal Affairs Division, Central Section. Today is Wednesday, March 7, 2001, and the time is 1255 hours. I am interviewing Corporal Nicholas D. GUSHKA, Badge Number 6602, who is assigned to the Patrol Unit at Troop P, Wyoming, as a Patrol Unit Supervisor. We are at Troop T, Pocono Station, located at P.O. Box 18 Whitehaven, PA 18661, and the interview concerns IAD Investigation 2001-0093.

DUBY:      Corporal GUSHKA, are you aware that this interview is being tape-recorded?

GUSHKA:    Yes.

DUBY:      And would you like to have somebody here from the PSTA to sit in on your interview with you?

GUSHKA:    No.

DUBY:      Prior to the start of the interview, I informed Corporal GUSHKA that he was not the subject of my investigation, and this investigation and interview is an administrative matter within the Pennsylvania State Police. And sir, what is your current job assignment?

GUSHKA:    Patrol Unit Supervisor, Troop P, Wyoming.

DUBY:      And between June of 1999, until August of 2000, where were you assigned, sir?

GUSHKA:    As the Vice and Narcotics Unit Supervisor, Troop P, Wyoming.

DUBY:      And where was that office located at?

GUSHKA:    At Troop P, Headquarters uh, in the rear garage area.

DUBY:      And where is that office in relation to the Troop P Tactical Narcotics Unit?

GUSHKA:    It's the same building.

DUBY:      And during this time period, was Corporal Louis ALTIERI the unit supervisor of the Troop P, Tactical Narcotics Unit?

GUSHKA:    To the best of my knowledge, yes.

DUBY:      And who was in the unit at that time?

GUSHKA:    In the TNT or in the Vice?





DUBY:        In the TNT unit.

GUSHKA:     It would be Trooper MURRAY, Trooper WEINSTOCK, Trooper WIGLEY, Trooper ZELINSKI, and Corporal ALTIERI.

DUBY:        And sir, how familiar are you with Trooper Laura ZELINSKI?

GUSHKA:     At that point in time, I really wasn't familiar with her.  I had never worked any job assignments with her or ever been stationed with her at any point. Umm, there came a time, approximately three months ago, where a position opened in the Troop P, Vice and Narcotics Unit, which she applied for and received that position.  So at that time, she fell underneath me.

DUBY:        Okay.  And sir, how would you rate her performance while she was assigned to Corporal ALTIERI's unit - what you might've observed or didn't observe?

GUSHKA:     I observed her as a hard worker, always conscientious of her actions. She would ask me questions related to assignments that she had; what did I think, uh, you know, she looked for guidance.

DUBY:        And what kind of a Trooper is she?

GUSHKA:     Outstanding Trooper.

DUBY:        And sir, how familiar are you with Trooper WEINSTOCK?

GUSHKA:     The same as Trooper ZELINSKI.

DUBY:        Okay, and sir, how would you rate his performance?

GUSHKA:     Outstanding.

DUBY:        And what kind of a Trooper is he also?

GUSHKA:     He was very conscientious with his work.  Once again, he would come to me just like other Troopers would, ask me questions.  I had approximately four years experience in Troop R, Vice, Narcotics and Intelligence, and he would always be conscientious of his work, and uh, just wanted to make sure that he proceeded in a good manner.  So he was conscientious of his work.

DUBY:        In your opinion, was there a breakdown in supervision within the Troop P, Tactical Narcotics Team Unit?

GUSHKA:    Could you repeat that please?

DUBY:    Yes, sir. In your opinion, was there a breakdown in supervision within the Troop P, Tactical Narcotics Team Unit?

GUSHKA:    I would say yes, as a general answer.

DUBY:    Okay, and can you expand on that, why that would happen?

GUSHKA:    Umm, I had conversations with Trooper WIGLEY, Trooper ZELINSKI, Trooper MURRAY, and Trooper WEINSTOCK. Uh, irregardless to day to day operations where sometimes they didn't feel that Lou ALTIERI's decisions on certain cases uh, I don't want to use the word "justified," I'm trying to think of a different word. "Justified," might be a little bit too harsh, but they would ask me my opinion umm, because they didn't feel - they didn't feel comfortable with Corporal ALTIERI's answers, if you want to say.

DUBY:    And did that eventually lead to like a revolt, so to speak?

GUSHKA:    I wasn't directly involved in the day to day operations of BDLE, umm, but from what I could sense and, and just from human nature, I could sense a, a uh, revolt if you want to say.

DUBY:    Did it center on anyone individual in particular, or did it just seem like the unit was that way?

GUSHKA:    No, it - it seemed like, like Trooper WIGLEY and Trooper ZELINSKI were a team, if you want to say. Uh, Trooper WEINSTOCK and Corporal ALTIERI were a team. And Trooper MURRAY kind of floated in the middle. You know what I mean? Umm, so it kinda got segregated that way.

DUBY:    Was there any concerns that you felt about that?

GUSHKA:    No, because I mean I wasn't responsible for the unit. Uh, I would reach out to Corporal ALTIERI when I needed assistance on a case, whether it be surveillance or if we were doing search warrants, uh, buy/bust operation or like a Triggerlock detail. So it was nothing that - nothing that affected me directly.

DUBY:    Okay, and sir in your opinion, did a hostile work environment exist within the Troop P, Tactical Narcotics Team Unit?

GUSHKA:   Yes.

DUBY:   And would you please tell me what your feelings are about that?

GUSHKA:   And once again, I wasn't involved in the day to day operations or I wasn't privileged to incidents. It's only stuff that I heard from uh, basically every member in the unit at that time. Uh, and I guess to sum it up, once again, it was WEINSTOCK and ALTIERI were a team; WIGLEY and ZELINSKI were a team; and MURRAY kinda floated in the middle, from what I saw. Uh, and there was just constant bickering back and forth.

Uh, there was an issue about overtime on, I believe, it was a DART detail. And uh, at one point, Trooper WEINSTOCK approached me and stated something to the effect of that Lou's a good guy and I, meaning me, Nick GUSHKA, wasn't giving him a fair chance. And I never expanded upon that with WEINSTOCK, but I felt that he meant that I should kind of be on their side, you know? And like I say, I wasn't - I was Troop P, Vice Unit. I mean, I had three guys underneath me and I have my own day to day operations and that was something that I spoke with my superiors and uh, basically TNT would handle their issues and Troop P, Vice would handle their issues. So, you know, I mean I was - I was privy to segments of bickering and what have you, but I was never - I was never involved in it, per se, to an extreme degree.

I've had my differences with Corporal ALTIERI over issues where I was blamed for an incident which I umm, did an STD-501 to my Captain, Captain ALTAVILLA, that I was blamed for uh, not carrying out a duty that was supposedly assigned to me in a search warrant incident. And I believe it got down to uh, Major BLOCKER and Captain DUIGNAN that I was responsible for not carrying that duty out that was assigned to me, which was false. So to clear up the matter, I met with my Captain and I put pen to paper and uh, I did an STD-501, and uh. . .

DUBY:   In other words, Corporal ALTIERI blamed you for a failure of a search, on a search warrant or something?

GUSHKA:   He blamed me - what had happened was uh, the team - what had happened was that several months back, the TNT Unit was doing a search warrant in the City of Wilkes-Barre, and there was a briefing prior to and everybody was given duty assignments. And one of the assignments that was allegedly given to me was that I was supposed to notify Wilkes-Barre City Police Department that we were coming into their city and that we would be serving a search warrant.

At that search warrant, shots were fired by members of the State Police. I was on the outside, perimeter security, and I requested EMS and additional units from the State Police in Wyoming to respond as a result of shots fired, not knowing if they were from our guys or the bad guys. And Wilkes-Barre City officials arrived on scene and it just became a cluster, if you want to say, because they were saying that they weren't notified that we were coming over. And I was blamed for that. I feel wholeheartedly that Lou ALTIERI blamed me for that, as to not to draw attention to himself, since he was the supervisor of that operation.

Umm, later it was determined from pulling the desk tapes that the State Police in Wyoming had in fact contacted the Wilkes-Barre City, and I believe it to be an error on their part that they never - the desk person from there never forwarded that information to the troops out in the field. Umm, but that was one issue that I had with Corporal ALTIERI.

Another issue I had with him was uh, there was an incident in Bradford County where a couple of my guys in my unit went out and uh, I guess they were approached by an individual or individuals who possibly said they were from the Liquor Control Enforcement, or something to that effect. I really, truly don't remember. But umm, evidently I found out that Trooper WEINSTOCK went back to Corporal ALTIERI and stated that the guys in the Vice Unit were drinking excessively that night on that operation and that WEINSTOCK was going to ALTIERI to tell him uh, you know, so that he didn't get in any trouble, he wanted to report it to his supervisor. And uh, which caused bad blood in the unit.

DUEY:       Was there any validity to that?

GUSHKA:    I mean, there was no - there was no IAD investigation or anything like that. Umm, it was just - it was just an incident where, in my opinion, Trooper WEINSTOCK just ran back to his supervisor, just to say, you know, "Lou, this is what the Vice guys are," allegedly in his opinion, "what the Vice guys did last night." I know that caused some friction in the unit. Umm, and as a result of those two incidents, I would say as a working relationship, myself and Corporal. ALTIERI, had a good working relationship. But on a personal level, I really don't think deep down that there's any umm, friendship, deep down. I think when we put the uniforms on or we go to our desks, we help each other out. That was never a problem. Lou would always give me what he needed. I would always give him what I needed. But I think deep down, that there was no friendship. At least on my part, I know that there's no friendship, uh, for the actions that he uh. . .



Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 6 of 16

DUBY:       Do you think the issue with the search warrant was ever resolved with him and you? I mean, did you ever talk to him about why. . .

GUSHKA:     I talked to Lou. I came down on my own time. I uh, I happened to be passing the barracks on my off duty time and I observed ALTIERI's vehicle still there and I popped in to station and I talked to him about it. And he had told me that he had uh, talked to Major BLOCKER or Captain DUIGNAN, or one or the other, and they were of the opinion through him that I was responsible for not notifying Wilkes-Barre City. That's what got me disturbed, that he didn't regroup and see what assignments were given or talk to anybody else because when everything went - I don't want to say bad on Wilkes-Barre - but when the pot was stirred on Wilkes-Barre, I just felt like Lou used me as a scapegoat so that his record wasn't tarnished with Bureau of Drug Law Enforcement. And that's my honest opinion.

DUBY:       Sir, in your opinion, was Trooper ZELINSKI being sexually harassed by Trooper WEINSTOCK or anyone else in the unit?

GUSHKA:     Not to my knowledge.

DUBY:       And in your opinion, did Corporal ALTIERI treat Trooper ZELINSKI unfairly?

GUSHKA:     Not to my knowledge. Like I said, I wasn't involved in the day to day operations of the Bureau of Drug Law Enforcement.

DUBY:       And sir, in your opinion, did Corporal ALTIERI show any favoritism towards any member of the unit?

GUSHKA:     In my opinion, he showed favoritism towards Trooper WEINSTOCK.

DUBY:       And why do you feel that way?

GUSHKA:     Uh, they worked a lot of the same shifts together. Uh, they would go to lunch a lot together. And also, I remember on one incident that there was an issue with Trooper MADIGAN from Troop F, Bureau of Drug Law Enforcement. And what the issue revolved around was one guy in my unit, Trooper ADAMS, who lives in Bradford County, has a lot of investigations going on in Bradford County. And Trooper MADIGAN, I don't know where he resides, but I know that he resides up in that northern tier. I don't know if he resides in Troop F's area or Troop P's area, but they would run together and work cases together, and Trooper MADIGAN was cutting incident numbers in Troop P, Towanda's area. And the one day, and this is going back several months, I was at my desk and I was the only one in my office, and Trooper WEINSTOCK stated that - I believe

he looked at some reports that were submitted by Trooper MADIGAN that were laying on Corporal ALTIERI's desk, and he stated something to the effect of like, "This is gonna stop. He's not gonna be doing work in Troop P's area." And I know that that was an issue with Corporal ALTIERI.

And getting back to the original question about showing favoritism, I think Lou possibly spoke about supervisory issues with Trooper WEINSTOCK after Trooper WEINSTOCK made that statement that, about Trooper MADIGAN's gonna stop cutting incidents in Troop P's area.

And there was also another issue up in Towanda where a Trooper made a statement uh, about Trooper MADIGAN's incident numbers in Troop P that, I guess Corporal ALTIERI wasn't uh, I don't want to use the word "happy" about MADIGAN working in Troop P's area. So I would say favoritism because WEINSTOCK was privileged to that supervisory information.

DUBY:     In other words, Corporal ALTIERI would consult with Trooper WEINSTOCK on supervisory matters, so to speak?

GUSHKA:   I don't want to make it plural, but I know about that one supervisory matter. Umm, but I mean they were constantly together, you know, and uh, and going back to an early statement that I made when WEINSTOCK approached me and made the statement that I never gave ALTIERI a chance. I should've gave him a chance, or something to that effect. I could only assume that that information was coming from ALTIERI and WEINSTOCK talking together and that WEINSTOCK approached me and made that statement. Uh, which going back to that there was really no friendship between Lou and I, I think maybe Lou made mention of that to WEINSTOCK, which to me is a supervisory issue, and then WEINSTOCK approached me and made the statement that I never gave Lou a chance.

DUBY:     Do you have any information as far for example Trooper WIGLEY and Trooper ZELINSKI going to Corporal ALTIERI about their problems and then it getting back to Trooper WEINSTOCK? Anything like that?

GUSHKA:   I don't know anything concrete. No, I can't say that I know anything concrete. Uh, nothing that comes to my brain right now, but. . .

DUBY:     In other words, like Trooper WIGLEY and Trooper ZELINSKI have a problem with WEINSTOCK, they go see the Corporal about it and then the Corporal discloses that to Trooper WEINSTOCK.

GUSHKA:   Like I say, I don't - to the best of my knowledge, I mean if there is an issue, or you know of an issue that would uh, you know, jarred my brain,

Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 8 of 16

but I don't know anything offhand.  I can only assume that that was happening though.  I mean it wasn't - it wasn't too hard to figure out, but I don't have any concrete evidence of that.

DUBY:      Sir, did you ever hear any sexual comments made to Trooper ZELINSKI by Trooper WEINSTOCK, or by anyone else in the Troop P, Tactical Narcotics Team?

GUSHKA:   No.

DUBY:      Did you ever go to Corporal ALTIERI about anyone in the unit making sexual comments about Trooper ZELINSKI?

GUSHKA:   No.

DUBY:      Sir, did you ever hear anyone make the comment that Trooper ZELINSKI was a quote, "sexual harassment suit waiting to happen?"

GUSHKA:   No.

DUBY:      And sir, did you ever hear Trooper WEINSTOCK comment that he could see Trooper ZELINSKI's underwear?

GUSHKA:   No.

DUBY:      And sir, did Trooper WEINSTOCK ever make any sexual comments about Trooper ZELINSKI or anyone else?

GUSHKA:   No.

DUBY:      Sir, did Trooper ZELINSKI ever tell you that Trooper WEINSTOCK wanted to give her a full body massage while she was attending the wiretap class in 1999?

GUSHKA:   No.

DUBY:      Did you ever hear about that incident?

GUSHKA:   No.

DUBY:      Did Trooper ZELINSKI ever tell you that Trooper WEINSTOCK wanted to have sex with her?

GUSHKA:   No.

Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 9 of 16

DUBY:     Did Trooper ZELINSKI ever tell you that Trooper WEINSTOCK had commented to her that he could see her underwear?

GUSHKA:   No.

DUBY:     Did Trooper ZELINSKI ever tell you that Trooper WEINSTOCK had made a comment to her that he could see down her sweater?

GUSHKA:   No.

DUBY:     On all those issues I asked, is there any information you have about that? Any rumors or anything like that, that floated your way as far as these things of the underwear issue, the sweater issue?

GUSHKA:   No.

DUBY:     Okay.

GUSHKA:   I just knew as a whole, when Trooper ZELINSKI came into my unit, that there was a sexual harassment issue at hand that was in the process of being investigated. But I didn't know any particulars or anything like that.

DUBY:     And sir, are you aware of any sexual harassing comments made within the Troop P, Tactical Narcotics Unit that you did not document or discuss with Corporal ALTIERI?

GUSHKA:   No.

DUBY:     Did Corporal ALTIERI ever tell you that Trooper ZELINSKI came to him and told him that she was being sexually harassed by Trooper WEINSTOCK?

GUSHKA:   No.

DUBY:     Sir, is there anything else about the work environment that you didn't tell me about as far as hostile or anything like that? Did we pretty much cover it?

GUSHKA:   The only other issue, and I don't know if it means anything, was there was an issue about her supervisory file.

DUBY:     Okay.

GUSHKA:   But I don't know if that's. . .

Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 10 of 16

DUBY:        Yeah, I'd like to hear that, if I could.

GUSHKA:    What had happened was Trooper KOEHLER had left the Vice and
                   Narcotics Unit. So upon him leaving and Trooper ZELINSKI entering, I had
                   to forward his supervisory file to Troop P, Tunkhannock.  So when I did
                   that, I knew that I had to get Trooper ZELINSKI's in, since that she was
                   underneath me at that time. It was a switch between her and KOEHLER.
                   So I contacted Corporal ALTIERI about her supervisory file via e-mail and
                   also the telephone, and he told me that he had forwarded same up to
                   Troop P, Tunkhannock.

                   So I contacted Sergeant KREIDLER, the OIC at Troop P, Tunkhannock,
                   and requested the supervisory file be forwarded down to me since Trooper
                   ZELINSKI was now underneath me.  And he stated that he had never
                   received it, but that he would check, and just to make sure, and get back
                   to me.  Sergeant KREIDLER got back to me and stated that he never
                   received it.

                   So I contacted the Criminal Section Commander, Lieutenant OLIPHANT,
                   at Troop P, Wyoming and I advised him of the fact that I had problems
                   locating Trooper ZELINSKI's supervisory file, and that according to the
                   AR, I should be in charge of it and that I should have it in my office. And
                   one of the reasons why I wanted it, besides the regulation, was I wanted
                   to review the file since that she was coming into my unit, to get familiar
                   with her background, if you want to say, because of all the issues that I
                   heard.

                   Umm, so I called back Corporal ALTIERI.  I stated to him that Sergeant
                   KREIDLER never received it.  He said that he forwarded it up.  So when I
                   went to Lieutenant OLIPHANT, I did up an STD-501 to him, just to
                   document it because I knew that it would probably be an issue down the
                   road and I didn't want it lost, and I wanted to basically cover myself and
                   notify my Lieutenant that, "Hey, I don't have the supervisory file."  And I
                   forget what the date is on that, but the very next morning, after I submitted
                   that 501 to my Lieutenant, her supervisory file was in my mailbox.  And uh,
                   it had Corporal ALTIERI's handwriting on the outside of the sealed
                   envelope.

                   So just to make sure that that's where it came from, I contacted him and
                   he had told me that he had forgot, that it had been in the trunk of his
                   vehicle.  And that when he was going through his vehicle that he had
                   found it, and that's when he forwarded it to me, that he had made a
                   mistake and that he had never actually forwarded it up to Tunkhannock.



So upon receiving it, I placed a copy of my 501 into her supervisory file and to the best of my recollection, I just jotted down a date and a time that I received it. Umm, you know, just to say that this is the date and time that I received it and I reviewed it and umm, I didn't see anything out of the normal. Uh, I didn't see any type of discrepancies or I didn't see any type of continued documentation or anything to that effect. And then I secured it as per the AR, and uh, I turned it over to the new Corporal and I left the unit.

DUBY:     Sir, did you see any notes in there about Trooper ZELINSKI having poor communication skills? Anything of that nature?

GUSHKA:   No, I didn't see - I didn't see anything uh, in the negative content.

DUBY:     No Supervisory Notations or anything like that?

GUSHKA:   No, sir.

DUBY:     And do you have an opinion as to why that showed up in your mailbox the next day? Is it because you generated a letter or. . .

GUSHKA:   I can only assume. I mean, when I gave it to my Lieutenant, he said, "I'll see to it that you get the supervisory file." So I don't know, I mean I never asked him. I think - I think it's a combination uh, from the 501 that I did and from whatever action Lieutenant OLIPHANT took, which I don't know. But within umm, you know, a half a day, overnight, it mysteriously showed up in my mailbox the next morning when I came in for roll call at eight A.M. I believe it was, or mid morning.

DUBY:     Evidently somebody probably made a phone call or something.

GUSHKA:   That's to the best of my knowledge, correct. I know I didn't, but I'm sure Lieutenant OLIPHANT probably did.

DUBY:     Sir, do you know anything about Trooper ZELINSKI's missing performance evaluation? It would've been from October of 1999 to October of 2000.

GUSHKA:   The two things I could tell ya is one, it was not in her supervisory file when I received her supervisory file; and two, I had conversation with Trooper ZELINSKI, and she stated that it had never been completed, to the best of her knowledge, due to the fact that she had never reviewed it or signed it.

DUBY:     And sir, did you talk to Corporal ALTIERI about this, about the performance evaluation issue?

Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 12 of 16

GUSHKA:     No, I did not.

DUBY:     That would've probably been needed for you to do yours for her. . .

GUSHKA:     Right, but we only - we only were in the unit, I believe Laura came in - I believe Laura came in December 1st, and I left in - I left like February 1st. So there - it wasn't anything that I was notified via the TAM that it was due or anything, you know. It wasn't a pertinent issue for me at the time that I was her supervisory, because I guess it wasn't time for it to be done.

DUBY:     So you supervised Trooper ZELINSKI in the Vice Unit for about two months then?

GUSHKA:     I'm trying to think - she either came in December 1st or January 1st, because I know uh - yeah, she came in December 1st, because Trooper KOEHLER left January 1st, and Captain ALTAVILLA wanted them two to run together uh, to transfer over case load and everything. So he gave it thirty days to leave me with an extra person in the Vice Unit. So I believe Laura came in December 1st, on or about December 1st, and I left whatever the first Saturday of February was, the 2nd or the 3rd, or something like that. So it would be all of December, all of January, and a day or two in February that I was her supervisor.

DUBY:     Sir, after Trooper ZELINSKI left from the TNT Unit, do you know if there was continued derogatory comments about her and her performance, or her ability to do the job made by anybody in that unit?

GUSHKA:     No.

DUBY:     And sir, do you know if Sergeant RUDA was made aware of any of these problems that was in Corporal ALTIERI's unit?

GUSHKA:     I know of one time going back, and I apologize for the date, but I know it was a few months back, that Trooper ZELINSKI - I'm not sure if there was others - went to see an FOP representative, Trooper PLANT, who's in the Forensic Service Unit at Troop P, Wyoming, to set up a meeting with Sergeant RUDA, because she felt that she wasn't getting response from Corporal ALTIERI as a supervisor, so she wanted to go above him to voice her opinions or complaints or issues. And I was asked by her and Trooper WIGLEY if I would also go the meeting, which I stated I would, uh, and I had my own reasons for going, which I explained to you. Just to kinda clear the air between myself and Lou about the Wilkes-Barre incident and just day to day friction.

Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 13 of 16

And I believe Trooper PLANT, when he contacted Sergeant RUDA, Sergeant RUDA advised him that the only way that the meeting would be held is if Corporal ALTIERI was present. And I don't believe - I know I didn't - I don't believe anybody attended a meeting with Sergeant RUDA, because they didn't want Corporal ALTIERI to be present, because in their opinion, Corporal ALTIERI was the problem. So they wanted to go uh, and meet privately with Sergeant RUDA, because according to ZELINSKI and others, their issues - the issues were about Lou, you know? So they wanted to notify his supervisor, you know, without him being present. But I don't believe that the meeting ever took place. I know it didn't between myself and Sergeant RUDA. To the best of my knowledge, it didn't take place with the others and Sergeant RUDA.

DUBY:       Sir, do you know if Corporal ALTIERI blamed Trooper ZELINSKI for the failure of that search warrant in which the dog was shot?

GUSHKA:    I don't know.

DUBY:       Okay, and do you know any information concerning her being blamed, her and Trooper WIGLEY being blamed for damaging Trooper WEINSTOCK's vehicle? Did you hear anything of that nature?

GUSHKA:    No.

DUBY:       And sir, just briefly tell me, what was the situation with this overtime issue with Trooper PLANT.

GUSHKA:    Umm, I don't - I don't - I guess the overtime issue with PLANT must be the one that you're talking about. I guess that they went out and did a DART or did a special detail, and I'm not familiar with Drug Law's terminology, or what have you. But I guess that they went out and did a DART, which is like our Triggerlock, if you want to say, where you're given so much time to make so many buys or roundup so many people. It's uh, in a concentrated area. But from what I remember, WIGLEY, ZELINSKI, I think MURRAY, and I guess WEINSTOCK, and I think the others came in from different areas, Troop F, or whatever, and there was a DART going on. And I guess Lou approved overtime, from what I understand, or said, "Whatever it takes. Just go out there and get it down," or what have you, and Trooper WIGLEY and Trooper ZELINSKI submitted overtime in conjunction with their participation in that DART program and it was denied.

Uh, evidently Corporal ALTIERI stated that he never authorized overtime in conjunction with that. And once again, I wasn't part of that operation,



nor were my people in my unit and part in that operation. So I don't know actually firsthand what was said or what wasn't said.

DUBY:     So basically the problems within his unit were Trooper ZELINSKI and Trooper WIGLEY were on one end, and then Trooper WEINSTOCK and Corporal ALTIERI were on the other end, and Trooper MURRAY was in the middle somewhere?

GUSHKA:   Right.  That's, from what I could observe from day to day operations and coming and going, and seeing people together and uh, talking with the people in the unit, what have you.  And like I say, the big thing was from my observations.  I mean it wasn't too hard to figure out, you know, that that's how that it was split up.

DUBY:     Do you know why they split?  Was it just because ZELINSKI and WEINSTOCK had prob - or ZELINSKI and uh, WIGLEY had problems with WEINSTOCK or with ALTIERI?

GUSHKA:   I guess.  I mean uh, you know, I guess that that's what the problem was. Uh, you know, I mean that's what it appeared to be anyway.  And uh, that's why I think it was segregated there between the members and the unit.

DUBY:     In your opinion, how would you rate Trooper WEINSTOCK's credibility?

GUSHKA:   Umm, I only know Rich on a professional level, but I would have to say I have faith in what Trooper WEINSTOCK would tell me.  I would give it uh, I would give it uh, I would take it as being good, I mean, what the man said.  I mean, I never had a problem with him.  I mean, I supervised him uh, you know, on different operations or here or there, or just for short periods of time, or if he would run with my guys.  But if I would ask him to do something, I mean, he would do it.  And uh, or he would go out and do it and come back and say, "Nick, I did it," and I had no reason to doubt the man.  I mean, I never had any, any phone calls or any correspondence or anybody else come to me and say that, "He lied to you Nick," on work related issues or stuff like that.

DUBY:     And just two more things.  How about Trooper ZELINSKI's credibility?

GUSHKA:   Once, uh, once again, I would have to say the same.  I mean, I never had any problems with her.  Umm, what she told me, I mean, I took as gospel. Umm, I didn't have no reason to doubt her.  Like I say, I just supervised her for a short period of time, but when I would give her an assignment with a time frame, I mean it would be done.  It would be done correctly, according to the regs.  And no matter what I told her to do, as far as like even changing her shifts, because in that field, I mean, you just can't say

"Well I'm gonna work four to twelve, eight to four, three to eleven." I mean, if the pager goes off, you have to change. And, and uh, I mean we, you know. . .

DUBY:     There has to be a certain amount of flexibility?

GUSHKA:  By everybody, and she was always flexible with her schedule and she did what was told. And uh, I'll be quite honest with you and I'll say it on tape here, I contacted Trooper ZELINSKI when I knew that that posting was coming up, that Trooper KOEHLER was leaving. That to me, she was an excellent worker and that's why I wanted her in my unit. I contacted her and I said, "Laura, please put in for it. I want you to work for me. I want you in my unit," because that's how much that I thought of Laura.

DUBY:     And what would you have to say about Corporal ALTIERI's credibility?

GUSHKA:  Umm, on different issues, Lou always told me that I misunderstood him, or I misinterpreted him. Uh, I had the Wilkes-Barre issue, uh, some other things that went on, you know, just day to day operations. As it stands right now, I have a hard time believing - if Lou was to walk through that door right now and tell me that it was March 7th, 2001, at twenty minutes to two in the afternoon, I would have to double-check that before that I would take Lou's word. And that's - and I say that because of prior experiences with Lou.

DUBY:     Okay.

GUSHKA:  I guess to sum it up.

DUBY:     Sir, is there anything else you feel I should've asked you? Any other problems or concerns within the unit that you didn't tell me about?

GUSHKA:  Not that I can think of, or nothing that jumps out at me, no.

DUBY:     Okay. Did we cover everything with Trooper WIGLEY, as far as him being removed from the unit? What kind of a worker was Trooper WIGLEY?

GUSHKA:  Once again, I mean he was a good worker. Uh, I would have not a lot of contact with him. But once again, he would come to me and say, "Nick, what do you think I should do here? You know, you've been in it for a few years, what do you think?" I would say, "Dan, I would this," or "I would do that," or "I would contact this person." He would take my word for it. He would do that. And I have a couple uh, investigations where I needed an extra person or two, and I utilized Dan on that. And uh, if I told him to do this, it was done. I mean, I never, I never had a problem with him.

Interview/Corporal Nicholas GUSHKA, Re: IAD-2001-0093
Page 18 of 18

DUBY:      And sir, do you know why they were removed from the unit?

GUSHKA:    No, I don't.  Uh, actually I was on vacation at the time.  I had left to go on vacation, and both WIGLEY and ZELINSKI were in the unit.  And when I returned from vacation, their desks were cleared out.

DUBY:      Did they ever tell you why they felt they were removed?

GUSHKA:    No.  No, I can't say that they - that they ever came out and told me that. No.

DUBY:      I don't think I have anything else.  Do you have anything else to add, sir?

GUSHKA:    Nothing that I can think of, no.

DUBY:      Okay.  I'm going to end the interview then at 1:39 hours.

This is Trooper John C. DUBY of the Pennsylvania State Police, Internal Affairs Division, Central Section. Today is Thursday, March 8, 2001, and the time is 1004 hours. I am interviewing Corporal Lewis M. ALTIERI, A-L-T-I-E-R-I, badge number ▮▮▮▮, who is assigned to the Bureau of Drug Law Enforcement as the Troop P, Tactical Narcotic Team Unit Supervisor. We are at the Bureau of Professional Responsibility office building located at 7820 Allentown Boulevard, Harrisburg, PA 17112, and the interview concerns IAD Investigation 2001-0093, which is an Attorney Work Product.

DUBY:    And Corporal ALTIERI, are you aware that this interview is being tape-recorded?

ALTIERI:    Yes, I am.

DUBY:    And you have Trooper Keith LEYDIG, L-E-Y-D-I-G, here today as your PSTA representative?

ALTIERI:    Yes, I do.

DUBY:    Okay. The first information that I want to read to you is the Administrative Warning. *"This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any criminal action. During the course of his questioning, even if you disclose information which indicates that you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statements nor its fruits will be used against you in a criminal proceeding.*

*Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during questioning. If during the course of this interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request."* Do you understand what I have just explained to you?

ALTIERI:    Yes.

DUBY:    And sir, do you have any questions concerning what I have just explained to you?

ALTIERI:    No.

DUBY:    Okay. And sir, if you would sign the bottom portion of the form for me please?

**EXHIBIT**

22

DUBY:    Thank you. And the second document is the Notification of Inquiry. Now, most of this information was taken directly from the complaint itself. So, it may not read free flowing here. *An administrative investigation is being conducted pursuant to a request from the Office of Chief Counsel. Your involvement has been identified as follows: The nature of this interview is in reference to a complaint that was filed by Trooper Laura ZELINSKI, formally assigned to the Bureau of Drug Law Enforcement Unit. Trooper ZELINSKI alleges that she is the victim of "Sexual Harassment" and had filed a complaint with the Commonwealth of Pennsylvania, Governor's Office, Pennsylvania Human Relations Commission, listed under "PHRC" Docket Number: E-97578-D and "EEOC" Charge Number: 17FA10802. The complaint was brought on or about November 15, 2000, and in addition to listing your name, the complaint also lists Trooper Richard WEINSTOCK and Sergeant Michael A. RUDA who are also assigned to the Bureau of Drug Law Enforcement Unit.*

*The complaint brought by Trooper ZELINSKI alleges that she was the victim of Sexual Harassment, which started on or about June 22, 1999, and progressed until her removal from the Bureau of Drug Law Enforcement Unit on or about August 22, 2000.*

*You were the Troop P, Tactical Narcotic Team Supervisor during this time period, and are a supervising member within the Bureau of Drug Law Enforcement where Trooper WEINSTOCK is assigned and did supervise Trooper ZELINSKI while she was assigned to the unit.*

*Specifically, Trooper ZELINSKI alleges that on October 14, 2000, she told you about the two incidents involving "Sexual Harassment" that were committed against her by Trooper WEINSTOCK in June and August of 1999, and that she did not feel comfortable working surveillance with Trooper WEINSTOCK. Trooper ZELINSKI further alleges that you told Trooper WEINSTOCK in the early part of the summer (1999), that she was a "sexual harassment suit waiting to happen." Trooper ZELINSKI alleges that she believes that she has been harassed because of her sex, female, and/or in retaliation for reporting sexual harassment, and that the harassment continued until her removal from the unit on or about August 22, 2000.*

*Therefore, an investigation is required.*

Do you have any questions about that sir?

ALTIERI:    Huh-huh.



DUBY:    Okay. And if I could just get you to review that and fill out the bottom portion of that form for me.

LEYDIG:    Question?

DUBY:    Sure.

LEYDIG:    It says she was in the unit from June '99 'til August 2000. Down here it is showing October of 2000 she told him about incidences involving sexual harassment. She would already been out of the unit.

DUBY:    Do you know what ah, you are correct, I might have a typographical error there then. Ah, I would have to go through the notes here. It probably is going to refer to October of 1999.

LEYDIG:    Right.

DUBY:    Let's see if I can find that real quick, and we can make a quick change to that. (Pause). Okay. That is correct. The correct date for that should be October 14, 1999.

ALTIERI:    I didn't see that.

DUBY:    Thank you Keith. I appreciate that.

ALTIERI:    Date today?

DUBY:    Sir, it is March 8th. And lastly, sir, I am going to review the Sexual Harassment Policy, which is ah, an excerpt from AR 4-25. The excerpt that I have is dated March 2, 2000. Ah, specifically referring to "26.03, General Information and Definitions.

    A.    *Acts of sexual harassment are in violation of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act of October 27, 1955, Governor's Executive Orders, and Department policy. Specific acts of sexual harassment include, but are not limited to:*

        *1.    Repeatedly asking a person for a date.*

        *2.    Inappropriate physical contact.*

        *3.    Making suggestive or provocative gestures, e.g., leering, staring, inappropriate comments, jokes, or stories of a sexual nature.*

    4.     *Creating or displaying visual materials of a sexual nature.*

    5.     *Retaliation against any persons for reporting instances of alleged sexual harassment.*

B.    *Sexual harassment is defined as unwelcome verbal or physical conduct of a sexual nature, sexual advances, or requests for sexual favors.  Sexual harassment occurs when any one or more of these unwelcome actions:*

    1.     *Are explicitly or implicitly a condition of employment.*

    2.     *Are used as the basis for employment decisions.*

    3.     *Create an intimidating, hostile, or offensive work environment.*

    4.     *Affect the individual's work performance.*

C.    *Types of sexual harassment:*

    1.     *Quid Pro Quo:  The offer or inference of a benefit for submission to sexual advances, e.g., an offer of an excellent performance evaluation, continued employment, or career advancement in return for sexual favors.*

    2.     *Hostile Work Environment:  Conduct that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment, e.g., repeated or constant conversational references, or the display of visual materials of a sexual nature.*

*In Subsection E,*

E.    *Supervisors shall:*

    1.     *Monitor the work environment to ensure that it is free of sexual harassment.*

    2.     *Process complaints of sexual harassment in accordance with this regulation.*

        *NOTE:  In cases where no actual complaint has been made, this regulation does not negate a supervisor's*



*responsibility to address inappropriate conduct in the workplace and take appropriate action.*

3.    *Take immediate action to avoid any adverse impact or reprisals against any person who reports an act of sexual harassment.*

4.    *Maintain confidentially of reports of sexual harassment.*

5.    *Contact the EEO Officer or EEO Liaison prior to taking action on a complaint of sexual harassment. If the nature of the incident is such that immediate action must be taken, e.g., sexual abuse, physical contact, etc. appropriate action shall be taken and then, the EEO Officer or liaison shall immediately be contacted.*

*With respect to Personnel in Subsection F:*

F.    *Personnel shall:*

1.    *Refrain from conduct, implied or direct, which constitutes sexual harassment.*

2.    *Not be fearful of advising an alleged harasser that their actions are unwelcome, offensive, or both. Failure to do so shall not prevent personnel from filing a complaint of sexual harassment."*

Sir, do you have any questions about that? I know that is kind of a lot of information I read.

ALTIERI:    No, I understand that completely.

DUBY:    Okay. Okay. We can pretty much get into the interview then. Sir, when did you become the Unit Supervisor of the Area II Tactical Narcotic Team?

ALTIERI:    Actually, I think on paper. I was officially there on paper on January 1, 1999; however, the Troop didn't release me until May of 1999. So, I was like periodically ah, Sergeant EVANCHICK, at the time had given me a car in order for me to periodically come down to the unit and maybe hit it and get with Nick GUSHKA who is the Vice Unit Supervisor. Just to kind of get an idea of what's going on until I was actually there from the Troop, because the Troop couldn't afford to – because I was the Acting Crime Sergeant at the time...

DUBY:              Okay.

ALTIERI:           ...in Towanda, and they didn't have anybody to replace me, so
                   they wanted me to stay until they could fill that position.

DUBY:              So pretty much in May, May 1999, that's when you actually were
                   there...

ALTIERI:           There on an...

DUBY:              .... in the office.

ALTIERI:           ...on a regular basis. That's correct.

DUBY:              Okay.

ALTIERI:           Prior to that, it might have been once a week, once every two
                   weeks, you know, and I was kind of gettin' the feel of things. And
                   at that time, ah, Trooper ZELINSKI wasn't there cause the Troop
                   wouldn't release her either. And I believe ah, Trooper MURRAY
                   was the only Trooper actually assigned at, at the time. Cause he
                   had been there prior from like '98. And then ah, Trooper
                   WIGLEY and Trooper WEINSTOCK were released from Troop
                   R, ...maybe, see, I say May, I came – they came in like April, so
                   they were there a month before me. So, I had met them in like
                   April.

DUBY:              Okay. And, sir, where was your office located at between June of
                   1999 to August 2000?

ALTIERI:           It was the - ah, they put an addition onto the vice office. It's in the
                   garage area of the, ah, ah, Troop P, Headquarters building. They
                   have a garage into the rear of their, their building. And they have
                   an office out there and the supervisor's office ah, Nike GUSHKA
                   and I shared, and then there was a doorway into an office where
                   my guys were at, and then there's another doorway into a separate
                   office where Nick GUSHKA's vice guys were at.

DUBY:              Okay. And sir, throughout any given week, how often would
                   Sergeant RUDA visit your unit?

ALTIERI:           Well, early on, Sergeant EVANCHICK was actually the Acting
                   Area II, was the Area II ah, Sergeant, until like November, I think,
                   November '99. And then through promotion, he went to Troop R
                   as a Lieutenant and then Sergeant RUDA, then Corporal RUDA

got promoted to Sergeant, I believe. Took the Area II position over in like the end of November, beginning in Ju...of December of '99. And he was only there for a little bit, and I got made Acting Area II Sergeant from that point until May or June 10, 2000. So, he, he, would only come up periodically, cause he was out on a special assignment with the Department.

DUBY:          Okay. So, within any given week, he was probably not there very much at all then just...?

ALTIERI:       Not during that time frame, because he was on another assignment. He would call and check with me and see how things were goin' and that, but essentially, I was, I acted as in the capacity of Sergeant the whole time, up until, I think it was June 10, 2000.

DUBY:          So, you would keep in contact with him pretty much on a day to day basis on the unit matters, maybe, or?

ALTIERI:       Not, not at that point, no, hu-huh.

DUBY:          Okay.

ALTIERI:       You know, he was like I said, new to that. He brought his stuff up to his new office, ah, and was just, ah, would check on me to see how things were goin' on in the area as a whole, you know, that, that sort of thing, you know.

DUBY:          Okay. Sir, did Trooper Laura ZELINSKI or anyone else ever report to you any incidents of sexual harassment involving her or Trooper WEINSTOCK?

ALTIERI:       No.

DUBY:          And when did you first find out about a sexual harassment issue coming to light between Trooper ZELINSKI and Trooper WEINSTOCK?

ALTIERI:       I guess the Troop rumor was like, we were gonna have an inquiry done on us. Ah, it was right before Lieutenant FRALEY actually interviewed me, cause I said to him, "It's all around the Troop already that ah, she's filed some kind of sexual harassment allegation against Rich and I." And he said, "How did you find out?" And I couldn't say specifically who told me, but I mean everybody knew about it, but us, you know. So, sometime in ah, you know, I remember that (inaudible) because that's all I been doin'.

DUBY:           Sometime during Lieutenant FRALEY's inquiry maybe…

ALTIERI:        It was just prior…

DUBY:           …or a little before?

ALTIERI:        …to my interview, maybe that week, you know.  He might have
                interviewed me on Wednesday, I think, and I found out about it
                either the Friday before that interview or Monday, or something,
                cause I went, and I asked him, "Is that true?"  And he says, "Yeah,
                I need to interview you about it."  And I said, "Oh, so it is true."

DUBY:           So, we are talking like maybe November of '99 then?

ALTIERI:        No, no, we are talkin' 2000.

DUBY:           Oh, I'm sorry.

ALTIERI:        Well, after their removal.

DUBY:           Okay.

ALTIERI:        They were already gone.  I had no knowledge of prior to that.

DUBY:           Okay.

ALTIERI:        It was a rumor. Like I said, it was just a rumor.  I think, in fact, the
                – no, I was gonna say, maybe, maybe Rich told me, cause a friend
                of his from Troop R, I think told him, but I, that I don't, I couldn't
                tell you absolutely for sure.

DUBY:           And sir, please tell me everything you know about the issue
                concerning Trooper ZELINSKI's complaint that she was being
                sexually harassed while she was assigned to the Troop P, Tactical
                Narcotic Team.

ALTIERI:        Other that what's in your complaint, there is no validity to her
                allegations at all.

DUBY:           Sir, did you ever make a comment concerning Trooper ZELINSKI
                being a quote, "Sexual Harassment suit waiting to happen?"

ALTIERI:        No, I did not.  And I would like to expound on that.

DUBY:           Sure.

ALTIERI:    When I first took over the office, the TNT, P office, not the Area II, ah, I had an opportunity to meet with Trooper WIGLEY, Trooper MURRAY, and Trooper WEINSTOCK.    Trooper ZELINSKI, I think she might have already been assigned to her Coach Training period, up in Dumore, Troop R, so she wasn't present, but I had known Laura, I had worked with her in Towanda.  She did her coach-pupil right out of the Academy up there, and I got to know her quite well.  I fact, we got along real well.  I was excited to have her come to our unit.  Ah, and it wasn't that I wasn't gonna meet with her, because I eventually did, and but anyway I wanted to do an introductory to these new guys.

DUBY:    Okay.

ALTIERI:    And my then my whole point was to introduce myself; go over my expectations; ah, talked about my likes and dislikes; what I expected to the guys; and in fact, I even covered the sexual harassment policy.  I said, "I wasn't gonna tolerate it."  I said, "There was no way I was gonna, you know, ah, see any kind of devices, any kind of magazines, any kind of posters."  I said, "We have a female coming to the unit, " and, I said, "There's no way that I wanna have a problem with any kind of future, you know working conditions as a result as her not bein' comfortable here."  And everybody was quite aware that my position was I was not gonna tolerate, any, any violation of that at all.

And when I first started comin' down with EVANCHICK, ah, Corporal GUSHKA in the vice unit had ah, ah, Playboy books and stuff over in his office.  And when I had walked around the office, I went over to him and I, and I had said, "Hey," you know, "Nick," I said, "I know I'm the new guy here, and I know this is your office, but the Enterprise computer's are over there, and the unisex and bathrooms' over there."  I said, "With a female comin' to our unit," I said, "these books are even supposed to be on a an installation, let alone have that present for a female.  I, I'm askin' that you get rid of 'em.  Do somethin' with them."  And he said, "Hey, anything you want.  Move anything you want."  Ah, I know I had to tell him several times during the course of my time there.  But they were in his office, and again, I wasn't tryin' to make waves.  We had our office, and they had their office.

DUBY:    Okay.

ALTIERI:    The materials – I was really, ah, big on ah, that, I was big on the use of profanity.  I don't go for that.   I, I don't use it myself, I

have five children. Ah, I believe it's a professional obligation as well as a moral obligation. They, they turned it into a mockery and made a curse jar, and then when somebody would say a curse, they would put a dollar in it. So, the guys knew that I stood my ground as far as those kind of activities. I mean there was no – that's, that's why I say, this is kind of...

DUBY:        Okay.

ALTIERI:     ...the allegations, the validity to the allegations. It's, it's, you know, bazaar to see that's the...

DUBY:        Were you aware of any past incidences...

ALTIERI:     Oh, absolutely.

DUBY:        ....of sexual harassment, ah...

ALTIERI:     Not sexual harassment's, but...

DUBY:        ...generated by ah...?

ALTIERI:     That she's, that she had problems. Now, in Towanda, she actually had some problems with other members up there that I wasn't a part of, I mean. I had heard about it was rumors, you know, that she had got mad at some people, you know, but I kept out of it. I, I worked in the Crime Unit. The only thing that I really did with her was ah, we did an investigation or two together when she was up in Towanda, you know, helped her on some interviews. We got along good. You know, her reports were lacking, but short of that, I didn't have a problem. When we got to TNT, P, her and I were like discussin' old times, and she told me she had a problem at Shickshinny with the Sergeant there, and her Corporal as a supervisor, you know. She didn't really get into a lot of details other than that the, you know, he always would go over to the strip club that I was asked to assist ah, the vice unit on takin' off. And she told me, "Oh, yeah, that Sergeant was somethin', you know. I could have turned him in." Ah, that sort of thing, but you know, other than that, you know, nothin' really.

DUBY:        Oh...

ALTIERI:     I guess, I guess she had a problem at the Academy also...

DUBY:        Okay.

ALTIERI:        …with another female. I and I don't know the details, but she, she told me that. I mean that was stuff she told me.

DUBY:           Okay. Ah, I think what I can do right now is we can just go right through the things one on one, here. And actually, what I am referring to will be Attachment #3 of my investigation. That is Trooper ZELINSKI's complaint.

ALTIERI:        The "PHRC" complaint?

DUBY:           Yes.

ALTIERI:        Okay. And I did, not to interrupt, but I just was thinkin' cause I'm tryin' to remember everything. I did have an opportunity to talk with Trooper ZELINSKI afterwards. And I even told her that I met with these three, and that we specifically discussed sexual harassment in the work place.

DUBY:           Okay.

ALTIERI:        And that if in fact, there was ever an issue, I said, "Because my goal is to make this a comfortable work environment that she has no ah, fears of working in and that if that there are any problems she should tell me."

DUBY:           Okay.

ALTIERI:        I mean we had that conversation. Her and I did. So, I wanted to cover that.

DUBY:           Sir, are you aware that Trooper ZELINSKI and Trooper WEINSTOCK attended the wiretap class at the Hershey Academy during the week of June 22, 1999?

ALTIERI:        I wasn't aware until actually all of this, you know, I knew that they had went to a wiretap eh, school. I didn't know they went together. This was…

UNKNOWN:        What was the date on that?

DUBY:           June 22, 1999.

ALTIERI:        Yes, see we had just come in, and they had went to coach-trainee period, and she was up in Dunmore and left from there. So, you know, I mean, I did get regular, ah, daily, ah - what do you call

them things that Troopers fill out for the coach-public period, you know, like a daily activity?

DUBY: Oh, sure, exactly.

ALTIERI: Not the monthly, but the daily thing what they did. So we could see that they did a large thing, but to – honestly, until, until we really started hashin' this around, I didn't realize that they actually had went together, when I heard about all the allegations and where they took place and everything.

DUBY: Okay. A lot of these are going to be dates, and I'll be honest with you, dates are things that people generally don't remember, so...

ALTIERI: Right.

DUBY: ...specific dates, but I'll, I'll try...

ALTIERI: And I, and I got some paperwork - I tried to, you know, I expressed that concern to Keith on my in. I said, "You know, I mean she threw a lot of dates out there," and I said, "because there was never anything significant that would have happened to bring that to my – want my memory to remember that." I said, "You know, I had to sit back and go through timesheets and schedules and...

DUBY: Sure.

ALTIERI: ...and you know my blotters and everything to try and get a recollection, so go ahead.

DUBY: Okay. Referring to on or about June, 1999, Trooper ZELINSKI claims that Trooper WEINSTOCK told her that he was attracted to her since he met her in April of 1999, and said that he wanted her to come to his room and give her a full body massage. And had placed his hand on her knee. Now, can you tell me anything that you know about this incident?

ALTIERI: Other than what you just read. And what I read when I got the grievance, a copy of the grievance.

DUBY: Okay.

ALTIERI: On or about August 4, 1999, Trooper ZELINSKI was assigned to ride in a van with Trooper WEINSTOCK, and claims that he graphically told her that he wanted to have sex with her. And that,

and that she told him what he was doing was wrong, and that she was uncomfortable with him. Do you know anything about that sir?

ALTIERI:    No, in fact that ah, that was the – we were doin' that wire investigation, TNT, N, ah, had a hardware investigation that we were all assigned to from all the area TNT offices. And ah, I was the midnight supervisor, steady midnight supervisor, the whole time; I never worked with any of my own people the whole course of that ah, investigation. I don't think I did at all, no. I'm pretty sure I…

DUBY:    Do you know if Trooper ZELINSKI did work a surveillance specifically with Trooper WEINSTOCK?

ALTIERI:    After I had read the allegations, I had asked Rich about it, you know, just here in the last month. And he said that they were never in the van together, you know. At least that's my recollection of what he told me, and you can ask him that directly, but I didn't even know that.

DUBY:    Okay.

ALTIERI:    I wasn't there to witness it or hear about it. Nobody ever told me about it.

DUBY:    Referring the December 30, 1999, Trooper ZELINSKI claims that while conducting a surveillance at a bar, Trooper WEINSTOCK told her quote, "If I can see down your sweater, everyone else can." Trooper ZELINSKI claims that she was playing pool with another team member at the time. Do you know anything about this incident?

ALTIERI:    Ah, on the thirtieth, and this is the way, this is kind of this whole thing of the sexual harassment kind of is funny. Prior to that incident, we had been workin' - ah, Laura and I drove together up to Wyalusing to meet WEINSTOCK, Trooper Al WISE, and Trooper Kevin SEIDEL, who were doing a surveillance on a house from another house - ah, the Travel Shop in Wyalusing. And we were usin' their venue to oversee this location where all this traffic was goin'.

Laura and I arrived and because we didn't know exactly where to park, WEINSTOCK came out and met us in the parking lot. Ah, when we exited the vehicle, she gave Rich a hug and a kiss right in front of me, so, you know, to say all these allegations, and that

would have been so far after the fact that these problems arose, I mean I watched that happen.

Now, at the conclusion of that surveillance -- her- I don't know about if Al WISE went home or not, but her, WEINSTOCK, and SEIDEL went to Rich and Charlotte's Bar to conduct or further an investigation of Trooper SEIDEL's. The ah, ah, contents that you read there to me other than, as a result of this inquiry investigations, I had no knowledge or nobody made any complaints to me about that that occurred or anything like that. So...

DUBY:           Trooper ZELINSKI didn't come to you and tell you this?

ALTIERI:        No, never.

DUBY:           Okay. And did Trooper ZELINSKI ever come and tell you that Trooper WEINSTOCK was in the van with her and wanted to have sex...

ALTIERI:        No.

DUBY:           ...with him?

ALTIERI:        No. No.

DUBY:           Okay. Sir, referring to June 28, 2000, Trooper ZELINSKI claims that throughout the day at work Trooper WEINSTOCK continuously made comments in front of the unit and patrol members that he could see her underwear. Do you know anything about this incident?

ALTIERI:        No. June 28?

DUBY:           Yes.

ALTIERI:        No. That was our DART week. Hu-huh. I would have been in my office, and you know, and ah, I would have been there, but I don't know remember any such thing.

DUBY:           Did she ever tell you about this?

ALTIERI:        Never. Hu-huh. No, there was never any complaints to me about, ah, Rich's conduct with that regard.



| | |
|---|---|
| DUBY: | Okay. Referring to October 14, 1999, Trooper ZELINSKI claims that she told you that she did not feel comfortable working surveillance with Trooper WEINSTOCK, and had told you about the two incidents that occurred in June and August. |
| ALTIERI: | When was that? |
| DUBY: | Ah, October 14, 1999, Trooper ZELINSKI claims that she told you that she did not feel comfortable working surveillance with Trooper WEINSTOCK and had told you about the two incidents that occurred in June and August. |
| ALTIERI: | No. In fact, we had - that was the night we did surveillance, her and I, at Jimmy's place. And ah, in the van, we talked about a lot of things, I mean we talked about my family. We talked about my kids, ah, but there was a rift forming in the unit at that point, and ZELINSKI, MURRAY, and WIGLEY all had some issues with WEINSTOCK. And the reason why I - that conversation came up was in confidence unbeknownst to WIGLEY and ZELINSKI, MURRAY had came to me, and said, "Hey, you know, we're tired of Rich, and the way he is. And as a group we're go together, and we're gonna confront him about it cause we wanna straighten this out so we can have harmony in our unit. And our goal is not to get you involved, but I thought it necessary to tell you on the side, but please don't tell anybody else." And I said, "Well, what are your issues?" "Well, you know, Rich has a big mouth, this and that," and ah, Rich is outspoken. And you'll find that when you talk to him, but, ah, you know, they wouldn't give me anything specific. But he said, that, you know, was the issue. I said, "Okay, but if in fact, ah, your little get together, ah, isn't productive, and I see that there's a problem, I'm gonna get involved." And he says, "Oh, yeah," he says, "in fact, that's why I want you to know about it, because if it, you know it escalates, and he comes and tells you, at least, you know, I'm givin' you a kind of a heads up." I said, "Okay." |
| | And then after that I have this surveillance with ZELINSKI, and we're talkin'. I just wanted to see, you know, what these issues were, so I asked her. I said, "Well, what's goin' on in the unit? I hear, you know, there's some grumblings, some rifts, you know, the vice unit is sayin' that, you know, you guys aren't gettin' along, you know." She says, "Well," and she kind of tells me the same thing, "we don't have any reason, you know, to get you involved. We think it's something we can handle, and we've kind of made a group pact, we're not gonna get the supervision involved, you know." But, she says, "It's difficult workin' with |

him because of his big mouth and I, you know, we wanna resolve this amongst ourselves before we get supervision involved."  I said, "Alright, " you know.  So, I left it at that.  And ah, that was the end of it.

DUBY:  Okay.  Referring to October 14, 1999, Trooper ZELINSKI claims that she learned that you had told Trooper WEINSTOCK in the early part of the summer that she was a "sexual harassment suit waiting to happen."

ALTIERI:  No.  No, I don't believe I ever said that.

DUBY:  Okay.

ALTIERI:  I know I emphasized, you know, our work environment is gonna be free of sexual harassment, and, and I might beat a dead horse, I know in fact, Bureau Headquarters sent us this policy down, and we had to sign it I think.

DUBY:  Okay.

ALTIERI:  It was like Statewide.

DUBY:  Yes.

ALTIERI:  And I went over it again with the guys, but I don't, I don't ever recall makin' that kind of statement.

DUBY:  Did she ever talk to you about that specific issue at all?  Did she ever come to you and say why are you making this...

ALTIERI:  No.

DUBY:  ...accuse you of making a claim...

ALTIERI:  No.  Never.  Hu-huh.

DUBY:  ...lot anything like that?  Okay.  Referring to February 22, 2000, Trooper ZELINSKI claims that Trooper WEINSTOCK, told a co-worker, which would be Trooper MURRAY, that "she tried to hurt him with you, and now he was going to hurt her."  Do you know anything about that?

ALTIERI:  When I read that, you know, in the complaint, I asked him about that, and ah, the only thing that I can recall, was I approached him on the difficulties within the unit, and she had told me that I can't

trust WEINSTOCK at one time. Ah, and, and I might have confronted him about, you know, my trust, you know, "Hey, as a unit we got to able to rely on one another, trust one another," but, you know, other than that, I don't know why he would make that statement to MURRAY.

DUBY:          Do you know if Trooper WEINSTOCK ever admit to you that he made that statement concerning Trooper ZELINSKI?

ALTIERI:       No, he never told me that, and I knew about it because of the complaint.

DUBY:          I guess what I am asking you is did you specifically ask Trooper WEINSTOCK, hey did you say that you are going to hurt...

ALTIERI:       Oh, no.

DUBY:          ZELINSKI...

ALTIERI:       No...

DUBY:          ...because...

ALTIERI:       ...the conversation never took place, no.

DUBY:          Okay.

ALTIERI:       And keep in mind, and, and I don't know how well you knew Shawn or not, but, you know, one, one thing I had with him was a guy who played both sides of the fence...

DUBY:          Okay.

ALTIERI:       ...and it was difficult, because he was a good worker, a hard worker, but a lot of the problems that I felt the guys were havin', her and WIGLEY and him, against WEINSTOCK, were generated because MURRAY and Rich had a friendship. I guess prior to coming to the unit, and they worked out together and what now. And I guess often times, you know, they're, ah, ball-busters, I guess you wanna call it at the gym, so I guess maybe some conversations relating to critical remarks one another might have occurred, and I was never present. I am only speculating. And then MURRAY would take them back to ZELINSKI. And WIGLEY – and then of course that would enflame them. And then they would say stuff about Rich. It was like this ongoing pissin' match, ah, that I intervened with at point, and basically confronted

|  | MURRAY about it and ah, he acknowledged the fact that he was in fact doin' that because of somethin' that Rich did to him. And it was with regard to some extra marital affair MURRAY was havin'. And Rich might have said somethin' that it could got his, MURRAY's wife might have found out, I, I don't really know, and I'm – again MURRAY kind of told me about it, but I don't wanna hear about it cause I don't, you know, condone that activity, you know. |
|---|---|
| DUBY: | Okay. Referring to April 14, 2000, Trooper ZELINSKI claims that Trooper WEINSTOCK began stating that "the reason Patrol would not serve search warrants with the unit was her fault for messing up a drug bust." Do you know anything about this? |
| ALTIERI: | Well, it was true that the Patrol was allegedly refusing to work with us as a result of a comment she made at a meeting, and her ah, failure to ah, fulfill her commitment on a search warrant execution. That is actually what the rumor was. |
| DUBY: | Okay. |
| ALTIERI: | Not that she messed up. But, she actually had made a, ah, I don't know, I don't think she did it on purpose, but there was a remark made during the critique, the after action critique of the search warrant where a dog was shot, and where she fired her weapon. |
|  | And ah, I was the downstairs' supervisor after we got the floor secured, and the rest of the team had to go upstairs to secure the upstairs, and there was a Sergeant WHITTAKER and a Corporal DEGNAN and a Trooper SPAGNOLA, MURRAY, and WIGLEY. I don't think MURRAY and WIGLEY ever got to the landing, but ZELINSKI did. |
|  | There they encountered a dog, and the allegation from Sergeant WHITTAKER and Trooper SPAGNOLA to me, and I talked to them personally after all of this, was that ah, she never finished – and Trooper Al WISE was up there – she never finished executing her commitment. Like when we go up and do a flood, are you familiar with the flood? |
| DUBY: | Yes. |
| ALTIERI: | You go and you hit every room. You start almost from the back and work you way forward. You don't stop at each room and go down, that way when the other guys are stoppin' at the rooms behind you, somebody doesn't pop out and blast you, you know, |

and that's the idea. Well, she never finished that, and Al WISE told me that she didn't because they had to cover the rooms, because they were tanglin' with these dogs. Trooper SPAGNOLA and Sergeant WHITTAKER said they had the dog under control when ZELINSKI busts through the center of them and with all the commotion, the dog lungin' back and forth, she gets bounced back into the wall, hurts her hand, and her gun gets discharged.

She's told me, and I wouldn't second-guess her, and I'm still not, not really, that she was aimin' at the dog and went to shoot, and she shot it in the leg. Now, that's what she told me when she came down. Immediately following her comin' down the Corporal, who actually killed the dog with the shotgun, two shots with the shotgun, comes down and tells me, "Uh, ZELINSKI misfired upstairs and leaves," and then he also tell me that he tells Captain ALTAVILIA. "Yeah, went in and told the old man, Trooper ZELINSKI had a misfire," and he's a seventeen-year man, Firearm's Instructor, and then he says, 'Wait until you see the R and I pictures, you'll know."

I talked to Sergeant WHITTAKER. I talked to SPAGNOLA. They confirmed, yeah, "That was a misfire." She tells me it wasn't. I said to her, "Laura," I'm ~ at that point, I'm not second-gessin' you." I had a concern because if in fact, she didn't fulfill her commitment, and if she did misfire, you know, what if down the road we go into another entrance someone gets hurt or killed, you know? And I knew that, and didn't do anything about it.

But at any rate, we then have an after action critique led by Lieutenant MENDOFIK and during this critique, you basically you talk about the goods and the bads; the fulfillment of your goals and objectives during this thing. And essentially, he had told us that ah, you know, the, the search warrant preparation was very well complete with what we had, you know.

Obviously, you can't have everything and under the circumstances there were things that were missing for ah, you know, as far as the intelligence on the location we're doin'. And at some point, we got into the entry, ah, portion of the ah, of the ah, execution of the search warrant, and ah, she pipes up out of the blue, and I can remember her sittin' in the chair, Dan WIGLEY and Trooper SPAGNOLA sittin' right behind me. She was sittin' to my right, just lookin' down like in a daze, and she says, "Well, maybe, you know, Patrol shouldn't come with us because they're not trained" and then "don't know what you are doin'" is essential what she said. I can't state it exactly. And then Corporal DAVIS was

instantly pissed off, cause it was kind of a remark that was a little bit of a jab. But I don't really think she meant it like that other than we work (inaudible) to a high risk class and we knew our order to go in the door about how we would execute it. So, at any rate, I tried to recover. I said, "Oh, that's not what you meant. Mike and the guys, you know, it's more like, you know, hey, we have this training," and I kind of recovered, I thought.

About a week or two later, about a week later, ah, I forget, Sergeant WHITTAKER pulls me aside and says, "Hey, Patrol's refusin' to serve search warrants with you as long as ZELINSKI's gonna be around." So, at that point, before I was going to approach Laura on it, based on any, based on the remarks she made at the meeting, and her actions upstairs which, like I said, I wasn't gonna say, Laura should of this and that. I wasn't upstairs. The Corporal DEGNAN was, Sergeant WHITTAKER was, so what I said was, to him, after he told me all this stuff, well, I'm – he told me to go and find out for yourself and I said, "I was gonna do that." So, I went around, I talked to a couple of other people, and I wanted to wait 'til I got the R and I photos back of the scene, cause I sent a photograph out.

In the interim, they had conducted an inquiry into the shooting rather than a Use of Force BPR. Ah, why they did that, versus that? Well, I guess the FR has a section that covers shooting destruction of an animal. But yet, you know, the Captain ALTAVILLA was aware that she also discharged her gun, and that was a judgement call on his part, you know, that's, that's his ball of wax, you know. I don't know.

DUBY:          Okay. Well, I guess what I specifically asked did Trooper WEINSTOCK claim that Trooper ZELINSKI, ah…

ALTIERI:       He didn't claim that to me. I got that from Sergeant WHITTAKER.

DUBY:          Okay. All right.

ALTIERI:       In a round about way I got to that.

DUBY:          Okay. Referring to after her transfer from BDLE, on August 21, 2000, Trooper ZELINSKI claims that Trooper WEINSTOCK and you continued to make derogatory remarks about her and her ability to do the job. Is that true sir?

ALTIERI:       No. In fact, I was told not to say anything.



DUBY:              Okay. Trooper ZELINSKI claims that Trooper WEINSTOCK said
                   that she was transferred because of her paperwork. Is that true?

ALTIERI:           No that's not true.

DUBY:              Ah, Trooper ZELINSKI claims that you said that she was
                   transferred because she was a liability from the March 3, 2000,
                   search warrant. Is that true?

ALTIERI:           No. No I never had a reason. She got transferred to (inaudible) up
                   and transferred her or unattached or whatever you wanna call it

DUBY:              Yeah, detached from ah – yeah, I guess…

ALTIERI:           …whatever you wanna call it.

DUBY:              …sent back from her…

ALTIERI:           She got sent back from her detached position.

DUBY:              Her detached position was rescinded, I guess, okay. Trooper
                   ZELINSKI claims that on January 13, 2000, you accused her of
                   refusing to work with Trooper WEINSTOCK. Trooper ZELINSKI
                   claims that she was blamed for not being a team player. Is that
                   true?

ALTIERI:           I had a conversation with her as well as Dan WIGLEY and
                   Trooper MURRAY, right in that time frame with regard to that.
                   Because my observations were they were ah, on a regular basis, ah,
                   excludin' him from the team activities. Or, I don't wanna say the
                   team activities, because I had to have a conversation with them that
                   one of my Monday meetings with regard to takin' so many people
                   out on a, on a buy…

DUBY:              Okay.

ALTIERI:           …and, and the Serge says to me, he says, "Hey", and this was said
                   at Corporals meeting, that "a buy should only take the undercover
                   and a surveillance person, unless, of course, you think this is a
                   dangerous situation, and you need more people." But generally,
                   it's a two-people deal…

DUBY:              Okay.



ALTIERI:    ...and maybe you CI. And it seemed like there was an ongoin'
amount of the whole team bein' out at the one buy and tyin' up
their time rather than gettin' out to their county substations. So,
with that and the fact that during these things, WEINSTOCK, it
didn't appear was bein' asked to, to go along. In addition to
Corporal GUSHKA sayin' to me, he says, "Hey, Louie, you know,
I don't care that Rich works with my guys," he says, "but it seems
like you guys are avoidin' him." And I said you know, "I know,
I've, I've noticed that, and I'm gonna have to talk to 'em about it."
And this is kind of when things in our unit were comin' to a head
again as far as personality conflicts and that. Just, you know, like,
an unwillingness to wanna get over, you know, their personalities
differences, and I stepped in and I said, "Hey, guys, you know,
Rich is part of the team. If you got somethin' goin' you ask Rich to
go." I said, "He asks you to go", I have his Monthly Activity
Reports where you list you buys and your assists. And I looked at
theirs. I looked at his. And it was obvious that he was requesting
their assistance, and when they would request his assistance he
would go. But they were sayin' well, was not available, that he,
he, he, would not show up, but it was like an (inaudible) amount of
numbers, I mean, he was there more for them than they would be
there for him, so he had to use vice quite a bit. And I said I was
not gonna put up with that. And I told MURRAY, ZELINSKI, and
WIGLEY as a whole, not just Trooper ZELINSKI, you know.

DUBY:    Okay. So, the team player issue was discussed with...

ALTIERI:    All of them.

DUBY:    ...Trooper ZELINSKI?

ALTIERI:    All of them.

DUBY:    Okay.

ALTIERI:    It wasn't just Trooper ZELINSKI. It was at a meeting.

DUBY:    Okay. Referring to February 1, 2000, Trooper ZELINSKI claims
that you critiqued the execution of a search warrant, and blamed
her for its failure. Trooper ZELINSKI claims that it was a team
effort, and it could have been planed better. Is that true sir?

ALTIERI:    It wasn't a team effort. It was Trooper ZELINSKI's buys ongoing
buy (inaudible) Andrew, Andrea, no Jolean GRUDISKY
(phonetics) Calvin EDWARDS, the two targets, ah, she had been
doin' some buys out for them and she wanted to do (inaudible)



Case 3:01-cv-01979-TIV    Document 54    Filed 02/03/2003    Page 116 of 278
Interview with Corporal L. v    M. ALTIERI re IAD 2001-0093
Page 23 of 57

Warrant which wasn't exactly what had happened. Ah, we ended up doin' a couple buys. At some point, I said, "Hey, you know, we got enough into them, when are we gonna take 'em off?" She said she was gettin' the intel around to do an probable cause affidavit for a search warrant.

DUBY:    Okay.

ALTIERI:    We, ah, she submits all the paperwork. She gets the ticket and the body warrants for the buys. I had asked her not to keep buyin' these large amounts because it wasn't affecting the, ah, the, ah, punishment phase of it. It was, you know, after you have so many, it's just not gonna make a difference. It's a waste of money, you know. So, I, I, asked her not to do that. She insisted anyway, and she did it despite my request, and ah, we get the paperwork. We execute the search warrant during the...

END OF TAPE #1, SIDE A, DATED MARCH 8, 2001.

START OF TAPE #1, SIDE B, DATED MARCH 8, 2001.

ALTIERI:    ...by the Department before we go in. These people are mobile, and I think we do a traffic stop on 'em. Ah, two people that were outside the residence at the time get arrested for disorderly conduct because they have an conflict with Trooper Al WISE and Trooper WEINSTOCK outside the apartment before we go up inside.

We go up inside the apartment. I'm up there. Trooper WISE's up there, Trooper ZELINSKI, and Trooper WIGLEY. Trooper WISE, we split up to do the search to expedite it. I think we had a dog there that day. The dog goes through first. They leave. Ah, she starts to trash this place, and I mean totally just throw, and she's lookin' doin' the search warrant in disarray.

At some point I stop her, I tell her, "Laura, I don't operate like that." I said, "Yeah, they're bad guys" I said, "but we're professionals. You can search the place without tearin' the place apart like that. There's no reason for that." She says to me, "I want to make sure they let them know that we were here." I said, "Well, we don't have to do that." She said, "Well, let me come over and re-search where you searched so I can make 'em..." I said, "Laura, you're not gonna come out of there. You're gonna finish your room up, and we're gonna get out of here."

Ah, we conclude. We go back; I think the following day or the following week. We do a critique of the search warrant. It is to



point out the goods, and to point out the bads. I point out that intel was lacking, but we did we meet our goal and objective? Yes, we did. I point out to Trooper WISE and to Trooper WEINSTOCK that we need to avoid confrontations like that, downstairs ah, with the outside. It was people unrelated. I guess they were goin' and gettin' dope from a downstairs apartment, as well. And we encountered them when we were gettin' ready to do a ticket on the upstairs apartment. And they get mouthy with Al WISE and WEINSTOCK. Well, they get arrested. My suggestion to them, and it wasn't just a critique focused on her, was that we avoid that we bite our tongues and sometimes you have to let that go in order so you can expedite gettin' into our target location. So, there wasn't any blame, it was just a critique.

DUBY:                  Okay. So, the critique happened, but she wasn't specifically blamed for the failure....

ALTIERI:               Right.

DUBY:                  ...for the search warrant.

ALTIERI:               Right. And it wasn't a team effort. It was her search warrant. She says it could have been better as a team. She initiated it the assignment. She has to carry it out. The others help, you know when they can, but ah, you know, as far as that goes, no, I, it didn't occur quite how she has that down there.

DUBY:                  Okay. Referring to April 13, 2000, Trooper ZELINSKI claims that you told her that it was her fault that Patrol would not serve search warrants with them, and that she should have been investigated and probably disciplined for firing her gun during a raid.

ALTIERI:               No, actually I did meet with her, April 13th or 14th, ah, at that point, ah, there were like six weeks between the time that, that after action critique lead by Lieutenant MENDOFIK happened and that her and I got to talk. And six weeks sounds like a lot of time, but actually I have it mapped out as to why it took so long.

DUBY:                  Six weeks is not a long time, really, for an investigation to be done.

ALTIERI:               Well, the inquiry, I don't know how long that took, Lieutenant OLIPHANT did that, but the reason why I didn't approach her on it, and cause she made than an issue at her meeting, "Why is it taking six weeks for you to say anything to me?" Well, the first part of April, the last two weeks, which – cause the 13th is when we had the conversation. She was on vacation. The week prior in

May, or in March, excuse me, she was at Basic Spanish Course, ah, at the Fort Indiantown Gap. The week of the 20th and the reason why I know this is cause I pulled my schedules to look at it, cause I was thinkin' well, that is a long time. Why did I wait? Ah, she was, she was working, but we had CPR. We had Legal Updates that week, and we were all different directions, not to mention, I didn't have the photos back from R and I yet. And I wanted to, to know my facts, I mean. I know what the allegations and rumors were in the Troop, but I didn't wanna, (a) send her off on a vacation worrying about that oh, ah, I'm, I'm being critical of her actions without knowin' the facts (a) and (b), you know, that's not how I am. I did not operate a unit like that.

Ah, I had a good working environment and I thought with everybody, I mean. I know that I might ah, want or expect a lot from everybody. I want your best. But other than that, I, I mean, I wasn't, I was very offering to everybody in the unit, not just to her, to everybody.

So, I did wait until she got back after I had all the facts, and I did ask her about it. And I did tell her that in fact the rumor is true that Patrol is refusin' to work with us based on your remarks and your actions, ah that happened at that search warrant. And I fact, ah, I told her that I already had put out all the fires, and I was comfortable with that. I think we're over that bridge, and, and there're not, I think the Troop had to regroup, and cover that conversation because I don't think they were allowed to, you know actually deny us. That fact, in fact, I had brought that to Sergeant RUDA's attention. They were refusin' to work with us, I know, when he talked to Sergeant WHITTAKER afterwards, you know, they kind of backed down from that position. And then it's my understanding since then that the Captain was aware of it, and I told one of his people that the Troop needs to take care of that, because we can't take that position. Ah, I told her that basically it's covered. She needs to just forget about it. I'm her supervisor. I'm in her chain of command. She doesn't have to go to anybody outside of this here to handle it. It's handled. In fact, I told her not to.

DUBY:                Okay.

ALTIERI:            Cause we had a subordinate ah, ah, buckin' the chain of command issue come up, because right after I told her not to pursue this, she went right out, it was like startin' the fire all over again, and gettin' some hard feelings goin'. I'm thinkin' I just told her not to do that.



DUBY:               Okay.

ALTIERI:            Go ahead.

DUBY:               Well, I guess what I was specifically asking in regards to her
                    specific allegation, ah, did you ah, tell her that she should have
                    been disciplined?

ALTIERI:            No.

DUBY:               Or investigated for firing her gun?

ALTIERI:            Alls what I said was, "Rather than an inquiry, it should have
                    probably been a BPR, but it wasn't." I never said she should be
                    disciplined over it, no.

DUBY:               Okay.

ALTIERI:            And it should have been a BPR in my opinion. In fact, you should
                    make that inquiry a part of your record.

DUBY:               It is part of it.

ALTIERI:            Oh!

DUBY:               Yeah, I, Sergeant RUDA suggested for me to obtain that, and I
                    actually did ah, in fact, while I have you here, it is not actually a
                    Supervisory Inquiry, it's a...

ALTIERI:            It is a Use of Force Inquiry, right?

DUBY:               No, it's a, how it is titled is ah, Report of Incident/Accident.

ALTIERI:            Oh. Okay.

DUBY:               And it consists of several pages, and in all honesty, I haven't read
                    it yet. But I received that from Troop P, so...

ALTIERI:            And I don't even know if she was interviewed for that.

DUBY:               I, again I haven't read it.

ALTIERI:            I, I'm just speculating. I don't know whether that's about or
                    relevant or not.

DUBY: And specifically, I know you mentioned the comments, but did you ah, tell her that it was her fault ah, that Patrol would not serve her, search warrants with the unit?

ALTIERI: As the result of her comment, yeah.

DUBY: Okay.

ALTIERI: And that's how I put it, "As a result of your comment." I said, "Patrol's reluctant to serve search warrants with us."

DUBY: Okay.

ALTIERI: And it's true.

DUBY: Referring the April 13, 2000, Trooper ZELINSKI claims that you had put a note in her file six weeks before about her poor communication skills, and that she never actually saw this note. Is that true?

ALTIERI: No, I put it in that day. I let her know that I had a note. I was puttin' it in her file. It wasn't an official Supervisory's Notation. It was just a hand-written note. The only person in my unit that ever got an actual Supervisory Notation for somethin' like a discrepancy type of one would be MURRAY. And I told her that to consider yourself counseled, just a verbal, you know.

DUBY: Was this on the day of the search warrant, or was this the day...?

ALTIERI: The 13th.

DUBY: The 13th?

ALTIERI: Uh-huh. When I met with her cause that's when I talked to her about the, ah, the search warrant and the allegations. I had walked in on her and WEINSTOCK. They were talkin' in the vice office and ah, right when I was just comin' into the door to go into the vice office, I heard her say, "Well, Rich, is it so? I heard that, ah, Patrol won't serve search warrants, ah, anymore because of me." And I walked in the door, and he says, "We'll let the Corporal tell you about it." I said, "Laura, I've been waitin' to talk to you about it, so we might as well do it now." I said, "Do you want to go into the other room?" And she said, "Yes." And we walked off to OUR, ah, CI interview room. It's just like a little...

DUBY: Okay.

ALTIERI:            ...private room that we had. But I did it in private.

DUBY:               Okay. So, the note was put in her file, but not six weeks prior?

ALTIERI:            Right.

DUBY:               And did the note have to do with her poor communications skills?

ALTIERI:            Yeah. It just said that her ability to articulate or something to that effect.

DUBY:               Okay. And sir, do you still have the note?

ALTIERI:            I believe I do.

DUBY:               Do we have it here today?

ALTIERI:            I can check.

DUBY:               We probably should make it part of the record, if that's okay with you, if not that's ah, you know, neither here or there. But, did she actually see the note or review the note?

ALTIERI:            I think I wrote it in front of her. I thought I did.

DUBY:               Okay.

ALTIERI:            And then I have her sign it, you know, like I said it wasn't like a formal counseling, it was just – I wanted her to be aware that, you know, it's stuff like this, sure, it needs to be documented.

DUBY:               Well, supervisors do that. That's part of the...

ALTIERI:            Yeah. And that's my right...

DUBY:               ...job.

ALTIERI:            ...to be able to put somethin' in her file.

DUBY:               Absolutely.

ALTIERI:            I said there's notes - I put in everybody's file. And I said unbeknownst to them, she asked me, I said, "Absolutely." I said "because it reminds me that if there are second, third, subsequent violations, you know, things that I've already asked you not to do,"

At least, I have something to say, "Hey, look, you know, I told you about this."

DUBY:           Well, her specific allegation is that she's claiming that she never actually saw the note. Did she actually see the note?

ALTIERI:        I, I believe that she did. I thought - like I said I was certain that I wrote it right in front of her. (Pause). (Sound of paper rustling). Go ahead. I'll keep lookin' while you are talkin'.

DUBY:           On, not a problem. Not a problem. Referring to July 7, 2000, Trooper ZELINSKI claims that you told her that she was being counseled and said about her charges about a previous drug bust were not prepared in a timely manner, and that there was a safety issue on June 28, 2000. We are going to hit a lot here, so we can go back on this, and she refused to sign STD-501 on a drug purchase on June 27, 2000, for Trooper WEINSTOCK, and that she had refused to change her timesheet. I guess we can hit them all at one time.

ALTIERI:        Actually, you are gonna have to break it up, cause it's, it's pretty involved.

DUBY:           Yeah. It's pretty involved...

ALTIERI:        I know I have a copy of that note, and I can get it to you. I thought I had it with me, I can't believe that I don't. Ah, after we get goin', I'll, I'll find it.

DUBY:           Not a problem. Okay. Regarding her claim that she was being counseled for not ah, having her charges prepared on a drug purchase. Is that true? Did you counsel her for that?

ALTIERI:        Here's, here's, you know, it is not a yes or no answer. Ah, all along from the back when Sergeant EVANCHICK was runnin' the show in Area II, and that's why I say all along, cause I had Monday, ten o'clock staff meetings, almost weekly. Ah, he had suggested because we had had conducted this heroin sting, ah, and when we went to crunch all the warrants, everybody had to type, type, type, type, and we had all these charges and reports laying around, and it just took so long to get that together. He told me, pulled me aside. He said, "Lou," he said, "to avoid that in the future, I think it's a good idea if you go out, and you do a buy. You cut a number. Crunch a PC Affidavit and Complaint, and attach it to your report in your folder in your desk. So that, you know, at the end of the week, if you decide Monday, you are gonna

crunch warrants, you just go to the Magistrate and drop them off and say I need these for Friday."

DUBY: Or if you need to pick somebody up right away.

ALTIERI: Right. You have the paperwork.

DUBY: Yeah.

ALTIERI: I liked that. That was a pretty good idea not to mention he kind of suggested it in a nice way, but it was like he was tellin' me to do it. So I thought, okay, that's acceptable. I'm not gonna argue that. I'm new to this position here.

I made it a point to pass it on at my first meeting prior, after that conversation with the Serge, I got resistance from WIGLEY, ZELINSKI, WEINSTOCK, MURRAY didn't say one thing or the other, but he never did when I was there. He would join the crowd after the fact. They didn't really like that idea, but ah, they reluctantly were going to comply. At any rate, that's what they said. So, this was goin' week to week to week, I would bring this up cause I was checkin'.

I'm not the type of supervisor to take and make a big issue out of things when we're such a small unit and our, our unity amongst us needs to be very special in that we depend on one another. So, I don't want to be known as the hard-nosed guy that cracks down, you know, and starts a BPR or goes progressive discipline over that. I just kept havin' to repeatedly tell them. Ah, MURRAY, I believe was on board, ah, he never had a problem. To get to the 28th and I'll jump right ahead rather than to go week to week. That was DART week.

DUBY: Okay.

ALTIERI: Ah, the beginning of DART week, was the 27th, was a Monday?

DUBY: I have no idea sir.

ALTIERI: Okay. I'm, I'm, guessin'. Friday, I talked to the Serge. We had what was called operation QUEEN and PLACED (phonetics), Trooper MURRAY had put this operation some time ago. Ah, and we were tryin' to get to it, and basically, it was another sting we were gonna do. But it just, with everything goin' on, we just couldn't. Ah, the end of June comes along and prior to that, like Friday, the Serge says to me, "Well, I guess we're not gonna get

our DART in and the Area's due to a year." One unit might do one and one might do another. I said, "Well, you know what Serge?" I said, "Maybe our operation QUEEN (phonetics) will fit the bill for the DART. I'll type up a letter to you with what the details are and give it to you, and see if it's acceptable." I think that was a Thursday, because then Friday I had it typed up. I stayed like all night to do it. And he sent it down to the Lieutenant. The details of it were fine. It would accepted to be as a DART, so we would have it in before our time frame was up.

Monday I have a briefin' with the guys, Monday morning, I think, we all - I tell them Friday we all need to be there for the ten o'clock meeting at the very least. We might have been there earlier. Ah, I break the news, "Hey guys, this week, we're gonna do a DART." I said, "MURRAY," I said, "this is your baby because this is operation QUEEN (phonetics)." He was all-thankful. Ah, I said, "And what'll be nice," I said, "even though we have only sixteen potential targets, all the charges you guys have typed up, we'll just incorporate, and we'll get them crunched this week. And we'll have more than what we will alleged to have, because we'll just use those other warrants, as if we did 'em this week. We'll just serve 'em at the end of the week." Well, grippin' and groanin' because unbeknownst to me, they didn't have a lot of their warrants done, the paperwork for these that we just talked about.

DUBY:                    The complaints and affidavits.

ALTIERI:                 The complaints and affidavits, exactly. So, at the end of the week, or the following week, when it came down to it, their puttin' all this all so called extra time in to type up these charges and everything, her and WIGLEY. MURRAY and WEINSTOCK didn't have to, and if they did, I didn't, I didn't get approached on it.

Ah, the following week when I denied their overtime, ah, she says, "Well, we were there." We deserve it and this and that. I said, "Hey," I said, "it wasn't authorized, and (b) you obviously didn't have your charges typed up before hand." And I knew she didn't cause I had walked upstairs into the Crime Unit where she was on the computer, and I seen her typin' up the charges. And I said, "Hey, consider yourself counseled, you know. You didn't have your paperwork done. You should had it done. You wouldn't have ran into this problem." Again, was there a note in her file? No.



DUBY:              Okay.

ALTIERI:          It was just a verbal acknowledgement that I was aware that she
                  didn't have 'em done.

DUBY:              Okay.  The counseling did take place then?

ALTIERI:          Essentially.

DUBY:              Okay.  And ah, in regards to the safety issue on June 28, 2000, can
                  you tell me about that?

ALTIERI:          Yeah.  What happened was ah, this, this DART essentially, was,
                  they had two real good CI's.  They said the best in the State, is
                  what they told me, but at any rate that's irrelevant.  They would go
                  to their house.  They had these lists of names that these particular
                  CI's were dealin' with to make drug purchases from.  The targets
                  use these people a lot, and unbeknownst to them they were workin'
                  for us.  So, the four of them went to their house.

                  I was not out in the field with them on this, because it was nothin'
                  more than your makin' con...you are makin' direct buys and some
                  controlled buys, and now you have four of youse out there.
                  There's no need for me to be there.  I am at my office.  The Serge is
                  over at his office.  So, at any rate, they go over.  They're inside.
                  We have two surveillance people outside.  They take a break at
                  some point during the evening and the one CI leaves.  He leaves
                  our surveillance guy outside.  Watches him jump in the car with
                  one of the targets.  He makes a drug purchase, but he makes a drug
                  purchase unbeknownst to all our guys, and then he goes back to the
                  house.  He calls, our guy calls into the house, or, or our
                  surveillance guy, and it might have been Kevin SEIDEL.  It might
                  have been Bill PATTON.  I don't know which one it was.  And
                  says, "Hey," he calls in on the two-way, I think or to MURRAY,
                  MURRAY received the transmission.  "Hey, do you realize your
                  CI - Oh, I have a guy leavin'.  I have a guy leavin'.  They're like
                  "What?"  And he describes, he says, "Well, that's so and so."  And
                  he says, "Well, he just made a drug purchase."  Well, here the guy
                  made a drug purchase.  He came in and left.  And he delivered the
                  drugs to somebody else because to my knowledge he didn't bring
                  any drugs back in the house.

                  After I interviewed the, the CI and asked him about it, you know,
                  he admitted that.  That he did do that, and they were told about the
                  incident by our outside surveillance people that it happened.  Well,
                  they never brought it to my attention until the end of the week.

And I said, "Well, he could have compromised your safety." I mean here he went and delivered drugs, bought drugs, delivered drugs, and you are supposed to be supervisin' him. I said he could have disclosed your guys were in there, I said, "A multitude of things could have happened."

And she wasn't the only one counseled, and I mean and it was a verbal. I told WIGLEY, and I told her, and I told WEINSTOCK, and I told MURRAY about it. MURRAY actually got a written counsel. He did call and tell me, that admitted that it happened. And WEINSTOCK said he was there and heard the transmission also. He said, "Does ZELINSKI and WIGLEY (went like that) like they didn't hear it, you know, one of them deals."

DUBY:        Actually, I think, I might be wrong on this, but I thought this issue had to deal with ah Trooper ZELINKSI working in an undercover capacity with another female...

ALTIERI:     Oh, that's...

DUBY:        ...informant...

ALTIERI:     Okay.

DUBY:        ...in which the two drug dealers arrived.

ALTIERI:     Right. Right. Well, here...

DUBY:        Can you tell me about that?

ALTIERI:     That was the first safety issue that I found out after that one alleged safety issue. When this DART took place, you gotta understand, WIGLEY and ZELINSKI both said, "Hey, you know, we got too much to do." They're very resistant on doin' it, but everybody, when I left the briefin', I told them Monday, go finish what other business you gotta do, and tomorrow we start.

Tuesday they get started. They go out in the van, and I guess somewhere on their way there after they broke for lunch right after we, we broke to go do the detail, WIGLEY and MURRAY get into a heated argument and WIGLEY's yellin', "Hey, this is bull shit. This isn't my thing. This is yours MURRAY, and I don't want any part of it." And he dropped his cell phone on the ground. He kicked it. I mean he was quite angry over it. He didn't want any part of it.

Case 3:01-cv-01979-TIV   Document 54   Filed 02/03/2003   Page 127 of 278
Interview with Corporal J⁻⁻   M. ALTIERI re IAD 2001-0093   ⁻⁻
Page 34 of 57

Unbeknownst to the guys, MURRAY calls me up and says, "Lou, I'm sick of this," he says, you know, "Dan don't want to be a part of this. He's doin' anything to derail this operation." And he says, "He just treated everybody like shit all night because of this detail. He says it's my fault because I insist on makin' all these arrests, him and WEINSTOCK, and we're not stickin' together." Their goal, WIGLEY and ZELINSKI was to get me thrown out of the position, out of my position. And I knew this because they went to another person in another Troop, and solicited his help to give me a shot. And I'll get into that later.

But anyway, ah, so, diggin' into, you know, this argument, and I guess now WIGLEY still participates, ah, to get into Wednesday, and ah, this so called safety incident happens where Laura goes out to meet with one of the guys, and I wasn't there, so I'm...

DUBY:          Okay.

ALTIERI:       ...paraphrasin' from what I understand and, and her position was was that the guy came around and refused to pick 'em up because they may have identified her or somethin' like that.

But at any rate, the deal goes down. They make the buy. They come back in. WIGLEY says, "We're shuttin' down the operation. It is a safety issue." MURRAY had come back to the barracks to take evidence back and calls me and he says, "Hey, Corp, I just want to tell you this is the second time now, WIGLEY is derailin' this thing. He's shuttin' it down because he's sayin' there is a safety issue. He says, "There is no safety issue." He says, "Don't let him know that I am callin'. He says, and I said, "What are you gonna tell him?" And he says, "I'll tell them that you called me at WEINSTOCK's desk, because they already didn't like Rich, so they would believe that I probably called Rich. I said, "Okay, tell 'em whatever you want." I said, "But tell, 'em to get out there. That's bull crap." I want 'em to get out and finish work. He said, "There was only an hour left on the shit."

But little to their knowledge, I already knew what they were comin' in for was not true or their variation, their variation of the story isn't true. I mean they found out about what the details were and they, they knew it wasn't a safety issue after it was done. And they didn't stay out there. And I did bring that up to her about lyin' to me about it.

DUBY:          Okay. So, she was counseled for that then, a verbal counsel?



ALTIERI:        Yeah. Just for lyin'.

DUBY:           Okay.

ALTIERI:        And so was MURRAY.

DUBY:           Okay.

ALTIERI:        And so was ah…

DUBY:           WIGLEY?

ALTIERI:        …WIGLEY, I mean I told them all. I said, "That's…" we, had, had, had, an actual meeting the following day. Because when they came back, and they had an hour to burn yet, instead of doin' their paperwork, they had, they had a gripe session and just ran me into the ground because MURRAY called me later and told me and so did WEINSTOCK. And I knew. And then I confirmed it with Bill PATTON (phonetics), another Trooper, at the Magistrate's Office the following day. They didn't do any paperwork. They gripped and complained about all this stuff I'm expectin' of 'em, and then I came in the next day, and we had a meeting about it cause I had found out about it. And ah, and I told 'em all, you know, I said, "Hey, this is a bunch of baloney, you know." And I said to 'em, you know, "This isn't done here with me." I said, "I've let the Serge know and, and it might have gone higher, you know, but I'm gettin' this resistance."

DUBY:           Okay. And sir, in regards to her claim that she refused to sign a STD-501 on a drug purchased on June 27th for Trooper WEINSTOCK…

ALTIERI:        I, I don't really understand that, and this is why I brought these along. One thing that I do, is, you know, maybe I was tellin' Keith, I am pack rat.

DUBY:           I think her allegation was that she wasn't present when this thing took place and that why should she sign off on something that he did when she wasn't there.

ALTIERI:        And nobody was – that's never been a issue, I mean, when I found out, I'm thinkin', I look back and, and essentially what she did – these, these are receipts. I don't know if you know about these or not. This is a receipt. You make a drug purchase from ah, ah, a target and you use a CI and you know, you indicate your drug purchase cost…

DUBY:            Yes.

ALTIERI:         ...and then your informant payment. Well, if it's fifty and over, you got to get a co-signature. Right? So, here's your informant's signature. This would be the investigating officer's signature, the one that accepted the money, and then your witness or vise versa. None of them were inconsistent. I mean she was the one dealin' with everybody's money, and she had 'em all sign. So, I don't really understand what that is about to be honest with you.

DUBY:            Yeah. She says "WIGLEY and I refused to cosign on WEINSTOCK's drug purchase because we didn't know anything about it." That's what she is claiming that she was counseled for not signing off on something of Trooper WEINSTOCK and cause she wasn't there.

ALTIERI:         No such thing happened.

DUBY:            Okay.

ALTIERI:         That's what I'm sayin'. I'm lookin' back on paperwork to try and see what she is even talkin' about cause I don't know.

DUBY:            Okay. And the last thing of that whole issue there was that she was counseled for refusing to change her timesheet. Is that?

ALTIERI:         Oh, absolutely not. Alls I told her was ah, ah, I see that you put in for overtime. She says, "Well we think we deserve it." I said, "Well, obviously you're aware of the Department's guide lines for overtime needs to be approved." She says, "Yeah, I'm aware of that." And I said, "You know, we never discussed it, and I never approved it, and I am gonna deny it." And I said, "I'm just givin' you heads up that I am gonna deny it."

DUBY:            Okay.

ALTIERI:         There was no counseling.

DUBY:            Okay.

ALTIERI:         I told WIGLEY the same thing.

DUBY:            All right. I guess what she's actually asserting is that you told her to change her time sheet, and she refused to do that.

ALTIERI:        No, I did not.

DUBY:           Okay.

ALTIERI:        I told her I was denyin' it, and if she wanted to change her time sheet that was up to her. I just wasn't gonna approve the overtime cause it was not pre-authorized like it's supposed to be.

DUBY:           Okay. Ah, referring to July 18, 2000, Trooper ZELINSKI claims that she disciplined because of her sex, being female, and in retaliation for reporting sexual harassment. Do you feel that is true?

ALTIERI:        Absolutely, positively not. She has never been — I have five children, four are females, my wife's a professional that works in the work field. If there was any, any, sexual harassment as a father or a husband, I would be disgruntled as a parent or a husband to know it, and I wouldn't permit anybody else to do that to her. And she never was.

DUBY:           Okay.

ALTIERI:        She had a professional working environment. She, and I believe WIGLEY, it could have been MURRAY, went to Trooper Nick MATTIGAN (phonetics) around July 14th in Troop ah, ah, F, TNT. And the only reason why I know about this is because the Corporal came to me and said that they had approached Trooper Nick MATTIGAN (phonetics) about gettin' rid of me.

DUBY:           Okay.

ALTIERI:        And they were lookin' for a way to get rid of me because Trooper MATTIGAN (phonetics), and I have a history of a problem prior to ah, me comin' to the Bureau, and he has an axe to grind. So, he had offered her back in like November of '99, if you ever have a trouble with the Corporal and need to get him, come to me, and I'll help you burn him.

                And July 14th we had a Corporal's meeting. And his Corporal came to me and say, "Hey, MATTIGAN (phonetics) told me" or somethin' to that effect. Told me that "Hey, two of you guys, Laura" and I think he said Dan, but I can't be certain, "came over and are soliciting his help to try and give you a shot." So, I suspect that with that that's where all of this is comin' from, you know."

DUBY:           Okay.



| | |
|---|---|
| ALTIERI: | That's what I suspect, I don't know. |
| DUBY: | And sir referring to July 18, 2000, Trooper ZELINSKI claims that she was informed by Sergeant RUDA and you that she would be counseled by you for not having her charges prepared on time, even though no one else in the unit, who also were behind, would be counseled. She claims that she was told her overtime request would be denied and that you stated you never authorized comp time. |
| ALTIERI: | That's true. |
| DUBY: | Okay. |
| ALTIERI: | I did – well, that's a three-part question. |
| DUBY: | Well, I guess you didn't give me a chance to finish. |
| ALTIERI: | Sorry. |
| DUBY: | By chance, did you ah, tell her that you never authorized comp time? |
| ALTIERI: | I never author – no way, there was no comp time. There was no overtime. There was no deal that she says there was. The only one that came to me and made the offer to me - now comp time, I know doesn't exist – officially, but MURRAY came to me in the beginning. Was so ecstatic that I was doin' his operation QUEEN (phonetics) that he had been buggin' me about for months, and puttin' it in his DART. He said he would do anything he needed to get done in order to see this through. That was the only person that ever came to me with that kind of an offer, and it was offered by him. I never told any other guys that in return for anything extra you do, I would pay you comp time instead of overtime. And we did get overtime during the week. |
| DUBY: | Sure. |
| ALTIERI: | It was pre-authorized. Ah, she was not counseled over the reports other than our verbal conversation we had, but RUDA had nothin' to do with that. |
| DUBY: | Okay. |



ALTIERI:     The only thing that I can recall that might have been said. Because I, I, had told the Serge, ah, when, back when I had started havin' these problems, and they were escalating beyond, what I felt to be out of my control because they just - people were comin' around. Ah, was that she and Dan both are very resistant to, to comply with my requests. And I don't think I'm bein' extraordinary, in fact, when I counseled WIGLEY about it, he says, "No, nothin' you ask is extraordinary it is just that, you know these, ah, nit-noy little requests, you know, we don't have time for that. The big thing's the investigation." I said, "Damm", I said, "the whole thing, the whole picture is part of your job." I said, "And if I request you to do that, I expect it to be done." And she was the same way.

DUBY:     Okay.

ALTIERI:     But the Serge only said somethin' to the effect, like, hey, if I work for so and so and he expects me to do A, B, and C, I either do A, B, and C, or I go and find somethin' else to do, you know. He says, "You know, I don't think we were bein' unreasonable." She wasn't counseled. And what was the other part of that question?

DUBY:     Well, I guess what I was getting at is ah, you and I have been both around the block long enough to know that traditionally drug units seem to have an inference of comp time for a lot of hours that they work.

ALTIERI:     Well...

DUBY:     ...because of the hours they work, you know.

ALTIERI:     And that is true with that respect. However, my first thing on board, when I first, one of my first things other than when I introduce myself, and it might have come then was, Corporal GUSKHA comes over to me and says, "Hey, MURRAY has a week of comp time comin' to him for all the extra hours he put in." Why, I got burned on comp time before in my career, and I'm sure you have and I'm sure you have where you give and give and give and you didn't get it back in return when you allegedly were going to. Well, after that, I have a bad taste in my mouth for it. I said to Nick, cause he had like supervised the, ah, BDLE Unit until I got there. I said, "Okay, I'll make sure I accommodate ah, MURRAY for that."

I grabbed everybody together in the very beginning and everyone of them, if you interview them or have interviewed them, I'm sure they would say this. I said, "I don't like comp time." I said, "I'm

a family man." I said, "I know that not everybody here's a family man, but I expect you to be home with your family. That's my first priority." I said, "I don't expect you to just drop everything at home with your boyfriend, girlfriend, or whatever you are doin' and run out and tend to these CI's." I said, "You dictate to them." I said, "Because I don't wanna be in a position that, you know, you're comin' to me and say I owe you comp time." I said, "I don't wanna hear that." I said, "You got so much down time, like you said, with our job where you, you might be in and you had a deal goin' on. All of a sudden it falls through, now there is nothin' to do, and well, that's (inaudible) to go home.

DUBY:          Okay.

ALTIERI:       And then they might get a phone call and they might act on it, and they don't put in for it. And it's not because I requested that. They know that they have to be approved for overtime, but I've never made that a condition. In fact, we had a detail at a March (phonetics) Bus Terminal, and I said, "Hey, the big one's comin' in guys," I said, "but," I said, "I'm not gonna be there," and I said, "I'm not forcin' anybody else to be there. You can wait around the clock and that may never come in."

DUBY:          Okay.

ALTIERI:       You know, and therefore it was, it was a thing of ah, MURRAY, ah says, "Well, hey, I'll stay, you know, and you can pay me, ah, in comp time and if we hit it we'll take overtime." I said, "Well, that's on you." I said, "I'm not even makin' that suggestion." And I never have.

DUBY:          Okay.

ALTIERI:       And I never expected that. That was never even an inference.

DUBY:          You expected your people to work their eight-hour day and that's it, essentially.

ALTIERI:       Wou...wou...and if they split it, they still had to work it.

DUBY:          Sure.

ALTIERI:       Like if you worked ah, you came in at eight, and around ten o'clock you decided to go because nothin' was happenin'. And you went to the gym for two hours. Well, yeah, you might come



|  |  |
|---|---|
|  | back, but at four o'clock, you know, if somethin' came in, I didn't think that it would be right to take overtime until six, you know |
| DUBY: | Sure. |
| ALTIERI: | …because you took a two-hour hiatus. Hey, you know… |
| DUBY: | Exactly. |
| ALTIERI: | But I have never made that a condition to anybody. In fact, in that DART week, I never, never. |
| DUBY: | Okay. Referring to August 21, 2000, Trooper ZELINSKI claims that she was transferred because of her sex, being a female, and in retaliation for reporting sexual harassment. Do you feel that is true? |
| ALTIERI: | Absolutely, positively not. And I think that if Chief Counsel's Office takes this to court, they'll be able to substantiate the fact there's no validity to any of those claims. |
| DUBY: | Okay. |
| ALTIERI: | Cause there's, there's a lot bigger picture here, I mean, I appreciate your questioning cause it is expeditin' the matter, you know, keepin' me quiet, but you know, its' — they're not seein' everything… |
| DUBY: | I know… |
| ALTIERI: | …and that's unfortunate, you know, but I guess it's to get any idea of what the big picture is, but, okay, go ahead. |
| DUBY: | Yeah. Because we are just going to go through them and you can tell me the big picture, if you want. |
| ALTIERI: | And that's what I'm tryin' to do here and there, you know, like I said, ah, it's unfortunate that it is that way, you know. |
| DUBY: | Okay. |
| ALTIERI: | Referring the August 21, 2000, Trooper ZELINSKI claims that Major BLOCKER told her that her services were no longer required, and effective August 22, 2000, she was transferred. Sir, do you know the circumstances regarding her being transferred? Was this a correspondence that went to Major BLOCKER? |

ALTIERI:            No, what happened was we were having our Monday meeting...

DUBY:               Okay.

ALTIERI:            ...I think that's a Monday. And ah, we were comin' in (inaudible) in fact, (inaudible) we were just talkin' about somethin' in my office, and I can not remember what, but just light conversation, you know. Ah, we got the meeting started, this is about ten o'clock, a phone call came in. I believe it was Sergeant RUDA. He says, "Hey, I need to talk to WIGLEY." I said, "Okay." I said, "Dan, phone." Dan picks up the phone. Talks for a little bit and then transfers the call to Laura. Ah, she concludes the phone call, ah, I start to go out, my meeting and Dan says, "We gotta go down to Departmental." And I said, "Well, I only have a couple of things to cover." And he says, "No, they want us to come down now." I said, "Okay." So, they left. And when they got there, my understanding, and they didn't tell me this, but when they got there they talked to, I believe the Major directly, you know, at some point.

DUBY:               Yes, they did.

ALTIERI:            Okay.

DUBY:               I guess is what I am wondering is how did Major BLOCKER pick their names out, so to speak, I mean, was there correspondence directed from you to the Sergeant, you know, up the chain of command, wanting their removal from EDLE?

ALTIERI:            There – this is a long convoluted story. As a result of the big picture on-going problems within the unit, ah, and like I said, ah, they had went outside the unit to bad mouth the unit, myself, ah, they had went to another unit to try and give me a shot. The Sergeant TRADDA (phonetics) from, I think he's Pittston PD, another local police department, nice guy. I don't really know him real well. But they went to him and said, I think Trooper MURRAY as the spokesperson said "Yeah, they're gonna give me one as a result of like on-going conflicts and problems that I've mentioned and that I haven't mentioned." Ah, I had spoke with the Serge. Ah, I had spoke with Lieutenant LOMAX. And at one point, I had spoke with the Captain, and I never spoke with the Major directly, myself.

DUBY:               Okay. Some people when they get to a unit, they just don't work out, and you know...

67
42 - 57

ALTIERI:            And that's my feeling…

DUBY:               Okay.

ALTIERI:            …you know.

DUBY:               All right.

ALTIERI:            I mean I hold no animosity towards them even dispute all the
                    problems ah, ah, facin', they gotta do what they gotta do.

DUBY:               Sir, if you don't mind, we are going to briefly stop and put a new
                    tape in here.

ALTIERI:            That's fine.

END OF TAPE #1, SIDE B, DATED MARCH 8, 2001.

START OF TAPE #2, SIDE A, DATED MARCH 8, 2001.

DUBY:               Okay. It is 1130 hours. This is going to be tape number two, and
                    ah, there was a tape change about three minutes prior to that.
                    Okay, we are almost done here, believe it or not. Referring to July
                    23, 2000, Trooper ZELINSKI claims that Trooper WIGLEY and
                    her were assigned to pick up Trooper WEINSTOCKs vehicle from
                    the barracks in Wyoming. Trooper ZELINSKI claims upon their
                    arrival, Corporal MURPHY and Sergeant RUDA were present, and
                    this was the only time that she drove the vehicle, and it was not
                    damaged. Do you know anything about that incident?

ALTIERI:            I know what they are referrin' to but actually, the, the actual story
                    to that goes like this. I was goin' on vacation, MURRAY and I
                    were on vacation, that week. Trooper WEINSTOCK was the
                    appointed one to be in charge in my stead. Ah, prior to leavin',
                    MURPHY's crew up in TNT, R, needed an undercover vehicle
                    with tinted windows, and WEINSTOCK was the only on that had
                    one.

DUBY:               Okay.

ALTIERI:            So, he must have called the Serge, because I believe the Serge
                    called me and said, "Hey, can you make arrangements to have
                    Rich's car taken up to ah, ah, Troop R, for Monday?" I said, "Oh,
                    yeah." I said, "Dan's right here. I'll instruct Dan to do that." I
                    talked to ah, WIGLEY, I said, "Dan," specifically, and there's no

other variation to it. I said, "Dan, here's what we gotta do." I said, "You take Rich's car home today or Monday when you come in," cause he said he had to come back to the office for somethin'. I don't know if he had court or whatever. "But leave your car here with the keys and take Rich's car up there cause he was gonna assist Dunmore." I said, "Because then when WEINSTOCK comes in he has a car to run." And I said, "That's, that's what needs to be done. He needs to have a car." There were no other cars available, an old army truck. You don't drive that around town. This is camouflage green, you know, it bounces you around. He said, he started to create a variation. I said, "Dan, that's not what we're gonna do, the Serge wants it this was way. Now, you leave your car. Rich will take care of it. You take his car up there, and then when youse are done with it, switch."

I went on vacation. I came back, and ah, you know, there were some problems. They took Dan's car and Rich's car and left him with no car. He was drivin' the army truck around ah, I guess there was some conflict that, you know, I can only tell you what I've heard, you know, with them and Rich and the Serge, you know, in this interaction with the car deal. You know what I mean? I don't really know the whole story there to accurately depict it to you, but you know. It was somethin' that they didn't leave him a car.

As far as the damage goes, ah, nobody was specifically blamed for that. Rich, ah, mentioned to me, he said, "Hey, look at my car." He says, "There's chips in the hood." Ah, I don't even think I went out and looked at it. I think I said to him, "Well, Rich", I said, "you know", and he's real anal about his car, ah, I mean he washes it and waxes on his own time, the whole nine yards. But I said, "Hey, you know, if you want to submit a lost ah, damaged property report to get some touchup paint to get it fixed, you can." I said, "But, you know, that nick could be sand off a gravel truck, you know, who knows, you know?" That was the end of it.

DUBY:          Do you know if ah, Trooper WEINSTOCK specifically blamed Trooper ZELINSKI for the damage of the car?

ALTIERI:       I have no knowledge of that, no. I don't know that.

DUBY:          Okay.

ALTIERI:       And I know that the Sergeant wasn't even aware of it until this complaint, cause he asked me about it. No, I never told you about it. He told me about it. I said, "That's trivial." You know,

basically, I'm, you know, like I say, I try to keep things at a down play amongst everybody to try and keep harmony, you know.

DUBY:    In your opinion, sir, were there supervisory problems within the Troop P, Tactical Narcotic Unit supervised by you?

ALTIERI:    Ah, supervisory problems, yeah, ZELINSKI and WIGLEY were supervisory problems. They did not wanna, they were not, I guess the word is, (inaudible) to supervision. I think that they're professionals in their own respect. And, you know, can do a job, but then I don't believe, with the, ah, the way our unit is functionin' or our detail functions, that in my opinion with the problems I was havin' with them that was not conducive to their abilities.

DUBY:    Okay. And sir, please tell me everything about Trooper ZELINSKI's performance evaluation covering the time period of October of '99 until October of 2000. This would be the one that ah...

ALTIERI:    Didn't do.

DUBY:    Right.

ALTIERI:    It's not done.

DUBY:    Okay. And sir is there a reason for that?

ALTIERI:    Yeah, I, ah, I got the, ah, the notification that you get every year when they are due. This had already broken free, you know, the inquiry ah, and I believe the PHRC. And I started to do it, I actually have ah, ah, a draft of it on my computer, ah, and I believe I talked to the Serge about it. But, ah, our feelin' was, no matter how you do it, it's gonna look like (a) you know, you're, you're taintin' it one way or, or, or the other, you know, you can't make it ah, you know, great, because it isn't true. But yet, if you say the things as they are, it's gonna look like I am tryin' to compound matters. So we thought it was best that it just ride until this gets done, and I believe we - I don't think I did it – I think he talked to maybe the Lieutenant or Captain or the Major to...

DUBY:    I believe the Serge said it was worked out...

ALTIERI:    Yeah.

DUBY:    ...up the chain of command.



ALTIERI:      Yeah. It was, it was beyond me, you know. I know that I didn't
              have to complete it.

DUBY:         Okay. And you talked about this briefly, but I'll ask you
              specifically, are you aware of an incident in which Trooper
              ZELINSKI had given Trooper WEINSTOCK a hug and a kiss?

ALTIERI:      Yes. I was right there. It happened at the Wyalusing Bank,
              People's Bank parking lot on December 30th, I guess.

DUBY:         Can you tell me about that incident sir?

ALTIERI:      That's when her and I rode up to do that surveillance detail from
              the Travel Shop's room they lent us to oversee this other residence
              where, I guess, there was a lot of traffic comin' and out. And the
              little old ladies in the Travel Shop were concerned for their safety,
              because they knew it was drug-related stuff.

              So ah, WEINSTOCK, SEIDEL, and WISE, ah, already had went
              up, and Laura and I – I don't really know why, cause I live right
              there – but, somehow, I was down in Wyoming – maybe I went to
              the office for the day, and I gave Laura a ride up with me. We
              arrived there. We had these Nextel cellular phones, no that
              wouldn't have worked – it might have been the radio – I call in, I
              say, "Hey, we're not exactly sure where you're at, cause we're
              comin' in from the back. Can somebody meet us in the parkin' lot?
              Ah, WEINSTOCK comes out to the parkin' lot, and as we exit the
              vehicle, she walks up hey (inaudible) gives him a hug, gives him a
              kiss on the cheek, you know. I was like great, you know. I mean,
              cause we had, you know, ah, personalities conflicts at that point
              already. And I was thinkin' oh this is great. It is workin' out.
              Things are good again. And that's all I wanted, you know,
              harmony, peace and harmony. And I thought that was a good
              show, you know, at least from her.

DUBY:         How did Trooper WEINSTOCK feel about that?

ALTIERI:      Just a look of surprise.

DUBY:         Just a look of surprise?

ALTIERI:      Yeah. Yeah.

DUBY:         Okay. Sir, are you aware of any other people that Trooper
              WEINSTOCK was alleged to have made sexual comments to?

ALTIERI:　　　　Other than what has been contained in the thing, no. I mean, I have no other knowledge other than readin' or hearin' about it through the complaint.

DUBY:　　　　And sir, how would you best describe Trooper ZELINSKI's performance while she was assigned to the Bureau of Drug Law Enforcement Unit?

ALTIERI:　　　　In a nutshell, I think ah, she has the ability to be aggressive. Ah, she does not like to have direction or supervision, ah, ah, what do you call it? Constructive criticism is totally ah, against her ah, ways, I mean she cannot take that. She ah, she doesn't like - it appeared to me that accountability was an issue with her, I mean she wouldn't return my pages when I would page her. In fact, at one point, she wasn't returnin' them so often, that I went over to the Area II office, and I had the Sergeant page her. And I had just paged her, and had my return number and she didn't return my page, but then when he paged her, she returned his page. So, I knew that her pager wasn't working. I had told her on one occasion to get the battery changed, on another occasion to take the pager to Pagers Plus to get it fixed, cause I said, "You're not callin' me." And I can't blame it completely on that, because I know in the area...

DUBY:　　　　You have some dead spots.

ALTIERI:　　　　...you have some dead spots. So, I'm, I'm reasonable enough to believe that occasionally that was the case especially up in the mountains. But ah, you know, like when I did that one where I paged a couple of times, she didn't return, and then she returns the Serge's page, you know, I mean it was confirmed what I was thinkin' all along. So, ah, you know, in a nutshell, I don't think she wants to be supervised. She likes to have it her way and, and doesn't like direction.

DUBY:　　　　And sir, how would you best describe Trooper MURRAY's performance while he was assigned to the Bureau of Drug Law Enforcement Unit?

ALTIERI:　　　　MURRAY was an aggressive investigator, not thorough. He ah, he rode the extreme edge of trouble all the time, you know, in that, do you know what I mean? When I say trouble, takin' a chance, you know. I am a very conservative person and they all knew it, and didn't like it and they created a lot of waves in my conservative nature. Ah, but, if, if, anything was they're gonna be

questionable in court, in a practice, it would be MURRAY's case. Because (a) he's not believable, I caught him in lie after lie, after lie, and he is a likable guy. (Laugh). You know, despite everything's he has done, you know, in this, in throughout my time with him, I still like him. But, ah, WOW, he just can't tell the truth to save his life.

DUBY:             So, he has a credibility issue with...

ALTIERI:          Oh, goodness, I, I, could march attorney's in here, and I think that they would, you know, back to the (inaudible). I don't think so.

DUBY:             Okay. And sir, how would be best Trooper WIGLEY's performance while he was assigned to the Bureau of Drug Law Enforcement Unit?

ALTIERI:          Ah, Dan was a very knowledgeable person, ah, cautious in nature. I, I thought with his background, ah, he had been in BCI, but he got booted out of BCI for ah, and I don't really know so I'm not gonna say it, I guess it was insubordinate action, but I, that's a guess. But ah, his ah, in our conversations, and it'll confirm it, he's from the old school. Like when I got in the Troop, I knew Dan in passing, but we knew a lot of the same older guys, and he was more of guy that liked to sit back and not do a whole lot - nice guy. Like I said I wanted to focus on the big investigations and do surveillance, but he didn't want to do a lot of arrests, cause he used to gripe about WEINSTOCK when he was on the Interstate makin' a hundred pinches in a month or somethin' like that. And we'd take issue and say that he was like juvenile kid pushin' his power around. But ah, and I even wrote in his ah, evaluation that his cautious nature is causin' him to be lack of motivation as a result of be so cautious, he's not very motivated. You have to light a fire under his rear end to get him goin' is essentially what it comes down to.

                  And he, and he was resistant. Like if he had plans to do his case today, which was a pretty significant case. And I got a phone call, ah, and this had to acted on real quick and he was the only one there, it, it would go down to the bottom of the pile, and he wouldn't do it. Ah, his tip hot line things, and I mean he had like other meanly tasks. He was the shotgun - we had one shotgun, the weapons locker inventory and cleaning guy. Never get it done, I would tell him four, five times. I, I wrote it in his evaluation or I gave him a note on it. And we talked about his evaluation. I said, "Hey, you know, you're lettin' me hang here. I got another SPR Line Inspection, and I got wrote up on it." I said, "I asked you four

times to get it done before hand." That's when he said to me,
"That nit-noy things are like bullshit. And the investigations are
the important things," he says, but, you know. And then he did get
it done eventually. But that was the kind of things I had with him.

DUBY:          And sir, how would you best describe Trooper WEINSTOCK's
               performance?

ALTIERI:       A go-getter, aggressive, wants to, to do a hundred-percent plus. I
               find him truthful and I think that he, and I and I, in his evaluation I
               documented it. I made no bones about it, I mean, the guys may not
               have liked it, but I put positives and negatives, and I said, "Rich,
               you shot from the hip." In other words, he got a tendency to have
               a loud mouth. It'll be the truth. And I might tell you in the same
               way, and you wouldn't get offended. But Rich might tell you, and
               it might just, you know, you know - maybe I don't like your tie
               today, and I might say, "You know, your tie..."he might say,
               "Hey, you know, that's a loser tie or somethin', do you know what
               I mean? That's, that's his personality.

DUBY:          Okay.

ALTIERI:       You know, maybe ah, you either like him or hate him type of guy.

DUBY:          Okay. Sir, did Trooper ZELINSKI ever meet with you to discuss
               any problems or concerns she had specifically with Trooper
               WEINSTOCK?

ALTIERI:       Hu-huh. I don't believe so. Did she initiate it? That she initiate
               it?

DUBY:          Right. Did she ever come to you and say WEINSTOCK is a
               problem to me - with me?

ALTIERI:       No. No.

DUBY:          Okay.

ALTIERI:       I mean I had the conversation about the group thing with her.

DUBY:          Yes.

ALTIERI:       But that was, that was (inaudible) at that. And she didn't wanna,
               like I said, provide me with any details, and I specifically, I was
               tryin' to needle it out of her why everybody's so reluctant to work

with Rich, you know. I know that he has a big mouth, but he's got a heart of gold, too, you know.

DUBY:    Okay. Sir, specifically did any member of the unit ever advise you of a sexual harassment situation or a problem existing within the Troop P, Tactical Narcotic Unit?

ALTIERI:    I have never been apprised by anybody, not inside the unit, not outside the unit.

DUBY:    And were there any sexual harassment allegations brought to your attention by Trooper ZELINSKI or any other member in the unit that you did not document or take action?

ALTIERI:    No. And I never observed any behavior from anyone that I would have construed as sexual harassment. And I'll tell you short of the smut books over in the vice office, which I kept hammerin' GUSHKA about, and his guys for lookin' at. I mean, I mean they did look at them on duty, but look then again, maybe I am at fault there, but it's in his unit, his office. It's really not even my area, so.

DUBY:    It is not your responsibility.

ALTIERI:    Not my responsibility. I made him aware of it. Let him handle it, and that's how I felt about it.

DUBY:    Okay. Sir, do you feel that a hostile work environment existed within the Troop P, Tactical Narcotic Unit during the time that Trooper ZELINSKI was assigned to the unit?

ALTIERI:    For me, it was hostile.

DUBY:    Okay.

ALTIERI:    For her, no way. I mean to know that my guys are out to try and give me a shot and have a Corporal from another team, that's embarrassing have another Corporal come and tell me and then an officer that's not even a PSP member, you know, say that he's speaking for the others, they're gonna give me one, you know. Hey, I expect a hundred percent from them. I expect high expectations, but I'm not a miserable (inaudible), (inaudible), you know.

DUBY:    Okay.

ALTIERI:         I think I am quite ah, offer a lot of latitude.

DUBY:            Ah, sir, did you have a meeting with the members at the Pink Apple to discuss the situation involving the unit?

ALTIERI:         Yes, I did. That was back in '99, probably in November of '99. I met there with ah, WIGLEY, by himself, he and I, and then I met there with MURRAY. I think it was in November, or no, no, no, let me just look here.

DUBY:            So, it was WIGLEY and MURRAY you met with there at the Pink Apple. Anybody else, sir?

ALTIERI:         Hum, I talked to Laura at the PSP Tunkhannock barracks.

DUBY:            And these were over the problems of not wanting to work with Trooper WEINSTOCK?

ALTIERI:         Right. Right.

DUBY:            Okay. The early problems. It was when we first - one of the first things we talked about.

DUBY:            Okay.

ALTIERI:         That was the one where they were handled it together. They got together as a group, and MURRAY had confided in me that he was gonna be their spok...in fact, (inaudible) said that he was gonna be their spokesperson, because him and WEINSTOCK had been friends, and that MURRAY could break it to him.

                 And the reason why this meeting came up was because I told him then if that wasn't gonna be handled, I was gonna get involved. Well, Rich and I had been talkin' about somethin' and it seemed like things were goin' along pretty good. And I said, "Well, I'm glad you guys got things worked out." And he said, "What are you talkin' about?" And I then proceed to get into, you know, what happened with Shawn and I. The conversation I had with Laura. And ah, he says, "Nobody ever came to me about anything?" Well, then it wasn't like a week later, things started to escalate again, and that's when I said, "That's it." And I stared to pull them in one on one. We all agreed at that time to have the clean slat theory hey, we can hash this out, you know. Let's do that, and ah, we'll start anew. And I won't hold it against you guys, but I'm not gonna manage this way from hereon out, I'm gonna start



documentin'. That's when I started sayin', "You can consider yourself counseled." And I put a note in their files, you know.

DUBY:    Okay. Sir, were there any specific issues concerning Trooper MURRAY that you already didn't tell me about. Anything that you want to say about him?

ALTIERI:    MURRAY. Like for instance?

DUBY:    In other words if there is something that you wanted to bring out during the BPR concerning Trooper MURRAY, Trooper ZELINSKI, Trooper WEINSTOCK or Trooper WIGLEY. Ah, anything that you want to make part of the records so to speak?

ALTIERI:    Huh.

DUBY:    We talked about a lot today…

ALTIERI:    I know. That's…

DUBY:    …and you told me about a lot. I was just wondering if there is something else that you have on your mind that you would like to say.

ALTIERI:    Probably there's a ton of things, I just can't ah…you know, say, that's a real broad statement, I mean, you know.

DUBY:    Yeah. It is.

ALTIERI:    Tryin' to be as, as informative as I can.

DUBY:    I guess the reason why I asked it is ah, if down the road, I…

ALTIERI:    I'm sure…

DUBY:    …I don't want to be in a situation where you say yeah, he didn't ask me about this, or he didn't ask me about that.

ALTIERI:    But that could happen.

DUBY:    That could happen.

ALTIERI:    And that's what I'm sayin', the whole thing about the big picture, I mean there are twenty-two pages of notes that aren't even complete. I mean I ended in March.

ATTACHMENT 57
PAGE 52 of 57

DUBY:        Okay.

ALTIERI:     I think I ended in March. Because April I had covered because of
             vacation, that would have got into May, June. And they're not
             even - they were just kind of to jog my memory. Cause, let's fact
             it, I get hit with this thing here, unbeknownst to me and then I get
             this inquiry, and like I said to you on the phone, it's like, you
             know, I'm gettin' a barrage of questions and because none of this
             was significant. I mean, yeah, we had our problems just like the
             vice unit, they had a guy suspected to usin' drug, and GUSHKA
             was when I got there, his unit was in total disarray. Ah, so, now I
             go through short stints of problems amongst the members, but
             nothing very significant.

DUBY:        Not really maj...

ALTIERI:     Yeah, stand out, no. And then all of a sudden...

DUBY:        Okay.

ALTIERI:     ...I get a inquiry and I'm, I'm gettin' a barrage of questions. Do
             you remember this? Do you remember that? Hey, I'm, the best I
             can and I try to go back and, and do that. I mean we're still faced
             with that. I'm gonna be honest with you. I'm...

DUBY:        Sure.

ALTIERI:     It could possibly happen. I hope not.

DUBY:        Okay.

ALTIERI:     The only thing that I would like to add and that would be (a), I
             mean I mentioned about ah, that Corporal comin' to me that about
             what MATTIGAN (phonetics) had said.

DUBY:        Did you tell me what the Corporal's name was?

ALTIERI:     Corporal Wendall MORRIS (phonetics).

DUBY:        Wendall MORRIS (phonetics).

ALTIERI:     Uh-huh.

DUBY:        Okay. Where is he from?

ALTIERI:     Ah, TNT, F, Montoursville.

DUBY:            And what specifically did he come to you and say?

ALTIERI:         Ah, he came to me after a Corporal's meeting that we have at the Area II office. He says, "Hey, Lou, I need to talk to you." We went out to Wegman's (phonetics) for lunch. Ah, we were leavin' in the parkin' lot," he says, "Hey," you know, "a supervisor's a supervisor's, a friend is a friend, however you wanna look at it. He says, "Two of your guys have come to MATTIGAN (phonetics) and they're gonna give you a shot." And I said, "What do you mean?" He says, "They're, they're gonna get ya." He says, "And they're askin' MATTIGAN (phonetics) to help, and MATTIGAN (phonetics) and I have a history. Ah, of...

DUBY:            I am sorry, is that Captain MATTIGAN (phonetics)?

ALTIERI:         Dick MATTIGAN (phonetics), he's a Trooper.

DUBY:            Oh, a Trooper, okay.

ALTIERI:         He works for Wendall MORRIS (phonetics), in fact.

DUBY:            Okay.

ALTIERI:         He's made other allegations that they are gonna try and substantiate with reference to ah, I made him, his supervisor, take comp time instead of overtime, and then I wanted him to adjust his evaluation because of some past history. But Nick has made no bones about it. He, he tells other peo...well, he had an incident with Laura. He calls and says he needs a female from Potter County, ZELINSKI. And he says, "Can I have Laura for the day?" I call Laura, "Hey, do you mind doin' this?" She says, "No problem." She goes up. The next day, she says to me, "Hey, I don't wanna work with that guy." I said, "Why not?" "Alls he does is bad mouth you the whole time, and said if I ever need to get ya, call him, and he'll help." And I said, "He said that to you?" I said, "Why, I thought things, it's been a couple years. I think bygones are bygones, you know. And here she does eventually take him up on the offer, you know.

DUBY:            Well, who are the two Troopers? It was one was ZELINSKI...

ALTIERI:         ZELINSKI, I believe, the other one was WIGLEY.

DUBY:            Okay.

ALTIERI:        And that was July – he told me that July 14th. I believe that was the early part of July cause it was after the DART, I think that he indicated that it occurred.

DUBY:           And do you feel that Trooper WEINSTOCK made the comments that Trooper ZELINSKI has alleged?

ALTIERI:        No, I do not.

DUBY:           Okay. And specifically, did you ever hear Trooper WEINSTOCK make any sexual comments concerning Trooper ZELINSKI or any other female member of the Pennsylvania State Police?

ALTIERI:        Nope. In fact, I know that ah, I've heard Laura criticize him or bust him. You know what I mean? In lighted-hearted fun, ah, as well as the other members, ah, we, we had a pretty, I thought, a good unit at one point. Where, you know, everybody's pretty friendly, and got to the point where there was a lot of ah, fun bustin' goin' on, ball bustin' or whatever you call it. And, and I told the guys in no uncertain terms, "Hey, I don't care what she says to you guys, but I don't want that done in return to her."

DUBY:           Okay.

ALTIERI:        And I was very specific about that, because I just didn't want what's happenin', at least didn't have any validity to it. I mean it's happened anyway, but there's no validity to it, and I'm not afraid of anything that is gonna come of this, you know.

DUBY:           So, you never counseled Trooper WEINSTOCK about makin' sexual comments or anything?

ALTIERI:        No. No.

DUBY:           Okay. And, sir do you feel that you should have been named in Trooper ZELINSKI's complaint?

ALTIERI:        No. As far as?

DUBY:           As far as her saying…

ALTIERI:        All these (inaudible).

DUBY:           …coming to you and saying hey, "Trooper WEINSTOCK wanted to have sex with me. He wanted to - I am being sexually harassed."

ALTIERI:             Absolutely not. In fact, my belief is this is all sour grapes over the fact that her and ah, ah, Dan are gone.

DUBY:                Okay. And this is the last issue, and then we are actually done. Her specific allegation was essentially that she reported incidents of sexual harassment by Trooper WEINSTOCK to you. And essentially you did not act on it. That's...

ALTIERI:             That's her allegation?

DUBY:                Yeah. That's, that in a nutshell. I have to throw it out to you because you are saying it didn't happen...

ALTIERI:             That's right.

DUBY:                Would you be willing...

ALTIERI:             Absolutely.

DUBY:                ...to take a polygraph exam?

ALTIERI:             Polygraph, voice stress analysis, you name it, I don't have a problem with it.

DUBY:                Okay. I have nothing further. Is there anything that you would like to add to the record itself, ah, that you would like me to attach to the investigation?

ALTIERI:             Well, I'd like to just say that it's ah, if in fact, she says, you know, I understand her allegation. But I also understand that her and Captain ALTAVILLA, and I really don't like to throw his name in this, but I'm going to because I think this is significant.

DUBY:                Okay.

ALTIERI:             She names him in her grievance. That she talked to him all along, and told him about all the problems over here. Her and Captain ALTAVILLA have a special relationship. He and his wife are very good friends with her Mom and Dad. She used to baby-sit his children growin' up. They lived on the same street or across the same street. She knew enough about Captain ALTAVILLA to tell me that (a) he had a lot of marital problems, because he had separated from his wife at one point. Ah, that ah, you know, about him growin' up and all the times they had and how good friends they are. Ah, and I guess what bothers me is during my time there,

Captain ALTAVILLA at times, would say to me, "You better be taking care of Laura." Now, you would make it sound like it was in jest, but in retrospect, I gotta say to myself, now was that in jest, or, you know? I don't - just because they're friends, I wasn't gonna treat her any different than I treat anybody else. But yet, with her, leanin' her relationship on him in these various paperwork, and that, I would think that she would have told him, hey, I told the Corporal, and he wouldn't do anything about it. You know, you know, it doesn't make sense to me that she told me, and yet she had all these conversations with him about how bad of a supervisor I was. And she didn't tell him. So, I think that needs to be part of the record. He may even need to be interviewed in my opinion.

DUBY:          Okay. Anything else sir, ah, that you would like me to make part of the record? Your notes, ah, the note from Trooper ZELINSKI's file the handwritten...

ALTIERI:       I'll look for that.

DUBY:          Okay.

ALTIERI:       And if I have it here, on the record, you can have it for the record.

DUBY:          Okay.

ALTIERI:       I mean that is hand scribbled on it. I know it. I'm sure I brought it. I can't believe I can't find it, no, but other than that no.

DUBY:          Okay. I have no further questions. Sir, do you have any questions?

LEYDIG:        No.

DUBY:          Okay. Then I'll end the interview then at 1158 hours.



Tape-recorded Interview
Trooper James MCEVOY
March 19,2001

Original Tape retained at IAD Central



EXHIBIT

2 9

11-15-02

72

SUMMARY REPORT

IAD #:            2001-0093

DATE:            June 6, 2001

ISSUING OFFICER:  Lt. Colonel Thomas K. Coury
                 Deputy Commissioner of Operations

BUREAU:          Bureau of Drug Law Enforcement

SUBJECT:         Trooper Richard S. WEINSTOCK
                 Bureau of Drug Law Enforcement, Troop P, TNT
                 Date of Enlistment:  01/25/93
                 Social Security Number: ▓▓▓▓▓

## REASON FOR INVESTIGATION:

This investigation was conducted upon receipt of a Use of Force Complaint Reception and Processing Worksheet submitted by the Office of Chief Counsel. The worksheet was submitted as a result of a complaint filed by Trooper Laura A. ZELINSKI, Troop P, Vice Narcotic Unit, in reference to Pennsylvania Human Relations Commission, Docket Number: E-97578-D, dated January 12, 2001.

## DETAILS:

This adjudication addresses the conduct of Trooper Richard S. WEINSTOCK as determined and articulated in IAD #2001-0093. After thorough review and analysis of IAD #2001-0093, I have made the following administrative determinations:

1.    Trooper ZELINSKI alleges that on June 22, 1999, you told her that you were attracted to her since you met her in April of 1999, that you wanted to give her a body massage, and that you placed your hand on her knee. Administrative determination – SUSTAINED.

2.    Trooper ZELINSKI alleges that on August 4, 1999, you graphically told her how you wanted to have sex with her. Administrative determination – SUSTAINED.

3.    Trooper ZELINSKI alleges that on December 30, 1999, while conducting surveillance at a bar, that you told her, "If I can see down your sweater, everyone else can." Administrative determination – SUSTAINED.



EXHIBIT
25

ATTACHMENT NO. 109
PAGE 1 OF 2

4.   Trooper ZELINSKI alleges that on June 28, 2000, throughout the day at work, you continuously made comments in front of Unit and Patrol members that you could see her underwear. Administrative determination – SUSTAINED.

5.   Trooper ZELINSKI alleges that she has been harassed by you because of her sex, being female, and in retaliation for reporting sexual harassment. Administrative determination – SUSTAINED.

During the course of this investigation, it was also determined that Trooper Richard S. WEINSTOCK conducted himself in an inappropriate manner in that:

1.   Trooper Richard S. WEINSTOCK failed to truthfully answer all questions relating to the allegations cited in IAD #2001-0093. Administrative determination – SUSTAINED.

2.   Trooper Richard S. WEINSTOCK attempted to exert inappropriate influence on a potential witness in IAD #2001-0093, namely Trooper Sean R. MURRAY, Troop T, Pocono. Administrative determination – SUSTAINED.

This adjudication is based upon statements contained in IAD #2001-0093. Copies of those statements are herein attached in accordance with the collective bargaining agreement.

This Summary Report is being provided to inform you that I am considering issuing a Disciplinary Action Report (DAR) with regard to your actions in this matter. If you desire to meet with me to discuss any justification or information being considered for use in the issuance of said DAR prior to my final determination, you may request a meeting by contacting Lieutenant Timothy J. Allue, Executive Officer to the Deputy Commissioner of Operations, telephone number ████████ within three (3) days of your receipt of this Summary Report.

Received By: _____   Date: 06/08/01   Time: 1050

Witnessed By: _____   Date: 6/8/01   Time: 1050

# SUMMARY REPORT

IAD #:              2001-0093

DATE:              June 6, 2001

ISSUING OFFICER:   Lt. Colonel Thomas K. Coury
                   Deputy Commissioner of Operations

BUREAU:            Bureau of Drug Law Enforcement

SUBJECT:           Corporal Louis M. ALTIERI, Jr.
                   Bureau of Drug Law Enforcement, Troop P, TNT
                   Date of Enlistment: 04/22/96
                   Social Security Number: ████████

EXHIBIT
2Q
11-15-02

## REASON FOR INVESTIGATION:

This investigation was conducted upon receipt of a Use of Force Complaint Reception and Processing Worksheet submitted by the Office of Chief Counsel. The worksheet was submitted as a result of a complaint filed by Trooper Laura A. ZELINSKI, Troop P, Vice Narcotic Unit, in reference to Pennsylvania Human Relations Commission, Docket Number: E-97576-D, dated January 12, 2001.

## DETAILS:

This adjudication addresses the conduct of Corporal Louis M. ALTIERI, Jr., as determined and articulated in IAD #2001-0093. After thorough review and analysis of IAD #2001-0093, I have made the following administrative determinations:

1. Trooper ZELINSKI alleges that on October 14, 1999, she told you about two incidents involving "Sexual Harassment" that were committed against her by Trooper WEINSTOCK in June and August of 1999, and that she did not feel comfortable working surveillance with Trooper WEINSTOCK. Administrative determination – NOT SUSTAINED.

2. Trooper ZELINSKI alleges that you told Trooper WEINSTOCK in the early part of the summer (1999) that she was a "sexual harassment suit waiting to happen." Administrative determination – SUSTAINED.

3. Trooper ZELINSKI alleges that she believes that she has been harassed by because of her sex, being female, and/or in retaliation for reporting sexual harassment, and that the harassment continued until her removal from the Unit on or about August 22, 2000. Administrative determination – NOT SUSTAINED.

ATTACHMENT NO. 110

4.    During the course of this investigation it was also determined that, from a supervisory accountability perspective, Corporal Louis M. ALTIERI, Jr., conducted himself in an irresponsible manner in that he failed to properly perform his supervisory duties.  Corporal ALTIERI allowed a hostile work environment to perpetuate within the Unit for an extended period of time.   Administrative determination – SUSTAINED.

This adjudication is based upon statements contained in IAD #2001-0093.  Copies of those statements are herein attached in accordance with the collective bargaining agreement.

This Summary Report is being provided to inform you that I am considering issuing a Disciplinary Action Report (DAR) with regard to your actions in this matter.  If you desire to meet with me to discuss any justification or information being considered for use in the issuance of said DAR prior to my final determination, you may request a meeting by contacting Lieutenant Timothy J. Allue, Executive Officer to the Deputy Commissioner of Operations, telephone number ██████████ within three (3) days of your receipt of this Summary Report.

Received By: _____ Date: _06/08/01_ Time: _11:13_ AM

Witnessed By: _____ Date: _6/8/01_ Time: _1113_

SP 3-336 (1-99)

PENNSYLVANIA STATE POLICE
## DISCIPLINARY ACTION REPORT

| NAME | RANK | SSN | DOE | TROOP/STATION |
|------|------|-----|-----|---------------|
| hard S. WEINSTOCK | Trooper | ▓▓▓▓ | 01/23/93 | Bureau of Drug Law Enforcement |

2. INFRACTIONS (LIST INFRACTIONS, DATES OF OCCURRENCE, AND DETAILS)

From June 1999, through June 2000, you engaged in a course of inappropriate, sexually oriented conduct directed toward a female member of the Department. During this time period, you made suggestive, sexually graphic comments toward, and inappropriately touched, the aforementioned female member.

In addition, you were deceptive and failed to truthfully answer all questions relating to the allegations cited in IAD #2001-0093.

Furthermore, you attempted to exert inappropriate influence on a potential witness in IAD #2001-0093.

In compliance with the Collective Bargaining Agreement between the Commonwealth and the Pennsylvania State Troopers Association, copies of pertinent witness statements were previously provided to you on June 8, 2001, as attachments to the Summary Report pertaining to IAD #2001-0093.

**EXHIBIT**
**27**
11-15-02

| | | |
|---|---|---|
| LT. *[signature]* | | 06/08/01 |
| Lieutenant Colonel Thomas K. COURY | | |
| SIGNATURE (INITIATING OFFICER) | | DATE |

3. MEMBER'S NOTICE

IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

I ACKNOWLEDGE RECEIPT OF THIS REPORT.

| | | |
|---|---|---|
| *[signature]* | | |
| Richard S. WEINSTOCK | Trooper | 06/08/01 |
| SIGNATURE | RANK | DATE |

4. ACTION

| | | |
|---|---|---|
| SIGNATURE (DISCIPLINARY OFFICER) | RANK | DATE |

SP 3-336 (1-99)

PENNSYLVANIA STATE POLICE
## DISCIPLINARY ACTION REPORT

| NAME | RANK | SSN | DOE | TROOP/STATION |
|---|---|---|---|---|
| 'is M. ALTIERI, Jr. | Corporal | ▓▓▓▓ | 04/22/96 | Bureau of Drug Law Enforcement |

2. INFRACTIONS (LIST INFRACTIONS, DATES OF OCCURRENCE, AND DETAILS)

During the period from June 1999 through August 2000, you knowingly allowed an environment to exist whereby one member of your Unit engaged in a course of inappropriate, sexually oriented conduct directed toward another member of your Unit.

In compliance with the Collective Bargaining Agreement between the Commonwealth and the Pennsylvania State Troopers Association, copies of pertinent witness statements were previously provided to you on June 8, 2001, as attachments to the Summary Report pertaining to IAD #2001-0093.



EXHIBIT
28
11-15-02

_Lt. _____
Lieutenant Colonel Thomas K. COURY        06/08/01
SIGNATURE (INITIATING OFFICER)                    DATE

3. MEMBER'S NOTICE

IN ACCORDANCE WITH THE PROVISIONS OF THE PSTA CONTRACT, I HAVE BEEN GIVEN NOTICE OF MY RIGHTS AS SET FORTH IN FR 3-3, AND HAVE BEEN AFFORDED THE OPTION OF REPRESENTATION AT THE PRESENTATION OF THIS REPORT.

I ACKNOWLEDGE RECEIPT OF THIS REPORT.

_Cpl. L.M. Altieri_
Louis M. Altieri, Jr.  Corporal        06/08/01
SIGNATURE                    RANK        DATE

4. ACTION

SIGNATURE (DISCIPLINARY OFFICER)        RANK        DATE

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LAURA ZELINSKI,                : NO.: 3:CV 01-1979
            PLAINTIFF          :
    VS.                        : CIVIL ACTION - LAW
PENNSYLVANIA STATE POLICE,      : CHIEF JUDGE THOMAS VANASKIE
COMMONWEALTH OF PENNSYLVANIA    :
LOU ALTIERI, AND RICHARD        :
WEINSTOCK,                     :
            DEFENDANTS         : JURY TRIAL DEMANDED


        DEPOSITION OF:   RICHARD WEINSTOCK

        TAKEN BY:        PLAINTIFF

        BEFORE:          SUSAN M. SIMON
                         REPORTER-NOTARY PUBLIC

        PLACE:           PENNSYLVANIA BAR ASSOCIATION
                         100 SOUTH STREET
                         HARRISBURG, PENNSYLVANIA

        DATE:            OCTOBER 2, 2002
                         BEGINNING 10:40 A.M.


APPEARANCES:

    SERRATELLI, SCHIFFMAN, BROWN & CALHOON
    BY:   SPERO T. LAPPAS, ESQUIRE
          FOR - PLAINTIFF

    COMMONWEALTH OF PENNSYLVANIA
    OFFICE OF THE ATTORNEY GENERAL
    BY:   SARAH C. YERGER, DEPUTY ATTORNEY GENERAL
          FOR - DEFENDANTS PENNSYLVANIA STATE POLICE
                AND LOU ALTIERI

    HAMBURG & GOLDEN, P.C.
    BY:   JAMES P. GOLDEN, ESQUIRE
          FOR - DEFENDANT RICHARD WEINSTOCK

---

Page 2

I N D E X

2 WITNESS                              EXAMINATION
3 RICHARD WEINSTOCK
4    By Mr. Lappas


                              PRODUCED
                              AND MARKED
8 EXHIBITS:
9 1.  68-page typewritten statement

PLAINTIFF'S
EXHIBIT
B

---

Page 3

1          STIPULATION
2          It is hereby stipulated by and between counsel
3 for the respective parties that sealing, filing and
4 certification are waived; and that all objections except as
5 to the form of the question are reserved until the time of
6 trial.
7          EXAMINATION
8 BY MR. LAPPAS:
9    Q    Will you give us your full name please.
10   A    Richard Scott Weinstock.
11   Q    And your current occupation?
12   A    State trooper.
13   Q    Mr. Weinstock, as you probably know, my name
14 is Spero Lappas, and I'm the attorney for Laura Zelinski in
15 connection with a lawsuit that she's filed against you,
16 Corporal Altieri, and others.
17          Our purpose in asking you to be here today is
18 to have you testify at a deposition in connection with this
19 suit.  And although I'm sure your attorney has already told
20 you much of what I'm about to say, for the record, I'm
21 going to give you some instructions concerning today's
22 deposition.
23          The format of the deposition will be that I
24 will ask and you will answer questions concerning this
25 case.  Because you're sworn to your oath, you're required

---

Page 4

1 to give full, honest, truthful, and complete answers to
2 every question that I ask.  If at any time you feel that
3 you are incapable of giving a full, honest, truthful, and
4 complete answer to any question, please tell me so.
5          It may be that you don't hear my question.  It
6 may be you don't understand it.  There may be some
7 distraction, some road noise, or perhaps some other reason
8 why you are unable to give that kind of an answer.
9          No one wants you to speculate as to what the
10 correct answer to a question is or what the most favorable
11 or appropriate or what kind of answer will be most well
12 received.  If you genuinely don't know the answer to a
13 question, you should tell me I don't know.  I don't know is
14 a perfectly acceptable answer as long as it is a truthful
15 one.
16          You are also required to give your answers out
17 loud, which is verbally.  If your answer to a question is
18 either yes or no, you should say yes or no, rather than nod
19 your head, shake your head, or make some other indication,
20 saying uh-huh or anything like that.
21          Finally, you should wait until I'm completely
22 done answering the question before you answer it.  The
23 purpose of the court reporter today is to produce a
24 stenographic record of every word that is said in this
25 room, and it will be difficult for her to take down both

Richard S. Weinstock                Condenselt!™                October 2, 2002

Page 5

1  your words and mine if we're speaking at the same time.
2  So, wait until you're certain that I'm done asking the
3  question before you answer it.
4        Do you understand those instructions?
5     A   Yes.
6     Q   It's not necessary for you to lean over and
7  talk into any particular area.
8     A   I just wanted to help you out there,
9  Mr. Lappas.
10    Q   Well, I'm sure we all appreciate it.
11    A   Thank you.
12    Q   Are you armed right now?
13    A   No, I am not.
14    Q   When did you first become aware of the fact
15 that Laura Zelinski was reporting that you had committed
16 acts of sexual harassment?
17       MR. GOLDEN: Excuse me, did you say recording
18 or reporting?
19       MR. LAPPAS: Reporting.
20       THE WITNESS: The day that I was made aware of
21 it?
22 BY MR. LAPPAS:
23    Q   When were you first made aware of that?
24    A   I don't recall the exact date. And I
25 certainly wouldn't want to speculate, because your

Page 6

1  instructions told me not to, but I know that I was working
2  surveillance on Interstate 80 by White Haven. And I had to
3  use the facilities. So I drove to another trooper's house.
4  When I got to his house, I was with Trooper Murray, your
5  star witness. And my friend was in his field. And he
6  said, hey, what's this I hear you getting sued for sexual
7  harassment.
8        So that was the first time that I was told
9  about it. I guess that's the first time I had learned
10 about it.
11    Q   Who was that trooper?
12    A   That was Trooper Mark Dotter, D-O-T-T-E-R,
13 Troop N, Hazelton headquarters, 570-459-3154.
14    Q   Did Trooper Dotter tell you how he was aware
15 of the fact that you were, to use your words, being sued
16 for sexual harassment?
17    A   State troopers like to talk, I guess. Rumors.
18    Q   Is that what he told you?
19    A   No, I'm speculating. I'm sorry, you told me
20 not to.
21    Q   So Trooper Dotter gave you no information as
22 to the source of his information, is that correct?
23    A   That is correct.
24    Q   Did you ask him what he was talking about?
25    A   I had no clue.

Page 7

1     Q   When he said to you you're being sued for
2  sexual harassment, did he tell you who was suing you?
3     A   He said three women.
4     Q   Did he tell you who they were?
5     A   Your client. A female lieutenant.
6     Q   Do you know what her name is?
7     A   I believe that would be your other client,
8  Diane Stackhouse. And the third one he didn't say. He
9  just said that's what he had heard.
10    Q   Who told you Diane Stackhouse is my client?
11    A   Is that relative to this?
12    Q   Yes.
13    A   In what way?
14    Q   You're not here to ask the questions. You're
15 here to answer them.
16       MR. GOLDEN: You can just answer that
17 question.
18       THE WITNESS: State troopers like to talk.
19 BY MR. LAPPAS:
20    Q   Anybody in particular tell you that?
21    A   I don't recall. I certainly wouldn't want to
22 speculate.
23    Q   So your testimony under oath is you have no
24 recollection as to anyone that may or may not have told you
25 that Diane Stackhouse was a client of mine?

Page 8

1     A   No, my testimony under oath is that I don't
2  recall. And I don't want to speculate, because your
3  instructions told me not to.
4        MR. LAPPAS: Let's go off the record.
5        (Discussion held off the record.)
6        MR. LAPPAS: Let's go back on the record.
7  BY MR. LAPPAS:
8     Q   When Trooper Dotter gave you this information,
9  what was your response, if any?
10    A   I was shocked. I didn't know what he was
11 talking about.
12    Q   Tell me again who the third person was. Laura
13 Zelinski, Diane Stackhouse, and who else?
14    A   He didn't say who the third person was.
15    Q   Did he tell you who the first two were, Laura
16 Zelinski and Diane Stackhouse?
17    A   He said a female lieutenant.
18    Q   How did you take that information to deduce
19 that it was Diane Stackhouse?
20    A   Well, I base my answer on what I know now.
21    Q   All right. So at the time you had this
22 conversation with --
23    A   He certainly never said the name.
24    Q   At the time you had the conversation with Mark
25 Dotter, he described the second complainant as a female

Page 9

1 lieutenant but did not tell you who that was?
2    A    That would be correct.
3    Q    You later learned that it was Diane
4 Stackhouse?
5    A    That is correct.
6    Q    How did you learn that?
7    A    I would speculate because of the statement
8 that Diane Stackhouse gave during the internal affairs
9 investigation.
10    Q    Did anyone ever tell you that Diane Stackhouse
11 had made a complaint against you charging sexual
12 harassment.
13    A    No.
14    Q    After having this conversation with Trooper
15 Dotter, when is the next time that you learned that Laura
16 Zelinski had made a sexual harassment complaint against
17 you?
18    A    When I was interviewed by Lieutenant William
19 Fraley.
20    Q    Do you know when that was?
21    A    I certainly wouldn't want to speculate.
22    Q    Do you remember that date?
23    A    No.
24    Q    Where was it?
25    A    In his office at Troop P headquarters in

Page 10

1 Wyoming.
2    Q    What did Lieutenant Fraley say to you?
3    A    That I was the subject of a sexual harassment
4 allegation by your client, and that as the staff officer,
5 the direct -- I guess the staff officer is the direct link
6 to the department EEO, so when there's a sexual harassment
7 allegation, he does the investigation.
8        At the time it wasn't an investigation. It
9 was a supervisor's inquiry.
10    Q    Did he tell you what the nature of the
11 allegation was?
12    A    Yes.
13    Q    What did he tell you?
14    A    That it was a sexual harassment allegation.
15    Q    Did he tell you specifically what you were
16 alleged to have done?
17    A    He asked me questions regarding certain
18 incidents that she alleged that I had done.
19    Q    Did he tell you specifically what you were
20 alleged to have done?
21    A    He asked me about incidents and asked me
22 answers -- he asked me to answer his questions.
23    Q    What questions did he ask you?
24    A    I don't remember. He asked me questions. He
25 did an investigation. I'm sure you have a copy of his

Page 11

1 report.
2    Q    Your testimony is you don't remember the
3 questions that he asked you, is that accurate?
4    A    He asked me a lot of questions.
5    Q    Do you remember any of them?
6    A    I know he asked me about a panic pager
7 incident.
8    Q    Tell me what he asked you concerning that
9 incident?
10    A    He asked me if I had left my post while your
11 client was in a house to do a buy.
12    Q    What house would that be?
13    A    A house in Luzerne, Luzerne borough.
14    Q    Whose house was it?
15    A    One of their informants.
16    Q    Name?
17    A    Cassie Price, I think it was. It was their
18 snitch. I mean, that would go back to -- your client never
19 told me anything. I didn't know what they were doing.
20 They asked me to go along, I went along.
21    Q    Getting back to the questions Lieutenant
22 Fraley asked you about that. What did he ask you?
23    A    About?
24    Q    That.
25    A    What is that?

Page 12

1    Q    What questions did he ask you about this panic
2 pager incident?
3    A    If I had left my post.
4    Q    And how did you answer that question?
5    A    I left my position. I certainly did not leave
6 my post.
7    Q    How does that relate to a panic pager?
8    A    I don't understand the question.
9    Q    You described that as a question about a panic
10 pager. Now you've told me about leaving the post. Tell me
11 how that relates to the panic pager.
12    A    She was wearing a panic pager. Are you
13 familiar with what that is?
14    Q    Um-hum.
15    A    Okay. I'm monitoring the panic pager on not
16 one but two Motorola Saber radios. I'm using my hard radio
17 in my glovebox to contact with the other vehicles. Trooper
18 Dan Wigley is the case officer. So he's following the
19 suspects.
20        Do you want their names?
21    Q    Yes.
22    A    I don't remember them. He was following the
23 suspects to this location where we were going to do the
24 buy. He's calling us. He's nowhere near this house.
25        Now, while this is going on I'm monitoring

**Page 13**

1 this panic pager. Two radios, okay.

2        My pager is going off. I have informants of

3 my own. So I was trying to set up a buy for a pound of

4 marijuana. So Murray who was behind me on the same street

5 is observing the house also, doing surveillance. He has

6 the unit phone.

7        So I asked him to call my informant, find out

8 what's going on with this potential buy. He calls me back

9 on the radio, and he says, listen, the guys needs to talk

10 to you. Okay. Dan is nowhere near the house yet which

11 leads us to believe the suspects aren't anywhere near the

12 target location at this time.

13        I make a U-turn. I drive an eighth of a

14 block -- or an eighth of a mile to Murray's car. Turn

15 around. I use his phone. I talk to my informant. I hook

16 up this deal. We're going to do a deal when we're done

17 here, Murray and I. Because your client and Dan Wigley,

18 they never helped me.

19        What we did next was we observed the two

20 targets, two black males, entering the target house of this

21 Cassie whatever her name was. Laura is inside the house.

22 I see this happen. I drive back to my location. I get in

23 the back seat of my car. They go in. They sell the coke

24 to Laura. They walk out. I take photographs from the back

25 seat of my patrol car.

**Page 14**

1        That's the panic pager incident.

2    Q    Did he ask you about -- Lieutenant Fraley ask

3 you about any other incidents?

4    A    I mean, he asked me a lot of questions.

5    Q    That doesn't answer my question. Did he ask

6 you about any other incidents?

7    A    Yes.

8    Q    Do you remember any of the other incidents

9 that he asked you about?

10    A    Not particularly.

11    Q    Did he ask you about an incident that was

12 alleged to have taken place at a time when you and Laura

13 were at the Pennsylvania State Police Academy attending

14 wiretap school?

15    A    Yes.

16    Q    Now that I've mentioned that, that refreshes

17 your recollection?

18    A    Yes.

19    Q    What did he ask you about that?

20    A    I don't recall the specific questions.

21    Q    Did he ask you if you had ever had improper

22 physical contact with Laura Zelinski?

23    A    He may have.

24    Q    But you're not sure?

25    A    If he did, my answer would be no.

**Page 15**

1    Q    We'll get to the answers in a moment. You

2 don't remember if he asked you that question, is that your

3 testimony?

4    A    I don't remember the verbiage of his

5 questions, that's my testimony.

6    Q    Do you remember whether he ever asked you if

7 you put your hand on Laura Zelinski's knee?

8    A    Yes, I believe he did.

9    Q    Do you remember if he ever asked you whether

10 you told Laura Zelinski that you'd like to have sexual

11 intercourse with her?

12    A    No, I don't think he asked me that.

13    Q    Did he ask you whether you ever told Laura

14 Zelinski that you wanted her to come to your hotel room for

15 a full body massage?

16    A    Yes, he did.

17    Q    Did he ask you whether you had ever told Laura

18 Zelinski about certain sexual practices you enjoyed that

19 you'd enjoy engaging in them with her?

20    A    I don't remember.

21    Q    A moment ago you referred to Trooper Murray as

22 the star witness?

23    A    Yes, I did.

24    Q    What did you mean when you said that?

25    A    I guess I was just using an adjective to

**Page 16**

1 describe one of your witnesses.

2    Q    Why would you describe him as my witness in

3 the first place?

4    A    He's a witness for your defense -- or your

5 client.

6    Q    What leads you to believe that?

7    A    Because I've been involved in this erroneous

8 investigation since Day One, and I know who is saying

9 what. I have the copies. I know. I mean, Murray changed

10 his story three separate times.

11    Q    You have the copies of what?

12    A    Of everyone's statements that were used

13 against me.

14    Q    You're referring to the general investigation

15 report?

16    A    Yes, I am.

17    Q    Do you have a copy of that along with all the

18 exhibits, all the attachments?

19    A    What are the attachments?

20    Q    Well, a moment ago you referred to all the

21 statements. Are those the statements you were talking

22 about?

23    A    Well, is there a difference between a

24 statement and an exhibit?

25    Q    Okay. This is what we're going to do. I have

Page 17

1 been given an index of the general investigation report
2 which includes 108 attachments. I'm going to read them.
3    A    Let's do it.
4    Q    And I'm going to ask you about each one,
5 whether you have ever received this particular document,
6 and the circumstances by which you received it, and whether
7 you still have it in your possession.
8        Explain to me what it just meant a moment ago
9 when you winked at Corporal Altieri?
10    A    I winked at him. I just winked at you.
11    Q    Attachment number one is an SP1-101, use of
12 force or complaint reception and processing worksheet dated
13 January 20, 2001.
14    A    When?
15    Q    It's dated January 20, 2001.
16    A    Um-hum.
17    Q    Answer yes or no.
18    A    I don't know. Let me see it.
19    Q    My question to you is have you ever seen or
20 received that document?
21    A    How can I answer that question in a fair and
22 honest way?
23    Q    You're not here to ask questions. If you
24 don't know if you received it, you may say I don't know.
25        MR. GOLDEN: I just want to remind you of two

Page 18

1 things. The first is, let him finish his entire question.
2        THE WITNESS: All right.
3        MR. GOLDEN: That's better for you, and it's
4 better for him.
5        THE WITNESS: Yes, sir.
6        MR. GOLDEN: If he's asked you if you've seen
7 a document, if you know that you've seen it, say that
8 you've seen it.
9        THE WITNESS: I don't know -- I'm sorry.
10        MR. GOLDEN: Listen to my instructions too.
11 If you know that you've seen it, say that you've seen it.
12 If you think you might have seen it, you say to whatever
13 degree of recollection you have, maybe you saw it, maybe
14 you didn't see it.
15        If you're not sure you didn't see, say you're sure
16 you didn't see it.
17        I think that covers the universe, and I think
18 that will get you what you want. Is that fair?
19        MR. LAPPAS: That will satisfy this portion of
20 my inquiry, yes.
21 BY MR. LAPPAS:
22    Q    Do you want me to describe that document to
23 you again?
24    A    Please do.
25    Q    It's described as SP1-101 use of force or

Page 19

1 complaint reception and processing worksheet dated January
2 20, 2001.
3    A    Is that a question?
4        MR. GOLDEN: Have you seen it?
5        THE WITNESS: I don't know.
6 BY MR. LAPPAS:
7    Q    The next is a document described as
8 supervisory inquiry dated November 7, 2000.
9    A    I don't know.
10    Q    The next is Commonwealth of Pennsylvania,
11 Pennsylvania Human Relations Commission complaint, docket
12 number E-97578-D dated January 12, 2001. And I will tell
13 you that that is a complaint file by Laura Zelinski.
14    A    I don't know if I've seen it.
15        MS. YERGER: Not to interrupt, but is there
16 any way we can gave him a list of all the documents very
17 quickly?
18        MR. LAPPAS: I'm not confident that he would
19 conscientiously review a list if I were to give it to him.
20        MS. YERGER: Okay. I just thought I'd try to
21 just speed things up.
22        MR. LAPPAS: If his counsel will assure me
23 that he will review the list with him, I agree that would
24 speed it up. But this witness' conduct since he entered
25 the deposition room has been obstreperous and designed to

Page 20

1 interfere with the question and answer process, and I do
2 not believe that he would conscientiously engage in that
3 review.
4        MR. GOLDEN: I object to all of those
5 characterizations. And I think that you are asking him
6 questions that are designed to do nothing but give him a
7 hard time, because I can't imagine what relevance there
8 could be as to whether he can tell you by a technical
9 description of a document whether he's seen it, as I'm sure
10 you know because you're experienced.
11        The conventional way this is done in a
12 deposition when it's relevant is the lawyer shows the
13 witness a document and says have you seen it before.
14 That's the way it's normally done. But you can chose to do
15 it another way.
16        I think that a lot of time is going to be
17 wasted because I can tell you I've looked at most of that
18 stuff, and if you read that list to me, I couldn't tell you
19 from the description on the list that you're reading
20 whether I'd seen the document or not.
21        And I don't think you could either. I don't
22 think anybody could.
23        MR. LAPPAS: I could tell you whether I had
24 seen statements. He's indicated he doesn't remember
25 whether he's seen any statements.

Page 21

1        Let me ask you again.
2  BY MR. LAPPAS:
3     Q    Have you seen any statements by any witnesses
4  whatsoever concerning Laura Zelinski's claim against you?
5     A    Yes.
6     Q    Can you remember any of the persons who made
7  those statements, the ones which you have seen?
8     A    I don't understand that question.
9     Q    The statements that you have seen, do you
10 remember any of them in detail, in particular?  Can you
11 remember the names of any witnesses whose statements you
12 have seen?
13    A    Yes.
14    Q    Tell me the names of the witnesses whose
15 statements you have seen.
16    A    I've seen hers, Laura's.  Murray's, Wigley's.
17 Mine, of course.  (Indicating.).
18    Q    You pointed to Corporal Altieri and indicated
19 you have not seen his?
20    A    No, I haven't.  Would you like me to elaborate
21 on that answer?
22    Q    Are there any other statements that you have
23 seen?
24    A    I mean, I'm sure there is.  I mean, I don't
25 know exactly what they are.

Page 22

1     Q    All right.  In light of the fact that you have
2  seen Trooper Murray's statement, tell me again, what is
3  about that statement that causes you to identify him as my
4  star witness?
5     A    I don't think anything in there causes me to
6  identify him as your star witness.
7        (68-page typewritten statement produced and
8  marked as Weinstock Deposition Exhibit Number 1.)
9  BY MR. LAPPAS:
10    Q    I've just placed in front of you a document
11 which has been marked as Weinstock Exhibit 1.  I'd like you
12 to look at that and tell me if you have seen it before.
13    A    Yes.
14    Q    What is that document?
15    A    This is a transcribed statement that I gave to
16 Trooper John Duby -- at the time he was a trooper.  I
17 believe now he's a corporal -- at the IAD building in
18 Hershey.
19    Q    Have you seen this document before today?
20    A    Yes.
21    Q    Have you carefully reviewed it before today?
22    A    Yes.
23    Q    At the time you reviewed it, did you become
24 aware of any inaccuracies in that statement, in this
25 transcript?

Page 23

1     A    Meaning?
2     Q    By inaccuracies, I mean things that are
3  reported to have been said by either you or Trooper Duby
4  which were not said.
5     A    No.
6     Q    Are there any things that you believe were
7  said during your interview either by you or Trooper Duby
8  which have been excluded from this transcript?
9     A    No.
10    Q    Have you ever reported to anybody that the
11 transcript was inaccurate in any way?
12    A    No.
13    Q    You have also been served I'm sure with a copy
14 of the federal complaint that Laura Zelinski filed, is that
15 correct?
16    A    Yes, I've seen that document.
17    Q    I'm going to ask some questions about it, so
18 I'll place a copy of that complaint in front of you.
19    A    Why, thank you.
20    Q    When did you first meet Laura Zelinski?
21    A    When did I first meet her?  When she came to
22 the unit.
23    Q    So that would have been May of 1999, is that
24 correct?
25    A    Is that when your client came to the unit?

Page 24

1     Q    I'm asking you if you can verify that that's
2  when you first met her?
3     A    I don't remember the time.  It was
4  insignificant to me.
5     Q    Let's start with some questions about your
6  background.  Where did you attend high school?
7     A    Riverside, R-I-V-E-R-S-I-D-E, Junior-Senior
8  High School.
9     Q    What is that located?
10    A    That is located in Taylor, Pennsylvania.
11    Q    What county is that?
12    A    That is Lackawana, L-A-C-K-A-W-A-N-A,
13 Lackawana County.
14    Q    What year did you graduate from --
15    A    1987.
16    Q    What year did you graduate from Riverside
17 Junior-Senior High School?
18    A    1987.
19    Q    And upon graduating, what did do you?
20    A    I enlisted in the United States Marine Corps.
21    Q    How long did you serve in the Marine Corps?
22    A    Four years.
23    Q    What was your rank upon discharge?
24    A    E-4, corporal.
25    Q    After that, what did you do?

Page 25

1    A    I attended school at night, and I worked at
2  the Empire sanitary landfill.
3    Q    Where is that located?
4    A    Taylor, Pennsylvania.
5    Q    What school did you attend at night?
6    A    Lackawana Junior College.
7    Q    Did you obtain a degree?
8    A    No. I wasn't going to that type of schooling.
9    Q    What kind of schooling were you receiving?
10    A    The Municipal Police Officers Training Course,
11  Act 120.
12    Q    When did you graduate from that program?
13    A    I believe September of 1992.
14    Q    As of September of 1992, what was your next
15  job?
16    A    I worked at the landfill until I was enlisted
17  in the Pennsylvania State Police.
18    Q    When was that?
19    A    January 25th of 1993.
20    Q    Were you accepted into the Academy on your
21  first application?
22    A    My second.
23    Q    When did you graduate?
24    A    From the Academy?
25    Q    Yes.

Page 26

1    A    June 6th of 1993, I believe.
2    Q    What was your first assignment?
3    A    I was assigned to Troop S Gibson.
4    Q    How long were you there?
5    A    Bear with me. A year and a half.
6    Q    Where were you assigned after Troop S Gibson?
7    A    Troop S Dunmore.
8    Q    How long were you there?
9    A    I was there until Troop S disbanded in --
10  1996?
11    Q    And then where did you go?
12    A    Troop N Hazelton.
13    Q    Now, at Troop S Gibson, Troop S Dunmore, and
14  Troop N Hazelton, were you a patrol officer at all three of
15  those locations?
16    A    Yes, I was.
17    Q    How long were you at Hazelton?
18    A    From the disbandment of Troop S, which was
19  June of '96 until August of '98.
20    Q    Where did you go in August of '98?
21    A    Troop R Blooming Grove.
22    Q    What county is that?
23    A    Pike.
24    Q    How long were you there?
25    A    Until I was accepted into the Bureau of Drug

Page 27

1  Law Enforcement in April of '99.
2    Q    So I take you applied for the job with the
3  Bureau of Drug Law Enforcement?
4    A    Yes.
5    Q    Do you know whose decision it was to accept
6  you into that position?
7    A    No. I could tell you who offered me the job.
8    Q    No, thank you.
9    A    All right. I didn't know if that would help
10  you or not. Here to help you.
11    Q    So in April or thereabouts in 1999, would that
12  be when you first met Laura Zelinski?
13    A    Say again?
14    Q    In April of '99 or thereabouts, when you went
15  to work for the Drug Law Enforcement office, is that when
16  you first met Laura Zelinski?
17    A    No, she wasn't assigned to the unit at the
18  same time I was.
19    Q    Did she come after you did?
20    A    I think so.
21    Q    And you had never met her at any of your
22  previous postings?
23    A    Never. I spoke to her on the phone one time.
24    Q    When that was?
25    A    When I was at Blooming Grove, before my

Page 28

1  assignment to BDLE, the bureau.
2    Q    What do you remember about that conversation?
3    A    Well, I had called her because she had already
4  taken the test. So I called her to ask her what was on the
5  test.
6    Q    How did you know she had taken the test?
7    A    It was common knowledge who was vying for
8  certain positions.
9    Q    At the time that you spoke to her on the
10  telephone, did you know anything at all about Laura
11  Zelinski?
12    A    No. Never even heard of her.
13    Q    So the only thing you knew about her was that
14  she was a member of the state police and she had taken the
15  same test that you were about to take?
16    A    Fair enough, yes.
17    Q    Do you remember anything about your first
18  meeting with her after you were assigned to the bureau?
19    A    No.
20    Q    Do you remember the circumstances of that
21  meeting?
22    A    No.
23    Q    During the time period between the first time
24  you met her and the time she left the unit, how would you
25  describe your relationship with her?

Page 29

1  A   I really wouldn't.  There was no relationship
2 with her.
3  Q   Well, let's use a more neutral term.  How did
4 you get along with her?
5  A   I didn't.
6  Q   Why not?
7  A   Because she's -- it was a hostile work
8 environment, that's why.
9  Q   And describe what you mean by that.
10  A   You'd walk in to the office, and she'd be on a
11 phone call.  I can't talk anymore.  She'd hang up the
12 phone.
13      We were assigned different tasks, simple
14 things like filing the reports.  I had gotten operated on
15 while I was in the unit, and I had that task for quite a
16 while.  When it was her turn to file the reports, she'd
17 file everybody's reports, but she wouldn't file mine.
18      Just things like that.  Childish games.
19  Q   Did you ever ask her why she was displaying
20 this hostility toward you?
21  A   No.
22  Q   Did anyone ever suggest to you possible
23 reasons why she would be hostile towards you?
24  A   No.
25  Q   Would you agree that there were other people

Page 30

1 in the unit that were behaving badly other than Laura
2 Zelinski?
3  A   Yes.
4  Q   Who would they be?
5  A   Dan Wigley.
6  Q   Is he the only other one?
7  A   Well, no, I would have to say no, it is not.
8  Q   Who else?
9  A   Well, of course, Murray.
10  Q   So it was Laura and Wigley and Murray, all of
11 them were behaving badly?
12  A   No.
13  Q   Is that your testimony?
14  A   Well, I need to elaborate on the answer.
15  Q   Okay, go ahead.
16  A   Okay.  Murray was my friend.  He's the one
17 that asked me to come to this unit.  He typed my letter to
18 come to the unit, gave it to me, I signed it.  I said I'll
19 put in.  I never thought I'd get the job because it said
20 right in the posting that preferential treatment will be
21 given to women and minorities, both of which I'm not.
22      So I got the job and I was happy.  And I said,
23 you know, it will be something different.  And I never
24 really wanted to do drug work.  It's not something I
25 thought I would be good at.  Well, I was wrong.

Page 31

1      And Murray would be nice to you, but when you
2 weren't there, he would try to screw you.  And that wasn't
3 just me.  That was how he was with everyone.
4      So, I mean, my answer then would be he was
5 never hostile -- in this incredibly hostile work
6 environment that did exist -- he was never hostile while
7 you were present.
8      Does that answer your question?
9  Q   So Murray was sort of a back-stabber?
10  A   I think that the word that you used is a good
11 terminology.
12  Q   How about Wigley, what was he doing that you
13 found to be negative?
14  A   Well, Dan throughout his career has -- he
15 spends more time writing things down about people so that
16 he can come back, far into the future, and he can pull out
17 this little book and say, look, on December 25th of the
18 year 1987, you picked your nose and wiped it under the seat
19 of the patrol call.
20      I mean, that's how Dan is and that's how Dan
21 is known.  And that's why Dan was kicked out of another
22 bureau before he got kicked out of this one.
23  Q   Because he documents things?
24  A   No, that's not at all what I said.  What I
25 said was, he spends more time on trying to screw other

Page 32

1 people than focusing his attention towards doing the task
2 at hand, i.e., his job.
3  Q   All right.  And Laura, her problem was what?
4 You told us she wouldn't file your reports, and she would
5 hang up the phone when you entered the room.
6      Did you have any other difficulties with her?
7  A   Laura is a follower.  That is her place in
8 life.  And, I mean, that's part of her problem.  She can't
9 except her mediocrity.  And that's her problem.
10      Corporal Altieri made it very clear when we
11 came into this unit of what he was going to expect.  That
12 it was going to be no magazines in this bathroom.  We had a
13 unisex bathroom.  She never used it because it was filthy
14 anyway.  But, I mean, he made it very clear as to what he
15 expected.
16      So whenever Laura Zelinski would make
17 derogatory comments to you, you couldn't say anything back,
18 because Corporal Altieri wasn't going to tolerate it.  And
19 he made that known from Day One.
20  Q   Did she ever make any derogatory comments to
21 you?
22  A   Yes.
23  Q   Do you remember any of them?
24  A   Certainly.  They bother me to this day.
25  Q   Tell me the ones you remember.

Page 33

```
 1   A   Well, she used to frequently make fun of the
 2   fact that my eyebrow was connected at the top of my nose.
 3   Q   How would she do that?
 4   A   She used to do something like this with her
 5   hand (indicating), and she used to call me Uni-brow.
 6   Q   You just indicated for the record --
 7   A   For the record. Go ahead, I'm sorry, sir.
 8   Q   You put your index finger up between your
 9   eyebrows and made an up and down motion.
10       MS. YERGER: Excuse me. Off the record.
11       (Pause taken off the record.)
12   BY MR. LAPPAS:
13   Q   What other kind of negative statements did she
14   make to you?
15   A   One time my wife bought me this leather jacket
16   for Christmas, and she used to say that I was mobbed up.
17   Q   Laura said that?
18   A   Yes. I was mobbed up. Because of the people
19   that I hang around with in my personal life.
20       Shall I go on?
21   Q   Yes, I want you to tell me every negative
22   remark that Laura Zelinski made to you that you remember.
23   A   Corporal Altieri and I have the same type of
24   vehicle. We have Buick Skylarks. Mine was burgundy in
25   color, his was green. Hunter green, to be more specific.
```

Page 34

```
 1   Mine had tinted windows. And she used to say how it made
 2   her sick that our cars would be parked next to each other.
 3   Q   Did she say why that bothered her?
 4   A   No, just that it made her sick.
 5   Q   These are things she said to you directly?
 6   A   Absolutely.
 7   Q   Do you remember any others?
 8   A   Corporal Altieri carries the waist pouch --
 9   what do they call it? Fanny pack.
10   Q   Fanny pack.
11   A   And he used to always take it off, and he
12   always put it in the same place. Always. He put it by the
13   book where he kept the UCR numbers. There was a little
14   gray and white book there. Not a book, a box. Excuse me.
15       And inside the box were leave slips. So
16   whenever you needed a leave slip, you'd have go have to go
17   over and pick up Lou's fanny pack, which Laura referred to
18   as his sack, and you'd have to lift it up to get the leave
19   slips.
20       And, I mean, she would say this with all of us
21   present, hey, Lou, are the leave slips under your bag,
22   under your sack. Things like that.
23       Did I find that offensive? Yeah, I guess I
24   did.
25   Q   What else?
```

Page 35

```
 1   A   Schooling.
 2   Q   What about it?
 3   A   I'm adamantly against Catholic schooling. And
 4   both of my children are now in school. One's in first
 5   grade, one's in kindergarten. At the time they were in
 6   preschool, when I was in the unit. At least, my son. He's
 7   7 now.
 8       And I was having a discussion with somebody
 9   else. It was probably Murray because Murray goes to a
10   different school district because he lives in a different
11   school district area, which would make sense. Anyhow, I
12   said that I would never send my children to a Catholic
13   school. And, of course, Laura chimes in, well, I went to
14   Catholic school, and I don't think there's anything wrong
15   with it.
16       Basically what I'm saying is, whatever you
17   said, Laura had to say the opposite. But it was only with
18   me.
19   Q   Was it your impression that she got along
20   better with Wigley and Murray than she did with you?
21   A   Well, this is a long answer. As I stated
22   earlier, Laura is a follower, and she was trained by Troop
23   R Dunmore. She was trained by Billy Schutter. So, of
24   course, as far as Laura was concerned the sun rose and set
25   with Bill Schutter.
```

Page 36

```
 1       They didn't care for Sean Murray, and they
 2   made her aware of his nicknames like the Lyin' King, Honest
 3   Abe. And she had come down to this unit. And I don't
 4   remember when it was. I don't remember when she got
 5   there. I mean, it was after I got there.
 6       She came down and she called me aside. She
 7   said, Rich, listen, I'm going to tell you something. She
 8   said I trust you. She said these guys from Dunmore told me
 9   Murray's a liar, you better watch yourself. Okay.
10       And as I stated earlier in my testimony,
11   Murray and I were friends. So I called him up. I said,
12   Sean, this is what she says. You're a liar.
13       And only later did I learn that she also said
14   that to Corporal Altieri. She had also said that to Dan
15   Wigley. This is her MO. Modus operandi. That's Latin.
16   That's her MO. Divide and then conquer.
17       And once she realized, she told me this, I
18   went back to Murray, he called her on it. She denied
19   saying it. She said it.
20       I'm under oath. And that's something I take
21   pretty serious, being under oath. And that was the
22   beginning of the downfall of our unit as it existed.
23   Q   When she called Murray a liar?
24   A   Yes.
25   Q   Did you ever have any opinion as to whether or
```

Page 37

1 not Murray was a liar?
2    A    Sean Murray is a flat lying cur dog. The man
3 would lie about the color of the sky, if you could look at
4 it, if it would benefit him in any way.
5    Q    When did you first begin to believe these
6 things about him?
7    A    About whom?
8    Q    Sean Murray.
9    A    Well, I mean, I'm in this unit on a daily
10 basis. You have to understand how hard it was to get
11 yourself out of bed and be motivated to go to work because
12 of the things that were taking place.
13    Q    Before you joined the unit in April of '99,
14 did you have any opinion as to whether or not Sean Murray
15 was an honest person?
16    A    I didn't have an opinion one way or the other.
17    Q    He was your friend before that, correct?
18    A    Yes.
19    Q    He had, you said, recommended or somehow
20 suggested that you put in an application for this unit?
21    A    Yes.
22    Q    During the time that the two -- how long have
23 you been friends, by the way?
24    A    Well, I think you're using friend as a very
25 broad -- we need to narrow this down a little bit.

Page 38

1    Q    That's the term you used. Let me just ask you
2 a different question.
3    A    Go ahead.
4    Q    When did you first meet Sean Murray?
5    A    I met Sean Murray when I went to the Academy
6 in 1992 to take my physical fitness test.
7    Q    Between 1992 and 1999, did you know him
8 throughout those years? '99 being the time you joined the
9 unit.
10    A    I mean, of course, I knew of him, but, I mean,
11 I didn't hang around with the guy. Can I elaborate?
12    Q    Let me --
13    A    Go ahead. I'm sorry.
14    Q    When he suggested to you that you put in an
15 application for this unit, what was the nature of your
16 relationship at that time?
17    A    Thank you. At that time I had switched the
18 gym that I had worked out at. I had moved. I lived in
19 Wilkes-Barre city. We moved to a new location. So, once
20 we moved to our new location, it was no longer feasible for
21 me to travel to the other gym. So I joined a new gym.
22         This is where I first see this guy with long
23 hair. But now this guy's got muscles everywhere. And I
24 didn't recognize him from Adam. I didn't know who he was.
25         So the one day he came up to me and started

Page 39

1 talking to me. And I said to him, I said, buddy, I think
2 you got the wrong guy. He said it's me, Sean Murray. I
3 couldn't believe him. The guy was huge. The guy must have
4 gained 150 pounds in muscle since the last time I saw him.
5         So that's how we began to talk about the drug
6 unit. He was in this unit as it existed prior to my
7 arrival.
8    Q    Is that when you were at Troop R Blooming
9 Grove?
10    A    Yes. And I'll tell you how I know that. I
11 moved into my new home right after I went to Troop R. And
12 only after I had moved into the new home did I join this
13 new gym, because the owner of the gym is my neighbor.
14    Q    So you and Sean Murray were not working
15 together at any time before you went to the unit?
16    A    No.
17    Q    After meeting him in the gym, did you
18 socialize with him?
19    A    In my personal time?
20    Q    Yes.
21    A    No.
22    Q    Go ahead.
23    A    He came to my house with his wife one time and
24 his children, only after I was accepted into the unit.
25 That's the only time that we had ever done anything as

Page 40

1 couples. And I got two trays of pizza.
2    Q    All right. So before you joined the unit in
3 April of 1999, did you have any opinion as to whether Sean
4 Murray was an honest or dishonest person?
5    A    No. I mean, the guy had a reputation. I
6 didn't know firsthand, so I was going to form my own.
7    Q    What was his reputation?
8    A    He tells you what you want to hear.
9    Q    After you got to know him and work with him at
10 the unit, you, as I understand it, came to believe that he
11 was a dirty, rotten, lying cur dog?
12    A    No, the proper verbiage would be a flat lying
13 cur dog.
14    Q    A flat lying cur dog?
15    A    That is correct. But I didn't answer your
16 question yet.
17    Q    And Laura Zelinski told you that he was a
18 liar?
19    A    Yes, she did.
20    Q    Which turns out to be true, correct?
21    A    It's absolutely true. She told me that. And,
22 yes, that is a fact, he's a liar.
23    Q    Now, as I understand it, after the unit became
24 fully staffed in '99, it consist of you, Laura Zelinski,
25 Murray, Wigley, and Corporal Altieri, correct?

Page 41

1    A    Correct.
2    Q    What was your opinion of Corporal Altieri as a
3    supervisor?
4    A    When I first got there?
5    Q    Well, if it changed, tell me what it was at
6    first, and then how it changed.
7    A    Well, I didn't know him. I mean, I knew that
8    he was a very religious person. I knew that he didn't want
9    us to say the F word in front of him. I kind of thought he
10    was a little corny, to be perfectly honest.
11    Q    And then after you did get to know him, did
12    you have a different opinion of him?
13    A    Yes, I did.
14    Q    What was that opinion?
15    A    I think that Corporal Altieri is the best
16    trooper that I have ever had the privilege of working with
17    in my ten-year career as a trooper. And I mean that.
18    Q    So among this unit, the staff of this unit,
19    you and Altieri were the ones that in your judgment were
20    not causing trouble?
21    A    No, that would not be my opinion. If you're
22    asking me, yes, that's a fact.
23    Q    So Wigley, Murray and Zelinski were causing
24    trouble, and you and Altieri were not?
25    A    Well, you're using words that I certainly

Page 42

1    didn't use. I never said they were causing trouble.
2    Q    Were they causing trouble?
3    A    Define trouble.
4    Q    Were they engaging in behavior that was
5    contrary to the mission of that unit?
6    A    Absolutely.
7    Q    And were you?
8    A    Never.
9    Q    And Altieri was not either, to your knowledge?
10    A    No.
11    Q    Now, you have the complaint in front of you.
12    A    My statement?
13    Q    No, the complaint. I'd like you to turn to
14    page 8 of the complaint.
15    A    I'm there.
16    Q    On page 8, paragraph C states that from on or
17    about June 22 of '99 until June 28th of 2000, plaintiff,
18    which means Laura Zelinski, was sexually harassed by you
19    who was then assigned to the same unit as her.
20    What is your response to that allegation?
21    A    False.
22    Q    During the time that you and Laura Zelinski
23    were working together in the same unit, do you feel that
24    you ever engaged in any kind of contact which could be
25    misconstrued as sexual harassment?

Page 43

1    A    No. I mean, we didn't have any contact.
2    Q    Did you ever put your hands on her?
3    A    We held hands one time.
4    Q    Is that the only time you ever put your hands
5    on her?
6    A    That was in the scope of the Pennsylvania
7    State Police mission.
8    Q    That was the only time you ever put your hands
9    on her?
10    A    She hugged me one time up in Wyalosing
11    borough.
12    Q    What were the circumstances of that?
13    A    My county was Bradford County. We get these
14    things called drug tip hotlines. And Lou, in all his
15    infinite wisdom at the time -- I didn't agree with it then,
16    and I don't agree with it now -- used to make us do a list
17    of things before we could close out these drug tip
18    hotlines.
19    What a drug tip hotline is, someone could call
20    in from Carlisle and say that Joe Schmuckatelli is selling
21    dope in town X in Bradford County. And I would get this.
22    And I'd have no names other than the alleged suspect, no
23    complainant information, no one to interview, and I'd have
24    to go to the house in the middle of nowhere and try to find
25    something out on these people.

Page 44

1    If you're not born and raised in Bradford
2    County, it's almost impossible to do anything. The reason
3    I go into that is, I get this thing in Wyalosing borough.
4    It's right next door to this travel agency. And it's these
5    two girls who are allegedly selling drugs to children as
6    they leave school.
7    So I set up a night to do some surveillance.
8    I don't remember the date, but I know it was around
9    Christmastime.
10    Q    Do you remember what year it was?
11    A    I think it was -- she was only there for one
12    Christmas. She got kicked out before the next one. So it
13    was the first Christmas that she was there. '99. So it
14    was Christmastime '99. Right before New Years, I think. I
15    think it was in between Christmas and New Years.
16    And I went up with Trooper Kevin Seidel and
17    Trooper Alfred Weiss, the Third. And we went into this
18    travel agency. It was an old house that was changed over.
19    We went up to the second floor. And I had worked something
20    out with these ladies that ran the business. And they were
21    okay with it, and they gave me the key to the back door.
22    They were nice ladies. Very helpful.
23    So we set up surveillance in this abandoned --
24    not abandoned, empty room on the second floor where I could
25    see across to their house. They being the targets of this

Page 45

1  complaint.
2      So Laura wants to come up. Well, we were
3  already there. Now, cell phones at that time didn't even
4  remotely work in Wyalosing. I don't know if they do now or
5  not. So I get a page. So I go out to the patrol car, I
6  drive to a pay phone, I call his unit phone. And he says,
7  listen, we're coming up. We don't know where we're at.
8  When I page you with a -- I think he paged me with like a
9  911. That meant for me to come back out of the house, meet
10  him in the parking lot, and bring them to this room that we
11  were conducting surveillance in.
12      So, sure enough, I said, okay. Back to the
13  house, back conducting surveillance with Alfred Weiss, the
14  Third, and Kevin J. Seidel. And the pager goes off. I go
15  out the back door, and I meet them. She gets out of Lou's
16  car, and she walks up and she hugs me and gives me this
17  kiss. I believe it was on the cheek.
18      And I'm like, what is up with this, you know.
19  I mean, it's like she's bipolar or something. One day
20  she's one thing, and the other day she's another thing. It
21  was weird.
22      So that's the context of how she kissed me.
23  Q  Is that the only time she kissed you?
24  A  I believe so. Absolutely. Yes.
25  Q  Is that the only time she ever hugged you?

Page 46

1  A  No, she hugged me another time.
2  Q  Tell me about that.
3  A  Murray came to me and said, Rich, listen, you
4  need to go to Laura, and you need to tell her that the past
5  is the past. I said what the hell is the past? What is
6  the past? I've done nothing to this girl.
7      I mean, I'm in the same unit as them, and I
8  don't even know what targets they're looking at. It wasn't
9  until after they were gone and I had the unfortunate task
10  of taking over their piss poor investigations that I knew
11  that they were looking at the same people as I was.
12  Q  When you say they, who are you referring to?
13  A  The three of them.
14  Q  Wigley, Murray --
15  A  No, let me rephrase that. The two of them.
16  Wigley and Laura. Because Sean did all his paperwork
17  before he left. See, Sean got to determine how he left.
18  He left on his terms.
19  Q  But the people who had excluded you from
20  knowledge about their investigations -- you said I didn't
21  even know who their targets were.
22  A  Right.
23  Q  Were you referring to all three of them or
24  just Laura and Wigley?
25  A  It would be all three sometimes, and

Page 47

1  just the two of them sometimes. Sean would give me little
2  bits of information. Hey, listen we're going to do a buy
3  with these black guys from New York. They did this case,
4  and I don't remember their names. They had like weird
5  street names. And I finished the case. I prosecuted with
6  the FBI, and every one of them is doing 87 months.
7      You know, but, I mean -- you asked me a
8  question earlier. I still haven't answered it. About a
9  hug.
10  Q  Right.
11  A  Let me go back. So I go out, and I said to
12  Laura -- she's leaving for the day. She's walking on the
13  side of the building where she used to park her car.
14  Q  Leaving your workplace?
15  A  Leaving the small office that Lou and I had to
16  move out of under cover of darkness because of this
17  erroneous complaint. But anyway, that's another story.
18      I go outside to talk to her at Sean's
19  recommendation. And I said, Laura, listen, I said, we're
20  not going to get anywhere in this unit unless we all get
21  along. And I don't remember the exact verbiage, but she
22  says, oh, I just feel like this huge weight has been lifted
23  off my back. And she hugs me in her unusual phony way.
24      Anybody that has met her knows how she is when
25  she first meets you. I mean, it's the same MO all the

Page 48

1  time. Same thing. And that was it.
2      So, I came back to the unit. I think it was
3  like the end of the week or something. And nothing's
4  changed. It's business as usual. The unit, those three,
5  and me. Okay?
6      The reason I'm looking at my clock is because
7  my meter expires in 30 minutes.
8      So I said to Murray, I said, Sean, you asked
9  me to go tell this girl whatever, that we need to all get
10  along, I said say it, and nothing's changed. He said,
11  well, it might have changed for you, but it hasn't changed
12  for her.
13      I'm like, what does that mean? What does that
14  mean?
15      See, they thought -- when I say they, the
16  three. They thought -- no, the two. Wigley and Zelinski
17  thought that I was telling Corporal Altieri everything that
18  was going on in this unit. But I wasn't. Murray was. And
19  then he'd go back and he'd say, yeah, Lou knows all these
20  details about what we've been doing. How the hell would I
21  know the details of what they were doing, when I wasn't
22  involved in what they were doing. I didn't know what they
23  were doing.
24      But he had all this information. He couldn't
25  have gotten it from me. I wasn't present. I mean --

Page 49

1    Next question.
2    Q    What kind of information about what you were
3 or were not doing was Murray passing out to Altieri?
4    A    Well, you would have had to have asked him
5 that in his deposition. I certainly wasn't present. It
6 would have to be a -- I don't want to say an ex parte
7 communication, but, I mean, I certainly wasn't present
8 during the communication between him and Murray. I don't
9 know what was taking place. I only learned this after
10 their removal from the bureau and then Murray's leaving.
11    Q    Do you remember there being a get-together at
12 a place called the Pink Apple with members of your unit?
13    A    I've never, ever, to this day been inside the
14 Pink Apple. And until Duby asked me about the Pink Apple,
15 I didn't even know where it was. And I drive past it every
16 time I would go to the Tunkhannock barracks. Never been in
17 the Pink Apple.
18    Q    Do you remember there being a meeting
19 somewhere out of the office, a meeting with you, Murray,
20 Wigley and Altieri, in which you discussed the problems
21 that the unit was having?
22    A    No.
23    Q    In other words, if it wasn't at the Pink
24 Apple, someplace else?
25    A    I don't remember a conversation like that ever

Page 50

1 taking place.
2    MR. GOLDEN: Let him finish.
3    THE WITNESS: Sorry. Boy, you're good, Jim.
4 BY MR. LAPPAS:
5    Q    Did you ever remember having any kind of
6 conversation in the office, the members of the unit, in
7 which you discussed the fact that there was a lot of
8 problems?
9    A    No.
10    Q    All right.
11    Q    Can I elaborate?
12    Q    Well, if you think no requires an
13 elaboration.
14    A    I think it does. I think it does.
15    Q    All right.
16    A    The reason that I think is does is you need to
17 get a clearer picture of what's taking place. Whenever
18 these alleged problems were taking place in the unit -- see
19 the problem was this. I wasn't going to undermine his
20 authority. If I didn't like what Corporal Altieri was
21 doing or told us to do, I did it, and then I questioned it
22 after the mission was complete. And that's the proper way
23 to do it. Anything less would be insubordination.
24    Every time these individuals would say,
25 listen, we have problems in the unit -- they never said

Page 51

1 them to me. They never said them to me.
2    See, Murray would go to him and say, listen --
3    Q    Indicating Altieri.
4    A    I'm pointing towards Corporal Altieri. I
5 apologize for that.
6    Murray would go to Corporal Altieri and say,
7 listen, Lou, there's a problem in the unit. Okay. And I
8 only know this now because of all the statements that I've
9 been given as a result of the internal affairs
10 investigation, which by contractual rights I am afforded
11 that opportunity to see that. But only the ones that they
12 use against me. And that's why I don't have a copy of
13 his. Or at least I didn't. I don't know if my attorneys
14 do.
15    With that said, you need to understand he
16 comes to me the one day, he being Corporal Altieri, and he
17 says, Rich, I'm really glad that you guys are working out
18 these problems in the unit. And I'm like, what are you
19 talking about?
20    See, the only people that talked about there
21 being problems in the unit were the problems. Never me.
22 From Day One, I wasn't going to play their game. Their
23 game was we do as we want, and we tell him what he needs to
24 know.
25    I don't work that way. That's not how I

Page 52

1 work. I don't have a problem with authority. I can tell
2 you every person in every chain of command that I have ever
3 been in. Every.
4    I pride myself on knowing my job. Okay? I
5 could tell you when he told me to do something, I did it
6 and I know that. And if I didn't like it, I did it. Now,
7 of course, if he told me to do something criminal in
8 nature, I certainly wouldn't do it. I'd report it to a
9 supervisor above him.
10    But if he told me to go buy dope from Joe
11 Blow, then I would do it, if I could. And I'll give you a
12 perfect example.
13    I wanted to do a search warrant on a house one
14 time because the guy was doing satellite cards, and the
15 informant says the guy's got two garbage bags full of pot.
16 I said, Lou, let's kick the door in. Let's get a search
17 warrant.
18    No, this is the first buy from this informant,
19 and I don't want to burn him. I didn't agree with that
20 decision. That tells me that, you know, this dope is going
21 to end up on the street. Yeah, we used the informant.
22 He's not really a proven reliable informant because he's
23 only got one buy, so I mean --
24    I didn't agree with his decision is basically
25 what I'm saying, but I did what he said. Or didn't do what

Page 53

1 he said in this case, being that I didn't do the search
2 warrant.
3        Can we take a break?  I really need to put
4 money in the meter.
5    MR. LAPPAS:  Yeah, sure.
6        (Lunch recess taken from 11:43 a.m. until
7 12:20 p.m.)
8    THE WITNESS:  Sir?
9 BY MR. LAPPAS:
10   Q    Pardon me?
11   A    Can I speak?  I don't have a question.  I have
12 a statement.
13   Q    Go ahead.
14   A    While I was at lunch, I had thought about
15 other things that -- names that I was called.
16   Q    Okay.  Sure, if you want to expound on a
17 previous answer, go ahead.
18   A    One of the things I used to be called was
19 Lou's bitch or Lou's boy.  Those two things by your client
20 and Dan Wigley.
21   Q    By my client and Dan Wigley?
22   A    Yes.  I don't recall ever being called Lou's
23 bitch by Murray.  I know he called me Lou's boy.  But Laura
24 called me Lou's bitch.
25   Q    Now, we're going to go back to the complaint

Page 54

1 which you have right in front of you opened.
2    A    I have it on page 8.
3    Q    Paragraph C-1 of the complaint alleges that on
4 or about June 26th of 1999, you told plaintiff that you
5 were attracted to her since you met her in April.
6        Is that true or false?
7    A    Well, I had never met her in April.  So that's
8 false.
9    Q    Without regard to whether you met her in April
10 or at some other time, did you ever tell the plaintiff that
11 you were attracted to her?
12   A    No.
13   Q    At any time in your life?
14   A    No, absolutely not.
15   Q    All right.  It further states that you told
16 her that you wanted her to come to your room so that you
17 could give her a full body massage.  Is that accurate?
18   A    No, that is inaccurate.
19   Q    You were asked these same questions by
20 Trooper Duby, correct?
21   A    Correct.
22   Q    The complaint also alleges that she told you
23 to stop saying such things to her, which I take it you deny
24 that she ever said anything like that?  Is that true?
25   A    The way it's worded is plaintiff told him to

Page 55

1 stop saying these things, and plaintiff had met his wife.
2    Q    Did Laura Zelinski ever say anything like that
3 to you?
4    A    No, she did not.
5    Q    And the next statement I've already asked you
6 about that she alleges you put your hand on her knee, and
7 you have denied doing that, correct?
8    A    Correct.
9    Q    Now, I want you to read to yourself paragraph
10 C-2, starting with August 4, 1999.  Read that silently to
11 yourself and tell me when you're finished please.
12        (Brief pause taken off the record.)
13   THE WITNESS:  Finished.
14 BY MR. LAPPAS:
15   Q    Are any of the allegations made in paragraph
16 C-2 correct?
17   A    No.
18   Q    So you deny the entire contents of that
19 paragraph?
20   A    The entire contents.
21   Q    Now, the next paragraph of the complaint goes
22 on to state that Laura Zelinski at some point in time told
23 Corporal Altieri that she did not feel comfortable working
24 with you.
25        Did you ever know that she felt uncomfortable

Page 56

1 working with you?
2    A    No, I did not.
3    Q    You testified earlier that one of the problems
4 in the unit was that people were talking behind each others
5 backs.  Do you remember saying that?
6    A    Did I say that?
7    Q    My question to you is do you remember saying
8 it.  If you don't --
9    A    I don't remember saying it.  If I said it, I
10 said it.
11   Q    To characterize it a different way, I think
12 you indicated this was Murray in particular and maybe also
13 Wigley, that they would go to Corporal Altieri and tell him
14 things that you had done or things that other people were
15 supposed to have done, et cetera.
16   A    No, I didn't say that.
17   Q    You did not say that?
18   A    I said Murray.
19   Q    Murray?  Murray did that?
20   A    Yes.
21   Q    All right.  Did you ever do that?
22   A    Did I go to him?
23   Q    That's my first question.  Did you go to him?
24   A    No.
25   Q    All right.  Did you ever go to other members

Page 57

1 of the unit and tell them about what different members of
2 the unit had been saying about them?
3          For example, would you go to Murray and tell
4 him what another person had said about him?
5     A   Well, yes, I testified earlier that I told him
6 she said he was a liar. So, sure, I went to him and I told
7 him. That is what she said. Straighten it out. Deal with
8 it. Confront her.
9     Q   And you thought that was okay to do?
10    A   You don't?
11    Q   You have to answer my questions. Do you think
12 that is okay to do?
13    A   I think that is a very wrong -- the very
14 problem with this world. That is the very problem.
15    Q   That you tell too many people what other
16 people are saying about them?
17    A   No, no, no, no.
18    Q   What is the very problem of this world, in
19 your opinion?
20    A   If you'd let me finish, you would know. That
21 people do this (indicating), when they should be doing this
22 (indicating).
23          And let the record reflect that I made a
24 talking motion with my hand and silent motion with my
25 hand.

Page 58

1          That's the problem. If people just told other
2 people what their problems were, then you would know.
3 There would be no reason. There would be no dysfunctional
4 TNT units like the one your client and Dan and Murray
5 caused. It wouldn't have happened.
6          That's what I'm saying. That's the problem,
7 yeah. If you came to me and you said, listen, I think Jim
8 is a big jerk. Well, I'm going to tell him, Jim, he thinks
9 you're a big jerk. Why don't you square it away with him.
10          Because I'm not going to play your game.
11 That's rumor. That's nonsense.
12    Q   When you went to see Murray to tell him that
13 Laura Zelinski said that he was a liar, did you say, and by
14 the way, I also think you're a liar?
15    A   No.
16    Q   Did you ever express to him that you thought
17 he was a liar?
18    A   Ever? Yes.
19    Q   When did you do that for the first time? And
20 if you can put it into context of when Laura left the
21 unit.
22          While Laura was still in the unit, did you
23 every tell Murray you thought Murray was a liar?
24    A   Repeat the question. I'm sorry.
25    Q   During the time period that you and Laura and

Page 59

1 Murray and Wigley and Altieri were working together in this
2 unit, did you ever tell Murray you thought he was a liar?
3     A   Not in a sense that would be like, dude,
4 you're a liar, you need to see some help.
5          Yeah, the guy was a liar. He lied about
6 everything. He would lie about everything.
7     Q   You've made that -- you've made your position
8 on that very clear. My question is did you ever tell him
9 to his face that you thought he was a liar?
10    A   I don't recall. I don't know. I mean, that's
11 my most honest answer. I don't know.
12    Q   Put the complaint aside and pick up your
13 statement to Mr. Duby. I want you to turn to page 35.
14    A   I'm there.
15    Q   All right. Now, actually if you turn back one
16 page to page 34, you'll see at the bottom of the page
17 you're speaking about someone named Sean. That would be
18 Trooper Murray, correct?
19    A   Direct me to a line.
20    Q   It's the second to the last time your name
21 appears.
22          I hated this about Sean, but he was good at
23 what he did because --
24          Have you found the place where I mean?
25    A   Yes, sir, I did.

Page 60

1     Q   That Sean you're referring to is Trooper
2 Murray?
3     A   Correct.
4     Q   Turn to the next page. And your first
5 statement on page 35 is that's the way he comes across. He
6 sells himself great. He'd slit his mother's throat for two
7 cents and a blow job. That's Trooper Murray.
8     Q   Did you ever express that to Trooper Murray,
9 that you had those feelings about him?
10    A   No.
11    Q   Did you ever express to Laura Zelinski that
12 you had problems with the way she was behaving in the
13 unit?
14    A   No, it wasn't my place to. I wasn't her
15 supervisor.
16    Q   Now, back to the complaint, still on page 8,
17 paragraph D. It alleges that Corporal Altieri told you in
18 the early part of the summer of 1999 that the plaintiff
19 was, quote, a sexual harassment suit waiting to happen,
20 closed quote.
21          Do you remember him ever saying that to you?
22    A   I need to read this because who said that has
23 been said so many different ways at so many different
24 times. So just let me read it before I give you an answer.
25          (Brief pause taken off the record.)

Richard S. Weinstock                              Condenseit!                              October 2, 2002

Page 61

1    THE WITNESS: No, that's not true.
2 BY MR. LAPPAS:
3    Q    Corporal Altieri never said those words to
4 you?
5    A    Not to me.
6    Q    Were you ever made aware of any complaints
7 that Laura Zelinski had made against troopers at the
8 Dunmore barracks?
9    A    About them?
10   Q    Yes.
11   A    I need you to reask that question.
12   Q    Were you ever made aware of any complaints
13 Laura Zelinski had made about troopers at the Dunmore
14 barracks?
15   A    No.
16   Q    Now, when we started this deposition you made
17 a reference to the fact that when Trooper Dotter told you
18 that three people were suing you for sexual harassment, you
19 eventually came to understand that one of those three
20 people was Lieutenant Stackhouse, correct?
21   A    Correct.
22   Q    What do you know about the allegations that
23 Lieutenant Stackhouse made against you?
24   A    I know that it is the exact same -- the
25 verbiage is identical to Laura Zelinski's.

Page 62

1    Q    Okay. Do you know anything else about it?
2    A    I know that it's erroneous. It's untrue.
3 It's a lie.
4    Q    Tell me what you understand Lieutenant
5 Stackhouse's complaint to be?
6    A    That while we were at a coalition, I asked her
7 to come to my room and give her a full body massage.
8    Q    Same MO as what Zelinski is claiming?
9    A    Sure.
10   Q    You told Trooper Duby that there was some
11 relationship or connection between Lieutenant Stackhouse
12 and Laura Zelinski, correct?
13   A    Correct.
14   Q    Tell us what you believe to be the connection
15 or relationship between those two people?
16   A    Well, I believe it because your client told me
17 it. She had told the entire unit this.
18   Q    Which client are you referring to?
19   A    Laura. And she had told the unit -- I don't
20 know where we were -- but she had told us about how Diane
21 Stackhouse was living with a woman what is another member
22 of the Pennsylvania State Police. And while they were
23 cadets at the Academy, Laura Zelinski and Beth Santelli,
24 now Beth Gunther, went to the house and knocked on the
25 door, and the woman that answered the door, who was not

Page 63

1 Diane Stackhouse, became defensive with the two as to what
2 was the nature of their visit to the house.
3    Q    Did Laura tell you what the nature of their
4 visit had been? Why were they going to the Stackhouse
5 residence?
6    A    It wasn't like the type of story where that
7 was the point of interest. The point of interest was the
8 fact that Lieutenant Stackhouse lived with another woman
9 and that this woman became defensive towards Zelinski and
10 Beth Santelli, now Beth Gunther.
11   Q    Who was it that you referenced that were at
12 the Academy together?
13   A    I don't understand your question.
14   Q    You said something about somebody being at the
15 Academy with somebody else. Who was it that was at the
16 Academy together?
17   A    Beth Gunther, Beth Santelli, is a classmate of
18 Laura Zelinski from the Academy.
19   Q    Okay. So we know, according to what you have
20 just told us, that on one occasion Laura Zelinski and
21 another person knocked on Lieutenant Stackhouse's door.
22        Do you know anything more about any connection
23 or relationship between the two of them, between Laura and
24 Lieutenant Stackhouse?
25   A    Do I?

Page 64

1    Q    Right.
2    A    No. I mean, just what she told us.
3    Q    Well, she told you that on one occasion she
4 knocked on Diane Stackhouse's door, and this woman answered
5 the door and became defensive.
6        Did she ever give you any other information
7 that indicated that she had some connection to Diane
8 Stackhouse?
9    A    Just by the way that she had talked about her
10 in general would lead one to believe that they were good
11 friends.
12   Q    And tell me what she would say about her that
13 would lead one to believe that?
14   A    I mean, I really don't recall things. I mean,
15 I don't remember.
16   Q    But it was your impression based upon the
17 things you have testified to today, it was your impression
18 that Laura Zelinski and Diane Stackhouse were good friends?
19   A    Yes.
20   Q    Do you feel that their friendship is in some
21 way responsible for the fact they have both made sexual
22 harassment complaints against you?
23   A    I think that -- I think a lot of things. And
24 I think that the fact that you represent Diane Stackhouse
25 in another matter, she stands to gain more financially if

Susan M. Simon, Professional Court Reporter                    Page 61 - Page 64

Richard S. Weinstock                    Condenselt!                    October 2, 2002

Page 65

1 she can prove that the state police is continuously a
2 hostile environment towards women in the state police.
3        And I think that is what Diane Stackhouse
4 stands to gain by her saying the exact same thing, the
5 exact same story, as Laura's. I mean, if I sexually
6 harassed this woman, certainly her being a lieutenant
7 within the ranks of the state police, she should know the
8 departmental policy on sexual harassment. Why didn't she
9 file a complaint on me?
10   Q   Am I to take that answer as a yes?
11       My question to you was, do you feel that the
12 fact that Diane Stackhouse and Laura Zelinski are
13 friends -- in your opinion, they are friends -- do you feel
14 that's responsible for them both making sexual harassment
15 complaints against you?
16   A   I mean, I don't know. I'm not going to
17 speculate as to what motivated their desires.
18   Q   You gave Trooper Duby your opinion as to why
19 Laura Zelinski made this complaint against you, correct?
20   A   I believe I did.
21   Q   And you told Trooper Duby that her reason for
22 complaining was that she wanted to get rid of Altieri and
23 get rid of you, correct?
24   A   Incorrect.
25   Q   What did you tell him?

Page 66

1   A   Her motivation or her -- not her motivation --
2 her goal was to eliminate myself and Altieri from the
3 unit. But once her services were no longer needed, she did
4 the only thing that she could to take me down and him with
5 me. That being accuse me of sexual harassment and then say
6 that she reported it to the supervisor of the unit and he
7 failed to act on it.
8   Q   Well, let me direct your attention to page 5
9 of the statement that you gave to Trooper Duby.
10 Specifically at the very bottom of the page, your last
11 answer beginning with the words, well, I think.
12       Do you see that?
13   A   Yes.
14   Q   This transcript reflects that you told Trooper
15 Duby the following, quoting, well, I think that it's a way
16 for her to get rid of Corporal Altieri which was her
17 motivation from her -- from the beginning. And in doing so
18 this would also get rid of me from the bureau, closed
19 quote.
20       Is that actually what you told Trooper Duby?
21   A   That's what I just said to you. Yes, that's
22 correct, I told that to Trooper Duby, and I answered that
23 to you.
24   Q   Why would she want to get rid of Corporal
25 Altieri, to remove him from the bureau?

Page 67

1   A   Because Laura Zelinski has a problem with
2 leadership or authority figures, and it just happened this
3 time to be the Bible-beater Lou Altieri.
4   Q   And why would she want to get rid of you?
5   A   Because I wouldn't play her game. She could
6 not divide and conquer.
7   Q   And what would Diane Stackhouse's motive be to
8 make a false complaint against you?
9   A   I answered that already.
10   Q   Well, answer it again.
11   A   Well, I'll answer it again for you. Her
12 motivation would be that because she is currently suing the
13 state police on a separate issue, she stands to gain more
14 money financially in a settlement --
15       This is my belief. I do not have this
16 documented. I was not told this by the chief counsel of
17 Kalamazoo. This is what I speculate. This is what I
18 think. I mean, I can't tell you what goes on in Diane
19 Stackhouse's brain housing group. I can't answer for her.
20   Q   Why would she, if you know, if you have an
21 opinion, of all the members of the state police she could
22 have falsely accused, why would Diane Stackhouse pick you?
23   A   Maybe it has to do with her friendship with
24 Laura. I can't -- I don't know.
25   Q   And the third person that has made a sexual

Page 68

1 harassment complaint against you, do you now know who that
2 person is?
3   A   I don't believe there was a third person.
4   Q   Wasn't there a third person that you discussed
5 with Trooper Duby who had claimed you made a sexually
6 inappropriate statement to her?
7   A   That's Beth Gunther, Laura's best friend, Beth
8 Santelli. And I believe she said in her statement she
9 didn't feel that I sexually harassed her in any way.
10   Q   But you deny even making the statement that
11 she attributes to you?
12   A   She said I said something about sex hurting
13 her because she was pregnant.
14   Q   Specifically --
15   A   Yes, I don't deny it. I am emphatically
16 saying that it is no.
17   Q   So these three people have come forward to
18 make statements about your sexually inappropriate behavior,
19 and all of their allegations are purely false, is that your
20 testimony?
21   A   No, my testimony is this. These three friends
22 came together and alleged that I committed these egregious
23 acts which I say, yes, are complete, baseless lies.
24   Q   And your feeling is that their friendship
25 between Gunther, Stackhouse and Zelinski has motivated the

Susan M. Simon, Professional Court Reporter                    Page 65 - Page 68

Page 69

1  making of these charges against you?
2      A    Can you ask again?
3      Q    Do you feel that the fact that Gunther,
4  Stackhouse and Zelinski are friends has motivated their
5  making of these charges against you?
6      A    No, you put it like that, no.  Can I
7  elaborate?
8      Q    There's no question on the floor.
9      A    Oh, I'm sorry.  The floor is yours.
10     Q    At page 8 of the complaint -- you have the
11 document.  Paragraph E, the complaint charges that while
12 conducting a surveillance at a bar you told the plaintiff,
13 quote, if I can see down you are sweater, everyone else
14 can.
15         Did that event take place?
16     A    No.
17     Q    Page 9 of paragraph G, states that on or about
18 February 22, 2000, you told a coworker that the plaintiff
19 had tried to hurt him with Altieri and that you were now
20 going to hurt the plaintiff.
21         Is that a true statement?
22     A    Ask that again?
23     Q    I want you to read paragraph G and tell me --
24     A    I've read it.  I said it.
25     Q    Did you say that?

Page 70

1      A    I didn't say it.  I'm sorry.  I recant my
2  outburst.
3      Q    All I want to know is, do you agree that
4  paragraph G is a true fact?
5      A    I do agree that it is a true fact, but we need
6  to elaborate on that.
7      Q    Go ahead.
8      A    It was brought to my attention that Laura went
9  to Corporal Altieri who worked 8:00 to 4:00 Monday through
10 Friday, 8:00 to 4:00, 8 a.m. to 4 p.m.  That I worked 12:00
11 to 8:00.  And as soon as he left, she told him -- your
12 client, Laura Zelinski -- told him, the supervisor of the
13 unit, that as soon as he walked out the door, I would leave
14 for the day.
15         Now, let's go to my statement, and in there I
16 said, no, I didn't say this.  And the reason that I'm
17 correcting myself is because I never, ever, was told by
18 Corporal Altieri that your client Laura Zelinski claimed
19 that I sexually harassed her.
20         She went to the guy and she's saying basically
21 that I'm stealing.  Theft of services.  That's a crime.
22 Two things that you don't fooling around with on this job
23 are evidence and time sheets.
24         She used to take my time sheets, by the way.
25         But the reason why when I gave my statement to

Page 71

1  Trooper Duby, no, I didn't say that, was because he was
2  firing off sexual harassment questions to me one after the
3  other.  Let the record reflect that I snapped my right
4  finger.
5         That's why I had said what I said.
6      Q    So you made this statement, but it was not
7  related to sexual harassment, is that --
8      A    Absolutely correct.  But it was such an
9  insignificant statement.  It wasn't like I wanted to
10 physically hurt her or I wanted to, you know -- just that
11 once I realized that chicanery that was going on in this
12 unit that I needed to start keeping my own documents.
13     Q    Who was the coworker to whom you said that?
14     A    Well, it was so insignificant to me that I
15 didn't even remember, but Trooper Murray reminded me so
16 many times that I said it.  So, Murray.
17     Q    Now, you have referred several times during
18 your testimony today, and I think it's even mentioned in
19 the statement that you gave to Mr. Duby --
20     A    Trooper Duby.
21     Q    -- that Laura Zelinski was -- well, that she
22 left the unit on terms that were not of her choosing.
23         Do you remember saying that?
24     A    Point me to the page and the paragraph.
25     Q    Well, do you remember saying it today?  You

Page 72

1  said Murray left on his own terms. --
2      A    I said that.
3      Q    -- and Wigley and Laura did not.
4      A    Well, I don't know if I said that.  They were
5  terminated because their services were no longer needed
6  under Article 37.
7      Q    Specifically at page 19 of your BPR statement,
8  your first answer is her and Trooper Dan Wigley got kicked
9  out of the bureau.
10     A    That's correct.
11     Q    What is your understanding of how and why she
12 was kicked out of the bureau?
13     A    I have no understanding.  And I did not know
14 why they got kicked out of the bureau.  And when your
15 services are no longer needed that is the same or more
16 politically correct way of saying go pound sand, you're
17 done.
18     Q    How do you know they got kicked out of the
19 bureau?
20     A    Because I was doing a buy, which was my job,
21 the mission of the Pennsylvania State Police of drugs in
22 Wyoming County with Trooper Murray.  And he got a page from
23 either your client or the other clown, Wigley, and they
24 told him that their services were no longer needed.  They
25 got kicked out of the bureau.

Page 73

1   And that's first I hear about it.
2   Q   You go on to tell Trooper Duby that this was
3   the second time Dan Wigley had been kicked out of a
4   bureau. You refer to him having been kicked out of BCI.
5   What do you know about that?
6   A   I know that he got kicked out of BCI.
7   Q   Is that all that you know about it?
8   A   I know that he had a problem with his
9   supervisor, and he was removed from BCI.
10  Q   Do you have any knowledge as to why Laura
11  Zelinski was removed from your unit?
12  A   I have no direct knowledge from my chain of
13  command as to why Laura Zelinski has been removed or was
14  terminated from the Bureau of Drug Law Enforcement.
15  Q   Has anyone ever suggested any possible reasons
16  why she was removed to you?
17  A   No.
18  Q   So you have no direct knowledge of why she was
19  removed and no one has told you why she was removed, is
20  that true?
21  A   I can speculate as to why I think they were
22  removed. I was in the bureau. I was in the unit. It was
23  hell. It was such a hostile work environment because of
24  your client's actions and Dan Wigley's actions, and their
25  fire was fueled by this flat lying cur dog Murray.

Page 74

1   I mean, I would think that I would know in my
2   brain housing group why they were removed. But I was never
3   asked to come down to DHQ and sit down with Major Tyree
4   Blocker and discuss why they were going to be removed.
5   No one ever called me and said, hey, they're
6   gone. No, I didn't see their letters. They didn't even
7   call me, their teammate, their unit member who got them
8   their cell phones. They didn't even have the courtesy to
9   say, listen, we got kicked out of the unit.
10  They didn't call me because they didn't care.
11  They didn't like me. They didn't converse with me. There
12  was no interaction.
13  To this day, as far as them, they've never
14  told me they've been removed from the bureau. But I know
15  they have been. Someone didn't have to tell me. It's
16  common knowledge.
17  Q   But it's also not the question I asked. You
18  don't know why -- I don't care whether they called you. I
19  don't care whether you got them their cell phones --
20  A   Do I know why? No, I don't why. No.
21  Answered. I don't know why. I could speculate, but that's
22  it. That's my answer.
23  Q   Earlier in your testimony today you made
24  reference to the fact that you and Corporal Altieri had to
25  move out of our office under cover of darkness.

Page 75

1   A   That's right.
2   Q   And then you attributed that to the fact that
3   my client had made what you described as an erroneous
4   complaint.
5   A   That is correct. I said that.
6   Q   Tell me what you meant when you said you had
7   to move out of the office under cover of darkness.
8   A   Well, Captain Altavilla, who is the commanding
9   officer of Troop P, who is also a very good friend of Laura
10  Zelinski from her civilian life, through her entire life,
11  had made available a position in the vice unit which your
12  client holds.
13  And as the commanding officer of Troop P, I
14  guess because she makes this complaint against myself and
15  the supervisor, in order for the department to protect
16  themselves in any further matters that may come before any
17  possible courts by yourself, they had us move so that it
18  would no longer be a hostile work environment, if in fact
19  that's -- you know, for us.
20  It wouldn't make it hostile for her. I'm sure
21  she would have come back in and made it hostile for us.
22  Q   So you and Altieri were taken out of your
23  office so that Laura could continue working in that same
24  location as a vice officer?
25  A   Correct.

Page 76

1   Q   Is that what you're saying? And did someone
2   explain to you that that was the reason you were being
3   moved?
4   A   I really don't remember. I mean, we knew why
5   we had to move. She was coming back to the unit. She got
6   the job. Her godfather, Captain Altavilla, got her the
7   job.
8   Q   On that same point, do you feel that there are
9   any other members of the Pennsylvania State Police that are
10  conspiring against you with Laura Zelinski?
11  MR. GOLDEN: Objection. Mischaracterizes what
12  he said.
13  BY MR. LAPPAS:
14  Q   Well, let's start with the word conspiring.
15  Do you feel there are other members of the Pennsylvania
16  State Police that are taking negative actions against you
17  in order to side with, out of personal friendship or
18  personal relations, with Laura Zelinski?
19  MR. GOLDEN: Objection, because it
20  mischaracterizes his testimony. In particular with regard
21  to other. You can ask -- the question is okay, but the way
22  you're framing it mischaracterizes.
23  BY MR. LAPPAS:
24  Q   So far you have told us that Trooper Gunther
25  Santelli, who you described as a friend of Laura Zelinski,

**Richard S. Weinstock**     Condenselt!     **October 2, 2002**

Page 77

1 made a false accusation against you.

2      And you told us that Diane Stackhouse or

3 Lieutenant Stackhouse, whom you characterize as having a

4 relationship or some connection with Laura Zelinski, has

5 made false charges against you.

6      Captain Altavilla made you move out of your

7 office because he's Laura Zelinski's godfather.

8    A   I didn't say that.

9    Q   You did use the word godfather.

10    A   I didn't say Captain Altavilla made us move

11 out of that office.

12    Q   Strike Captain Altavilla. Do you think there

13 are any other members of the Pennsylvania State Police who

14 out of loyalty to Laura Zelinski are making your life

15 miserable?

16    THE WITNESS: Okay, Jim?

17    MR. GOLDEN: Yes.

18    THE WITNESS: Laura Zelinski and Beth Gunther

19 had a bet coming out of the Academy who could sleep with

20 the most troopers. Okay? Was I told that by your

21 client? No, but that's her reputation. That's her

22 reputation.

23      I think that Captain Altavilla has done a lot

24 of things that are very questionable when it comes to this

25 department. Do I think that people are conspiring? Do I

Page 78

1 think that there are little men on my shoulders? No, I'm

2 not crazy.

3      But, I mean, facts don't change. I think that

4 there are people who have conspired with your client in

5 order to protect their own personal lives because maybe

6 they have crossed the line with Ms. Laura Zelinski.

7    Q   Who are those people?

8    A   I don't know. I'm just guessing. But we'll

9 get into that as we go on, I'm sure.

10    Q   My specific question to you was --

11    A   I know what your question was. No, I don't

12 think.

13    Q   You didn't answer it though.

14    A   Go ahead. I'm sorry.

15    Q   Do you think that there are people, other than

16 the ones you have named so far today, who out of sense of

17 friendship, personal obligation, or relationship with Laura

18 Zelinski are making your life miserable?

19    A   Yes.

20    Q   Do you know who they are?

21    A   I know who I feel that they are. But I don't

22 know with a degree of certainty who they are.

23    Q   I want you to tell me everybody you feel is

24 doing that.

25    A   Trooper Bill Schutter, Laura Zelinski, Dan

Page 79

1 Wigley, Joe Nigro, Gus Diana. I don't think Sean Murray is

2 doing it because of his relationship with Laura. I think

3 Sean Murray is doing it because at the time it was the

4 right move for him to make.

5      And I don't think that Captain Altavilla has

6 conspired against me in any way. I never said that.

7      I said that Captain Altavilla -- excuse me. I

8 had bean soup for lunch. It was very tasty.

9      But I think that Captain Altavilla has done

10 some things that are very questionable as far as the

11 mission, since you used that word, of the Pennsylvania

12 State Police. I think a lot of things have been done.

13      And if there are other names, I'll name them,

14 if I can remember them.

15    Q   What do you think Bill Schutter's relationship

16 with Laura Zelinski is?

17    A   Bill Schutter is in love with Laura Zelinski.

18 I mean, that's no joke. Every time you see them, like he

19 follows her around like this little puppy dog, you know.

20 And I don't know if they ever had a sexual relationship,

21 but people often refer to Laura as Bill's girlfriend, and I

22 only know what I've heard in circles.

23      But people are very guarded because of the

24 situation at hand. People don't want to get involved in

25 this.

Page 80

1    Q   What do you think Dan Wigley's relationship

2 with Laura Zelinski is?

3    A   I think that Dan is asexual. I mean, I don't

4 think that they had a sexual relationship certainly, but I

5 think that Dan is trying to ride Laura's coattails to make

6 a statement. That's what I think Dan --

7    Q   What kind of statement does Dan Wigley want to

8 make?

9    A   Well, look at the things he said about me. I

10 siphoned gas from my undercover car. That I rolled back

11 mileage. Where would those things come from?

12    Q   So he's making false charges against you in

13 order to make a statement against you?

14    A   Dan Wigley is trying to show that he wasn't

15 the problem in this unit. Rich Weinstock was and Lou

16 Altieri was.

17    Q   How about Gus Diana, what was his

18 relationship --

19    A   You had asked me -- ask your question in its

20 entirety.

21    Q   That's my question in its entirety.

22    A   I didn't get it.

23    Q   What is Gus Diana's relationship with Laura

24 Zelinski?

25    A   The van. Gus Diana says he saw me in a van

Richard S. Weinstock          CondenseIt!™          October 2, 2002

Page 81

1 with Laura Zelinski.

2 Q You're not answering my question.

3 A I'm trying to.

4 Q What is his relationship with Laura Zelinski?

5 A What is his relationship?

6 Q Right.

7 A I don't know what his relationship is.

8 Q Okay. Do you know that he's ever had any kind

9 of personal relationship with Laura Zelinski?

10 A I've seen them together, and with your

11 client's track record as a promiscuous person, I would

12 speculate that something could have happened.

13 Q What information do you have that Laura

14 Zelinski is or ever was a promiscuous person?

15 A Only what I've heard.

16 Q Tell me everything you have heard that leads

17 you to believe that she's a promiscuous person, or that she

18 ever has been a promiscuous person?

19 A I don't know if it's true. Every time you

20 talk to someone about Laura Zelinski, the first thing that

21 comes out of their mouth is, are you screwing her yet?

22 You tell me. That kind of leads somebody --

23 You know, if they said are you going to mass

24 with them yet? Maybe that would apply to Lou. Of course,

25 he doesn't go to mass because he's Lutheran.

Page 82

1 Q Tell me everybody that you can remember who's

2 ever made any statement to you that Laura Zelinski was a

3 promiscuous person or ever had been?

4 A I don't remember who they are.

5 Q Your testimony is that you cannot give us even

6 one name of any person that's ever made a statement to you

7 indicating Laura Zelinski was sexually promiscuous, is that

8 true?

9 A Can I talk to my attorney?

10 Q You can talk to him all you want.

11 (Witness and Mr. Golden confer out of

12 conference room from 1:00 p.m. until 1:01 p.m.)

13 BY MR. LAPPAS:

14 Q All right. My last question to you was

15 whether you could name even one person who had ever made a

16 statement to you indicating that Laura Zelinski was or ever

17 had been sexually promiscuous.

18 A Ready?

19 Q I'm ready.

20 A Captain Altavilla's brother, Mark Altavilla.

21 He's a civilian. He's a friend of mine. He told me at a

22 gym how Captain Altavilla had transferred a gentleman who

23 was a trooper -- and I cannot remember his name. Bear with

24 me. His name is irrelevant because he certainly never said

25 anything to me about Laura Zelinski.

Page 83

1 But Captain Altavilla's brother, Mark

2 Altavilla, told me that this guy -- he talked to his

3 brother to get this guy transferred up to headquarters from

4 Shickshinny where Laura was at because his head was, quote,

5 fucked up, unquote, from his relationship that he's been

6 having with some broad down there.

7 The only broad down there, since he used the

8 word broad, was Laura. And I didn't know her at the time.

9 I didn't know her at the time. Never even heard of her.

10 And I guess that she wanted a -- I'm trying to

11 think of the proper way to say it. She wanted a one-night

12 stand with this guy, and I guess he fell for her. And I

13 guess it was affecting his work. The mission of the state

14 police. And they transferred him to Wyoming. Mark says he

15 went to his brother and got him transferred.

16 Q So now you have identified one person with

17 whom Laura Zelinski may or may not have had a one-night

18 stand?

19 A Right.

20 Q Can you give us any other indication, any

21 other evidence people have said to you, who they are --

22 strike that.

23 Can you identify any other people that have

24 made statements to you indicating that Laura Zelinski is or

25 ever has been sexually promiscuous, other than Captain

Page 84

1 Altavilla's brother Mark?

2 A Trooper Ronald Zukowski.

3 Q What did he say?

4 A I was getting gone one day at the gas pumps,

5 and he asked me if I was fucking her yet.

6 Q Anyone else?

7 A Trooper Andy Bomber. I called down to

8 Shickshinny to ask her what was on the test. He said what

9 the fuck do you want to talk to that psycho slut for?

10 I doubt the tape's still around. They moved

11 into a new building.

12 Q Anybody else?

13 A I can't name anyone else offhand other than

14 just a general conversation, consensus, things that I've

15 seen her do.

16 Q Let's concentrate on the things you've seen

17 her do. What has she done that has fostered that opinion

18 of her?

19 A We went to a drug conference in Lancaster in

20 the fall of '99. We stayed over for two nights. And when

21 you see her going back to her room with a different guy

22 each night, I didn't think that she was serving tea and

23 biscuits. I speculated.

24 Q So you saw her go back to her room with two

25 men over the period of two nights?

Richard S. Weinstock                    Condenselt!™                    October 2, 2002

Page 85

1    A    Yes.
2    Q    And did you see them go in the room?
3    A    Just saw them go and get in the elevator
4    together and leave. Didn't know where they went. Didn't
5    care.
6    Q    Do you remember who either of those guys were?
7    A    No. I'm terrible with names, good with faces.
8    Q    A moment ago you testified that Trooper
9    Gunther and Trooper Zelinski had a bet upon leaving the
10    Academy to see who could sleep with the most people?
11    A    Um-hum.
12    Q    Yes?
13    A    Did I say that?
14    Q    You have to answer yes or no. Did you say
15    that?
16    A    Yes.
17    Q    What is your source of information for that
18    testimony?
19    A    Just the general rumor mill.
20    Q    Did anyone claim that they heard either Laura
21    Zelinski or Trooper Gunther make that statement?
22    A    I don't remember where I heard it. I don't
23    know who said it. Just general rumor mill information.
24    Q    I'm detecting a certain amount of hostility on
25    your part towards Laura Zelinski, is that accurate? Do you

Page 86

1    feel hostile towards her?
2    A    Well, she's not on my Christmas card list.
3    Q    Do you feel hostile towards her?
4    A    I in no way want to cause physical harm to
5    that individual in any way.
6    Q    Thank you for that assurance. Do you feel
7    hostile towards her?
8    A    Define hostile?
9    Q    Do you have bad feelings for her?
10    A    I mean, the woman has turned my life upside
11    down for the last three years or however long it's been
12    since I've been kicked out of the bureau. I mean, kicked
13    me. I don't know how long it's been. My life's been hell.
14        Do you want me to, you know, tell you that I
15    want to take her out for a beer after this? No, I don't.
16    I didn't like the girl. I didn't talk to her.
17        And by not talking to her and not playing her
18    game, she did the only thing she could to suck me into her
19    hell, and him, and she made this erroneous allegation.
20        Am I hostile towards her? No, I'm not hostile
21    towards her. And, again, I say I in no way want to cause
22    physical harm to your client, but I'm certainly not going
23    to mail her a Christmas card this year, sir.
24    Q    What is your current assignment?
25    A    I'm in patrol. I'm wearing a big hat and a

Page 87

1    gray shirt and a gun. And that's what I came on this job
2    to be, a trooper.
3    Q    Where are you assigned?
4    A    The place where you sent me all those letters,
5    Blooming Grove. Remember, you addressed them to Sergeant
6    Richard Weinstock? That's where I got them. Blooming
7    Grove, Pike County.
8    Q    Is it your belief that you were removed from
9    the Bureau of Drug Law Enforcement because of Trooper
10    Zelinski's complaint?
11    A    It is not my belief. I know.
12    Q    What is the source of that knowledge?
13    A    The letter that I received from the Deputy
14    Commissioner Coury stating that my removal from the bureau
15    is disciplinary in nature as a result of IAD investigation
16    2001-0093.
17    Q    Is this the only discipline in your state
18    police career?
19    A    Yes. At that point, yes.
20    Q    Have you received any others since then?
21    A    I have one pending.
22    Q    What is the nature of that allegation?
23    A    Rudeness. In fact, they might ask you to
24    testify.
25    Q    Did anyone ever tell you that while you were

Page 88

1    working at the Bureau of Drug Law Enforcement under
2    Corporal Altieri that you had a reputation among your
3    coworkers as being abrasive?
4    A    Did anyone ever tell me that?
5    Q    That's my question.
6    A    Yes, he did (indicating). And I pointed to
7    Corporal Altieri with my left hand for the record.
8    Q    What was your reaction to that?
9    A    What am I going to a say? I'm an abrasive
10    person. I agree. I know I am. I am. Tact is not one of
11    my strong points.
12    Q    Did Corporal Altieri ever tell you that all
13    three of the other members of the unit, being Wigley,
14    Murray and Zelinski, had complained to him about problems
15    they were having with you?
16    A    Corporal Altieri never came to me about
17    problems that these individuals had. I mean, I never
18    remember him ever coming to me complaining about anything.
19        The only thing I remember him coming to me
20    about was I'm glad to see that everything is working out.
21    And, of course, my response earlier is what are you talking
22    about? Because I didn't know there was a problem. They
23    didn't tell me there was a problem.
24        He always said I was abrasive. He put that
25    right in my evaluation. Which was a good evaluation. He

Richard S. Weinstock                    CondenseIt!™                    October 2, 2002

Page 89

1  said that I shoot from the hip.
2      Q    My question to you is, did he ever tell you
3  that the other three members of the unit had come to him
4  complaining about problems they were having with you?
5      A    I don't remember.  He certainly never came to
6  me and said Laura Zelinski reported sexual harassment
7  though.
8      Q    So Laura Zelinski's complaint which formed the
9  basis of the BPR that you just designated for us, that was
10 determined to be a founded complaint?
11         The Pennsylvania State Police determined that
12 her complaint was well-founded, is that true?
13     A    Ask that again.
14     Q    Well, let me ask it a different way.  What was
15 the result of the BPR investigation?
16     A    Well, I guess that it was founded because I
17 received discipline.
18     Q    Now, in the administrative and collective
19 bargaining environment in the state police, do you have the
20 ability to grieve that determination?
21     A    I did grieve it.
22     Q    What was the result of the grievance?
23     A    Well, it's a long answer.  Do you want it?
24     Q    Certainly.
25     A    I got kicked out of the bureau.  I got sent

Page 90

1  back to Troop R.
2          MR. GOLDEN: Excuse me, before you start I
3  just want to caution you.  In your answer, don't disclose
4  anything that was told to you by counsel as part of the
5  grievance.
6          THE WITNESS: No, no, no, no, no.  I
7  understand.  He asked me what other disciplinary actions I
8  received as a result of this.
9          MR. LAPPAS: I asked you that already.
10         MR. GOLDEN: You were testifying about your
11 grievance, and I'm instructing you that in your answer
12 don't say anything that your counsel told you as part of
13 representation for that grievance.
14         THE WITNESS: I never had a grievance hearing
15 though, Jim.
16 BY MR. LAPPAS:
17     Q    My question to you, just in case you didn't
18 understand it.  After you get disciplined, you have a right
19 to file a grievance, correct?
20     A    Correct.
21     Q    And you told us that after you received a
22 disciplinary transfer back to patrol, you did file such a
23 grievance, correct?
24     A    I filed three.
25     Q    All based on the same incident?

Page 91

1      A    Yes.
2      Q    What was the result of those grievances?
3          MR. GOLDEN: Oh, yes, you can answer the
4  question, just remember my instruction about --
5          THE WITNESS: I was removed from the bureau.
6  That's one.
7          I filed a grievance.  The grievance board sent
8  me a letter back saying we understand that you have
9  received a DAR, a disciplinary action report.  Which means
10 there's more discipline coming.
11         So then I get three days off.  I now grieve
12 that.  There's two grievances.
13 BY MR. LAPPAS:
14     Q    What's the three days off for?
15     A    As a result of this investigation.
16     Q    All right.
17     A    Okay?  So now I felt that I was punished two
18 times now for the same incident.  So my grievance is
19 pending.  I get a third kick in the quijones, which is that
20 I'm not going to be represented by the Pennsylvania State
21 Police and that I need to seek my own counsel, and I will
22 not be indemnified.
23     Q    With respect to this lawsuit?
24     A    Yes.  So then I filed another grievance on
25 that.

Page 92

1      Q    I see.
2      A    And what happened was I got my three days
3  back.  I never got three days off without pay, because the
4  investigation took too many days.  They exceeded the time
5  limit.  And they said we will indemnify you and represent
6  you, however, I have to drop my grievance to come back to
7  the bureau.
8      Q    I see.
9      A    Hindsight being 20-20, I feel that I
10 compromised my position, but I did what I felt I had to do
11 for my family.
12         (Brief recess taken.)
13 BY MR. LAPPAS:
14     Q    Now, look at your statement to Trooper Duby at
15 paying 18, please.
16     A    Okay.
17     Q    His first question on this page was, he says
18 Trooper Zelinski claims that you and Corporal Altieri
19 continued to make derogatory remarks about her and her
20 ability to do the job, is this true?  And your answer is
21 no.
22         And then he says, did you ever make any
23 derogatory comments concerning Trooper Zelinski after she
24 left the unit?  And your answer was no.
25         Is that still true?

Richard S. Weinstock          CondenseIt!™                    October 2, 2002

Page 93

1    A    Yeah. I really didn't care. I was like glad
2 they were gone. I wasn't going to dance on their grave.
3 Yes, that's true.
4          MR. LAPPAS: That's my last question. Thank
5 you.
6          THE WITNESS: Thank you.
7          MS. YERGER: I have no questions.
8          MR. GOLDEN: I have no questions.
9          THE WITNESS: I have no questions. Lou, do
10 you have any questions?
11          (The deposition was concluded at 1:19 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

94

COMMONWEALTH OF PENNSYLVANIA      )

                                  )    SS

COUNTY OF DAUPHIN                  )

       I, Susan M. Simon, do hereby certify that before

me, a Notary Public in and for the County and Commonwealth

aforesaid, duly commissioned and qualified, personally appeared

               RICHARD S. WEINSTOCK

who was then by me first duly cautioned and (sworn, affirmed) to

testify the truth, the whole truth and nothing but the truth in

the taking of (his, her) oral deposition in the cause aforesaid;

that the testimony given as above set forth was reduced to

stenotype by me in the presence of said witness and afterwards

transcribed by me or under my direction.

       I do further certify that said deposition was

taken at the time and place in the foregoing caption specified.

       I do further certify that I am not a relative,

counsel or attorney for either party, nor am I otherwise

interested in the event of this action.

       IN WITNESS WHEREOF, I have hereunto set my hand

this 14th day of October, 2002.

NOTARIAL SEAL
SUSAN M. SIMON, Notary Public
Harrisburg, Dauphin County
My Commission Expires Oct. 30, 2002

_____
    Susan M. Simon
    Reporter-Notary Public

The foregoing certification of this transcript does not apply to
any reproduction of the same by any means unless under the
direct control and/or supervision of the certifying reporter.

This is Trooper John C. DUBY of the Pennsylvania State Police, Internal Affairs Division, Central Section. Today is Thursday, March 8th of 2001, and the time is 1403 hours. I am interviewing Trooper Richard S. WEINSTOCK, Badge Number 6946, who is assigned to the Bureau of Drug Law Enforcement in the Troop P Tactical Narcotics Team Unit. We are at the Bureau of Professional Responsibility office building located 7820 Allentown Boulevard, Harrisburg, PA 17112, and the interview concerns IAD investigation 2001-0093, which is an attorney work product.

DUBY:           Trooper WEINSTOCK, are you aware that this interview is being tape-recorded?

WEINSTOCK:   Yes.

DUBY:           And you have Trooper Keith LEYDIG here today as your union representative?

WEINSTOCK:   Yes.

DUBY:           The first document I'll read you is your Administrative Warning.

"*This questioning concerns administrative matters relating to the official business of the Pennsylvania State Police. I am not questioning you for the purpose of instituting a criminal prosecution against you, or for the purpose of securing additional evidence against you in any pending criminal action. During the course of this questioning, even if you disclose information which indicates you may be guilty of criminal conduct concerning this allegation, neither your self-incriminating statement nor its fruits will be used against you in a criminal proceeding.*

*Since this is an administrative matter within the Pennsylvania State Police, you are required to answer questions truthfully and completely or you may be subjected to administrative action. You do have the right to have a union representative with you during such questioning. If during the course of the interview, you have reason to believe that your statements could result in administrative action being initiated against you, union representation will be provided upon request.*

*Do you understand what I have just explained to you?*"

WEINSTOCK:   Yes.

DUBY:           Okay, and sir do you have any questions concerning what I've just explained?

WEINSTOCK:    No, sir.

DUBY:    And if you would fill the bottom portion out for me.  Okay, that's that copy.   Okay, and the second one is the Notification of Inquiry.

"An administrative investigation is being conducted pursuant to a request from the Office of Chief Counsel.  Your involvement has been identified as follows:

The nature of this interview is in reference to a complaint that was filed by Trooper Laura ZELINSKI, formerly assigned to the Bureau of Drug Law Enforcement Unit.  Trooper ZELINSKI alleges that she is the victim of sexual harassment and had filed a complaint with the Commonwealth of Pennsylvania Governor's Office, Pennsylvania Human Relations Commission, listed under PHRC Document Number E-97578-D, and EEOC Charge Number 17FA10802.

The complaint was brought on or about November 15, 2000, and in addition to listing your name, the complaint also lists Sergeant Michael RUDA and Corporal Louis ALTIERI, who are assigned to the Bureau of Drug Law Enforcement Unit, Troop P Tactical Narcotics Team.  The complaint brought by Trooper ZELINSKI alleges that she was the victim of sexual harassment which started on or about June 22, 1999, and progressed until her removal from the Bureau of Drug Law Enforcement on or about August 22, 2000.

Specifically, Trooper ZELINSKI alleges that on June 22, 1999, you told her that you were attracted to her since you had met her in April of 1999, that you wanted to give her a body massage, and that you placed your hand on her knee.  Trooper ZELINSKI alleges that on August 4, 1999, you graphically told her how you wanted to have sex with her.  Trooper ZELINSKI alleges that on December 30, 1999, while conducting a surveillance at a bar, that you told her, "If I can see down your sweater, everyone else can."  Trooper ZELINSKI alleges that on June 28, 2000, throughout the day at work, you continuously made comments in front of the unit and patrol members that you could see her underwear.  Trooper ZELINSKI alleges that she has been harassed because of her sex, being a female, and in retaliation for reporting sexual harassment.  Therefore, an investigation is required.



That's a lot to throw at you. Do you understand what I've just read?

WEINSTOCK:    Yes.

DUBY:    Okay, and this is what she's alleging. And if I can get you to fill out the bottom portion of this?

(Signing of Papers)

WEINSTOCK:    Thank you.

DUBY:    Your welcome. And the last document I'll read is an excerpt of AR 4-26. It concerns the Sexual Harassment Policy. My excerpt is dated 03/02/2000. I'm going to refer to 26.03 of the *General Information and Definitions*:

*Acts of sexual harassment are in violation of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act of October 27, 1955, Governor's Executive Orders, and Department policy. Specific acts of sexual harassment include, but are not limited to:*

*① Repeatedly asking a person for a date.*

*② Inappropriate physical contact.*

*③ Making suggestive or provocative gestures, e.g., leering, staring, inappropriate comments, jokes or stories of a sexual nature.*

*④ Creating or displaying visual materials of a sexual nature.*

*⑤ Retaliation against any person for reporting instances of alleged sexual harassment.*

*Sexual harassment is defined as unwelcome verbal or physical conduct of a sexual nature, sexual advances, or requests for sexual favors. Sexual harassment occurs when any one or more of these unwelcome actions:*

*① Are explicitly or implicitly a condition of employment.*

*② Are used as the basis for employment decisions.*

      *❷ Create an intimidating, hostile, or offensive work environment.*

      *❷ Affect the individual's work performance.*

      *Types of sexual harassment:*

      *❶ Quid Pro Quo: The offer or inference of a benefit for submission to sexual advances, e.g., an offer of an excellent performance evaluation, continued employment, or career advancement in return for sexual favors.*

      *❷ Hostile Work Environment: Conduct that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment, e.g., repeated or constant conversational references, or the display of visual materials of a sexual nature.*

      *Personnel (in Section F) shall:*

      *❶ Refrain from conduct, implied or direct, which constitutes sexual harassment.*

      *❷ Not be fearful of advising an alleged harasser that their actions are unwelcome, offensive, or both. Failure to do so shall not prevent personnel from filing a complaint of sexual harassment.*

      And I know that's a lot to throw at you. Do you understand what I've just explained?

WEINSTOCK:    Yes, I do.

DUBY:    Do you have any questions about that?

WEINSTOCK:    No, I do not.

DUBY:    Also, while I'm taking these notes here, you might see my head buried in my paperwork. Don't get offended if I don't look at you while we're talking one on one here.

WEINSTOCK:    That's fine.

DUBY:         Some of these questions I already know the answers to, but we'll put them officially on the record here.

WEINSTOCK:    Okay.

DUBY:         Sir, when did you become assigned to the Bureau of Drug Law Enforcement at Troop P?

WEINSTOCK:    In April of 99.

DUBY:         And was Corporal ALTIERI, Trooper ZELINSKI, Trooper MURRAY, and Trooper Dan WIGLEY assigned to the Troop P Tactical Narcotics Team during June of 99 to August of 2000?

WEINSTOCK:    Yes.

DUBY:         Was there anyone else?

WEINSTOCK:    No.

DUBY:         Okay. And Corporal ALTIERI was the supervisor of the unit during that time period?

WEINSTOCK:    Yes.

DUBY:         And the office for that was located in a garage area of Troop P?

WEINSTOCK:    Yes.

DUBY:         Okay. And sir, please tell me everything you know about the issue concerning Trooper ZELINSKI's complaint that she was being sexually harassed by you while she was assigned to the Troop P Tactical Narcotics Team. I mean, what do you know of her complaint? I mean, why is this. . .

WEINSTOCK:    How I found out about - how did I find out about it?

DUBY:         Yes, what do you think the nature of her complaint is essentially? Why would she say that. . .

WEINSTOCK:    Well I think that it's a way for her to get rid of Corporal ALTIERI, which was her motivation from her - from the beginning. And in doing so, this would also get rid of me from the Bureau.

DUBY:         So a way of getting rid of, essentially you and Corporal ALTIERI?

Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 6 of 68

WEINSTOCK:   Yeah, but more so him, because I feel that they feel - she feels he's responsible for her removal from the Bureau.

DUBY:   Okay.  Sir, were you ever present when a comment was made concerning Trooper ZELINSKI being a, quote, "sexual harassment suit waiting to happen?"

WEINSTOCK:   No.

DUBY:   Was this comment ever brought to your attention by anyone?

WEINSTOCK:   It was a question that was asked of me in the supervisor's inquiry, if I related to her as a sexual harassment suit waiting to happen.

DUBY:   Okay, I'm just going to go through her complaint one by one here and we'll address them all here.  Did you and Trooper ZELINSKI attend the wiretap class at the Hershey Academy during the week of June 22nd, 1999?

WEINSTOCK:   Yes.

DUBY:   Now I'm going to hit you with a lot of dates here and a reasonable person wouldn't remember specific dates, but I'll try to address it with what she claims here in conjunction with the date.

Referring to on or about June 22nd of 1999, Trooper ZELINSKI claims that you told her that you were attracted to her since you met her in April of 1999, and you said that you wanted her to come to your room and give her a full body massage and then placed your hand on her knee.  Did you say that to her?

WEINSTOCK:   No.

DUBY:   Did you place your hand on her knee?

WEINSTOCK:   No.

DUBY:   And what do you know about this specific incident?

WEINSTOCK:   June 22nd, my wife and my two children came to Hershey.

DUBY:   Okay.

WEINSTOCK:    They stayed with me at the Comfort Inn. My son's birthday is June 23rd. My wife came down, took the kids to Hershey Park on the 23rd. The 22nd, I gave ZELINSKI a ride back to our hotel, but I did not take her to the Academy that morning. When we got to the hotel, my wife and kids were waiting for me in the uh, parking lot area, standing around.

DUBY:    Okay, is that the only time that you gave Trooper ZELINSKI a ride?

WEINSTOCK:    That's the only time at the Academy that I gave her a ride.

DUBY:    While attending the wiretap class?

WEINSTOCK:    Absolutely.

DUBY:    Okay. Referring to on or about August 4th of 1999, Trooper ZELINSKI claims that she was assigned to ride in a van with you and that you had graphically told her how you wanted to have sex with her. Did you say that to her?

WEINSTOCK:    No, I did not say that to her.

DUBY:    Okay. And what do you know about this particular incident, sir?

WEINSTOCK:    During that time frame we were on a wire and it was with the DEA. It was a federal case. We were never assigned to ride with anybody. And I mean, you had - you came in, you got your car. You know, in BDLE we have our own vehicles. And there was Vice members on this wire also. You get a portable radio or a telephone, whichever they had at the time, and you just go out on surveillance. It was a real slow case. I mean, there was no reason for us to be together. And I also remember that Trooper MCEVOY, James MCEVOY, he's from Troop R TNT, he kids me even to this day that I was the invisible man in this wire, because I was never around. The wire was so slow. If they needed ya, you went somewhere. I mean I was never around. I didn't work with her. At the beginning, we uh, we were on the same shift like, you know, for the swearing in, that type of thing. I mean, I don't know if she was on vacation. I don't know what shift she went on after the minimization plan kicked in. I was put on six "P" to two "A," never saw her. I didn't work with her during the case.

DUBY:    So you were not in the van with her then?

WEINSTOCK:    No.    *See* ATTACHMENT #104, PAGE 6

79
7 v 68

DUBY:          Okay.  Referring to December 30th, 1999, Trooper ZELINSKI claims
               that while conducting a surveillance at a bar, you told her, quote, "If I
               can see down your sweater, everyone else can."  Trooper ZELINSKI
               claims that she was playing pool with another team member at the
               time, and that team member would've been Trooper SEIDEL.

WEINSTOCK:     Kevin SEIDEL.

DUBY:          Yes.  Did you say that to her?

WEINSTOCK:     No.

DUBY:          Okay.  And sir, please tell me what you know about this specific
               incident.

WEINSTOCK:     My county of operation was Bradford County.  That night we had
               gotten a drug tip hotline.  People can call them in through the Internet.
               And when you get them, Sergeant RUDA has certain things you have
               to do before you can close them out - conduct surveillance, talk to
               neighbors.  And then the last resort, do a trash pull.  This was a new
               one. This is December 30th.  It's the day before New Years Eve.

DUBY:          Yes.

WEINSTOCK:     I go up with SEIDEL.  He's was with.  We meet Trooper Al WEIS.  We
               meet him there.  I had already formed a relationship with the people
               that worked next door to this house.  It was called the Travel Shop.  It
               was a travel agency.  They had allowed us to use their upstairs room.
               It was like an old house and they allowed us to use this room for
               surveillance because we could see these - uh, they were two females
               that lived together were the targets, I guess we called them at this
               point.  SEIDEL went up with me in my car.  We got there, we set up.
               Corporal ALTIERI pages me, says, "I'm comin' up, meet us so I don't
               park my car in front of their house."  I slip out through the back door.  I
               leave WEIS and SEIDEL in this room.  We're doing surveillance on this
               house.  It was real slow.  There was absolutely no traffic that night.
               When I get out there, ZELINSKI is with Lou.  She gets out of the car
               and she gives me this big hug.

DUBY:          Okay.

WEINSTOCK:     And I mean, I was like in total shock, because I knew that the girl didn't
               like me.  I mean, she constantly bad-mouthed me to everybody.  And
               uh, I mean Lou was standing there, he saw it.  I take them in the back
               door of this house, like it was like a kitchen or eating area for this

working place, this travel shop. We go in, we go upstairs - there was nothing going on. This place was dead. We decided, "Let's head down." On the way down, Lou goes home. Lou lives north. Lou continued home. Al WEIS lives in the Tunkhannock area. He went home. He had his own vehicle. He's got me, SEIDEL, and Trooper ZELINSKI go to a place that's called, "Rich and Charlotte's Bar." This is in Harvey's Lake Borough, Luzerne County. We go there. The gig is this, I'm the third wheel, Kevin and her are boyfriend and girlfriend.

DUBY:        Okay.

WEINSTOCK:   We sit down at the bar. It's me, SEIDEL, her on the other end of SEIDEL. As soon as you walked in this door, we sat right there, the first three spots at this bar. Supposedly there was a female selling marijuana in the bar. They played pool, Kevin and her. I never played pool, never talked to them while they were playing pool. Like I sat down at the bar. They're playing pool, they're forming a relationship with this girl that allegedly sold marijuana. I mean, I never played pool. I never walked over to her. I don't remember if she had a sweater on. I'm - I don't, you know. I never said anything like that to her.

DUBY:        Do you remember is she had a loose top on?

WEINSTOCK:   I don't remember what she wore. I mean, I didn't - I didn't look at the girl that way.

DUBY:        Okay. I guess what I was wondering is if maybe you could see down her shirt, but just didn't comment to her. . .

WEINSTOCK:   No, I mean I - I don't remember what she even had on. If she had on a skintight jacket. I don't know. I mean I just - but I didn't say that to her. I certainly didn't say that.

DUBY:        Okay. Referring to June 28th of 2000, Trooper ZELINSKI claims that throughout the day at work, you continuously made comments in front of the unit and patrol members that you could see her underwear. Did you say this to her?

WEINSTOCK:   No.

DUBY:        And please tell me what you know about this specific incident.

WEINSTOCK:   Actually, I don't know anything about it. I mean, I remember that was during the week that we did the DART. I certainly don't remember saying anything like that to her. And if there were other people



present, you know, I don' recall. I mean, I didn't say that to her. Uh, I don't refer to underwear as underwear. I was in the Marine Corp and I call 'em skivvies, and that's - to me, underwear are skivvies or drawers.

DUBY: Okay. Referring to October 14th of 1999, Trooper ZELINSKI claims that she learned that Corporal ALTIERI had told you in the early part of the summer that she was a sexual harassment suit waiting to happen. Did Corporal ALTIERI tell you this?

WEINSTOCK: No.

DUBY: Okay. And can you tell me what you know about this specific incident?. Was this an allegation that was floating around?

WEINSTOCK: No. I never - that's the first time I think I ever heard of it was when, I think I was accused of saying it during the supervisor's inquiry.

DUBY: Okay.

WEINSTOCK: That's the first time I'd heard about it, or that terminology. I think the Lieutenant actually said to me, "Did you refer to her as this?" He didn't say ALTIERI. I mean, I never referred to her as it.

DUBY: Yeah, that was one of her claims, that she said that. . .

WEINSTOCK: That I said it?

DUBY: No, she said that - I'll read it back again. Trooper ZELINSKI claims that she learned that Corporal ALTIERI had told you in the early part of the summer that she was a sexual harassment suit waiting to happen. In other words, she's referring that Corporal ALTIERI came up to you and said, "Hey, she's a sexual harassment suit."

WEINSTOCK: No. The only time Corporal ALTIERI ever spoke of sexual harassment was when we all came to the unit, he sat the three of us down - MURRAY, WIGLEY, myself. He said, "We're coming on board with a female. There's not gonna be anything tolerated. No girlie magazines, no naked pictures, none of that kind of crap goin' on."

DUBY: Okay, referring to February 22nd of 2000, Trooper ZELINSKI claims that you told a co-worker, referring to Trooper MURRAY, that she had tried to hurt you with Corporal ALTIERI, and now you were going to hurt her. Did you tell Trooper MURRAY this?

WEINSTOCK: No.

77
10 of 68

DUBY:          Okay.

WEINSTOCK:     But when I asked MURRAY about it, he said that I did come to him and
               say that and I - I mean, why would I want to hurt her?

DUBY:          I think the assumption was that Corporal ALTIERI had told you that she
               made a complaint to him about you, and now you were going to get
               even essentially.

WEINSTOCK:     She made a complaint to ALTIERI about me?

DUBY:          Right, and Corporal ALTIERI told you about it, and now that you were
               upset about it.  That's the assumption behind that comment.  That, you
               know, she tried to hurt you with Corporal ALTIERI, is "now I'm gonna
               try and hurt her."

WEINSTOCK:     Not as far as sexual harassment.  No way.

DUBY:          Okay.  Referring to April 14th of 2000, Trooper ZELINSKI claims that
               you began stating that the reason patrol would not serve search
               warrants with the unit was her fault for messing up a drug bust.  Did
               you say that?

WEINSTOCK:     No.

DUBY:          Okay.  And can you tell me everything about that particular incident?

WEINSTOCK:     You ready?

DUBY:          I'm ready.

WEINSTOCK:     Okay.

DUBY:          Go ahead.

WEINSTOCK:     I'd been buying pounds of marijuana from these white females.  As a
               result of one of the buys, we followed them to this house.  Me,
               MURRAY, ALTIERI are doing surveillance.  They go to this house.
               The informant has my money.  I think we were paying like twelve
               hundred dollars or thirteen hundred dollars for the pound of weed. We
               find out later that this informant was ripping us off.  He's currently
               wanted.  So this guy's in NCIC as a wanted person.

Anyway, we identify the house that she's, when I say she, my target, the subject of my current investigation is getting her marijuana. So we're gonna do a ticket. So it's coming up for D-day. You have 48 hours from the time of your buy to get the ticket, and then 48 hours from then to serve it. We do two search warrants in the same day. One at the house of Amanda CRICH and Amber SEEMAN.

DUBY:          Okay, to be honest with you, your interview is probably going to get transcribed. Can you spell those names for me so that. . .

WEINSTOCK:    Amanda, A-M-A-N-D-A. Her last name is C-R-I-C-H. She's currently a source of information for us. And the other one is Amber SEEMAN, S-E-E-M-A-N. She's currently - uh, not currently, but she may be indicted in an unrelated case that we're doing now with the FBI, a cocaine case.

               Getting back to what you had asked me. We did two search warrants on this day. I had just had surgery July 15th. I had fallen, and I got surgery on the 15th of January. So I have staples down my shoulder. I do the search warrants, get all my homework done, get them crunched. They were sealed search warrants, sealed by a county judge.

               Everybody comes down for D-day. This is what we're gonna do. Now, this is important. I had absolutely no intelligence into the house that we were fol - that we followed CRICH and SEEMAN to. None. Didn't know what it was like inside. Didn't know anything about it. That's important.

DUBY:          Okay, can I - please clarify. . .

WEINSTOCK:    Sure.

DUBY:          Those two females were the targets, but you were using them as unwittings to get to their supplier?

WEINSTOCK:    Right. Yes.

DUBY:          And that's what you had no intel on?

WEINSTOCK:    No intel on the inside of this house, yes.

DUBY:          Okay.

WEINSTOCK:    On their supplier's house we had no intel.



DUBY:          In other words, you didn't know that the dogs were in the house?

WEINSTOCK:     Absolutely not.  Absolutely not.  And that's exactly what I'm getting at.

DUBY:          Okay.

WEINSTOCK:     So with that in mind, when I'm prepping for my search warrant, the worst case scenario is every scenario.  There's dogs in the house.  There's guns in the house.  There's drugs in the house.  We're goin' in there totally blind, but we're gonna be prepared for whatever is in there.  So thinking that there might be dogs in the house, a lot of drug dealers have dogs.  It's a fact.  A lot of non-drug dealers have dogs.  I have dogs.  I'm not a drug dealer.  I can assure you.  We had a special tank uh, like a fire extinguisher. . .

DUBY:          Yes.

WEINSTOCK:     . . .that's made for dogs.  We take that with us.  The first house we go to, is the house that we have no intel on.

DUBY:          Who's responsibility was it for the intel - yours, Corporal ALTIERI's, or somebody else's?

WEINSTOCK:     It was mine.

DUBY:          Okay.

WEINSTOCK:     It was mine.  It was my case.  And I take full responsibility for not having any info, but who was I gonna get it from?  They wouldn't let my informant go into the house and I certainly couldn't talk to CRICH and SEEMAN, because they didn't know that we existed at this point in time.

DUBY:          Okay.

WEINSTOCK:     Alright.

DUBY:          Yeah, there were no informants in the house.  You were just - the unwitting. . .

WEINSTOCK:     Unwittings.  And they didn't - they weren't unwittings of the type that we're talking to them.  They were just people that we were getting ready to pinch.

DUBY:          Okay.

77
13-88

WEINSTOCK:   Now, everybody had an assigned task. While I'm doing my briefing on two search warrants, ZELINSKI, WIGLEY, and MURRAY are in the other room, not even around. Not even paying attention to what I'm telling patrol members. Lieutenant MENDOFIK, who was the patrol Lieutenant at Wyoming, is present. This guy's a diehard Marine. He's squared away. He leaves no stone unturned, asks questions about everything.

They go into the house. I'm outside. And it killed me to be outside this house because, you know, I had my shoulder. I still had stitches. I'm on light duty.

DUBY:   Okay.

WEINSTOCK:   But I'm not really on light duty, I mean I just - I couldn't sit around and not do anything. I'm outside this house. They make entry. Shots are fired. They have to dispose of a dog. Okay. Can I stand up?

DUBY:   Sure.

WEINSTOCK:   Here's a doorway. Sergeant Ray WHITTAKER has the CO2. I call it CO2, I think its something else. He has the fire extinguisher. He's on the left-hand side of the doorjamb. I know this because they told me this. This is what WHITTAKER, Sergeant WHITTAKER told me, and Trooper SPAGNOLA, who was on the other side of him, is in the doorjamb with his gun drawn with his hand against the doorjamb. They have this room covered.

All of a sudden, Trooper ZELINSKI runs up between the two of them - bang! Her gun goes off. Puts a round through the floor at their feet, almost hits Trooper DIANA in the top of the head. He's downstairs. There's Sheetrock dust all over his body where the round came through. We recovered that round.

As a result, Corporal Jay DEGNAN has the shotgun. He term - uh, he kills the dog. He has to. This dog is going crazy. There was two dogs in that house. We did not kill the dog because we wanted to. It had to be done. It was a safety issue.

DUBY:   How many dogs were actually killed, just one?

WEINSTOCK:   One.

DUBY:   Just one dog?



WEINSTOCK:    One dog.

DUBY:    Okay.

WEINSTOCK:    And there's an article hanging at Troop P, Wyoming, "Drug Arrests Made in Wilkes-Barre," and you can see it. It says actually, "Dog Shot During Search Warrant by State Police." And that's framed. It's right there at Wyoming Headquarters.

DUBY:    Now was there anyone that prevented you from getting some intelligence from Wilkes-Barre or anything like that?

WEINSTOCK:    They had - we did get information or who was in the house, but I didn't have anybody that had been in the house to give me the information.

DUBY:    I see.

WEINSTOCK:    Do you know what I mean?

DUBY:    Yeah.

WEINSTOCK:    I mean it's not an uncommon practice.

DUBY:    It's not.

WEINSTOCK:    No.

DUBY:    There's times we have a job to do, we can't have a perfect world.

WEINSTOCK:    Exactly. And I mean, this was a great case. And I'm not saying it because it was mine. I mean, I had the search warrants. I still - I keep copies of all my search warrants. I keep them on disk. It was a good case. They plead out because they knew it was a good case. As a matter of fact, they had a pretty high priced attorney.

Anyway, going back, what had happened was that was on a Friday that we served the search warrants. Monday, I go to Hershey for driving school, three-day course. Had an accident with the State car. We ran into a lady on surveillance. Doing the right thing. No damage at all to the car. Doing the right thing. Called Wyoming, they send a Trooper over, he does a report. I mean, the car was not even damaged. I just touched her - the car, the car's touched. So then what happened then was, I had to go to the driving school. I'm at the three-day course. I could barely drive a car. Turned around, you know,

driving backwards because my shoulder's - I mean, I just had major surgery.

I come back Thursday morning, come to work, Trooper SPAGNOLA comes up to me. He goes, "Do you believe what she said?" I said, "Well what are you talking about?" "She says that we shouldn't," she, meaning Trooper ZELINSKI, "that we shouldn't do search warrants with you guys because we're not trained the way you are. You should see how pissed off the guys are over here. They don't want to work with her." I says, "Spags, I don't know - I can't comment on it." I said, "I wasn't there." I said, "You gotta take it up with my boss." Spags is a good friend of mine.

DUBY:          Okay.

WEINSTOCK:    Okay. He's a uniform member of patrol at Headquarters. Now when I say good friend, I mean we don't go out drinking together. Our families don't get together. I talk to him at work. I see him at the gym. He's a nice guy. I don't know if it was the next day or the next week, I don't remember the date, I'm in there, I'm going to work, I'm doing Supplementals, I got hearings on these people that we threw in jail, you know, I'm doing some stuff on the computer, she comes in and one of the few times that she actually would address me, she says to me, "Rich, can I talk to you for just a second?" I said, "Yeah." I said, "Go ahead."

She says, "Did you hear anybody from the Patrol Unit saying that they didn't want to do search warrants with us because of me?" And I said, "Listen, I'm not even gonna talk about this without Corporal ALTIERI present." Boom - he walks through the door. I said, "There he is." I said, "You talk to him." They started to talk. I got back on the computer, started my reports, they leave. They leave the office. They left - there's two separate rooms in this building in the garage. They leave the office and go somewhere out in the garage. I think they went to the interview room. What took place in that conversation, I don't know.

I later find out that she's blaming me for starting a rumor that they won't work with us because of her. So then I find out in this. She goes to Lieutenant MENDOFIK, and says, "I want to give you my heartfelt apologies," and I believe she did because that's something that she would say. And she says in her letter that Lieutenant MENDOFIK told her the reason why we won't work with you guys anymore is because your search warrants were so poorly uh, prepared.

DUBY:        Okay.

WEINSTOCK:   Okay.  Now, I know Lieutenant MENDOFIK.  Worked for him as a
             Sergeant in Hazleton.  This guy is the ultimate professional.  If he
             thought that you did something wrong, he would tell you in such a
             tactful manner, or he would take it up with you and your supervisor
             together.  So I go over to the office the one day at Wyoming - recently,
             like within the last three weeks.  Knocked on his door, said, "Can I talk
             to ya?"  He says, "Yeah, come on in."  Sat down and we talked.  He
             said, "Listen, I never said that to her.  We talked.  She cried.  She
             apologized.  But I never said that your search warrants were poorly
             prepared."  He said, "Can we always do better on search warrants?
             Absolutely.    There's always things that we can Monday morning
             quarterback."  He said, "But I never said that about your search
             warrants, and if I did, I would've said it to you with your supervisor
             present."  So I think that there's an individual, Lieutenant MENDOFIK,
             that definitely needs to be spoken to.

DUBY:        Okay.

WEINSTOCK:   And then Trooper SPAGNOLA, I know in there she says that the
             reason she drew down on this dog is because SPAGNOLA had his
             weapon holstered.  He did not.  He had his gun out.  His gun is against
             the doorjamb.  He told me this.  I confirmed that with him within the last
             three weeks.  "Yeah, my gun was out.  She came running around.
             Bang.  Has the accidental discharge.  Leaves the building."

             I come running around because this is my ticket, I want to know what's
             going on.  As I come in the doorway, here she comes, tears in her
             eyes.  She looks like she's gonna puke.  She walks out to the curb and
             she bends over like she's gonna vomit.  And here she starts spitting.
             She was just like spitting.  Gus DIANA comes out.  The house is
             secured.  House is, you know, everything is safe.  We get the guy in
             custody.  The dogs come in.  We had to clean up the dead dog before
             the other dog could come in to do the search.  We had to have the
             other dog taken out.  We called the Humane Society, I think the
             Humane Society, or maybe the wife came home or something.
             Something like that.  Like this guy and his wife didn't live together.  Got
             the other dog out of there safely, okay?

DUBY:        Okay.

WEINSTOCK:   Cleared the house, took some stuff into custody, i.e., drugs,
             paraphernalia, that type of stuff.  We leave half the team there, and



then we continue on with our prearranged plan that we did in the meeting to go to the second house, and we went.

DUBY:    Okay. Referring to after her transfer from BDLE on August 21st of 2000, Trooper ZELINSKI claims that you and Corporal ALTIERI continued to make derogatory remarks about her and her ability to do the job. Is this true?

WEINSTOCK:    No.

DUBY:    Did you ever make any derogatory comments concerning Trooper ZELINSKI, after she left the unit?

WEINSTOCK:    No.

DUBY:    Other than just venting?

WEINSTOCK:    Than what?

DUBY:    Than venting.

WEINSTOCK:    No, I didn't - I haven't said against the girl.

DUBY:    Okay. Did Corporal ALTIERI ever make any derogatory comments concerning Trooper ZELINSKI, after she left the unit?

WEINSTOCK:    It's not in his nature, and that's a no. As a matter of fact, on the way down here this morning, he told me that he prays that her heart will change, because he's a Christian. I mean, Corporal ALTIERI is a very religious man. That's a fact. And that's the kind of person he is. So I mean, here's somebody who's trying to ruin his career, and he prays for them, you know.

DUBY:    Okay. Well, like I say, I'm just taking her allegations one by one.

WEINSTOCK:    Yeah, I'm just trying to answer them as best I can for ya.

DUBY:    Not a problem. Not a problem. Trooper ZELINSKI claims that you said that she was transferred because of her paperwork. Did you say this, sir?

WEINSTOCK:    No, I did not, but I'd like to elaborate on that.

DUBY:    Sure, go ahead.

WEINSTOCK:    Okay. Her and Trooper Dan WIGLEY get kicked out of the Bureau.

DUBY:    Okay.

WEINSTOCK:    Now this is the second time Dan's been kicked out of a Bureau. He's been kicked out of BCI, okay. So he gets kicked out. And just a little side note here. After he got kicked out of BCI, he filed a complaint with the Internal Revenue System against his then Corporal Mark GEORGE.

DUBY:    Okay.

WEINSTOCK:    Okay? Turned out to be erroneous. Just another - tried to be a pain in somebody's side. Now, I took over everybody's investigation when they left the Bureau. So I just got inundated with a pile of work.

DUBY:    It's just essentially you and Corporal ALTIERI, right?

WEINSTOCK:    Well, MURRAY's still there.

DUBY:    Okay.

WEINSTOCK:    But now we're in the height of marijuana eradication season. And this is something that we really wanted to get the ball rolling on, because it's not something that gets done a lot. It's something that goes by the wayside because you don't have time.

DUBY:    Right.

WEINSTOCK:    We want to, you know, it's overtime. So we're gonna put a lot of effort in. I mean, he and I really humped a lot. Now MURRAY - he would go with us. He'd sit in the car and watch the plants that we had already eradicated. Somebody had to do it, but Sean did that. I took over her investigations, Dan's investigations, and then when Sean left, now I've taken over his. As a result of this, I have the unfortunate job of entering all these John DOE's into NCIC. I mean, if you want to take me saying, you know, "I have to enter all these John DOE's." You know, "Look at this report, how do you get anything out of that report?" That I went and said that her - she was kicked out of the Bureau because of her paperwork, and that's what you said?

DUBY:    That was her claim. I'll read it over to you again. Trooper ZELINSKI claims that you said that she was transferred because of her paperwork.

WEINSTOCK: No. No, but I mean, like I said, I had to take over her cases. And is her paperwork bad? Heck yeah!

DUBY: Okay.

WEINSTOCK: But did I. . .

DUBY: That's not understandable. I mean that's understandable.

WEINSTOCK: I mean, I take over somebody's investigation and I mean, you go from - I mean, it should be a chronological order of events. You've done reports. You were the Crime guy for fourteen years, or nine years?

DUBY: Nine years.

WEINSTOCK: You see what I mean?

DUBY: Yeah.

WEINSTOCK: I mean, it's not a hard thing to do. Went here, bought drugs. Did this. I mean, you're trying to identify someone to put them in NCIC and they're "John DOE SLEEPY," "JOHN DOE MIKEY." No description of color. No description of height. Yeah, her reports stink. Did I say that? No.

DUBY: Okay. Trooper ZELINSKI claims that Corporal ALTIERI said that she was transferred because she was a liability from the March 3rd search warrant. Is this true?

WEINSTOCK: He never said that to me. No way.

DUBY: And what do you know of that?

WEINSTOCK: Nothing.

DUBY: Okay. Referring to from January 13th of 2000, to August 21st of 2000, Trooper ZELINSKI claims that she was subjected to a hostile work environment by Corporal ALTIERI, in the following manner.

Trooper ZELINSKI claims that on January 13th of 2000, Corporal ALTIERI accused her of refusing to work with you. And Trooper ZELINSKI claims that she was blamed for not being a team player. Do you know if that is true, sir?



Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 21 of 68

WEINSTOCK:     I don't know what Corporal ALTIERI said to her. If he counseled her, that's a management thing. I mean, I'm not privy to what goes on in there. They're trying to say that Lou and I are in bed with each other and that's just not true. Now you can't go out and arrest somebody alone. You can't go out and make payment for dope alone. Agreed?

DUBY:     Right.

WEINSTOCK:     Let me expound on that.

DUBY:     Sure.

WEINSTOCK:     Base - basically, uh, read it again to me.

DUBY:     Yes. Trooper ZELINSKI claims that on January 13th of 2000. . .

WEINSTOCK:     Okay, okay, here. That she refused to work with me?

DUBY:     Yes.

WEINSTOCK:     Perfect example.

DUBY:     She was accused of not working with you essentially.

WEINSTOCK:     Right.

DUBY:     By Corporal ALTIERI on that date.

WEINSTOCK:     Yeah, but I didn't have a problem - like, I didn't go to Lou and say, "Listen Lou," I said, "I think there's a problem. They don't want to work with me." I never - I could care less. I got my job done. I had 52 felony arrests last year. That's pretty good in the Bureau, isn't it?

DUBY:     That's high, yeah.

WEINSTOCK:     But I'm a hammer. Now, reports. Lou corrects your reports, puts them in the box on top of the cabinet. It has to be secured all the time. You'd come into work, you'd need a report, you gotta supplement it. You pull it out, you go in chronological order. You know how that is?

DUBY:     Sure.

WEINSTOCK:     Well here your reports that need to be filed are still on top of the box. She'd come in. She'd file everybody's reports and she'd leave all of mine sitting in the box. Now, I'm not saying that filing the reports were

job, but we took turns. I would file 'em this week. You would file 'em next week. I mean, yeah, it's a pain in the butt. You gotta stop what you're doin', you gotta look at the number. You know how that is?

DUBY:         Sure.

WEINSTOCK:    She would never file my reports. I didn't care. I knew she didn't like me. I wasn't gonna lose sleep over it. Was this a hostile work environment? Absolutely - for me, for Lou.

DUBY:         Why - well, you bring that out. Why do you feel she didn't like you?

WEINSTOCK:    Here's what happened. This is - this was my biggest mistake that I made in the Bureau. I came to the Bureau because MURRAY asked me to, alright?

DUBY:         Okay.

WEINSTOCK:    I like Sean. I thought he was a pretty good guy. I thought he was a straight shooter. And anybody that meets MURRAY, thinks he's a great guy. Sean tells you the sky's blue, you better go look, because it's getting ready to fall down on ya. You see what I'm saying?

DUBY:         Okay.

WEINSTOCK:    The guy lies about everything. You can't - you can't take anything he says with a grain of salt, but you accept him for that. Now she's up getting coached by the Dunmore guys. Davis HAHN's up in Dunmore. He used to be in Troop P. Billy SHUTTER's her coach. Jimmy MAC's up there. None of these guys like MURRAY, because of his nonsense, his lies, okay? She comes down and we had just gotten into the unit. This was before wiretap school. She says to me, "Listen," she goes, "I trust you." She goes, "You need to know that Sean's a liar. These guys in Dunmore totally filled me in on him and he's no good." Hey, my policy is, if I'm gonna say it, I'll say it to ya.

DUBY:         Okay.

WEINSTOCK:    I think that's a pretty fair policy. Would you rather me say it behind your back?

DUBY:         Right.

WEINSTOCK:    So I went and I told Sean. I said, "Sean, listen, this is what the girl said." That's my biggest mistake. I told him what she said. He turns

around and says, "Laura, if this is how little you think of me, give me the opportunity to prove myself to you." So now she's got an alleg - an alliance with MURRAY. Dan hated me from way back, because I was a hammer. See, when I was on the interstate, I used to make 80 to 100 pinches a month, and do my Whiteline arrests. And I'd help any county guy with anything. Did I do a lot of numbers? Yeah. I'm here to work. I'm not here to go slow and take my time. If I do quality work at a high rate, yeah, I'll do it. You see what I'm saying?

DUBY:          Sure.

WEINSTOCK:     So it made it easy for her to join forces with MURRAY and WIGLEY, and alienate me. But did I care? No. I still made a lot of arrests. I did a heroin hit November 10th, 1999, the day of the Marine Corp birthday. Me and MURRAY arrested 24 people. She arrested zero. Dan arrested one for heroin. Okay?

DUBY:          Do you know if Corporal ALTIERI ever claimed that Trooper ZELINSKI was not a team player?

WEINSTOCK:     Did he say it to me?

DUBY:          Did he ever make that claim?

WEINSTOCK:     No, not to me.

DUBY:          Okay. Referring to February 1st of 2000, Trooper ZELINSKI claims that Corporal ALTIERI critiqued the execution of the search warrant and blamed her for its failure. Trooper ZELINSKI claims that it was a team effort and that it could've been planned better. Did Corporal ALTIERI critique the execution of the search warrant and blame her for its failure?

WEINSTOCK:     No. Did he critique it? Yes.

DUBY:          Okay.

WEINSTOCK:     Before I forget, can we go back?

DUBY:          Sure.

WEINSTOCK:     Remember the week when, uh, of 06/22/99, when she says that I put my hand on her leg?

DUBY:          Yes.

WEINSTOCK:    And, and I, I was in the car alone with her? Okay. During that week, we were there - we, we were supposed to go down on Sunday night, but I didn't. I went directly to class on Monday morning. Monday night, I went out to dinner with Corporal GRENFELL, Sergeant KAZIMER, and Dan WIGLEY. They were down for blood pressure training. Okay?

DUBY:    Okay.

WEINSTOCK:    The next night, I went out to dinner with Corporal GIBSON and his girlfriend, who's a Trooper over at Headquarters. Corporal GIBSON's in MAP. The next night, my wife is down. I go to Olive Garden. We invited her to go with us. We invited Laura to go to dinner. She declined. You know what I mean?

DUBY:    Okay.

WEINSTOCK:    It was my kid's birthday. I mean, would she had fun? Probably not. She declined. Then the next night was Thursday night, we did a sear - not a search warrant, we had a study class, because the final exam was the next day. We studied in the library at the Academy. I showed up late. Like they said, "We're gonna start at six," or five, whatever the time was and I got there like fifteen minutes late. I didn't come with her. I didn't leave with her. We didn't sit next to each other in this wiretap class. I mean, she sat over - like the tables are like a "U" in that room in the BESO building?

DUBY:    Okay.

WEINSTOCK:    She sat over here. I sat in the center of the table. I mean, there had to be like five people between us. We didn't even sit by each other, and here we were on the same team. I mean, this is, you know. Like I said, she knew she didn't like me because of the thing with MURRAY. And that's why - see, she used to bust my hump all the time. She used to say, "Do you trust me?" It was like a joke. It was a dig, because see, she came to me and said, "I trust you. MURRAY's a liar. You know, keep that yourself, he's a liar."

DUBY:    And then she sided with MURRAY then?

WEINSTOCK:    Because I went and told him. So she knew that she couldn't trust me, or maybe in her - in her world or her mind or her brain housing, but somehow she didn't trust me. So now she made it look like I used to say, "Do you trust me," and it was her that said it. And that was one of the things they always used to tease me about. Like they used to

make fun of my eyebrows. See, your eyebrow connects in the middle. Well so does mine. Well like they used to make fun of me. They used to say like I'd (inaudible), but I didn't care. But what sucked about it was, Lou made it real clear. "You can't - don't make fun of her, any time, no matter what. I'm telling ya, don't do it." And Lou was very strict on that.

DUBY:         Okay.

WEINSTOCK:    Was it a double standard? Absolutely. Was it a hostile work environment? Sure it was, for me and for Lou.

DUBY:         Okay.

WEINSTOCK:    Sorry I had to go back to that.

DUBY:         Not a problem. You may not know anything about this, but I'll run it by you anyway. Referring to April 13th of 2000, Trooper ZELINSKI claims that Corporal ALTIERI had put a note in her file six weeks before about her poor communications skills and that she never actually seen the note. Do you know anything about that?

WEINSTOCK:    No.

DUBY:         Did Trooper ZELINSKI refuse to sign STD-501 on a drug purchase that you made on June 27th of 2000?

WEINSTOCK:    Remember what I talked about before?

DUBY:    .     Yes, about the uh, the. . .

LEYDIG:       It's called a drug receipt.

WEINSTOCK:    We don't do STD-501's.

LEYDIG:       Yeah.

DUBY:         Okay.

WEINSTOCK:    I don't - I never asked her, and Corporal ALTIERI has with him today all of our receipts from our inception. Okay?

DUBY:         Okay.

WEINSTOCK:    You could see them all.

DUBY:              So you just never asked her, period?

WEINSTOCK:    I never did anything with her.  Now, I did the DART with her, but so
               was - Dan was there was too and so was Sean.  Each one of us would
               do a buy.  Laura did all the work.  Let me rephrase that.  Laura did all
               the undercover work.   But I did my incident reports.  She did her
               incident reports.  Do you see what I mean?

DUBY:              Sure.  If she did all the undercovers, but she used your money. . .

WEINSTOCK:    My money from my accounts. . .

DUBY:              . . .when you did your investigations. . .

WEINSTOCK:    Right.

DUBY:              If she was taking the investigation, she used her money. . .

WEINSTOCK:    Her money.  For Dan's, she used Dan's money.  For Sean, she used
               (END OF TAPE).

                          -   TAPE 1, SIDE B -

DUBY:              Hold on one second.  Go ahead.

WEINSTOCK:    I'd say, "Okay, here's two hundred dollars for the cocaine purchase."
               and Lou made it clear going in, each payment, each buy, twenty-five
               dollars CI fee.  Twenty-five bucks.  And you could see on mine how
               pretty that the two and the five and the zero, zero are written.  It's in
               her writing, but it came from my account - so yeah, I filled it out.  The
               only time I would ever need her to make, uh, to co-sign a payment
               would be if the payment was in excess of fifty dollars, and that's in AR
               9-9.

DUBY:              Okay.

WEINSTOCK:    Now one time, and let me make this very clear, we did a buy on a
               Friday - me, her and Dan.  She had my money, okay?  She paid Sheila
               GLASSER (phonetic sp.) and I didn't see the payment.  She co-signed
               that one for me.  Yeah, and she did, she didn't refused to sign it, but
               she did sign it.  I never asked her to sign an STD-501.  So, I mean if
               she's wrong in that or if that's. . .

DUBY:              Well that was her specific thing, STD - so even. . .

WEINSTOCK:    But we would never need to do that.

LEYDIG:    We don't STD-501's for that.

WEINSTOCK:    Never, never.

DUBY:    Okay. Referring to July 18th of 2000, Trooper ZELINSKI claims that she was disciplined because of her sex, being a female, and/or in retaliation for reporting sexual harassment. Do you know anything about that?

WEINSTOCK:    I know nothing about sexual harassment towards Trooper ZELINSKI.

DUBY:    And referring to August 21st of 2000, Trooper ZELINSKI claims that she was transferred because of her sex, being a female, and in retaliation for reporting sexual harassment.

WEINSTOCK:    Know nothing about it.

DUBY:    Okay. Referring to August 21st of 2000, Trooper ZELINSKI claims that you had submitted an STD-501 letter that you and Trooper - umm, that Trooper ZELINSKI and Trooper WIGLEY had intentionally damaged your vehicle and that you did not know where they were at on August 1st of 2000. Did you submit a letter to anyone?

WEINSTOCK:    Absolutely not. Was never asked to. Was never told to or ordered to. Did Lou tell me to send a letter in if I wanted to make it a Lost or Damaged Property? Yeah. Was my car damaged? Yes. Now, let's go into this, because this is a very, very important topic.

DUBY:    All right. You can just go ahead.

WEINSTOCK:    Okay. I'm acting supervisor starting Monday. Did not ask to be. Wasn't gonna turn it down. It's a couple extra dollars an hour, you know that. Okay. Plus, it makes me look pretty good, probably in the future for promotion. I mean, it can't hurt. Friday, Lou's getting ready to leave. I'm wrapping up for the day. I take the Army truck home. Lou tells me, "Rich, they're doin' a DART in Skytop at Dunmore. They need your car with the tinted windows." Not a problem. I leave my car. Dan's right there. He goes, "Dan, take Rich's car up to uh, to Dunmore for this work with this DART," that started on a Sunday.

DUBY:    Okay.

Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 28 of 68

WEINSTOCK:    Okay. Now I know where they're at. I know where they're goin'. "Take Rich's car. Leave your car here for him to use on Monday." Okay. Lou calls me Friday night. He goes, "Okay, Dan's gonna leave his car for you. You'll have his car next week." Excuse me. Not a problem - now I had the Army truck at my house. I don't care what I drive. And when I was in patrol, you didn't get any car. You know what I mean?

DUBY:    Right.

WEINSTOCK:    I got a ride home. I live three miles from the barracks. I take the Army truck home. I like it. It's a - it's - you know what it is, those old Dodges. I like it. If it wasn't camo green, it would be great for buying drugs. Anyway, I go to work Monday morning, there's no car for me at all. I tell Nicky GUSHKA, who's the Corporal for the Vice Unit, okay?

DUBY:    Okay.

WEINSTOCK:    Who we need to go into him also, okay? Remember that. So he lets me use one of his cars, so that I had a vehicle for when I had to run around. Because the Army truck just wasn't conducive to what we were doing. You know what I mean?

DUBY:    Okay.

WEINSTOCK:    Now, I knew where these people were. Lou made it very clear, "Every day you will call Sergeant RUDA, and tell him what you're doin'." Okay? He's my boss. RUDA's his boss. So they're both my bosses. Tells me to call him, I'm gonna do it. Tell me to jump off a bridge, I'll do it and I'll question it later, but I'm not gonna disobey a direct order. It's called insubordinate, okay?

DUBY:    Okay.

WEINSTOCK:    I called RUDA, check in with him. He goes, "Where are your people?" "They're up in Dunmore." "Did they check in with you today?" "No." Okay, see what I'm saying? I knew where they were, but did they check in with me? No. Karen calls me. First order of business Monday morning, she pages me. I'm sitting at Lou's desk in the Corporal's office.

DUBY:    I'm sorry, who's Karen?

WEINSTOCK:    Karen is our - our secretary.

LEYDIG:    Area secretary. It would be Sergeant RUDA's secretary.

WEINSTOCK:    She needs the car mileage on all the cars in our unit. MURRAY's on vacation. His car's supposed to be at the barracks. It wasn't. Lou's on vacation. His car's supposed to be at the barracks. It wasn't. I paged Dan. I paged Laura. "It's Rich. Can you call me and give me the mileage." Dan calls me back in about twenty minutes. "Hey Rich, Dan. Here's my mileage." Gives it to me. "Thanks Dan, see ya later." Now I just talked to Dan. So he checked in with me for the day. As far as I'm concerned, that's his check-in for the day.

Laura doesn't call me back. I page her again. I page her again. I call Karen. I said, "Karen, I'm sorry. She, she just won't call me back or maybe she's not getting my pages." "Oh, she called me hours ago." Well here I'm the acting supervisor, I told her to call me. She can't even follow a simple order like that.

Did I know where they were? Absolutely. Did they check in with me, like RUDA told them to do, like Lou told them to do? No. Did I make an issue of it? No. When RUDA asked me about it, I told him the truth. "Rich, did they check in with you today?" "No."

I had to go make a payment for marijuana, okay, and it turned out to be a real hairy situation where the guy that we were doing the buy from knew who I was. He knew what I looked like. I used to have a ponytail. They used to call me Steven SEAGAL, okay? Now I'm at this house doing this buy, or doing the payment. I said to the Sarge, I said, "I'm just gonna do it by myself." He said, "No, you're not." He said, "I was up in Dunmore and I saw what's going on up there. They're sitting around doin' nothing. I call up there and I'll get ya a guy free."

Now in the meantime, I had already called Dan on the Nextel. Dan is with Al WEIS. He says, "Rich, why don't you call PATTON." Now Dan says this. "Why don't you call PATTON. He's done for the day. He's home. Let him help ya." So, I think that's a good idea. I call PATTON. I says, "Listen," I said, "I'll sign your timesheet." I said, "I'm acting supervisor." I call the Sarge back. I said, "Sarge," I said, "I got somebody. PATTON's gonna help me." "No he's not." He said, "I'm telling you, I'm the boss and they're gonna do what I tell them to do. Whether or not they like it, they're gonna do it." Do you see what I'm getting at?

DUBY:    Sure.

WEINSTOCK:    I said, "Sarge, I'll go make the payment by myself." He says, "No, you are not." He said, "I'll get ya somebody." Now I feel bad, because I

already told PATTON to come out. PATTON put in for the overtime. I had to sign for the overtime. The Sarge was bent out of shape at me. You know what I mean? I mean, I didn't lose sleep over it and he didn't write me up over it, but I couldn't go back on what I had already told the guy. "Come out and help," I needed somebody to help me. Here while we're doing the payment, by the way, the guy says, "Listen, I understand that uh, you're an informant for the State Police." Now I'm under this guy's Jeep, working on it. I don't have a clue about cars. I'm sitting under there getting dirty, just looking good. Had a beer by me. We were drinking. Just looking like I fit in. You know what I mean?

DUBY:          Sure.

WEINSTOCK:     I gave the informant the money. Bad guy comes to the informant's house. Pulls up. He says, "I understand that you're an informant for the State Police, and that the. . .

DUBY:          He says this to you?

WEINSTOCK:     No, to my informant.

DUBY:          Okay.

WEINSTOCK:     While I'm under the car. And I could hear it. He says, "I got a friend who's a State Trooper and he tells me that the Trooper that's coming to do me looks like Steven SEAGAL." I under this truck and I'm like, "Holy Christ! Can you imagine if I come up here by myself and got killed." Now did we ever find out who the leak was? No. We have our suspicions.

DUBY:          Do you want to tell me who you feel it is?

WEINSTOCK:     No, because it would be speculation.

DUBY:          Okay.

WEINSTOCK:     Do I feel it was a unit member? No.

DUBY:          Okay.

WEINSTOCK:     No. I feel it's a retired member. So like I said, we have our speculations. It's not a unit member. Anyway, did I know where they were? Sure, I knew where they were. Did they check in with me? No, they didn't.

Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 31 of 68

DUBY:            Okay, and you didn't submit a letter to Sergeant RUDA then?

WEINSTOCK:  Absolutely not. I never even heard of that until RUDA asked me at the
                     Area office, "Rich, did I ever tell you to submit me a letter?" I said,
                     "No." I said, "What are you talking about?" He said, "One of things I
                     was asked was. . ." I said, "I never heard of it." That's the first time I
                     heard of it. That was it.   My car had a cracked windshield. Am I anal
                     about my car? Sure I am. You rode in my car today. Car's pretty
                     clean for a drug car, isn't it?

DUBY:            Actually Corporal ALTIERI commented on that. That you like to have it
                     waxed and washed and do it yourself.

WEINSTOCK:  Well I do it myself. But I mean, that's your office. That's your office.

DUBY:            I do mine at home.

WEINSTOCK:  Yeah! I mean, I take it home and I pull it in the garage and I do it, you
                     know. It's tough this time of year. Like right now, the outside's very
                     dirty. But anyway, go ahead. I'm sorry.

DUBY:            Referring to August 2nd of 2000, Trooper ZELINSKI claims that you
                     accused Trooper WIGLEY and her of damaging your vehicle by
                     chipping the paint and that they were never questioned about it. Did
                     you actually accuse Trooper ZELINSKI or Trooper WIGLEY of
                     damaging your car?

WEINSTOCK:  No, I never went to them and said, "Hey, did you damage my car?" No
                     way.

DUBY:            How about to other members. . .

WEINSTOCK:  No.

DUBY:            . . .did you accuse them through other members of damaging your car?

WEINSTOCK:  No. No, everybody else was on vacation when I got the car back. I
                     went and got the car myself.  They were done with it. The car got
                     burned. I went and got the car. I got a ride up with SEIDEL in his car.
                     Went to Dunmore. They're all out in the parking lot - see Laura, see
                     Dan. "Hey, what's goin' on guys?" "Hey, what's up Rich?" Blah-blah-
                     blah, you know, "Nice to see ya." Turn around and they stick one in
                     your back. But I got in my car and I drove back myself. Sean's not
                     around and Lou's not around. I'm the acting supervisor.  Now this I

think was like maybe Tuesday or Wednesday. Unsure of the day. Lou didn't come back until the following Wednesday. MURRAY didn't come back until the following two weeks. MURRAY took a two-week vacation.

DUBY:        Okay. In your opinion sir, was there a supervisory problem within the Troop P Tactical Narcotics Unit supervised by Corporal ALTIERI?

WEINSTOCK:   Read it again.

DUBY:        In your opinion sir, was there a supervisory problem within the Troop P Tactical Narcotics Unit supervised by Corporal ALTIERI?

WEINSTOCK:   Not from Corporal ALTIERI's standpoint.

DUBY:        Its been described to me in some of the interviews that the perception was that it was Trooper WIGLEY and Trooper ZELINSKI against Corporal ALTIERI and against you, with Trooper MURRAY in the middle. Was that accurate?

WEINSTOCK:   Well that's bullshit.

DUBY:        Okay.

WEINSTOCK:   Here's the way it was. See, these three. . .

DUBY:        In other words, like two teams and one in the middle.

WEINSTOCK:   It wasn't me and Lou. Okay, don't think that for a second.

DUBY:        I'm not. That's what's coming to me.

WEINSTOCK:   Lou made no doubt about it. He was the boss. Did we eat lunch together? Yeah. Have I had him over to my house for lunch? Yeah. Did I go on vacation with him? No. Do I associate with him off my business hours? No. That's a shame, isn't it? Yeah. This is a guy that, I mean, he's got a nice wife, five kids. I got a nice wife, two kids. We can't even get together because of this shitcannery. That's - that's real nice that this is the kind of crap that's been goin' on. Was it - but see what happened was, Dan and Laura thought that I was going to Lou, and telling him everything. But I wasn't. It was MURRAY. See, MURRAY wanted to be the top dog. Is MURRAY a good worker? Absolutely. Did he ever put anybody in jail? Not too many people. He cut deals. He dropped felonies all the time. He constantly drops felonies. And as a matter of fact, let me go into this with you.

DUBY:          Okay.

WEINSTOCK:     He has a guy in NCIC, this is about three weeks ago.   MURRAY's
               gone.  He's on the turnpike.  You know that, you interviewed him in
               here yesterday.

DUBY:          Yes.

WEINSTOCK:     Correct?

DUBY:          Yes.

WEINSTOCK:     Okay.  This guy gets picked up.  Now this guy's a heavy-duty drug
               dealer.  I can't think of his name.  His picture's are out.  His photograph
               and print cards are in my car right now in my briefcase.  This guy's a
               heavy-duty druggie.  Got a gun permit.  The whole nine yards.  He beat
               us, before I got to the unit, in a suppression hearing.  Gets to keep his
               gun.  There's no reason why a guy of this caliber should be carrying a
               weapon.  They get a buy off of him.  Before MURRAY leaves, he puts
               him in NCIC.

               Nanticoke PD, a local department, picks him up.  I have to go for the
               hearing, because I took over all the cases.  I subpoena MURRAY, by
               the books.  MURRAY comes up.  He's in uniform, driving a Troop T
               car.  I pull in.  The guy's there.  I can't remember his name.  It's an odd
               name, an odd first name.  Black male, dreadlocks.  Anyway, I get
               there.  I start talking to Sean.  We're, you know, shootin' the shit.  I
               said, "Boy," I said, "What's goin' on there?"  I said, "Let's get the ball
               rolling."  I said, "Where's his attorney?"  "Oh, he's in there."

               Well I know the attorney.  The attorney works in the PD's office, but he
               also has a private practice.  He's a pretty good guy.  He's a pretty
               heavy hitter when it comes to drug cases.  We have a good working
               relationship.  He knows what I'm about and I know what he's about.
               You know what I mean?  You know how you form relationships with
               attorneys?

DUBY:          Sure.

WEINSTOCK:     Okay.  This is a guy that I have a pretty good relationship with.  His
               name is Jonathan BLONG (phonetic sp.)  I go in.  I said, "Jon," I said,
               "what are we gonna do here?  We gonna have this hearing or what?"
               He said, "Well we think we're gonna take MURRAY's deal."  I said,
               "Really?  What deal is that?"  "Drop the felony and let us plead to a

misdemeanor." I said, "There's no deal like that on the table." I said, "We're having a hearing." I go out.

MURRAY's a different person now, totally different person. "What is your problem?" I said, "What do you mean what's my problem? The guy's a drug dealer! Let's get him a criminal record for a felony. Get this gun permit off of him."

Now I had already been in contact with the sheriff's office and the drug agent from Nanticoke PD. His name is SHULTZ (phonetic sp.) He's a pretty good guy. He does all their drug work. I work with him a lot too. We go in. I said, "Sean," I said, "I can't drop the felony." He goes, "What does it matter? Just drop the felony. Say that the hearing was waived and when it comes out; just put 'plead guilty.' Nobody will ever know the difference." I said, "I'll know the difference." "Okay, we'll have a hearing."

Now I came with everything that I needed for this hearing. The rule that said I don't have to have the informant present, the Rules of Criminal Procedure, I had the case law. I had the, you know, MURRAY was subpoenaed there. He's there. Here's the bad guy. I have enough to get it through a preliminary hearing.

DUBY:        Okay.

WEINSTOCK:   Should we stop?

DUBY:        No, we're good.

WEINSTOCK:   I have enough to get through the preliminary hearing for a felony drug arrest.

DUBY:        Okay.

WEINSTOCK:   Agreed?

DUBY:        Uh-huh.

WEINSTOCK:   Okay. He sits down. He sits on the stand and he's sitting there like this. And I hated this about Sean, but he was good at what he did, because - you don't have a bad thing to say about him, do ya?

LEYDIG:      I don't really know, I just work with. . .

WEINSTOCK:   But you think he's a pretty nice guy, right?

STATEMENT 77
PAGE 34 68

LEYDIG:        Yeah, seems like.

WEINSTOCK:     That's the way he comes across.  He sells himself great!  He'd slit his
               mother's throat for two cents and blowjob.  That's Trooper MURRAY.
               Bottom line, okay?

DUBY:          Okay.

WEINSTOCK:     Now he goes to the guy, "Listen, come on, come here, let me talk to
               ya."  Now he's got to console this guy because he said he'd drop the
               felony, but now he's not.  See I know what MURRAY's probably telling
               him.  "Trooper MCMINN (phonetic sp.) is no longer a member of the
               State Police.  Take a hearing and you'll win."  That's probably what
               he's telling him, but I can't prove that.  Did I get it through as a felony?
               Absolutely.  I did my job.  I supplemented the report.  And the thing he
               begged me to do was, "Please don't tell Corporal ALTIERI.  Don't tell
               Lou that I did this."  I said, "Yeah, sure, I'm not gonna tell him."  As
               soon as I got back I called Lou.  "Lou, this is what happened," let him
               know immediately, because this is the type of shitcannery that was
               going on when he was in the unit that led everybody to think that I'm
               this sexual predator and this monster at this point now.  This is why I'm
               here now, okay?

DUBY:          Okay.

WEINSTOCK:     All right.  Is that a fair enough answer?

DUBY:          Sure is.

WEINSTOCK:     Okay.

DUBY:          All right.  And I'm just going to get back to what you had said here.
               Please tell me everything you know concerning the hug and kiss
               incident.  Yes.  In other words, where you said. . .

WEINSTOCK:     On the night of the 30th - December 30th?

DUBY:          You know what, I don't have the date here in front of me.  I read it to
               you previously.

WEINSTOCK:     Yeah, here.

DUBY:          I'm assuming that - no, in fact it's not even in here.

Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 36 of 68

WEINSTOCK:   December 30th was the night of the surveillance, when she got out of the car and kissed me.

DUBY:   Yes, tell me about that.

WEINSTOCK:   I did.

DUBY:   Basically, she got - was there a reason for her doing that?

WEINSTOCK:   She got out of the car! I mean, I don't know, was it New Year's? I don't know. It was the day before New Year's Eve, but I mean, "What's up team mate?" Gave me a kiss. And I'm looking at Lou like, "What the hell is wrong with this girl?"

DUBY:   And who else was present besides. . .

WEINSTOCK:   Me, her and Lou.

DUBY:   Okay, what about Trooper WIGLEY and MURRAY? Were they there?

WEINSTOCK:   They weren't with us on this night. I couldn't tell ya where they were.

DUBY:   And how did you feel about that?

WEINSTOCK:   About?

DUBY:   The hug and kiss.

WEINSTOCK:   How'd I feel?

DUBY:   Yeah. Did it shock you? Did it surprise you?

WEINSTOCK:   Does this girl not know - or not - does she think that I do not know what she is trying to do? I mean, I know that she bad-mouths me to everybody. I knew that. It's like, you know, it's like in the Italian movie when they come up and give you the kiss and the next thing you know, they're sticking the ice pick in your ear. I mean, it was like the kiss of death, as far as I was concerned.

DUBY:   And sir, are you aware that other female members of the Pennsylvania State Police have disclosed information that. . .

WEINSTOCK:   Yes, I am.

DUBY:   . . .sexual comments. . .

WEINSTOCK:    Yes, I am.

DUBY:    Okay, do you want to expand on that?

WEINSTOCK:    Her best friend, Beth SANTELLI.  Well, it was SANTELLI at the time, now she's married.

DUBY:    GUNTHER today.

WEINSTOCK:    Whatever it is.

DUBY:    What can you tell me about that?

WEINSTOCK:    I worked on a wire with her.  She's nine months pregnant.  I'm talking like this, ready to have a baby. She's doing paperwork on this wire.  I'm on this wire with Dan WIGLEY.  It's her best friend.  It's her best friend.

DUBY:    I think the actual comment was that you're alleged to have made a comment, "Is having sex uncomfortable for you?"

WEINSTOCK:    To her?

DUBY:    To Beth.

WEINSTOCK:    Well I - I don't even - I mean, I know that this girl's her best friend.  She asked me like when we got there, "How's Laura doin'?"  I said, "Oh she's doin' real well."  I'm not gonna bad mouth another Trooper.  I believe it's an FR violation, one-oh-four.  But I mean, the girl had the baby.  We're at the conference right after the wire's over.  Her and her husband come to my room, it was Corporal ALTIERI, ALTIERI and I stayed together, and Sean stayed together.  Laura, Beth GUNTHER, whatever her name is, who now is no longer pregnant, she had a kid, they come to our room.  I mean, there's a lot of people in our room partying.  I make these sexual comments to her - why didn't she tell her husband and he'd come up and punch me in the head.  That's what I would do if somebody said something like that to my wife.  But now all of a sudden, she's saying that I said these kind of things to her, now, all of a sudden.

DUBY:    Well it was only one specific comment that she's alleging.

WEINSTOCK:    Okay.

DUBY:    And that was. . .

WEINSTOCK:    But lets go back.

DUBY:    Well did you - did you. . .

WEINSTOCK:    No way.

DUBY:    . . .know the comment that I'm referring to?

WEINSTOCK:    No, I couldn't even imagine what it was. I couldn't.

LEYDIG:    He just said there while you were talking.  She - go ahead.

DUBY:    Yeah, the comment that she was referring to. . .

WEINSTOCK:    About sex - being uncomfortable.

DUBY:    . . .was while she was pregnant.  In other words, she's out to here. . .

WEINSTOCK:    What business is that of mine?

DUBY:    That - you know. . .

WEINSTOCK:    What business of mine is her sex life while she's nine months pregnant?

DUBY:    Okay.

WEINSTOCK:    The only thing that I ever talked with that girl about, and I believe Sergeant MCHALE was there.  Sergeant MCHALE, well now he's a Lieutenant, Sergeant MCHALE is a P- I-double A official for football. I'm a big football fan.  She is originally from the Mt. Carmel area.  Mt. Carmel has a great high school football program.  They no longer play Berwick.  Berwick is from my area.  We talked about high school football.  Who was present in the room?  The prosecuting attorney from the case, he was in the room.  Now all of a sudden, I'm gonna say, "Hey, by the way, is sex uncomfortable for you?"  I mean, come on.  That's none of my business.  This girl's her best friend.

The only people that Laura ever tried to discredit me with were people that I work with.  If I sexually harassed this girl for so long - she repeatedly in her allegation admits breaking the chain of command, which is another Departmental violation, by going to Captain ALTAVILLA, who's her personal friend through childhood.  He's great friends with her family, okay.  Why didn't she report it to him?

She went to Lieutenant MENDOFIK to apologize and give her heartfelt apologies if something was misunderstood. Why didn't she tell him? We all had to go see Sergeant RUDA if we had a problem in the unit. I declined. I had no problem. Sean declined. Obviously - he said he had no problem. Does he now? I don't know. Dan went and saw him. I don't know what he said. Laura went and saw him. Did she report sexual harassment at that time? RUDA is so by the book, if she did, he would've reported it right then and there. He'd of jammed Lou and I both up. But there was no allegation made until after she gets bounced out of the unit.

And Dan WIGLEY, who has a history of making allegations against other members, is riding her coattails as a female. That's all this is, sour grapes. She had all the opportunity. She went to Lieutenant OLIPHANT and complained about Lou, and "he's up to his games again." That's right in there. Corporal GUSHKA's in the office with us every day. Did she report it to him? And if not, then why didn't he initiate a BPR on me? Or as Lou refers to it, a 101. Go ahead, I'm sorry.

DUBY:          Okay. Did you ask Lieutenant Diane STACKHOUSE, while at a Troopers Coalition Picnic in 1999, to come by your room and offer to give her a backrub, which would make her feel real good?

WEINSTOCK:     I found out about this this morning.

DUBY:          Okay, and did that happen?

WEINSTOCK:     No.

DUBY:          Okay.

WEINSTOCK:     Number one. I went to the Coalition last year. Okay? I stayed overnight because it was up in New Hampshire. I stayed over the night before, going into the night of the Coalition. Stayed with Corporal ALTIERI in my room, okay? Is that us going out together? Yeah, well then yeah, we did. The next morning at the Coalition, I no longer have a hotel room. I see Diane STACKHOUSE. She walks up and hugs me. I worked for Diane for a long time. I'm a member of the Ceremonial Unit, original, before I came into Drug Law. I was an original member of the Physical Fitness Team, okay?

DUBY:          Okay.



WEINSTOCK:    I mean, the only Coalitions I've ever slept over at was the one up in Maine in like 94, didn't know her then. And last year, we slept over. I slept over the night before, into the day of the Coalition. I was with Lou. She walked up, she gave me a hug. When she did it, I'm in the presence of Corporal Richard GRENFELL, and I'm with Corporal ALTIERI. I'm introducing these two to each other. She walks up, she gives me a big hug. And I already talked to GRENFELL about it and he said, "Yeah, I remember it." She gave me a hug and she moved on. There was no conversation.

Now, let's expound on Diane STACKHOUSE and Laura ZELINSKI. There's an issue or an incident that you need to aware of. Diane STACKHOUSE, I understand used to live with a lady who is now a Lieutenant in Troop R. I don't know her name. She's the Crime Lieutenant up there. When ZELINSKI just gets out of the Academy, her and Beth are out, you know, clubbing or whatever you call it. I don't go out. I mean, hitting the bars. Whatever they call it today, okay?

DUBY:    Okay.

WEINSTOCK:    They leave a phone message on Diane STACKHOUSE's answering machine. Now I don't know why they're fraternizing with a Lieutenant. I mean, that's none of my business. But when they get to Diane STACKHOUSE's home, they are greeted by her significant friend, who's at this house, who's the blond haired lady who was a Sergeant in BESO at the time. And as Laura put it, "This girl jumped down my throat as to what am I doing calling her house."

So I mean, do they have - does, does Lieutenant STACKHOUSE and Laura ZELINSKI have a background? Yeah, they do. You see? I mean, and this is Laura telling me this. Laura told me this. She told it to Lou. I mean, this, you know, she made no bones about it. She used to call Diane STACKHOUSE at home. She went to the house. Left a message on the machine, went to the house, knock on the door, here they're greeted by this other person, not Diane STACKHOUSE, whatever her name is.

DUBY:    Okay.

WEINSTOCK:    Okay? And basically, like she started to threaten 'em, is what Laura said. You know, "She totally freaked out on us." And I was like, "Yeah, whatever."



I know Diane. And do I have anything bad to say about Diane? No. I think she's pretty squared away. She's one of the most physically fit people I've ever worked with. Always thought of her as a very professional individual.

DUBY:    Well, the only. . .

WEINSTOCK:    Did I ask her to come back to my room and give her a massage? No.

DUBY:    Okay. And the only reason why I asked is this is information that was brought out during Lieutenant FRALEY's supervisory inquiry.

WEINSTOCK:    I found that out this morning.

DUBY:    So - yeah, that. . .

WEINSTOCK:    And I didn't find it out from him or Lou. I don't know if you told them that or not, but I didn't.

LEYDIG:    I didn't. That's the first time I heard about it.

DUBY:    Okay. Yeah, I was actually trying, just because it specifically mentioned Trooper WEINSTOCK, just to keep it between Trooper WEINSTOCK.

WEINSTOCK:    It was.

DUBY:    How would you best describe Trooper ZELINSKI's performance while she was assigned to the BDLE Unit?

WEINSTOCK:    That's a hard question for me to answer.

DUBY:    Well I mean. . .

WEINSTOCK:    Well, I'm not a supervisor. . .

DUBY:    . . .in that was she a slacker, was she a good worker, hard worker?

WEINSTOCK:    No, no way was she a slacker.

DUBY:    Okay.

WEINSTOCK:    She did her work. But there's a difference between quality and quantity. There's also a difference between working in harmony and



purposely trying to cause dissention amongst a unit.  Was that her?
Yeah.

DUBY:          And how would you best describe Trooper MURRAY's performance
while he was assigned to the unit?

WEINSTOCK:     Sean can work with anybody.  And what I mean by that is, he's a
hustler.  He can do a lot of work.  But if he tells ya the sky is blue, ya
better go look, because it's not.

DUBY:          Credibility?  Credibility issue?

WEINSTOCK:     Zero.  His credibility is zero.

DUBY:          And how would you best describe Trooper WIGLEY's performance
while he was assigned to the BDLE Unit?

WEINSTOCK:     Wherever Dan WIGLEY moves in life, there's a slime trail behind him.
He is a slug to the - if you looked up slug in the dictionary, they should
have his picture there.  The guy did nothing, and he complained
repeatedly when we would go out and do work.  "You guys are
screwing up.  Are you gonna be able to work at this pace in five years.
Think about it.  If you do fifty arrests this year, they're gonna expect
fifty-one next year.  Ya better slow down.  Ya better cut it out.  Ya
better slow down.  Ya better take your time."  And he - he made
statements to Lou about me.  "Hey, this guy's a hammer from way
back."  You know, "Hey, yo, he can, anybody can go out and write
pinches."  Yeah, they can, but that was my job.  I went out and wrote
pinches when I was on the interstate.  Well now I'm in Drug Law.  I go
out and I arrest drug law violators.  That's my job.  And it's been real
hard to do that for the past seven months.

DUBY:          All right.  And sir, how would you best describe your performance?

WEINSTOCK:     I think that - I think I'm a good Trooper.  I think I do a good quality job.
Do I make mistakes?  Absolutely.

DUBY:          Yeah, we all make that.

WEINSTOCK:     But I don't make mistakes, you know, on purpose.  I don't violate the
law.  I don't violate people's civil rights, which is another thing that I've
been accused of doing in this allegation.

DUBY:          Actually I don't think she uh. . .

WEINSTOCK:     Well I think this is a different allegation than the first one, but she said I put my gun to this kid's head and I said something like, "How does that feel?" And I'd like to talk about that incident also.

DUBY:          Sure, go ahead.

WEINSTOCK:     Okay.

DUBY:          We're good. Go ahead.

WEINSTOCK:     We're doin' bus stop interdiction, okay?

DUBY:          Okay.

WEINSTOCK:     Me, her and MURRAY. We're driving in her van. She drove a van, a Plymouth Voyager minivan. It was light blue in color, piece of junk. We go down - we're doing uh, interdiction. Now we had information that somebody was getting off the bus. Well here comes this young, black male, gets off the bus. Did we target him because he was black? Hell no. This kid stepped off the bus. I'm standing up. He steps off the bus, looks around, looks around, walks over to the pay phone, picked it up, looks around, hangs it up, starts walking down. Wilkes-Barre Police Department is right there. He stops. He turns around and he starts walking back and he's looking. MURRAY gives us the signal. We're gonna talk to this guy. Okay. Laura and I, I said, "Come on, let's go." Now we're holding hands. Laura and I are holding hands like we're a couple, okay?

DUBY:          Okay.

WEINSTOCK:     We're walking down. We out into the street. He's walking down with his little backpack on. He goes into this store. Real surreptitious, lot of good body language for us. This guy's talking to us and he's not saying a word. You know what I'm saying? You done it a thousand times. Here we follow the guy. She gets in the van, she picks us up. I continue to follow him on foot. She runs back with MURRAY. She has no badge, no ID, no way of ID'ing herself, no handcuffs, nothin'. I got my badge, my ID card, my weapon. I'm ready to make a lawful arrest, because that's what we're doing. Okay? MURRAY's got the experience. MURRAY's got the gift of the gab. He can talk ya into selling you his sister for, you know. He could sell ice to an Eskimo, alright? Does that make sense?

DUBY:          Okay.



WEINSTOCK:    Alright. MURRAY walks up. He starts talking to the guy. Laura and I are standing behind. We're walking behind him. Now MURRAY says something to the guy and he shows him his tin, flashes his badge case, has to identify him. The kid stops. "No, keep going," because that's right in the interdiction. You can't stop somebody's progress. We have no right. We're walking with him, just talking to him. Kid gives us a name. It's a fake name. He goes, "Listen man, I lied to ya." Well, now we got him. He lied to us. So now we got something on him, but we're still not stopping his progress. He's walking. Long story short - we stop. We're standing there, MURRAY - I'm behind MURRAY, ZELINSKI's here. Bad guy's here, looking at MURRAY.

He says, "Listen, I got some marijuana for personal use," and he pulls it out of a pocket like this and gives him a little ziplock bag, like a nickel bag. Gives it to him. He says, "Yeah man, I could deal with that." MURRAY takes the bag, opens it up and dumps it on the ground. He says, "I can deal with personal use dope. That's no big deal." He goes, "Listen," he goes, "I want to get ya out of here." Now at this point, we know the guy's real name, Todd Jay SHYLOE (Phonetic sp.). He's currently doing three years in State prison, okay?

DUBY:    Okay.

WEINSTOCK:    SHYLOE says to MURRAY, "Alright, I understand." He goes, "Well you don't have anything else on you, do you, like guns, knives, drugs, weapons, anything like that?" He goes, "No, no, I'm straight. I'm straight." The guy goes to take off his backpack and as he does it, he takes his backpack off and boom - he hits MURRAY, and takes off running like a bat out of hell.

DUBY:    Like a shove?

WEINSTOCK:    I mean, he got MURRAY good. MURRAY's a big guy.

DUBY:    Yeah, he is.

WEINSTOCK:    He knocked MURRAY back. MURRAY bumps into me. I take off running. I know I'm gonna catch the kid. I - I ran out in the street. He crosses traffic. We almost get hit by a car. He runs through a park - uh, through a car lot. Goes through the car lot. We keep going. MURRAY dives and hit the ground and really hurt his back bad, he did. I grabbed this guy by his ankles and I tackle him. Now my gun is - I'm running - is flopping around in the small of my back. So I grab it out. It's in the holster. It's the kind of holster that snaps onto your belt.

Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 45 of 88

DUBY:        Like a pancake uh...

WEINSTOCK:   Yeah, it's like a pancake holster, but one that goes on the inside with
             the clip on the outside. It's flopping around. So I grab it out and I'm
             holding it while I'm running. I tackle this clown. My gun's in the
             holster. All right? Got my gun. Put my gun to the back of this kid's
             back and I said, "Listen, I'm not chasin' ya anymore." I'm out of breath.
             This kid - we ran a good ways. I said, "I'm not chasin' ya anymore." I
             said, "That's my gun in your back." I said, "Just stay here until the car
             gets here."

DUBY:        Okay.

WEINSTOCK:   Okay. ZELINSKI comes running up, don't know where she's been. All
             right, all of a sudden, she comes up, it was like something out of
             Cagney and Lacey. Like ten minutes later, she shows up and she
             says, "Hey, you need to chill out, Rich. Chill out right now." I look at
             her. "Well, what are you talkin' about?" She said in her thing that I put
             my gun to the kid's head and I said something like, "How does that
             feel?" I read it. I read it right in her allegation.

DUBY:        Okay.

WEINSTOCK:   Okay? Some lady pulls up. She's got kids. It's another minivan.
             Some lady pulls up, she goes, "What are you doin' to that guy?" She
             goes, "We're with the State Police." And I said, "Here Laura, give her
             my badge," because Laura couldn't identify herself as a police officer.
             I give her my badge, she identifies herself. The lady dials 911.
             Wilkes-Barre sends a marked car. They cuff him. We take him back.
             We find a piece of crack cocaine the size of a bar of soap. We won at
             that suppression...

DUBY:        Where was that found, in the backpack or was that on him?

WEINSTOCK:   No, it was in his pants.

DUBY:        Oh, in his pants.

WEINSTOCK:   That's why he took the backpack off because he knew there was
             nothing in it.

DUBY:        Okay.

WEINSTOCK:   See, but this guy, his street name was "Knowledge." He had it
             tattooed on his arm, "Knowledge." But uh, the kid's doing three years.

He took a suppression hearing and uh, the hearing was transcribed. We went to the hearing in front of Marty KANE's office. MURRAY didn't show up for the hearing. Laura was there. She said, "I don't think that I can uh, give this testimony." She said, "Will you give the testimony?" So I testified at the preliminary. We had enough to waive it through. We went, the guy's doing three years. He took a nonjury trial in front of Judge Mark SHIVARELLO (phonetic sp.), three years in the State.

DUBY:     All right. Do you feel that a hostile work environment existed in the Troop P Tactical Narcotics Unit during the time that Trooper ZELINSKI was there?

WEINSTOCK:     Absolutely.

DUBY:     And why do you feel that way? Just because of the ongoing problems?

WEINSTOCK:     It was - it was uncomfortable to come to work. I'd walk in the office and she'd be on the phone and she'd go, "Alright, listen I can't talk anymore." And I said, "Laura, I'm just getting my stuff. I'll go in the other room and do my paperwork." "Oh, okay. Hold on." She put whoever she was talking to on hold, wait until I left the room, then she'd resume her phone calls. She'd always be whispering. Everything was a secret, like you couldn't - like, like the Vice guys would come to me, "Hey, we're thinking about opening up an investigation into Joe SCMUCKATELLI. You guys got anything going on?" Nick - "I don't have anything going on." Do they? I don't know. They didn't tell me what they had going on. I didn't know. You know what I mean?

Was it a hostile work environment? Absolutely. We did this DART program. Lou gives us a couple hours overtime the one day. And I said, "See that Dan," I said, "put a little pressure on Lou, and he gave us some overtime." And he goes, "Fuck you, Rich. Too little, too late." Is that a comfortable work environment? Hell no.

DUBY:     Okay.

WEINSTOCK:     I had all my physical fitness stuff hanging up on the board in front of me. I'm proud of what I've accomplished on this job. I love this Department. I'd do this job for half the money. And somebody who stays in patrol, sits back, does nothing, watches TV, sleeps on the midnighters, they don't give a crap. I, I'm out bustin' my hump. If I could arrest a thousand people this year, I would do it. You couldn't do

DUBY:                             it. It just was – it was not a healthy work environment for anybody, especially me and especially Lou.

DUBY: Let me uh, just change tapes here real quick.

WEINSTOCK: Can I use the head?

## TAPE 2, SIDE A

DUBY: It is now 1528 hours. We had a break for about two minutes. Trooper WEINSTOCK had used the facilities. During the course of the break, we reviewed the definition under Sexual Harassment Policy relating to Hostile Work Environment. I think what's happening is Trooper WEINSTOCK probably confused the two issues. As it relates to hostile work environment under Sexual Harassment, do you feel that there was that type of environment going on?

WEINSTOCK: I don't think that it was a hostile work environment to Trooper ZELINSKI, no.

DUBY: Relating to sexual harassment?

WEINSTOCK: Absolutely not.

DUBY: So in your previous statement of a hostile work environment would generally just categorize just working in the unit, period, with the little problems that were going on, not the sexual harassment then?

WEINSTOCK: No, not from the definition that you just read. No, it was not.

DUBY: We got it clarified?

LEYDIG: Yeah, I believe.

DUBY: Sir, did you ever meet with Corporal ALTIERI at the Pink Apple?

WEINSTOCK: Never. Never even been in the restaurant, period.

DUBY: Okay.

WEINSTOCK: Couldn't even tell ya where it is.

DUBY: And I'm not sure if I asked you think early on or not, but I'll ask it to you officially here. Why do you think Trooper ZELINSKI is making these claims that you were sexually harassing her?

WEINSTOCK:    Why do I think she is?

DUBY:    Uh-huh.

WEINSTOCK:    You asked me that before.

DUBY:    Okay.

WEINSTOCK:    You want me to answer it again?

DUBY:    If we already asked - if it's answered. . .

WEINSTOCK:    You asked me. I told you why.

DUBY:    Okay. And sir, how did you feel about Trooper ZELINSKI when she first arrived in the unit prior to you attending the wiretap class? In other words. . .

WEINSTOCK:    How did I feel about her?

DUBY:    Yeah.

WEINSTOCK:    I didn't know her. How could I feel an opinion on someone I don't know? That's the problem with this job.

DUBY:    Actually I think that's what Chief Counsel wanted to know. He like, "Well she's in the unit a couple of months, you know, was there anything going on before she went to the wiretap school?" So that's why I asked that question.

WEINSTOCK:    Well you need to re - yeah, I mean, that - that thing with MURRAY was before the when I told her, you know. "Rich, you can't trust him." That was before the wire.

DUBY:    That was before the wire?

WEINSTOCK:    She hated me going into the wire.

DUBY:    Okay.

LEYDIG:    He's talking about wire school.

WEINSTOCK:    Yeah, but going - no, at wire school is when, when - yeah, we had already had a strained, in quotation marks, "relationship" at that time

because of that incident when I told MURRAY, "Hey, listen, she's saying you're no good." Well now come to find out she also went to Corporal ALTIERI and said that he was no good.

DUBY:        Okay.

WEINSTOCK:   Listen, let's go back to the Pink Apple.

DUBY:        Sure, go ahead.

WEINSTOCK:   I understand now, and I did not know this at the time, that Lou met with each of them at the Pink Apple because they all had issues with me.

DUBY:        Yes.

WEINSTOCK:   But I didn't know that. That night, I think it was that night or another night, he comes to me and he says, "Hey, I'm glad you guys got that problem worked out." And I'm like, "What are you talking about Lou?" He said, "Well didn't MURRAY talk to you?" I said, "About what?" See, MURRAY would go to uh, Lou and say something about me. He'd go back and tell the other two, "Lou wants me to take care of it." But I - from what I take, that wasn't happening because I didn't know that there was a problem. I didn't know there was a problem until Corporal GUSHKA went to Lou and said, "Boy, there's a problem in your unit." But see, all that was was Corporal GUSHKA stirring the pot. That's. . .

DUBY:        Okay, well remind me when we're done, and we're almost done here, that you wanted to make some comments that concern Corporal GUSHKA.

WEINSTOCK:   Yeah, and Dave DARROUGH. I also want to make comments with Dave DARROUGH. He's at Troop N, TNT. You continue. Why don't we talk about that? That's important. She's trying to say that I left her hanging out to dry.

DUBY:        You want to talk about that?

WEINSTOCK:   Absolutely.

DUBY:        Okay, this is the. . .

WEINSTOCK:   That's a main part of her - yeah, the panic pager incident. That's a main part of her allegation.

Interview/Trooper Richa.   WEINSTOCK, Re: IAD-2001-0095
Page 50 of 68

DUBY:          Well its not actually in her complaint.

WEINSTOCK:     It was in the first part.

DUBY:          I think that was from the search warrant that went awry.

WEINSTOCK:     No, no, no, no, it wasn't.

DUBY:          All right, let's talk about the panic pager then.

WEINSTOCK:     Dan WIGLEY had this case going on. Were these guys big players?
               Absolutely. And I'm not gonna draw this out here. These guys were
               big. They were black males, four of them, sometimes there was a fifth.
               Right now they've all been federally indicted. I've done this case. I've
               continued the investigation by myself and I forwarded it to the FBI in
               Scranton and I worked with Kevin (inaudible) on this case. It turned
               out to be a pretty good case and it was tied into a lot of players in our
               area. We're gonna get a lot more indictments out of it.

               Anyway, one of the buys, we go to it, its on a day that I'm gonna buy a
               pound of marijuana from Amanda CRICH and Amber SEEMAN, the
               same two girls. I got my pager on. We didn't have phones at the time.
               We didn't have Nextels. We had one phone in the unit. Lou was the
               one that usually had it. Sean had it with him that day. Dan goes to the
               house where the bad guys are living. He's gonna follow them over and
               he's gonna let us know on the radio when we're getting close.
               Remember that.

DUBY:          Okay.

WEINSTOCK:     Laura's in the house with the informant, Cassie PRICE, already at her
               house. She's wearing a panic pager. I'm monitoring that panic pager
               on not one, but two, two portable radios and I'm using my car hard
               radio to speak to everyone else. Okay?

DUBY:          Okay.

WEINSTOCK:     MURRAY's down the street behind me. On the side of the street
               where MURRAY's at, there's houses. Across the street, there's
               nothing, a big field. You can't mistake where this house is. It's a green,
               lime green house. It's an ugly house. We since relocated her. It was a
               thousand dollars we gave her for relocation.

               Now, my pager's going off. I said, "Sean, call Boogs," his street name
               was Boogs, it was Wilson ANDERSON. I said, "Call him up and tell

him I'll call him as soon as I'm done here." Sean calls me back. My pagers still going crazy. He goes, "Rich, come talk to this guy." Now Dan's on his way over with these guys, but they're in Wilkes-Barre, we're in Luzerne. We're a good ten minute ride away.

I sit back - I'm right in front of the house. Now MURRAY can see the house from his location, but of course, he can't remember that when he did his interview. I run back to MURRAY. I get on the phone. I said, "Boogs, I'm in the middle of a buy. When I get done, I'm coming over. We'll buy the pound of weed, okay?"

And that was another one of MURR - or ZELINSKI and WIGLEY's allegations, that I was never around to help them. Well here I am doing surveillance with them. They get done with their buy, they disappear. Me and Sean, we went and did this buy by ourselves. Why didn't they come with me? But I never complained about them. Its just they're sour grapes, again. See they were setting a stage. They were setting a stage. That's all they were doing, okay?

Dan's on his way over. I said, "Holy Christ! There they are. They're walking across the street." They walk into the house, and I'm out of position. My job was to get a photograph. I saw them go into the house. I'm monitoring the panic pager on two radios. I'm right there. MURRAY's monitoring the panic pager on a portable. I'm with MURRAY. I get in my car. I zip back up. I pull into the spot. Windows are tinted out. I turned the car off. I jump in the backseat. They come out. I get four photographs.

Dan withheld those photographs for the entire time that he's been kicked out of the Bureau until I just got them back. We asked his Sergeant. He said, "Yes, I'll get them to you." He didn't. I went to Mike RUDA. Mike RUDA went to his Sergeant and said, "I need the photos." They miraculously appeared a week and a half ago. I just gave them to the FBI in Scranton.

So why did he keep them? I don't know. He had no business keeping them. Anyway, Dan comes up to me. We get back. Now I get great photographs of these guys coming out of the house. They were so good. It was with the digital camera. We can only print in black and white, because that's what we have. You have the same printer. You could see the rimmed glasses on the guy's face. I mean, they were great photos. Did I do my job? Yeah. Did I leave her hanging? Never. I never would. I would never leave anybody hanging out when there's bad guys in the area. Never, ever, ever, ever. I don't know care if it was male, female, androgynous, whatever. I wouldn't leave

anyone hanging out to dry. I monitored her panic pager from the beginning of the incident until the end.

DUBY: Okay. Sir, did Trooper ZELINSKI ever make sexual comments to you?

WEINSTOCK: She used to talk about Lou's sack. Lou wears one of those, what'd ya call it?

LEYDIG: Fanny bags.

WEINSTOCK: A fanny bag, a pouch, okay? And he used to leave them - he used to leave the sack, pouch, whatever - I used to call it his "bitch bag." He used to leave it on top of the box where he kept leave slips. Okay? Right next the UCR's and the Arrest Report Records, all that crap. So I kept in my drawer, I have like every piece of paper that I ever need. Like if I need a Daily, well open my drawer, Dailies, under the "D." I got it.

DUBY: Right.

WEINSTOCK: She's like, "Rich, you have any leave slips?" And I was like, "Oh, they're in there on Lou's, you know, next to Lou's desk." "Oh, they're under Lou's sack." Well Lou was sitting right there. Well I think she's making reference to his - his uh, scrotum, if that's the medical term you want to use, or his ball bag, I mean if that's the street name you want to use. I think that's what he's saying or she's saying. And then she made a gesture like this as she walks back, "Yeah, they're under Lou's sack, woo-woo!" She walks away. You want to talk about foul language? Yeah, she had a foul mouth. She had the most foul mouth in the office.

DUBY: I guess what I'm asking is, did she ever make a sexual innuendo towards you?

WEINSTOCK: No way.

DUBY: In other words, like say, "I want to have sex with you,". . .

WEINSTOCK: Hell no!

DUBY: . . .or anything like that?

WEINSTOCK: Hell no!



DUBY:           Okay.  And sir, do you feel that you should've been named in this complaint?

WEINSTOCK:      No, this - this is extremely erroneous.

DUBY:           Okay.

WEINSTOCK:      This floored me.  This floored me.  I mean, I expected something.  Like, I knew that they were gonna grieve it from the Article 37 point of view. Like, why were we booted?  But this - see but by doing this, I'm gone and Lou's gone.  You see what I mean?

DUBY:           Sure.  Let's talk about Corporal GUSHKA.  What did you want to tell me about him?

WEINSTOCK:      Nicky GUSHKA's a good guy.  Well, unfortunately in this situation, all gloves are off.  We're - this is - this is life.  This is my job, okay?  See what Corporal GUSHKA did was, Corporal GUSHKA would sit back, things would happen.   He'd see MURRAY doing things, dropping felonies to summaries.  How do you do that?  You know what I mean? Lou was totally against this.  Lou didn't go for that crap.

                Something would happen and GUSHKA would know about it - perfect example - a guy named Scott BROWN.  He's an informant of ours.  The kid's a real dirt bag.  He's a coke smoker.  GUSHKA had charges against him.  Not charges, but he had a buy on him through his unit, okay?  One of his members that was dismissed from the Vice Unit for allegedly sleeping with an informant and drug use, okay?  MURRAY drops charges on this Scott BROWN from a felony to a summary, but Lou can't prove it.  Lou's pissed, okay?  Nicky G comes to Lou.  "Lou, let me tell ya what I'll do for ya.  We got some buys on him.  I'll file a felony.  We'll get a warrant.  We'll pick him up, throw him in jail."  "All right, you do that.  That's a good idea." Well somehow, MURRAY pulls his little magic again.  The charges get knocked down again to a summary, unbeknownst to Lou.

                But there's Nicky G, with his typical feet up on the desk like he always used to sit.  "Hey, I understand your boy MURRAY got those charges knocked down to a summary again?"  Well now Lou was really hot.  "I gotta find out what's going on."  See Lou - or Nick would stir the pot.  All he wanted to do was he wanted to cause dissention amongst us. That's all he wanted to do.  I mean, I have no bones with Nicky G, Corporal GUSHKA.  But uh, I think his initials suit him well, "NDG," no damn good.



DUBY:          Okay. And is it Trooper Dave DARROUGH?

WEINSTOCK:     Dave DARROUGH. We're on that wire where she says that I'm - I'm in this surveillance van and we're assigned together, which was - we were never assigned together. We never were assigned anybody together until D-day, and I wasn't with her on that day. I was with Dave DARROUGH.

               We go to the house. We serve a search warrant at the main guy's house, okay? His name is Dave DRISDOWSKI (phonetic sp.). We did this case with the DEA, okay? We go to the house as a result of it, we get another search warrant at a house of Graham JONES.

DUBY:          Okay.

WEINSTOCK:     Graham JONES, major coke dealer in the Wilkes-Barre area, okay? Now, we're sitting out in front of the house in the van looking at the house, okay? DARROUGH's got a van. We're sitting there, me and him. And Dave's a ball-buster. Dave's a great guy, agreed?

LEYDIG:        Yes.

WEINSTOCK:     And he's a great ball-buster. I mean, he's good at it, you know? So he says to me like this, he goes, and not meaning it, just like in jest, like you know, fooling around, "Hey, you screwing around with that? You hittin' that?" "Who?" "ZELINSKI, you hittin' that?" I said, "Dave," I said, "I don't even want to have a conversation like that about Trooper ZELINSKI," and you can feel free to contact Dave DARROUGH. I've talked to him about this and he said, "Yeah, I remember that." He said, "You were pretty adamant about it."

DUBY:          This is uh, you were with Dave during the van incident that Trooper ZELINSKI is claiming. . .

WEINSTOCK:     It was the same wire.

DUBY:          Same wire?

WEINSTOCK:     Yeah, but this is D-day. D-day, meaning the day we did all the search warrants. We did all the arrests.

DUBY:          So this wouldn't have been like a surveillance day?

WEINSTOCK:     No, no, no. We, we got - I went. . .

LEYDIG:           This is the final day.

WEINSTOCK:        Right. It's the final day. We went to our house, did our search warrant
                  and as a result of that, we got another search warrant. And by the
                  way, we do the search warrant at Graham JONES' house. We go in
                  there and we're going through Graham JONES' phone book. There's
                  Sean MURRAY's name in the guy's book. That's nice.

DUBY:             Okay. Where's Dave at now?

WEINSTOCK:        He's in Troop N TNT.

DUBY:             Troop N. . .

WEINSTOCK:        TNT. And I told him that I would be disclosing this today.

DUBY:             Not a problem.    Sir, is there anyone else that you feel I should
                  interview?

WEINSTOCK:        Lieutenant MENDOFIK.

DUBY:             And what would you like me to talk to him about?

WEINSTOCK:        About what she has in this letter as to her interview with him - or not
                  interviews, but her statement. If you flip to it, I'll show you directly.

DUBY:             Sure, go ahead, and we'll just put it on the record what you're referring
                  to.

WEINSTOCK:        Right, right. Bear with me.

DUBY:             Not a problem. I'm wondering if it has to deal with the uh. . .

WEINSTOCK:        Here, here, right under Section C. two, C, double I. This is one thing.

DUBY:             Okay, that's going to be on page number four of Attachment number
                  three.

WEINSTOCK:        "I fired my gun at a pit bull that was attacking a Trooper. Attack dogs
                  are a problem with drug busts and we were authorized to shoot any
                  dogs by Lieutenant MENDOFIK, if necessary." This is absolutely true.
                  Now, go back to when I said I had no intelligence as to the inside of
                  this house. Lieutenant MENDOFIK said that destroying an animal in
                  the course of a search warrant for safety issues is allowed under the
                  AR.

DUBY:          Okay.

WEINSTOCK:     It's the AR or the FR. I think it's the AR. But it says right in there that
               no BPR would be initiated if a dog is destroyed. It doesn't cover
               accidental discharges. This goes back to I had no intelligence, but yet
               she put - it might not be in this letter, but it might be in her other letter.

DUBY:          Okay, well I can tell you what she did was uh, or what actually
               happened is. . .

WEINSTOCK:     She typed a different one?

DUBY:          No. Uh, there was an investigation into that shooting.

WEINSTOCK:     Right.

DUBY:          I have not read it yet, to be honest with you.

WEINSTOCK:     Was she interviewed as a result of it?

DUBY:          Well, you know what, if you can bear with me, maybe we'll uh. . .

WEINSTOCK:     Can I look through this while we do this?

DUBY:          Sure.

WEINSTOCK:     You want to let the tapes run?

DUBY:          Yeah, that's fine.

WEINSTOCK:     Okay.

DUBY:          Actually what I'm going to refer to on the uh, is going to be Attachment
               number 56. Attachment 56 is a Report of Incident and Accident, and
               its dated March 3rd of 2000, for the incident date that occurred at 19
               Garfield Street in Wilkes-Barre. And this would be referring to the
               incident in which the dog was shot. And this would be the report that
               was prepared in connection to the shooting and the reporting individual
               or officer is Willard M. . .

WEINSTOCK:     OLIPHANT.

DUBY:          O-L-I-P-H-A-N-T. So this would cover the details of the shooting and
               that's why I'm wondering if, if by chance, we need to go up and talk to

|  |  |
|---|---|
|  | him about this because maybe its already documented.  The list of the individuals that submitted correspondence for it is Trooper William SPAGNOLA, S-P-A-G-N-O-L-A, Trooper Daniel WIGLEY, Trooper Laura ZELINSKI, Corporal James D. DEGNAN, D-E-G-N-A-N, Sergeant Raymond WHITTAKER, W-H-I-T-T-A-K-E-R. |
| WEINSTOCK: | He needs to be interviewed also. |
| DUBY: | Okay.  I don't see any correspondence from uh, I'm sorry, is it Lieutenant. . . |
| WEINSTOCK: | Sergeant. |
| DUBY: | Sergeant MENDOFIK. |
| LEYDIG: | MENDOFIK, right? |
| WEINSTOCK: | MENDOFIK, Paul MENDOFIK, yes. |
| DUBY: | How do you spell that? |
| WEINSTOCK: | M-E-N-D-O-L-F-I-K, MENDOLFIK. |
| DUBY: | Okay. |
| WEINSTOCK: | And basically. . . |
| LEYDIG: | Oh, he's a Lieutenant.  I'm sorry. |
| WEINSTOCK: | He's the Patrol Lieutenant. |
| DUBY: | He's the Patrol Lieutenant at what station, sir? |
| WEINSTOCK: | Wyoming Headquarters. |
| DUBY: | And basically, maybe I'm wrong, but you're saying that she went to him and apologized for the comments to the. . . |
| WEINSTOCK: | Right.  She said, and it's not in this allegation. |
| DUBY: | Okay. |
| WEINSTOCK: | There's another allegation that she has, agreed? |
| DUBY: | This is what I have. |

WEINSTOCK:    Okay, there's another allegation and there's also one by Trooper WIGLEY, okay?

DUBY:    Okay.

WEINSTOCK:    In that allegation, she says that she went to Lieutenant MENDOFIK, and gave her heartfelt apologies for any misunderstandings that may have taken place a result of something she may or may not have said in this debriefing which took place Monday morning. He said, "Laura, we're not refusing to do search warrants because of what you said. We're refusing to do it because those search warrants were so poorly prepared." I confronted Lieutenant MENDOFIK. He's a friend. If that constitutes a violation of the chain of command, well then yeah, I'm guilty of that.

DUBY:    All right. Well you talked to him and. . .

WEINSTOCK:    Well I talked to him and he said, "Yeah," he said, "that's erroneous." He said, "She came to me. She cried." That's Laura's MO. If she really wants to get your attention or, you know, she'll cry, you know. But I mean, that's - she's a - you know, she's entitled to cry, if she wants. I mean that's - but Lieutenant MENDOFIK denied it. And I said, "Well listen," I said, "I'm gonna have to give your name to BPR," I said, "because they're really submarine-ing me here." And I think you need to interview Lieutenant MENDOFIK, because that would help you get a picture of her lack of credibility.

DUBY:    Okay.

WEINSTOCK:    Trooper SPAGNOLA- she puts in that letter, "Trooper SPAGNOLA's gun was holstered." Then she says right here, on page four of nine, Attachment number three, "Attack dogs,". . .

DUBY:    And just give the subsection.

WEINSTOCK:    Oh, I'm sorry - C, double l. "Attack dogs are a problem with drug busts and we were authorized to shoot any. I fired my gun at a pit bull that was attacking a Trooper." The pit bull was on the bed. Her gun went through the floor in the doorway and the pictures from R& I show that. Is that an accidental discharge? Absolutely. People have gotten days off for this. Should there have been an investigation? Yeah. Why wasn't there? Well, there's the State Police and then there's Troop P, Wyoming.

DUBY:           I guess what I'm trying to wonder is uh, and I can understand where
                you're coming from, but my investigation deals with the sexual
                harassment issue in the complaint. . .

WEINSTOCK:      I understand.

DUBY:           And for. . .

WEINSTOCK:      Oh yeah, you should - well he's a Lieutenant. He's a Lieutenant in the
                Pennsylvania State Police and she went to him to talk with him
                privately. She's being sexually harassed, allegedly, by me. Why didn't
                she report it to him?

DUBY:           Well that's something I'll have to ask her. I mean, all of this. . .

WEINSTOCK:      Right. She went - she repeatedly in her letter went to Captain
                ALTAVILLA about Lou. "Lou's doin' this," and "Lou's doin' that." But
                she never said that I was sexually harassing her because if she was - if
                she said that to him, he would be compelled to do a 101 on me.

DUBY:           Absolutely.

WEINSTOCK:      And that is right in the guidelines of the Department regulations.

DUBY:           I guess what I'm trying to say is there's so many incidents that have
                come to light. . .

WEINSTOCK:      Oh, there are.

DUBY:           . . .during this whole thing that I'm not sure if its entirely appropriate to
                go out, and for lack of a better word, re-investigate every incident. I
                think it's more appropriate to hang with the issue of the allegation itself.
                And the allegation is specific to the sexual harassment.

WEINSTOCK:      Well, I disagree. It started with sexual harassment in the beginning of
                your interview, but then we got into other things - the panic pager
                incident. We got into uh, what took place, what was said, how was -
                what kind of work environment, what do I think of other individuals? I
                think these people - what it will do is it will help discredit her as a - as a
                person. And I think that what you said first, when we started the
                interview, is that I don't think that the Department should settle this. I
                want my day in court. If the Department settles this, they will be
                admitting guilt on something that didn't happen, and that's wrong.

DUBY:           Okay.



WEINSTOCK:    The Department should have their day in court. These people need to be interviewed because it will show everything that Trooper ZELINSKI talks about, there's a little bit of truth in it. And then it goes into a lie. Yeah, on 06/22, were we at the Academy at a class? Sure, we were, but I didn't sexually harass her. On uh, December 30th, I made a statement about her - her skivvies or something like, or her bra, or whatever you said it was. We were at Ron and Sheila's, that's true. SEIDEL was there. Interview SEIDEL. He's on vacation. Kevin needs to be interviewed, absolutely.

DUBY:    Absolutely, he will be interviewed for that.

WEINSTOCK:    He was present. I mean he was present.

DUBY:    Well what I'll do is uh. . .

WEINSTOCK:    You need to interview Corporal Mark GEORGE, because its gonna help give you a background into what type of person Dan WIGLEY really is.

DUBY:    Okay, so we have SPAG. . .

WEINSTOCK:    SPAGNOLA, and his name is right in here.

DUBY:    Okay, I already have that on the record.

WEINSTOCK:    S-P-A-G-N-U-O-L-A.

DUBY:    Okay, and. . .

WEINSTOCK:    Dave DARROUGH.

DUBY:    DARROUGH.

WEINSTOCK:    James MCEVOY.

DUBY:    Now who is James MCEVOY?

WEINSTOCK:    Troop R TNT.

DUBY:    And what would he be able to tell me?

WEINSTOCK:    That during that wire, when Laura says that I was sexually harassing her again, MCEVOY says hey, I was like a ghost. Man, I wasn't even

around.  They never saw me.  They used to go out and go drinking and you know, like after the thing was over.  I was never around to go with them.

DUBY:          And you're referring to August 4th of 1999?

WEINSTOCK:     No, I'm not saying any specific date.

DUBY:          Oh, okay.  I saw your arrow.

WEINSTOCK:     But I - I'm saying this. . .

LEYDIG:        That wiretap didn't. . .

WEINSTOCK:     Well I'm just saying it came from the wire.  That was during the wire where MCEVOY said, yeah, during that wire I was like the ghost.  The invisible man, he called me.  I was never around.

DUBY:          Okay.  All right.

WEINSTOCK:     I mean, Captain ALTAVILLA needs to be interviewed.  She went to him all the time.  This is her life-long friend who she, you know, and she gives this guy a lot of shots, you know.  "My mother tells me how he cheats on his wife."  See, Lieutenant ALTAVILLA had a break-up with his wife, and they separated.  So he was staying at the barracks for awhile.  Well she would come in and she'd give us all the dirt on this incident.  "Oh yeah, my mother told me he's got a girlfriend," and bing-bang.  Well, I didn't care about Lieutenant or Captain ALTAVILLA's business.  That's not our business.  But that's Laura's MO.  She talked about everybody.  When she's with ya, she's your best buddy.  But when she can discredit ya to somebody else to make herself look good, she would do it.

DUBY:          Okay.

WEINSTOCK:     Lieutenant OLIPHANT, he needs to be interviewed.  I mean this thing here.  Well - is - interviewing Lieutenant OLIPHANT isn't gonna prove anything.  It won't prove anything, because I mean I don't think uh, I mean like all these people here.  Why didn't I give a letter?

DUBY:          I don't know.

WEINSTOCK:     It was my search warrant.

DUBY:          Well, to be. . .

WEINSTOCK:    Bernie was in the house, did he get a letter?

DUBY:    To be honest with you, totally honest with you, I didn't even know these things existed.

LEYDIG:    I didn't either, that surprised me.

DUBY:    You know. . .

LEYDIG:    That's kind of a use of force and that's an automatic BPR.

WEINSTOCK:    But see they - they state - what they did was they took her weapon going off, her weapon went off. The dog was killed, but not by her. You need to ask SPAGNOLA, "Where was the dog in the room? Where did she shoot?" Was she - was she needed to be there? Was the room covered?

DUBY:    And that's why I'm saying, I don't know if its appropriate to reinvestigate an incident that's already been investigated that has nothing to do with sexual harassment.

WEINSTOCK:    Right, I understand what you're saying, but see she says during that day, what was the date that we did that search warrant?

DUBY:    Uh, March 3rd of 2000.

WEINSTOCK:    Okay, she's saying 6/29. Then there was another thing about a safety issue, why we shut down an operation. Wasn't there?

DUBY:    Yes.

WEINSTOCK:    How come I wasn't asked about that?

DUBY:    I don't think you were present, were you?

WEINSTOCK:    Sure I was! I was the surveillance man during the whole thing.

DUBY:    Which safety issue are we talking about?

WEINSTOCK:    Where we shut down the DART operation because she said there was a safety issue.

DUBY:    Okay, I got the impression it was a thing with WIGLEY, MURRAY and her.

77
62-63

Interview/Trooper Richard WEINSTOCK, Re: IAD-2001-0093
Page 63 of 88

WEINSTOCK:     It was all of us. It was a DART, and it was the most pitiful DART that I've ever seen in my life.

DUBY:     You can tell me about it, if you want.

WEINSTOCK:     We did a DART. I was the surveillance man.

DUBY:     By the way, if you don't mind me stopping - what does DART mean? I'm sure somebody's going to ask.

WEINSTOCK:     Drug Abuse Resistance Team. You target an area. . .

LEYDIG:     The Bureau sends out to every police department, district attorney's office, offering uh, Drug Law, BDLE members as undercovers in surveillance. Uh, basically. . .

WEINSTOCK:     Whack the hell out of a group. . .

LEYDIG:     . . .for one week you do concentrated undercover buys. If you can ID the people - they go in a week, get intell, possible dealers. Go in and make buys and if you have an ID on the person, you don't pop 'em then. If you don't know 'em, we do buy/bust. It all depends on the location you're at. But it's a one week, concentrated effort. . .

DUBY:     It's a saturation.

LEYDIG:     . . .of drug buys and busts, undercover buys, yeah. A lot of times if you can have confidential informants, that's better. And it sounds like this case, Laura was with confidential informants, is that correct?

WEINSTOCK:     Yeah.

DUBY:     Okay.

WEINSTOCK:     Laura goes into the house. Two informants that we bought dope from, we flipped 'em, they now become confidential informants for the Pennsylvania State Police. They're signed up properly, bing, bang, boom, the whole nine yards. Okay, Ron and Sheila GLASSER are their names, okay? They are diehard coke users, okay? We're at their house, the four of us, MURRAY, WIGLEY, ZELINSKI, me. Laura's in the house doing the buy. She's got the evidence envelopes, the receipts, everything's getting signed as we do it. Okay, Rich WEINSTOCK gives Laura two hundred dollars for the cocaine buy.

Here's twenty-five dollars for his CI fee. Lou made that clear, twenty-five dollars per buy for each CI, okay?

DUBY:    Okay.

WEINSTOCK:    So Sheila calls up her first person. They come to the house. I'm outside taking photographs. Laura makes the sale. The person leaves. I get all the information. Laura paid her twenty-five dollars. Laura walks outside. She gives me an evidence envelope with the cocaine inside. I look at it, see how many rocks or how many bags were there. She give me the receipts, saying that she gave twenty-five dollars to the informant, put the informant's initials on it, and the informant's number, okay?

DUBY:    Okay.

WEINSTOCK:    Now its MURRAY's turn. MURRAY gives two hundred dollars to Laura. We call somebody else. We bought a lot of coke that day, that week, but we bought a lot of coke from the same people over and over and over. You see what I mean?

DUBY:    Okay.

WEINSTOCK:    Dan had two arrests that week, okay? Everybody else had more. But what Laura did, and this is where she's saying about she was counseled about not having time to type her charges, this all fits in together. Laura typed up charges from buys that she had in February, and in March, on all those John DOES that I still have sitting in NOIC, that will never be arrested. And those are the charges that she didn't have time to type up that she was running late about. Do you see what I mean? So she padded her stats. She lied. She took credit for arrests that she made months earlier during the DART, but we didn't realize this until we just looked now trying to get all our information together to come down here for this, all right?

DUBY:    Okay.

WEINSTOCK:    Now. . .

DUBY:    Safety issue.

WEINSTOCK:    The safety issue. We go down the street. The girl - Sheila GLASSER walks out of the house with Laura ZELINSKI. They walked out of the house. We all know what's going on. The black male's gonna come, his name is "Oodie." (Phonetic sp.). This kid's still wanted. He's also

wanted for aggravated assault in Troop P's area, okay, a shooting incident. He lives in Far Rockaway, New York. He's a bad egg. He shows up with another guy, street name of "Teegotti," (phonetic sp.) okay? His real name is Kevin HUGHES. He's in jail in Texas on an unrelated incident. We still have warrants for him. We're waiting for extradition.

Now, they walk down the street. Here comes Oodie, Teegotti, driving up the street. I'm in the car. I get the photos. They stop. They see Laura standing there next to her. They take off. They turnaround, they come back, and they're eyeballing Laura, you know? They're checking her out. They're checking her out because she's a woman. You see what I mean? There was no safety issue. I'm right there. I got her back. I got her covered.

Deal is, don't get in a car with anybody. Sheila GLASSER gets in the car. They go up around the bend behind me. Another surveillance - I said, "Okay, they're driving away." Another surveillance vehicle comes running down the street, drives up around the bend. All they did was go around the bend, sell her the dope, and she got out of the car. They came all the way around the block and they started flirting with Laura.

This is their safety issue. Dan wants to shut the operation down. They thought that I was - (beeping noise) That was my watch.

DUBY:           Okay.

WEINSTOCK:      They thought that I went and called Lou, and said, "Hey, this is what's going on," but I didn't. MURRAY did. MURRAY was calling Lou, and saying, "Listen, this is what's up. Dan's throwing a hissy fit." And Dan did, Dan threw his phone and - I thought it was pretty comical, because Dan bitched about overtime. We showed up twelve o'clock that day - me, PATTON, and ALTIERI went right to lunch, because we knew we were in for a long day. Dan's working noon to eight on the schedule. We get back from lunch about twelve thirty-five, Dan's not around. Dan's noon to eight on the schedule. Dan shows up at one-thirty, an hour and half late into his shift. Shows up late. Then we start the operation. Then we take an hour and a half lunch break because Dan wants to sit around and bullshit, okay? And then he has the nerve to say that Lou refuses to give him overtime. It was terrible!

And one other incident that's exactly like that is Friday morning of the week that I'm the acting supervisor. We're gonna do marijuana eradication. So we're all gonna work eight to four, and then from four



|             | to eight, we're gonna do marijuana erad.   Well I called Sergeant RUDA, he said, "Wait a second, Rich."  He said, "You can't just do marijuana erad on overtime."  He said, "You have to be doing marijuana erad and be finding it, cutting it down, run into overtime and continue erading the dope." |
|-------------|---|
| DUBY:       | Sure. |
| WEINSTOCK:  | I said, "I didn't know that." I said, "All right, good to go." So I go outside and they're all standing around the gas pumps.  They're sitting there, and Laura says, "Yeah, Dan wants to go for breakfast."  I said, "Listen," I said, "we gotta get out and start looking for dope."  I said, "I don't care how we do it.  If you wanna get the boat, we'll go check the islands. Let's do it."  Now, I said like this, I came back in, I'm looking - it's ten thirty now.  We've been there since eight o'clock and we haven't left.  I said, "Listen," I said, "you guys wanna do marijuana erad," I said, "we'll do it on Monday." I said, "Maybe then you'll all be on the same page as to how you want to work this." |
|             | See Dan, he wants overtime, but doesn't want to do anything to get it. You know what I mean?  Like he's making this - like it was a safety issue.  There was no safety issue.  Dan didn't want to be there.  If it was Thursday night, and that's Dan's softball night, Dan wanted out of there to go play his softball game.  You know what I mean? |
| DUBY:       | Okay. |
| WEINSTOCK:  | I mean, Dan's original allegation against me - this is his best buddy, Laura ZELINSKI, how come he never was told that I sexually harassed Laura ZELINSKI?  Why didn't she go to Dan, her best buddy and confidant?  She never went to him.  Why?  The only people that she ever tried to discredit me to were people that I directly worked with. |
|             | This girl, Beth GUNTHER or SANTELLI, whatever you want to call her, that's Laura's best friend.  Does she have a reason to give me a shot? Sure, her friendship to Laura. |
|             | Does Diane STACKHOUSE have a reason to give me a shot?  I certainly didn't think so coming into here today, you know, but until I heard about this this morning, I was floored.  That's an absolute untruth, just like the rest of ZELINSKI's allegations into sexual harassment.  Absolute untruth.  I didn't even stay there.  The night I saw her, "come back to my room," I didn't have a room.  We checked out of the hotel, ask Lou. |



Interview/Trooper Richard WEINSTOCK, Re:  IAD-2001-0093
Page 68 of 68

DUBY:           I don't know if that's going to - I don't even know if it could be asked, but I wanted to. . .

WEINSTOCK:      Yeah, I'll take one!  I would do it now if it would make this end!

DUBY:           Okay.  Do you have anything, Keith?

LEYDIG:         I think everything's been put out.

DUBY:           We pretty much covered it then?

LEYDIG:         Yes, sir.

WEINSTOCK:      Yup.

DUBY:           Okay.  If you feel there's anything that I need to know down the road, you can discuss it with Keith, and Keith can advise you as to how you want to handle that and we can go from there.

LEYDIG:         It's still not a problem if 501.

DUBY:           Sure.

LEYDIG:         If he thinks of anything, sending to you?

DUBY:           Sounds good, absolutely.  Okay.  I'm going to end the interview then at 4:05 hours.



## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**BARBRA A. WILHELM,**          :          **CIVIL NO.1:CV-01-1057**

     **Plaintiff**          :

     **v.**          :

**COMMONWEALTH OF**          :
**PENNSYLVANIA; COLONEL PAUL**          :
**J. EVANKO, COMMISSIONER;**          :
**COLONEL THOMAS J. COURY;**          :
**and CAPTAIN MICHAEL D.**          :
**SIMMERS,**          :

     **Defendants**          :



## MEMORANDUM

     Before the court are the parties' cross motions for summary judgment. The parties have briefed the issues, and the motions are ripe for disposition.


**I.**          <u>**Background**</u>

     Plaintiff, Barbra A. Wilhelm, filed this suit alleging violations of the following statutory mandates: (1) the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (Count I); (2) the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e (Counts III and V); (3) the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 955 (Counts II, IV, and VI); and (4) the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421 *et seq.* (Count VII). Plaintiff's cause of action arises out of her employment with the Pennsylvania State Police. Defendants in this action include: (1) the Commonwealth of Pennsylvania;[1] (2) the Pennsylvania State Police

---

[1]Although the complaint lists the Commonwealth of Pennsylvania as a Defendant, nowhere does the complaint set forth grounds for the Commonwealth's liability. It appears that the Commonwealth's liability is limited to the PSP's liability. Therefore, the court will apply each of its

(continued...)



("PSP"); (3) PSP Commissioner Colonel Paul Evanko; (4) Lieutenant Colonel Thomas Coury, and (5) Captain Michael D. Simmers. The following facts are undisputed unless otherwise noted.

### A. PSP Office of Legislative Affairs

Plaintiff was employed by the PSP as a legislative specialist in the PSP Office of Legislative Affairs ("the Office") from January 1998 until May 1, 2000. Plaintiff functioned as the staff assistant to Major Richard Morris, Director of the Office. For the first year of Plaintiff's employment, Captain Michael D. Simmers, Assistant Legislative Liaison, directly supervised her. Except for a brief period of a few weeks, the Office did not have any clerical support staff during Plaintiff's tenure.

At the time Plaintiff began working in the Office, Ronald Plesco had been employed there since 1996. Plesco, a former assistant district attorney, made recommendations to the Pennsylvania Governor's Office regarding the Administration's position on legislation affecting the PSP. Plesco also reported to Commissioner Evanko and Major Morris and was responsible for briefing legislators and providing testimony at legislative hearings on behalf of the PSP. Additionally, Plesco drafted PSP regulations. In particular, Plesco drafted the PSP regulations establishing PSP protocol for use of the Instant Check System, which provides required criminal record checks of potential firearms purchasers.

As previously stated, when Plaintiff began working for the Office, Captain Simmers was her immediate supervisor. Later, however, Major Morris

---

[1](...continued)
rulings with respect to the PSP to the Commonwealth as well.

directly supervised her. Although there is some dispute as to the extent of Plaintiff's work responsibilities and autonomy, it is undisputed that one of Plaintiff's primary duties was performing legislative analysis. Plaintiff reviewed proposed legislation and, after collecting input from various branches of the PSP, submitted a document evaluating how proposed legislation impacted the PSP. Plaintiff presented the legislative analysis to Major Morris. Commissioner Evanko and Major Morris ultimately decided what positions the PSP would take on legislation, ensuring that the position was consistent with the Governor's views. Plaintiff, in conjunction with Major Morris, also prepared responses to inquiries made by members of the General Assembly. They submitted the prepared responses to Commissioner Evanko who reviewed them before sending them back to the inquiring member. Plaintiff's position did not require that she testify at legislative hearings. Plaintiff contends that she drafted department directives and administrative orders. (Wilhelm Depo. Ex. 1 at p. 000244.) Defendants, however, contend that Plaintiff's position did not involve developing or drafting PSP regulations. (Wilhelm Depo. at 26-29.)

Although a former police officer, Plaintiff was never a uniformed member of the PSP. In contrast, both Major Morris and Captain Simmers were uniformed members of the PSP at all times relevant to this litigation. Uniformed members of the PSP are sworn law enforcement officers who are required to take appropriate police action whether on or off duty. These actions include: making arrests; serving warrants; and responding in cases of emergency, civil disorder, and disasters. Uniformed members are also required to carry a pistol and ammunition with them at all times when in public. The PSP also requires that uniformed members be mentally and physically fit.

3

**B.    Plaintiff's Internal Complaints**

In July of 1998, Plaintiff orally complained to Major R. Dane Merryman about Captain Simmers and Ronald Plesco. Major Merryman is the Director of the PSP Bureau of Professional Responsibility, which oversees investigations of uniformed members accused of misconduct. Plaintiff accused Captain Simmers of creating a difficult work environment. She also alleged that he did not have the requisite skills to successfully execute his duties and was not held accountable for abusing other emoluments. Specifically, she accused Captain Simmers of: taking unauthorized leave; disregarding working hours; and misusing his state vehicle privileges. Plaintiff also accused Plesco of taking excessive leave. Major Merryman informed Plaintiff that if she filed a complaint, the Bureau of Professional Responsibility would investigate the matter. Plaintiff did not file any complaint until September of 1999 when she sent a memorandum to Lieutenant William Horgas, as discussed below. *Infra* at pp. 5-6.

In the interim, Major Morris submitted a complaint to the Bureau of Professional Responsibility, accusing Captain Simmers of making comments and taking action with the intent to undermine Plaintiff's qualifications and abilities.[2] The complaint, filed in June of 1999, stated that Plaintiff did not wish for the complaint to go forward and that she would not talk to any Bureau personnel or the Equal Employment Opportunity Office about the issue. Plaintiff, however, spoke with Corporal Rain, who investigated the matter on behalf of the Bureau of Professional Responsibility. During that discussion, Plaintiff questioned Captain

---

[2]Plaintiff disputes that Major Morris filed a complaint. However, she acknowledges all other pertinent facts concerning the investigation. (Pl. Resp. to Def.'s Stat. of Mat. Facts at ¶ 101-06.)

4

Simmers's competence. Corporal Rain explained to Plaintiff that he would be unable to investigate competency issues. Defendants contend that competency issues are handled by the employee's supervisor. (Def. Stat. Mat. Facts at ¶ 107.) Plaintiff, however, contends that the Bureau of Professional Responsibility is empowered to undertake such investigations. (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 107.)[3] Regardless, Plaintiff described Captain Simmers's comments that she found offensive, including comments that Commissioner Evanko was reclassifying her position and that she would be removed from the Office. Corporal Rain requested information regarding Captain Simmers's work misconduct, but Plaintiff refused to provide that information.

As previously stated, Plaintiff later sent a memorandum on September 13, 1999 to Lieutenant Horgas, a staff member of the Bureau of Professional Responsibility. In that letter, Plaintiff requested a private audience with Major Morris and Lieutenant Horgas to discuss a variety of issues, including Plaintiff's ongoing tension with Captain Simmers. At that meeting, Plaintiff accused Captain Simmers of harassing her, although the harassment did not refer to gender. At the conclusion of the meeting, Lieutenant Horgas indicated that the matter could be more properly addressed by another division of the Bureau of Professional Responsibility – the Internal Affairs Division. Defendants allege that Plaintiff never submitted a complaint to the Internal Affairs Division. (Def. Stat. Mat. Facts at ¶ 120.) Plaintiff, however, contends that the memorandum to Lieutenant Horgas

---

[3]In her response to Defendant's Statement of Material Facts, Plaintiff cites a "Hickes Dep." for the proposition that the Bureau could investigate competency issues. The court has scoured all exhibits that the parties submitted in support of their positions. Yet, nowhere did the court encounter this exhibit.

constituted a complaint submitted for investigation by any and all divisions of the Bureau of Professional Responsibility, including the Internal Affairs Division. (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 120.)

On January 3, 2000, Plaintiff sent Major Morris a memorandum complaining of disparate treatment due to her gender. Specifically, Plaintiff accused her male counterparts, both uniformed and civilian, of taking unauthorized paid leave. When the men abused these privileges, they were not held accountable, according to Plaintiff. In response, Commissioner Evanko directed that Plaintiff's complaint concerning leave abuse be forwarded for investigation to the Director of the Bureau of Professional Responsibility, the PSP Office of Chief Counsel and the PSP's Equal Opportunity Officer.

### C.     The Selection of Major Morris's Successor

In January of 2000, Major Morris retired. Traditionally, vacancies in the Office were not posted. Instead, candidates would informally notify the Commissioner of their interest. About two weeks after Major Morris's retirement, Plaintiff expressed an interest in the position to Linda Bonney, PSP Personnel Director. Ms. Bonney responded by sending Plaintiff an email. The entire body of that communication is set out below:

> I have not discussed this with LtC. Coury, but I will tell you, Barbara, that my guess is they will put a Major in the job and not accept bids from anyone. The reason I say this is that this has historically been L-1 bargaining unit work, including the most recent Legislative Liaison, and the Labor Board has taken the position that work belongs to the bargaining unit of the former incumbent. The alternative is to bargain with the PSTA to put a civilian in the job. I don't see the union giving up this Major slot. . . . This is all conjecture, because I don't know what is in the Commissioner's mind. I really haven't heard anything. . . . Never-the-less, for your information, when my job was open, I submitted my resume with a cover letter, [letting] the Deputy of Amin [sic]

6

> know I was interested.  I also sent a copy of my resume to the OA
> to Mr. Sciotto.

(Wilhelm Depo. Ex. 7 (emphasis in original).)  "L-1 bargaining unit" refers to the portion of the collective bargaining agreement between the PSP and Pennsylvania State Troopers Association ("PSTA") which governs uniformed PSP positions for the ranks of Trooper through Major.

Defendants contend that, other than her brief communication with Ms. Bonney, Plaintiff never submitted anything to the PSP indicating her interest in the position left vacant by Major Morris's retirement.  (Def. Stat. Mat. Facts at ¶ 130.) Plaintiff, on the other hand, contends that she did not submit her resume to the Deputy Commissioner because she expected Ms. Bonney to get more information for her.  Ms. Bonney never provided Plaintiff with such information.  However, Ms. Bonney also indicated in her deposition that even had Plaintiff applied for the position, her application would not have been considered.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 130; Bonney Depo. at 62-63.)

Commissioner Evanko subsequently identified several candidates for the position.  He only considered uniformed members of the PSP as appropriate candidates because he believed that the uniformed members would be more effective in representing the PSP to the members of the Pennsylvania General Assembly.  Additionally, although there is no statutory or regulatory requirement that the position be filled with a PSP L-1 bargaining unit member, the PSTA filed unfair labor charges against the PSP whenever the PSP attempted to place civilians in positions previously held by uniformed members.  Rather than face such a charge, Commissioner Evanko just assumed that the position should be filled by a uniformed member.  He then submitted his list of qualified candidates, all uniformed

7

members, to the Governor's Office.  In the end, Captain Jeffrey B. Miller was selected as Major Morris's successor.

### D.    Selection of Captain Simmers's Successor

After Captain Miller took over as the Director of the Office, he authorized Captain Simmers's transfer to another PSP unit.  Eventually, Captain Miller selected Sergeant William McHale to replace Captain Simmers.  The entire process that yielded this result, however, is in dispute.

Defendants contend that in filling the vacancy created by Captain Simmers's departure, the PSP utilized the same method that it employed when selecting Major Morris's successor.  However, in replacing Captain Simmers, Captain Miller made the final determination, and the Commissioner concurred with his choice.  Sergeant McHale, though, was the only candidate that Captain Miller interviewed.  Defendants contend that neither Captain Miller nor Commissioner Evanko was aware that Plaintiff had an interest in the position.  (Def. Stat. Mat. Facts at ¶ 139.)  Plaintiff, however, avers that she contacted Barbra Christie in the PSP Office of General Counsel to get information concerning the position.  Therefore, according to Plaintiff, Commissioner Evanko must have been aware of her interest.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 139.)

### E.    Plaintiff's Dismissal

At some point – although the parties dispute exactly when this occurred – the Office became acutely aware that it lacked sufficient clerical personnel.  That is, no person in the Office performed purely clerical tasks as their primary duty.  Plaintiff avers that as early as April 1999, the Office planned to hire someone to serve in a purely clerical position under Plaintiff's direct supervision.  (Complaint at

¶¶ 100, 101.)  However, the PSP took no affirmative steps to hire clerical staff until after Plaintiff filed her complaint with the Bureau of Professional Responsibility on September 13, 1999.  (Pl. Resp. to Def. Stat. Mat. Facts at ¶ 145(b).)

Defendants version of the facts differs significantly.  According to Captain Miller, when he started as Director of the Office, Commissioner Evanko informed him that he would be making several personnel changes in the Office.  Specifically, he indicated that Captain Simmers and Ron Plesco would be transferred out of the Office.  At that time, however, Commissioner Evanko did not indicate that there would be a change in Plaintiff's job status.  Two months later, Captain Miller apprised Commissioner Evanko of two things: (1) that he needed someone to perform purely clerical tasks more than he needed an extra legislative assistant; and (2) that Plaintiff was having trouble communicating and participating with other members of the Office.  Based on these conclusions, Captain Miller recommended to Commissioner Evanko that he convert Plaintiff's position into a purely clerical position.  (Miller Depo. 61-64.)  The Commissioner agreed with Captain Miller's recommendation and ordered Lieutenant Colonel Thomas Coury, Deputy Commissioner in charge of the Bureau of Personnel, to implement the decision.  (Coury Depo. at 5-6; 21-22.)

According to Defendants, Lieutenant Colonel Coury instructed Ms. Bonney to attempt to place Plaintiff in another position if possible.  Plaintiff was an at-will employee with no rights under the Civil Service Law or the PSP collective bargaining agreement.  Therefore, Ms. Bonney concluded that if there was no vacancy for which Plaintiff was qualified, the PSP would have to dismiss Plaintiff.  No other appropriate positions were available.  (Def. Stat. Mat. Facts at ¶¶ 153-55.)

9

Accordingly, Ms. Bonney informed Plaintiff on May 1, 2000 that she had been terminated.

## II.        <u>Legal Standard</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in her complaint. Instead, she must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element

10

essential to that party's case and on which that party will bear the burden at trial."
*Id.*

## III.    Discussion

### A.    42 U.S.C. § 2000e

In Counts III and V of her complaint, Plaintiff asserts that Defendants
violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964. 42 U.S.C.
§ 2000e *et seq.*  Specifically, in Count III, Plaintiff accuses Defendants PSP,
Commissioner Evanko, and Lieutenant Colonel Coury of disparate treatment due to
Plaintiff's gender. In Count V, Plaintiff accuses all Defendants of discriminatory
discharge and retaliation.

Title VII cases are governed by the familiar burden shifting analysis
promulgated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S.
792, 802 (1973). This analysis first requires that the plaintiff establish a prima facie
case of discrimination. *Id.* Once the plaintiff establishes the prima facie case, the
employer must articulate some legitimate non-discriminatory reason for its action.
*Id.* If the employer offers some evidence of such a justification, the plaintiff must
demonstrate that the stated reason for plaintiff's rejection was a pretext for
discrimination. *Id.* at 804.

### 1.    Liability of the Individual Defendants

The individual Defendants – Commissioner Evanko, Lieutenant
Colonel Coury, and Captain Simmers – move for summary judgment on Plaintiff's
claims in Counts III and V. Specifically, the individual Defendants contend that
Title VII does not impose liability on individuals. The individual Defendants are

11

correct. *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) (concluding "that Congress did not intend to hold individual employees liable under Title VII"). Accordingly, the court will grant summary judgment in favor of the individual Defendants as to Counts III and V of Plaintiff's complaint.

### 2.    **Failure to Promote**

In Count III, Plaintiff claims that the PSP is liable under Title VII for not promoting Plaintiff to the position of Director of the Office when Major Morris retired, and for not promoting Plaintiff to the position of Assistant Legislative Liaison when the PSP transferred Captain Simmers out of the Office. Defendants concede, for purposes of this argument, that Plaintiff can establish a prima facie case of gender based discrimination.

Instead, Defendants contend that they have presented evidence establishing several legitimate non-discriminatory reasons for not promoting Plaintiff. First, Plaintiff did not express an interest in the position. Second, even if Plaintiff had expressed such an interest, she would not have been considered because Commissioner Evanko wanted to hire a uniformed member of the PSP to replace Major Morris. Third, even if Commissioner Evanko would have considered non-uniformed members for the position, he still would have chosen Captain Miller over Plaintiff because he was more qualified. Fourth, even if Captain Miller had known that Plaintiff was interested in filling the vacancy left by Captain Simmers's transfer, he would still have chosen Sergeant McHale over Plaintiff because, once again, he was more qualified.

As to the appointment of Captain Miller, Defendants contend that Commissioner Evanko wished to have a uniformed member of the PSP serve as the

12

new director because he felt that having uniformed members testify at legislative hearings brought more credibility to the PSP's dealings with the General Assembly. Moreover, Commissioner Evanko's credibility analysis was based, at least in part, on the uniformed members' knowledge of PSP operations. Because Plaintiff had never been a uniformed member of the PSP, she would not have this level of expertise. For this reason, Commissioner Evanko would not have seriously considered Plaintiff for the position. (Evanko Depo. at 110-11.)

Similarly, with respect to the hiring of Sergeant McHale, Captain Miller merely opined that Sergeant McHale was the most qualified candidate for the position. Captain Miller was looking for someone who was a uniformed member and had experience both in the field and in some of the various PSP bureaus. Sergeant McHale had over sixteen years of experience with the PSP at the time he was appointed to replace Captain Simmers. During that period, Sergeant McHale served as a trooper and supervisor in the field. Additionally, he had previously held positions in the Internal Affairs Division of the Bureau of Professional Responsibility and in the Bureau of Drug Enforcement. Moreover, according to Defendants, Sergeant McHale possessed the requisite communication skills that Plaintiff lacked. (Def. Resp. to Pl.'s Interrogs. at 10.)

The court finds this evidence sufficient to satisfy Defendants' burden of production as to its reasons for not promoting Plaintiff into either the Director or Assistant Legislative Liaison positions. The burden now shifts to Plaintiff to demonstrate that Defendants' proffered justifications are merely pretexts for discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). At this point, a plaintiff may defeat a motion for summary judgment by pointing "to

some evidence, direct or circumstantial, from which a fact-finder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *accord Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999). At this stage, a plaintiff cannot simply assert that the defendant's proffered reason is insincere. Instead, she must point to some inconsistencies or contradictions in the defendant's reason that would indicate that it was not only wrong, but that it was "so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d. Cir. 1997).

Plaintiff contends that the following accusations give rise to a finding of pretext: (1) there was no requirement under law that the PSP fill the vacant positions with uniformed members; (2) Ronald Plesco, a non-uniformed member of the PSP, temporarily performed Captain Simmers's job during the period in which the PSP looked for his replacement; (3) Plaintiff performed Captain Simmers's duties while he was in the Office; and (4) Commissioner Evanko does not feel that women should fill high ranking positions in the PSP.

The court finds that these allegations are insufficient to support a finding of pretext. Defendants have acknowledged that there was no requirement under law that they fill the vacant positions with uniformed members. Instead, Commissioner Evanko stated that he had a preference for uniformed members because they have a high level of credibility with members of the General Assembly. Additionally, Commissioner Evanko never insisted that there was such a requirement under law. Rather, he simply stated that the PSTA would file charges

14

against the PSP if it failed to replace Major Morris and Captain Simmers with uniformed members.

Likewise, the fact that Ronald Plesco, a non-uniformed member, briefly performed Captain Simmers's job while the PSP searched for a uniformed member to replace Captain Simmers does not, as Plaintiff contends, support a finding that Commissioner Evanko's preference for uniformed members was a pretext for gender discrimination. Once the PSP transferred Captain Simmers, there were only two legislative analysts left in the office – Plesco and Plaintiff – neither of whom were uniformed members. In the end, a uniformed member, Sergeant McHale, permanently replaced Captain Simmers. Had Plesco been permanently promoted to the position of Assistant Legislative Liaison or had a non-uniformed male been appointed instead of Sergeant McHale, then perhaps Plaintiff could make a valid argument. The undisputed facts indicate that this did not occur. Plaintiff, therefore, cannot reasonably argue that Plesco's brief tenure as interim Assistant Legislative Liaison supports a finding that the PSP discriminated against Plaintiff based on her gender.

As to the Plaintiff's remaining arguments, she offers little to no evidence that would support such conclusions. Although the evidence indicates that Captain Simmers poorly executed his job, the court fails to see how this fact makes it more likely that Commissioner Evanko lied when stating that he preferred to replace Captain Simmers and Major Morris with uniformed members. Likewise, Plaintiff would have the court twist the deposition testimony of Lieutenant Coury and Commissioner Evanko to conclude that "the Commissioner did not want any women, including qualified enlisted women, considered for the position." (Pl. Br. in

15

Opp. Def. Mot. for Sum. J. at 16.)  None of the evidence that Plaintiff points to supports such a blunderbuss accusation.[4]

Defendants have articulated legitimate non-discriminatory reasons for not promoting Plaintiff to fill vacancies left by the departures of Major Morris and Captain Simmers.  Plaintiff has failed to present evidence from which a reasonable fact-finder could conclude that Defendants' proffered reasons were a pretext for gender discrimination.  Accordingly, the court will grant summary judgment in favor of Defendants on Count III of Plaintiff's complaint.[5]

### 3.  Plaintiff's Discharge

In addition to the claim for failure to promote, Count V alleges that the PSP terminated Plaintiff's employment based on her gender and in retaliation for complaining to the Bureau of Professional Responsibility.  These allegations amount

---

[4]Additionally, Plaintiff points to the deposition testimony of Rebecca Balsbaugh alleging that Paul Woodring, Director of the Bureau of Professional Responsibility at the time, sexually harassed her.  Defendant Evanko was the PSP Commissioner when this alleged event took place.  According to Plaintiff, this "is the best evidence of Colonel Evanko's true disposition toward women." (Pl. Br. in Opp. Def. Mot. for Sum. J. at 16.)  The court fails to see the relevance of an event that involved neither Defendants nor Plaintiff in this action.  The fact that the alleged event took place during Defendant Evanko's tenure as PSP Commissioner does not, alone, support a finding that Defendants' proffered reasons for not promoting Plaintiff were a pretext for gender discrimination.

[5]In her brief in support of summary judgment, Plaintiff also briefly contends that she was discriminated against in the terms of her employment because she was forced to do clerical tasks that her male counterparts did not have to do.  To the extent that Plaintiff seeks to assert a claim of hostile work environment, Plaintiff failed to assert this in her complaint.  Furthermore, she fails to provide any legal support for such a finding.  Therefore, the court need not address the merits of such a claim. *Cf. Pennsylvania Dept. of Pub. Welfare v. United States HHS*, 101 F.3d 939, 945 (3d Cir. 1996) (noting that passing references, unaccompanied by substantive argument, will not suffice to bring an issue before the court); *United States v. Callwood*, 66 F.3d 1110, 1115 n.6 (10th Cir. 1995) ("A litigant who mentions a point in passing but fails to press it 'by supporting it with pertinent authority . . . forfeits the point.' " (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)); *Mueller v. CBS*, 200 F.R.D. 227, 234 (W.D. Pa. 2001) (holding that the court will not do the lawyers' work for them and a lawyer who fails to press a point forfeits the point).

16

to two different violations under Title VII – discriminatory discharge and retaliation. The court will address these issues separately.

### a.    Discriminatory Discharge

Defendants acknowledge that Plaintiff's evidence is sufficient to establish a prima facie case of gender discrimination. However, they contend that they have articulated legitimate non-discriminatory reasons for terminating Plaintiff's employment. That is, Captain Miller determined that he needed clerical help more than he needed an extra legislative analyst, and Plaintiff had trouble communicating openly with other members of the Office. Captain Miller concluded that the Office would be better served if he replaced Plaintiff with a person serving in a purely clerical capacity because Plaintiff indicated on numerous occasions that she did not wish to do such work. Commissioner Evanko concurred with Captain Miller's determination and forwarded the matter to Lieutenant Colonel Coury. He, in turn, forwarded the matter to Ms. Bonney who determined that due to Plaintiff's status as an at-will employee, she would have to be terminated unless another position was available for which Plaintiff would be qualified. Although Ms. Bonney inquired about other positions, no appropriate vacancies existed. Accordingly, the PSP discharged Plaintiff. Once again, the court finds that this satisfies Defendants' burden of production and shifts the burden back on Plaintiff to point to evidence establishing pretext. *See St. Mary's Honor Ctr.*, 509 U.S. at 515.

In support of a finding of pretext, Plaintiff argues that "[t]he entire so-called reorganization is suspect." (Pl. Br. in Opp. Def. Mot. for Sum. J. at 17.) Specifically, Plaintiff contends that Defendants' reasons are disingenuous because:

17

(1) there is no record that Plaintiff performed her job poorly; and (2) the PSP indicated in its employment records that it terminated Plaintiff.[6]

This evidence, however, is insufficient to create a genuine question of material fact as to pretext. Defendants do not claim that she performed her job poorly. Rather, Captain Miller felt that between himself and Plesco, he had enough help to fulfill the Office's responsibilities as to policy and legislative analysis.[7] Furthermore, it is undisputed that the Office was in sore need of additional clerical help, and Plaintiff had made it clear to her supervisors that she was unwilling to perform such work. Therefore, she was unqualified, or at least unwilling, to fill the clerical position. Plaintiff has also failed to present evidence that the person who ultimately filled the clerical position was a male. Given these circumstances, no reasonable fact-finder could conclude that Defendants' proffered reasons were pretexts for gender discrimination.

b.    Retaliation

Plaintiff also contends that she was terminated in retaliation for having engaged in conduct protected under Title VII. Namely, she alleges that the PSP discharged her because she filed internal complaints against Plesco and Captain Simmers, charging her superiors with disparate treatment. Title VII prohibits an employer from "discriminat[ing] against an[ ] . . . employee[ ] . . . because [s]he has

---

[6]Plaintiff also argues that although the PSP planned to reorganize the Office for some time, it took no action until after Plaintiff filed a complaint with Lieutenant Horgas on September 13, 1999. That evidence, however, is not relevant to the accusation that Defendants dismissed Plaintiff because she is a woman. Because such evidence is relevant as to whether Defendants terminated Plaintiff in retaliation for engaging in protected activity, the court will consider the matter when addressing Plaintiff's claim of retaliatory discharge. *See infra* at Part III.A.3.b.

[7]Plaintiff does not argue that Plesco should have been terminated instead of her, nor does she argue that she was qualified to perform the clerical job.

18

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000(e)-3(a). To establish a prima facie claim of Title VII retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) that the employer took adverse action against her; and (3) that a causal link exists between the protected activity and the employer's adverse action. *Weston v. Commonwealth*, 251 F.3d 420, 430 (3d Cir. 2001); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000); *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). Defendants contend that Plaintiff cannot establish a causal link between Plaintiff's complaints and her dismissal. Alternatively, Defendants apparently contend that there is no evidence indicating that its proffered reasons for dismissing Plaintiff, see *infra* at Part III.A.3.a, are a pretext for discrimination.

Plaintiff contends that the following events constitute protected activity: (1) Plaintiff's oral complaint to Major Merryman in July of 1998; (2) Plaintiff's discussion with Corporal Rain in June 1999; (3) Plaintiff's memo to Lieutenant Horgas, dated September 13, 1999, regarding Captain Simmers's harassment; and (4) Plaintiff's memo to Major Morris, dated January 3, 2000, regarding the disparate treatment as to unauthorized leave. It is undisputed that Plaintiff was terminated on May 1, 2000 -- almost four months to the day after her last complaint.

In determining whether there is a sufficient causal connection between protected activity and an adverse employment decision to support an allegation of retaliation, "each case must be considered with a careful eye to the specific facts and circumstances encountered." *Farrell*, 206 F.3d at 279 n.5. However, much of the

19

Third Circuit precedent on this topic focuses on the temporal proximity between the plaintiff's protected conduct and the adverse employment decision.[8] Only where the temporal proximity is extraordinarily suggestive will the timing of an adverse employment decision, alone, be sufficient to raise an inference of retaliation. However, in *Farrell*, the Third Circuit clarified that this is not the only manner of proving a causal link. 206 F.3d at 283-84 ("[I]n cases where a plaintiff must illustrate a 'causal link' for purposes of establishing retaliation . . . a plaintiff may rely on a broad array of evidence.")

In this case, the temporal proximity between Plaintiff's final complaint and her termination is approximately four months. Alone, this would be insufficient. *Cf. Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that a difference of two days is sufficient to establish a causal connection). Yet, the timing does suggest some degree of connection. *But cf. Williams v. Pennsylvania State Police*, 108 F. Supp.2d 460, 466 (E.D. Pa. 2000) (holding that the passing of over a year between protected activity and adverse employment decision "undermines plaintiff's effort to establish causation"). Plaintiff also points out that she internally complained about disparate treatment several times and that no action was ever taken to remedy the situation. Although the PSP intended to add a clerical position to the Office, it did not take any action in this respect until after Plaintiff complained to her superiors about desperate treatment. Plaintiff also points out that even though her position was eliminated, the PSP indicated, in its personnel files, that it had terminated Plaintiff. Moreover, both Plaintiff and Captain Morris

---

[8]Neither party disputes that Plaintiff engaged in protected activity. Therefore, the court will not address that issue.

indicated that Commissioner Evanko and Captain Simmers had a very close relationship, and Captain Simmers was the primary target of Plaintiff's complaints. (Morris Depo. at 76-78.)

Drawing inferences in favor of Plaintiff, a reasonable jury could conclude that Commissioner Evanko made the decision to eliminate Plaintiff's position not because the Office an administrative clerk, but because he was sick of Plaintiff's complaints against his good friend, Captain Simmers. Although the Office needed a clerical worker, this coincidence may have provided Commissioner Evanko with the opportunity to remove a pesky employee who was drawing attention to perceived male favoritism. Therefore, there is a material issue of fact as to the causal relationship between Plaintiff's protected activities and her termination. Likewise, this evidence is sufficient to create an issue of fact as to whether Defendants' proffered reason for terminating Plaintiff is a pretext for retaliation. Accordingly, the court will deny Defendants motion for summary judgment as to Plaintiff's claim of retaliatory discharge in Count V.

## B.    The Equal Pay Act

In Count I of Plaintiff's complaint, she asserts that the PSP violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by paying her less than Plesco and Captain Simmers for performing the same duties. Defendants move for summary judgment as to this claim. In *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000), the Third Circuit succinctly set out the burden shifting analysis to be applied in such cases:

> Unlike . . . Title VII claims, claims based upon the Equal Pay Act . . . do not follow the three-step burden-shifting framework of *McDonnell Douglas*; rather, they follow a two-step burden-shifting paradigm. The plaintiff must first establish a prima facie

21

> case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work' – work of substantially equal skill, effort and responsibility, under similar working conditions . . . The burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the Act. . . . Because the employer bears the burden of proof at trial, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary.

*Id.* at 107 (citations and quotations omitted) (emphasis in original).

Defendants argue, however, that the court need not analyze Defendants' burden because Plaintiff has failed to provide evidence establishing her prima facie case. It is undisputed that the PSP paid Plaintiff less than Captain Simmers and Plesco. Defendants contend, however, that Captain Simmers had significantly more responsibility than Plaintiff due to his status as a uniformed member of the PSP and that Plesco's position required more skill than Plaintiff possessed. Therefore, Plaintiff did not perform "equal work" as contemplated by the Equal Pay Act.

As *Stanziale* indicates, Plaintiff must prove, as part of her prima facie case, that she performed work which was "of substantially equal skill, effort and responsibility, under similar working conditions." *Id.* " 'Skill' includes an assessment of such factors as experience, training, education and ability. . . . 'Responsibility' concerns the degree of accountability required in performing a job." *Welde v. Tetley, Inc.*, 864 F. Supp. 440, 442 (M.D. Pa. 1994) (citing 29 C.F.R. §§ 1620.15 and 1620.17). Along with effort, Plaintiff must establish both of these conditions as part of her prima facie case. *Id.* (citing 29 C.F.R. § 1620.14(a)).

Applying this standard, it is clear that Plaintiff cannot prove that she performed the same job as either Captain Simmers or Plesco. In support of her claim, Plaintiff proffers several exhibits that persuasively support her contention

22

that, essentially, she performed Captain Simmer's job. There is an abundance of evidence in this case suggesting that Captain Simmers was not adequately executing his responsibilities in the Office and that Plaintiff was forced to pick up the slack. However, it is beyond dispute that Captain Simmers was a uniformed member of the PSP and Plaintiff was not. It is also undisputed that uniformed members have significantly more law enforcement duties than non-uniformed personnel. The court lays those responsibilities out in some detail in the statement of undisputed facts. *Supra* at Part I.A. at p. 3. Therefore, it need not discuss them here except to state that those additional responsibilities indicate that Captain Simmers and Plaintiff did not have the same job responsibilities. Thus, Plaintiff has failed to establish the prima facie case as to Captain Simmers.

Likewise, Plaintiff's position did not involve the same skill or responsibility as Plesco's. A significant portion of Plesco's duties involved not only performing legislative analysis, but also drafting policy on behalf of the Administration. In executing all of these responsibilities, Plesco employed his legal training as an attorney and experience as an assistant district attorney. Plesco reported directly to Commissioner Evanko and the Governor's Office. Plesco also testified, while accompanied by uniformed members, before the General Assembly as part of his job responsibilities. Plaintiff, on the other hand, reported to either Captain Simmers or Major Morris, and her most important job duty was performing legislative analysis. Plaintiff contends that Plesco did not possess superior skills because, although Plaintiff is not an attorney, she had ample legal training when she was a police officer. While legal training is a foundation of good police work, it is not the focus of a police officer's job. The fact that Plaintiff received some legal

23

continuing or ongoing violations of federal law. *Ex Parte Young*, 209 U.S. 123 (1908).

In this case, Plaintiff has brought suit against a department of the Commonwealth of Pennsylvania, thus invoking its sovereign immunity. Plaintiff does not contend that the Commonwealth has waived its immunity, nor could they. Pennsylvania has expressly reserved its power to invoke sovereign immunity. 42 Pa. Cons. Stat. § 8521(b) (2001). Because Plaintiff's PHRA claim arises under state law, obviously, she cannot claim that Congress validly abrogated Pennsylvania's sovereign immunity here. Additionally, Plaintiff's claim against the PSP does not implicate *Ex Parte Young*. Accordingly, the court will dismiss the claim in Count VI against the PSP for retaliatory discharge. *Accord Williams v. Pennsylvania State Police*, 108 F. Supp.2d 460, 465 (E.D. Pa. 2000) ("Thus, a plaintiff may never pursue a PHRA claim against Pennsylvania or its agencies in federal court.").

Unlike Title VII, individual liability under the PHRA may be imposed on supervisors who have the power to aid and abet an employer with such unlawful discriminatory practices. *See* 43 Pa. Cons. Stat. § 955(e); *Dici v. Commonwealth*, 91 F.3d 542, 552-53 (3d Cir. 1996). Therefore, unless sovereign immunity applies, the individual Defendants may be held liable under the PHRA. Although the individual Defendants do not argue that they are entitled to Eleventh Amendment immunity, it is a question of subject matter jurisdiction, and the court will address the issue *sua sponte*.[10]

---

[10] "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3).

26

Because a suit against a state officer in his official capacity is effectively a suit against the state itself, thus implicating the Eleventh Amendment, only prospective injunctive relief is available against such defendants. *Edelman v. Jordan*, 415 U.S. 651, 664-68 (1974). Furthermore, this relief is limited to situations where there is an ongoing violation of federal law. *Longoria v. New Jersey*, 168 F. Supp.2d 308, 318 (D.N.J. 2001) (citing *B.H. Papasan v. Allain*, 478 U.S. 265, 278 (1986) (holding that the *Ex Parte Young* exception to state's sovereign immunity applies only where violation of federal law is ongoing, not where federal law was violated only in the past) and *Milliken v. Bradley*, 433 U.S. 267, 289-90 (1977) (same)).

In Count VI, Plaintiff states a claim for a violation of state law that occurred completely in the past. Therefore, no relief, either injunctive or monetary, is available against the individual Defendants in this situation. *Accord Cory v. White*, 457 U.S. 85, 89-91 (1982) (holding that agencies of the state and state officials sued in their official capacities are similarly immune under the Eleventh Amendment when the state is the real party in interest). Because the court lacks subject matter jurisdiction over Plaintiff's claim in Count VI, the court will dismiss that Count. Therefore, the court need not reach the merits of Defendants' claim that Plaintiff failed to exhaust her administrative remedies.

### D.    The Pennsylvania Whistleblower Statute

Finally, Defendants move for summary judgment on Plaintiff's claim in Count VII for violation of the Pennsylvania Whistleblower Statute, 43 Pa. Cons.

27

Stat. § 1423.[11]  Defendants contend that Plaintiff filed that claim well beyond the
180 day statute of limitations established in the Whistleblower Statute.  *See* 43 Pa.
Cons. Stat. § 1424(a).  Plaintiff, in contrast, contends that the claim was brought
within the statute of limitations because that period was tolled by the discovery rule.

      Under Pennsylvania law, it is the duty of the party asserting a cause of
action to use all reasonable diligence to properly inform herself of the facts and
circumstances upon which the right of recovery is based and to initiate suit within
the prescribed period.  *Hayward v. Medical Center of Beaver County*, 608 A.2d
1040, 1042 (Pa. 1992).  Therefore, the statute of limitations begins to run as soon as
a right to institute and maintain suit arises.  *Pocono International Raceway, Inc. v.
Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983).  In some circumstances,
although the right to institute suit may arise, a party may not, despite the exercise of
diligence, reasonably discover that she has been injured.  In such cases, the statute
of limitations does not begin to run at the instant the right to institute suit attaches.
Instead, the discovery rule applies.  This judicially created device tolls the running
of the applicable statute of limitations until the point where the complaining party
knows or reasonably should know that she has been injured and that her injury has
been caused by another party's conduct.  *Pearce v. Salvation Army*, 674 A.2d 1123,
1125 (Pa. Super. Ct. 1996).

---

[11]The Whistleblower statute states, in relevant part, that:

No employer may discharge, threaten or otherwise discriminate or retaliate against an
employee regarding the employee's compensation, terms, conditions, location or privileges
of employment because the employee . . . makes a good faith report or is about to report,
verbally or in writing, to the employer . . . an instance of wrongdoing or waste.

43 Pa. Cons. Stat. § 1423(A).

In this case, it is undisputed that Plaintiff was dismissed on May 1, 2000 and did not bring this action until June 14, 2001. This fell well beyond the 180 day limitations period. Additionally, Plaintiff in her deposition indicated that, at the time she was dismissed, she thought that the PSP was firing her for making complaints concerning Captain Simmers's job performance, a violation of the Whistleblower Statute. (Wilhelm Depo. at 179.) Therefore, Plaintiff knew, at the time the PSP terminated her, that she had suffered an injury implicating her legal rights. Plaintiff, however, argues that because she did not learn until March 2001 that the PSP listed her dismissal as a termination in her personnel file, the statute of limitations should be tolled until that date. However, the discovery rule only requires that Plaintiff knew that she suffered some type of injury, not that she fully comprehended the extent of the injury or its exact legal implications.

The PSP discharged Plaintiff on May 1, 2000. By her own admission, Plaintiff believed on that date that her rights had been violated. Therefore, the statute of limitations began to run on that date, and Plaintiff failed to file suit for violation of the Whistleblower Statute within the applicable statute of limitations. Therefore, the court will grant summary judgment in favor of Defendants on Count VII of Plaintiff's complaint.

## IV.    Conclusion

In accordance with the foregoing discussion, the court finds that Defendants' motion for summary judgment should be granted in part and denied in part. The motion will be granted as to all claims except Plaintiff's claim against the PSP in Count V for retaliatory discharge. Additionally, the court will dismiss, for

29

lack of subject matter jurisdiction, the claims in Counts II, IV, and VI against the individual Defendants. The sole issue remaining for trial is Plaintiff's Title VII claim against the PSP for retaliatory discharge. Additionally, the court will deny Plaintiff's motion for summary judgment. An appropriate order will issue.

SYLVIA H. RAMBO
United States District Judge

Dated: June **28**, 2002.

30

CERTIFICATE OF SERVICE

　　　I hereby certify that on this date I served a true copy of the attached document upon the person(s) named below by mailing a copy addressed as follows, postage pre-paid, deposited into the U. S. Mail at Harrisburg, Pa.

JAMES GOLDEN, ESQUIRE
1601 MARKET STREET
SUITE 565
PHILADELPHIA, PA. 19103-1443

SARAH YERGER, ESQUIRE
OFFICE OF ATTORNEY GENERAL
STRAWBERRY SQUARE
HARRISBURG, PA. 17120

RESPECTFULLY SUBMITTED,

By: _____

Date:  FEBRUARY 3, 2002